Peggy A. Tomsic (3879)
  tomsic@mgpclaw.com
James E. Magleby (7247)
  magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
  parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DEREK KITCHEN, individually; MOUDI SBEITY, individually; KAREN ARCHER, individually, KATE CALL, individually; LAURIE WOOD, individually; and KODY PARTRIDGE, individually,** | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
|     **Plaintiffs,** | |
| **v.** | |
| **GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah; and SHERRIE SWENSEN, in her official capacity as Clerk of Salt Lake County,** | **Case No.  2:13-cv-00217-RJS** |
|     **Defendants.** | **Honorable Robert J. Shelby** |

## TABLE OF CONTENTS

Page

### Contents

INTRODUCTION.........................................................................................vii

STATEMENT OF ELEMENTS ................................................................. viii

STATEMENT OF UNDISPUTED MATERIAL FACTS.................................xiv

ARGUMENT............................................................................................... 1

I.    SUMMARY JUDGMENT STANDARD.................................................. 1

II.   UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE DUE PROCESS
      BECAUSE THEY INFRINGE ON EACH PLAINTIFFS' FUNDAMENTAL
      RIGHT TO MARRY A PERSON OF HIS OR HER CHOICE ................................ 1

      A.    Marriage Is a Fundamental Right Protected Under the Due Process
            Clause of the Fourteenth Amendment ........................................................ 4

            1.    Marriage Is a Fundamental Right to Marry the Person of
                  Your Choice .................................................................................... 6

      B.    Utah's Marriage Discrimination Laws Cannot Survive Strict
            Scrutiny, as the State of Utah Has Failed to Meet Its Burden of
            Showing That the Laws Are Narrowly Tailored to Achieve a
            Compelling State Interest........................................................................ 14

III.  UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL
      PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
      BECAUSE THEY DENY EQUAL ACCESS TO A FUNDAMENTAL RIGHT,
      AND THE STATE CANNOT MEET THE APPLICABLE STRICT
      SCRUTINY STANDARD .................................................................................... 16

IV.   UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL
      PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
      BECAUSE THEY DENY GAY AND LESBIAN INDIVIDUALS EQUAL
      PROTECTION OF THE LAW ............................................................................ 18

      A.    Post *Windsor*, Utah's Marriage Discrimination Laws Fail Under Any
            Standard of Review Because Prejudice Is Irrational, and These
            Laws Are Based on Prejudice.................................................................. 20

1.    Utah's Marriage Discrimination Laws Were Enacted to Further Private Moral Views That the Relationships of Gay and Lesbian Individuals Are Immoral and Inferior – Not to Further Any Legitimate Purpose ...................................................... 21

2.    Utah's Marriage Discrimination Laws Are Unconstitutional Under *Windsor* .............................................................................. 23

B.    Utah's Marriage Discrimination Laws Also Fail Under the Heightened Scrutiny Applicable to Classifications Based Upon Sexual Orientation and Gender ................................................................ 26

1.    Under the Supreme Court's Binding Precedent, Classifications Based on Sexual Orientation Meet the Criteria for a Quasi-Suspect Class ................................................. 26

2.    Utah's Marriage Discrimination Laws, Which Burden a Suspect Classification Based on Sexual Orientation, Cannot Survive Heightened Scrutiny ........................................................ 34

3.    Utah's Marriage Discrimination Laws Also Fail Under the Heightened Scrutiny Applicable to Classifications Based on Gender .......................................................................................... 35

V.    UTAH'S REFUSAL TO RECOGNIZE SAME-SEX MARRIAGES FROM OTHER JURISDICTIONS IS UNCONSTITUTIONAL UNDER THE SUPREME COURT'S DECISION IN *WINDSOR* ................................................. 37

VI.    UTAH'S MARRIAGE DISCRIMINATION LAWS ARE ACTIONABLE UNDER 42 U.S.C. §1983 ................................................................. 39

CONCLUSION ........................................................................................... 39

## TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 1

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ........................................................ 17

*Bowen v. Gilliard*, 483 U.S. 587 (1987) .....................................................xii, 28

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ............................................... 28, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................... 1

*Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971 (2010) ............................................ 32

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................... xi, xii, 19, 28

*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974) .........................................ix, 4, 8

*Concrete Works v. City & County of Denver*, 36 F.3d 1513 (10th Cir. 1994) ................ 35

*Craig v. Boren*, 429 U.S. 190 (1976) ............................................................ 35

*Dunn v. Dunn*, 802 P.2d 1314 (Utah App. 1990) ........................................................ xxiii

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ..................................................xii, 17

*F.S. Royster Guano Co. v. Virginia*, 253 U.S.412 (1920) ............................................. 19

*Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993) .................................................. 30, 31

*Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality) ......................................... 33, 35

*Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012)
   ...................................................................................................passim

*Griswold v. Connecticut*, 3811 U.S. 479 (1965) ...........................................xii, 5, 10, 17

*Hodgson v. Minnesota*, 497 U.S. 417 (1990) .........................................................ix, 4, 6

*In re Balas*, 449 B.R. 567 (Bankr. C.D. Cal. 2011) .......................................... xiii, 26, 29

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) ....................................................passim

*Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008)............................passim

*Lawrence v. Texas*, 539 U.S. 558 (2003) ...............................................................passim

*Loving v. Virginia*, 388 U.S. 1 (1967)....................................................................passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................................viii

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................ 1

*Meyer v. Nebraska,* 262 U.S. 390 (1923) ..................................................................... x, 5

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982)....................................... 35

*Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012)............passim

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010)..........................passim

*Planned Parentood v. Casey*, 505 U.S. 833 (1992) ........................................... 6, 7, 8, 9

*Plessy v. Ferguson*, 163 U.S. 537 (1896) (Harlan, J., dissenting)................................ 19

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ...................................ix, 4, 8, 10

*Romer v. Evans*, 517 U.S. 620 (1996)....................................................................passim

*Turner v. Safley*, 482 U.S. 78 (1987).....................................................................passim

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ....................................xi, 19

*United States v. Virginia*, 518 U.S. 515 (1996)............................................................ 35

*United States v. Windsor*, 133 S. Ct. 2675 (2013)..................................................passim

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009)..................................................xiii, 26, 29

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ...................................................passim

*Watkins v. United States Army*, 875 F.2d 699 (9th Cir. 1989) (Norris, J., concurring in the judgment)...................................................................................................... 31

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................................ 3

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) ...........................................passim

*Zablocki v. Redhail*, 434 U.S. 374 (1978) .............................................................passim

## Constitutional Provisions

U.S. Const. Amend. XIV, § 1 ........................................................ viii, xi, 2, 19

U.S. Const., Art. III, §2 .................................................................................viii

Utah Const., Art. I, § 29 ................................................................................vii

## Statutes

1 U.S.C. § 7 (2012) .................................................................................passim

42 U.S.C. § 1983 (2013) ........................................................................ viii, 39

Utah Code § 30-1-1 (2013) ...................................................................... xxvii

Utah Code § 30-1-2 (2013) ........................................................... vii, xiv, xxvii

Utah Code § 30-1-3 (2013) ...................................................................... xxvii

Utah Code § 30-1-4.1 (2013) ...................................................................... vii, xiv

Utah Code § 30-3-4.5 (2013) ....................................................................... xxiii

Utah Code § 75-2-102 (2013) ...................................................................... xxiv

Utah Code § 76-5-403 (2013) ......................................................................... 29

## Rules

Fed. R. Civ. P. 56(a) ......................................................................................... 1

Local Rule DUCivR 56-1(b)(2) ............................................................... viii, xiv

## Other Authorities

Act of July 15, 1977, ch. 1, § 1, 1977 (1st Spec. Sess.) Utah Laws (codified as amended at Utah Code Ann. § 30-1-2).................................................................................xiv, 36

Act of March 23, 2004, ch. 122, §§ 1-4, 2004 Utah Laws (enacted as Utah Code Ann. § 30-1-4.1 and amended in other statutes).....................................................................xv

Am. Psychiatric Ass'n, Position Statement On Homosexuality and Civil Rights, 131 Am. J. Psychiatry 436 (1974) ....................................................................................xxix, 30

Barbar S. Gamble, *Putting Civil Rights to a Popular Vote*, 41 Am. J. Pol. Sci. 245 (1997) ......................................................................................................................................... 33

Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 Mich. L. Rev. 1421 (2012) .................................................................................................... 38

Plaintiffs Derek Kitchen, Moudi Sbeity, Karen Archer, Kate Call, Laurie Wood, and Kody Partridge (collectively, "Plaintiffs"), by and through their counsel of record, Magleby & Greenwood, P.C., respectfully submit this Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs, three sets of same-sex couples, each residing together in Utah in long-term, committed relationships, challenge the State of Utah's prohibition against same-sex marriage and the recognition of such marriages, as embodied in (1) Utah Code § 30-1-2; (2) Utah Code § 30-1-4.1; and (3) Utah Constitution, Article I, § 29 ("Amendment 3") (collectively, the "Marriage Discrimination Laws"), under the United States Constitution (the "Constitution").

Utah's Marriage Discrimination Laws violate the Fourteenth Amendment to the Constitution, as a matter of law, both because the laws infringe, without justification, Plaintiffs' fundamental liberties and privacy rights in violation of the Due Process Clause, and because the laws fail to provide each Plaintiff equal protection under the law in violation of the Equal Protection Clause.  Accordingly, Plaintiffs are entitled to summary judgment, and this Court must strike down Utah's Marriage Discrimination Laws as contravening the Constitution, and enjoin Defendants Gary R. Herbert, John Swallow (collectively, the "State Defendants"), and Sherrie Swensen (collectively with the State Defendants, "Defendants"), each in their respective official capacities, from enforcing Utah's unconstitutional Marriage Discrimination Laws.

## STATEMENT OF ELEMENTS

Pursuant to Local Rule DUCivR 56-1(b)(2), Plaintiffs set forth the statement of elements of the claims asserted in this action with supporting legal authority:

I. **STANDING OF PLAINTIFFS TO ASSERT THEIR CLAIMS AGAINST STATE AND LOCAL OFFICIALS FOR VIOLATING THEIR RIGHTS UNDER THE UNITED STATES CONSTITUTION**

a. Article III to the Constitution provides that, "The judicial power shall extend to all cases, in law and equity, arising under this Constitution . . . ." U.S. Const., Art. III, §2.

b. To have standing, (1) Plaintiffs must have suffered an injury in fact; (2) that injury must be caused by the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

c. For Plaintiffs to assert their claims against state and local officials for violating their constitutional rights, it must be shown that Defendants, acting under color of law, have deprived Plaintiffs of their "rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983.

II. **PLAINTIFFS' RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE CONSTITUTION ARE VIOLATED BY DEFENDANTS' ENFORCEMENT OF UTAH'S MARRIAGE DISCRIMINATION LAWS**

a. The Due Process Clause of the Fourteenth Amendment guarantees that "[No] State [shall] deprive any person of life, liberty, or property without due process of law . . . ." U.S. Const. Amend. XIV, § 1.

b.      To show a violation under the Due Process Clause, the law at issue must

burden a fundamental right or liberty interest.  *See Washington v. Glucksberg*, 521 U.S.

702, 719-20 (1997) ("The Due Process Clause guarantees more than fair process . . . .

The Clause also provides heightened protection against government interference with

certain fundamental rights and liberty interests.").

c.      Fundamental rights are those "which are, objectively, 'deeply rooted in this

Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that

'neither liberty nor justice would exist if they were sacrificed.'"  *Id.* at 720 (citation

omitted).

d.      An individual's right to make decisions about marriage, including the

choice of a marriage partner, is a fundamental right and liberty interest protected under

the Due Process Clause.  *See Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) (the

decision of who a person shall marry is constitutionally protected); *Turner v. Safley*, 482

U.S. 78, 95-96 (1987) (holding that prison inmates have a fundamental right to marry

protected by the Due Process Clause); *Roberts v. United States Jaycees*, 468 U.S. 609,

620 (1984) (the right of intimate association limits the State's "power to control the

selection of one's spouse"); *Zablocki v. Redhail*, 434 U.S. 374, 384-85 (1978) ("[T]he

right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth

Amendment's Due Process Clause. . . . [I]t is clear that among the decisions that an

individual may make without unjustified government interference are personal decisions

relating to marriage . . . .") (quotation and citation omitted); *Cleveland Bd. of Educ. v.

LaFleur*, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of

ix

personal choice in matters of marriage and family life is one of the liberties protected by

the Due Process Clause of the Fourteenth Amendment."); *Loving v. Virginia*, 388 U.S.

1, 10-12 (1967) ("The freedom to marry has long been recognized as one of the vital

personal rights essential to the orderly pursuit of happiness.  Marriage is one of the

'basic rights of man,' fundamental to our very existence and survival."); *Griswold v.

Connecticut*, 3811 U.S. 479, 486  (1965) ("Marriage is a coming together for better or for

worse, hopefully enduring, and intimate to the degree of being sacred.  It is an

association that promotes a way of life, not causes; a harmony in living, not political

faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for

as noble a purpose as any involved in our prior decisions."); *Meyer v. Nebraska,* 262

U.S. 390, 399 (1923) ("Without doubt, [the Due Process Clause] denotes not merely

freedom from bodily restrain but also the right of the individual . . . to marry . . .

according to the dictates of his own conscience, and generally to enjoy those privileges

long recognized at common law as essential to the orderly pursuit of happiness by free

men." ).

        e.      Where a fundamental right is at issue, strict scrutiny applies, and the State

must show that Utah's Marriage Discrimination Laws are narrowly tailored to meet a

compelling governmental interest.  *Glucksberg*, 521 U.S.at 721.

x

**III.    PLAINTIFFS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE CONSTITUTION ARE VIOLATED BY DEFENDANTS' ENFORCEMENT OF UTAH'S MARRIAGE DISCRIMINATION LAWS**

a.    The Equal Protection Clause of the Fourteenth Amendment guarantees that "[No State shall] deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

b.    Courts must closely scrutinize, and not simply defer to the State's judgment, where there is reason to suspect "prejudice against discrete and insular minorities . . . which tends seriously to curtail the operation of those political processes ordinarily relied upon to protect minorities."  *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938).

c.    Where the design, purpose, and effect of a law is to single out same-sex couples to impose a disability on them, and to treat them unequally, the law is irrational, and no legitimate purpose overcomes the law's purpose and effect to disparage and injure these couples.  *United States v. Windsor*, 133 S. Ct. 2675, 2696 (2013); *see also Romer v. Evans*, 517 U.S. 620, 633 (1996) ("Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.") (quotation and citation omitted).

d.    Where a law operates to deny a class of citizens equal access to a fundamental right, strict scrutiny applies, and the State must demonstrate that the classification is narrowly tailored to further a compelling governmental interest.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (defining strict scrutiny); *see also, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 383-91 (1978) (declaring Wisconsin

statute unconstitutional under Equal Protection Clause of the Fourteenth Amendment

based on strict scrutiny because classification created under statute significantly

interfered with the exercise of fundamental right to marry protected by the Due Process

Clause);  *see also Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7(1972) ("if we were to

conclude that the Massachusetts statute [treating married and unmarried persons

differently] impinges upon fundamental freedoms under *Griswold*, the statutory

classification would have to be not merely *rationally related* to a valid public purpose but

*necessary* to achievement of a *compelling* state interest.") (emphasis in original).

     e.    Where a law operates to burden a class of individuals that is quasi-

suspect, including classifications based on gender, a form of heightened scrutiny,

referred to as intermediate scrutiny, applies, and the State must demonstrate that the

classification is substantially related to an important governmental interest.  *City of*

*Cleburne*, 473 U.S. at 440

     f.    The criteria mandated by the United States Supreme Court (the "Supreme

Court") to determine whether a classification should receive heightened scrutiny as a

quasi-suspect class, include:

> A) whether the class has been historically "subjected to discrimination,"; B) whether the class has a defining characteristic that "frequently bears [no] relation to ability to perform or contribute to society,"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group,"; and D) whether the class is "a minority or politically powerless."

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (quoting *Bowen v. Gilliard*,

483 U.S. 587, 602 (1987) & *City of Cleburne*, 472 U.S. at 440-41) (citation omitted)

g.    Classifications based on sexual orientation meet the criteria for

heightened scrutiny.  *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir.

2012); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 310-33 (D. Conn.

2012); *Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 985-90

(N.D. Cal. 2012); *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011); *Perry v.

Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010); *Varnum v. Brien*, 763

N.W.2d 862, 885-96 (Iowa 2009); *In re Marriage Cases*, 183 P.3d 384, 441-44 (Cal.

2008); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule DUCivR 56-1(b)(2), Plaintiffs set forth the statement of undisputed material facts demonstrating that the elements of the claims asserted in this action have been met and Plaintiffs are entitled to summary judgment:

**I.     STANDING OF PLAINTIFFS TO ASSERT THEIR CLAIMS AGAINST STATE AND LOCAL OFFICIALS FOR VIOLATING THEIR RIGHTS UNDER THE UNITED STATES CONSTITUTION**

### Utah's Marriage Discrimination Laws

1.     In 1977, the Utah legislature amended Utah Code § 30-1-2 (hereinafter, the "1977 Marriage Discrimination Statute") to include marriages "between persons of the same sex" as "marriages [] prohibited and declared void." *Id.*  The amendment became effective on July 15, 1977.  *See* Act of July 15, 1977, ch. 1, § 1, 1977 (1st Spec. Sess.) Utah Laws (codified as amended at Utah Code Ann. § 30-1-2), excerpts attached as Exhibit A to the Declaration of Jennifer Fraser Parrish in Support of Plaintiffs' Motion for Summary Judgment ("Parrish Decl."), attached hereto as Exhibit 1.

2.     In 2004, the Utah legislature passed Utah Code § 30-1-4.1 (hereinafter, the "2004 Marriage Discrimination Statute") (collectively, with the 1977 Marriage Discrimination Statute, the "Marriage Discrimination Statutes"), which provides:

> (1)(a)  It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
> (b)  Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married. . . .

*Id.* The 2004 Marriage Discrimination Statute became effective on March 23, 2004.

*See* Act of March 23, 2004, ch. 122, § 1, 2004 Utah Laws (enacted as Utah Code Ann.

§ 30-1-4.1), excerpts attached as Exhibit B to Parrish Decl.

3.     In the 2004 General Session, the Utah legislature also passed a Joint

Resolution on Marriage, proposing to amend the Utah Constitution to add a provision

relating to marriage, and directing the Utah Lieutenant Governor to submit the following

amendment to the Utah Constitution to the voters in Utah at the next general election:

> (1) Marriage consists only of the legal union between a man and a
> woman.
> (2)  No other domestic union, however denominated, may be recognized
> as a marriage or given the same or substantially equivalent legal effect.

Utah Voter Information Pamphlet General Election November 2, 2004 (the "Pamphlet")

at 37, excerpts attached as Exhibit C to Parrish Decl.

4.     The proposed amendment to the Utah Constitution became known as

"Amendment 3" and was placed on the ballot in the November 2, 2004, general election.

*See id.* at 34.

5.     The Pamphlet was prepared under the direction of the Lieutenant

Governor, given to the voters, and stated that Amendment 3 would do the following:

> . . . [T]he Amendment, like its statutory counterpart [i.e., the 2004 Marriage
> Discrimination Statute], creates a classification of persons to whom the
> right to marry is not available . . . .
>
> . . . [T]he Amendment prohibits any other domestic union from being given
> the same or substantially equal legal effect as is given to a marriage
> between a man and a woman.  Presently when a man and a woman
> marry, they receive certain rights, benefits, and obligations provided in the
> law.   A married man and woman receive those rights, benefits, and
> obligations automatically, by operation of law and solely by virtue of being
> married.   The Amendment prohibits a domestic union from being given

those same or similar rights, benefits, and obligations.  The scope of that prohibition may be more precisely defined by Utah courts as they interpret the provision in the context of lawsuits that may arise.

*Id.* at 34-35.

6.      As the Pamphlet explains, Amendment 3's contrast between "marriage between a man and a woman" and any "other domestic union" was intended to specifically prohibit the recognition of marriages between individuals of the same sex. *Id.*  Thus, the express and stated purpose of Amendment 3 was to single out same-sex couples for disparate treatment, by stripping them of federal and state rights, benefits, and obligations granted to all opposite-sex married couples in Utah by operation of law. *See id.*

7.      Moreover, the proponents of Amendment 3 stated that the amendment was necessary to "maintain[] public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship," and to ensure the continuation of "the ideal relationship where men, women and children thrive best and that is an enduring natural marriage between a man and a woman."  *Id.* at 36.

8.      Thus, the express and stated purpose of Amendment 3 was also to further privately held moral views that same-sex couples are immoral and inferior to opposite-sex couples.  *See id.*

9.      Amendment 3 passed by receiving the support of approximately 66% of the voters in the November 2, 2004, general election, and was subsequently amended to the Utah Constitution as Article I, § 29, which went into effect on January 1, 2005.

*See Utah [Election Results]*; Wash. Post, Nov. 24, 2004, available at

http://www.washingtonpost.com/wp-srv/elections/2004/ut (last visited Oct. 7, 2013)

(Amendment 3 passed with 66% of the vote); *see also* Pamphlet at 37 ("amendment

shall take effect on January 1, 2005").

**Defendants**

10.     Defendant Gary R. Herbert is the Governor of the State of Utah (the

"Governor").  State Defendants' Answer, ¶ 16.

11.     In his official capacity, the Governor is the chief executive officer of the

State, and is responsible for ensuring that the laws of the State are properly enforced.

*Id.*

12.     Defendant John Swallow is the Attorney General of the State of Utah (the

"Attorney General").  *Id.*, ¶ 17.

13.     In his official capacity, the Attorney General is the chief legal officer of the

State of Utah, and it is his duty to ensure that the laws of the State are uniformly and

adequately enforced.  *Id.*

14.     Defendant Sherrie Swensen is the Clerk for Salt Lake County (the

"Clerk").  Defendant Sherrie Swensen's Answer, ¶ 18.

15.     In her official capacity, the Clerk is responsible for issuing marriage

licenses, and performing civil marriage ceremonies in Salt Lake County.  *Id.*

16.     Defendants are each persons under 42 U.S.C. § 1983, acting under the

color of state law at all relevant times.  *See* Undisputed Material Facts, ¶¶ 10-15, *supra.*

**Plaintiffs Kitchen and Sbeity**

17.     Plaintiffs Derek Kitchen ("Kitchen") and Moudi Sbeity ("Sbeity") are two

men who live together in Salt Lake City, Utah.  Declaration of Derek Kitchen in Support

of Plaintiffs' Motion for Summary Judgment ("Kitchen Decl"), ¶¶  1-2, 4, attached hereto

as Exhibit 2; Declaration of Moudi Sbeity in Support of Plaintiffs' Motion for Summary

Judgment ("Sbeity Decl.")., ¶¶ 1-2, 7, attached hereto as Exhibit 3.

18.     Plaintiff Kitchen has a Bachelor of Arts degree in Political Science from the

University of Utah.  Kitchen Decl., ¶ 5.

19.     Plaintiff Sbeity has a Bachelor of Science degree in Economics with a

minor in Philosophy from Utah State University, and is studying for a Master's degree in

Economics from the University of Utah.  Sbeity Decl., ¶ 5.

20.      In February of 2012, Plaintiffs Kitchen and Sbeity started a business in

Salt Lake City called "Laziz," which produces, markets, and sells Middle Eastern

spreads (such as hummus, muhammara, and toum), and has now grown to have a

presence in statewide retail stores such as Harmon's grocery stores, and in restaurants

such as the Avenue's Bistro.  Kitchen Decl., ¶¶ 5-6.

21.     Plaintiffs Kitchen and Sbeity have been in a long-term, committed

relationship with each other for over four years, and have lived together continuously for

over half of that time.  *Id.* ¶¶ 2, 4; Sbeity Decl., ¶¶ 2, 7.

22.     Plaintiffs Kitchen and Sbeity desire to marry each other, to publicly commit

themselves to each other by entering a civil marriage sanctioned by the State of Utah,

and to receive the same rights, protections, and obligations that federal and state laws

confer on opposite-sex couples who marry in the State of Utah.  Kitchen Decl., ¶¶ 2, 7-9, 11; Sbeity Decl., ¶¶ 2, 7-10, 12.

23.    Plaintiffs Kitchen and Sbeity meet all of the legal requirements for marriage in Utah, except that they are of the same sex.  Kitchen Decl., ¶ 10; Sbeity Decl., ¶ 11.

24.    In March of 2013, Plaintiffs Kitchen and Sbeity applied for a marriage license from the office of Defendant Sherrie Swensen, Clerk of Salt Lake County, but were denied a marriage license because they are of the same sex.  Kitchen Decl., ¶ 9; Sbeity Decl., ¶ 10.

**Plaintiffs Archer and Call**

25.    Plaintiffs Karen Archer ("Archer") and Kate Call ("Call") are two women who live together in Wasatch County, Utah.  Declaration of Karen Archer in Support of Plaintiffs' Motion for Summary Judgment ("Archer Decl"), ¶¶ 1-2,7, attached hereto as Exhibit 4; Declaration of Kate Call in Support of Plaintiffs' Motion for Summary Judgment ("Call Decl.")., ¶¶ 1-2, 10, attached hereto as Exhibit 5.

26.    Plaintiff Archer has a Bachelor of Arts degree and a Doctor of Medicine degree, both from the University of Texas.  Archer Decl., ¶ 4.  She did her OB/GYN residency at Penn State from 1976-1980, and subsequently became a Fellow of the American Board of OB/GYN in 1983.  *Id.*  Archer subsequently worked for Kaiser for approximately nine years and had several solo OB/GYN practices.  *Id.*  She retired in 2001, after developing two serious illnesses, which have made her unable to continue in

her chosen profession of medicine, and have led to her progressively deteriorating health. *Id.*, ¶¶ 4, 8.

27.     Plaintiff Call received her Bachelors of Arts degree from Brigham Young University in 1974, and has owned several businesses in Utah, and a sheep ranch in southeastern Utah.  Call Decl., ¶ 8.

28.     Plaintiffs Archer and Call have been in a long-term, committed relationship with each other for over three years, and have lived together continuously for most of that time. *Id.* ¶¶ 2, 7; Archer Decl., ¶¶ 2, 10.

29.     In 2011, Plaintiffs Archer and Call were legally married in Iowa.  Archer Decl., ¶ 9; Call Decl., ¶¶ 2, 11.

30.     Plaintiffs Archer and Call desire to have their legal marriage in Iowa recognized in the State of Utah, including so that they may receive the same rights, protections and obligations that federal and state laws confer on opposite-sex couples now living in Utah that have been legally married outside of Utah.  Archer Decl., ¶¶ 9-12; Call Decl., ¶¶ 2, 10-11, 13.

31.     Plaintiffs Archer and Call meet all of the legal requirements for having their Iowa marriage recognized in Utah, except that they are of the same sex.  Call Decl., ¶ 12.

**Plaintiffs Wood and Partridge**

32.     Plaintiffs Laurie Wood ("Wood") and Kody Partridge ("Partridge") are two women who live together in Salt Lake City, Utah, where they own their own home. Declaration of Laurie Wood in Support of Plaintiffs' Motion for Summary Judgment

("Wood Decl"), ¶¶ 1-2, 11, attached hereto as Exhibit 6; Declaration of Kody Partridge in Support of Plaintiffs' Motion for Summary Judgment ("Partridge Decl.")., ¶¶ 1-2, 9, attached hereto as Exhibit 7.

33.    Plaintiff Wood has a Bachelor of Arts degree from the University of Utah, and a Masters of Arts degree from Brigham Young University, which she received in 1982.  Wood Decl., ¶ 4.  Wood is currently employed by Utah Valley University as an Associate Professor in English; prior to that, she spent over eleven years as a high school teacher in the public school system in Utah County.  *Id.*, ¶ 5.

34.    Plaintiff Partridge has a Bachelor of Arts degree in Humanities and Spanish from Brigham Young University, and a Masters in English, which she received in 1994.  Partridge Decl., ¶ 5.  Partridge has been employed as a teacher in the English Department at Rowland Hall-St. Mark's, a private school in Salt Lake City, for the past five years; prior to that, she was a middle school teacher in the public school system in Salt Lake County.  *Id.*, ¶¶ 5-8.

35.    Plaintiffs Wood and Partridge have been in a long-term, committed relationship with each other for over three years.  Wood Decl., ¶ 2; Partridge Decl., ¶ 2.

36.    Plaintiffs Wood and Partridge desire to marry each other, to publicly commit themselves to each other by entering a civil marriage sanctioned by the State of Utah, and receive the same rights, protections, and obligations that federal and state laws confer on opposite-sex couples who marry in the State of Utah.  Wood Decl., ¶¶ 2, 8, 11-18, 20; Partridge Decl., ¶¶ 2, 11-16, 18.

37.     Plaintiffs Wood and Partridge meet all of the legal requirements for marriage in Utah, except that they are of the same sex.  Wood Decl., ¶ 19; Partridge Decl., ¶ 17.

38.     In March of 2013, Plaintiffs Wood and Partridge applied for a marriage license from the office of Defendant Sherrie Swensen, Clerk of Salt Lake County, but were denied a marriage license because they are of the same sex.  Wood Decl., ¶ 18; Partridge Decl., ¶ 16.

**Effects of Utah's Marriage Discrimination Laws on Plaintiffs**

39.     Plaintiffs inability to marry in Utah or to have their legal marriage recognized by the State has caused them severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma.  *See* Kitchen Decl., ¶¶ 7, 9; Sbeity Decl., ¶¶ 8-10; Archer Decl., ¶ 6; Call Decl., ¶¶ 6-9, 11; Wood Decl., ¶¶ 13-15, 18; Partridge Decl., ¶¶ 14-16.

40.     Because of Utah's Marriage Discrimination Laws, Plaintiffs desire, but have been unable, to file state tax returns as married individuals, causing them to incur tax obligations that they would not have incurred if Utah law permitted them to marry or recognized their legal marriage.  *See* Kitchen Decl., ¶ 11; Sbeity Decl., ¶ 12; Archer Decl., ¶ 11; Call Decl., ¶ 13; Wood Decl., ¶ 20; Partridge Decl., ¶ 18.

41.     Because of Utah's Marriage Discrimination Laws, Plaintiff Wood cannot leave her substantial pension to her life partner, Partridge, that Wood has accumulated with the Utah Retirement System for working for more than thirty plus years as a

teacher in Utah, even though this is Wood's desire. Wood Decl., ¶ 16. If Wood dies, her pension would simply revert to the State fund. *Id.*

42. Because of Utah's Marriage Discrimination Laws, the property Plaintiffs have acquired during the course of their relationships that would be deemed by Utah law to belong to both spouses only belongs to one individual, and Plaintiffs desire their property to be considered marital property, just like opposite-sex married couples. *See* Kitchen Decl., ¶ 11; Sbeity Decl., ¶ 12; Archer Decl., ¶¶ 9-12; Call Decl., ¶¶ 13; Wood Decl., ¶ 20; Partridge Decl., ¶ 18.; *see also Dunn v. Dunn*, 802 P.2d 1314, 1317-18 (Utah App. 1990) ("Marital property is ordinarily all property acquired during marriage and it encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived.") (quotation omitted).

43. Because of Utah's Marriage Discrimination Laws, Plaintiffs desire, but are not eligible for, favorable insurance rates and coverage, in addition to other discounts offered to married couples by various businesses. *See, e.g.*, Archer Decl., ¶ 12; Wood Decl., ¶ 15; Partridge Decl., ¶ 5.

44. Because of Utah's Marriage Discrimination Laws, Plaintiffs desire to be, but are not, mutually responsible for supporting their same-sex partner in the event of their separation, just like married opposite-sex couples. *See* Kitchen Decl., ¶ 11; Sbeity Decl., ¶ 10; Archer Decl., ¶ 11; Call Decl., ¶ 13; Wood Decl., ¶ 20; Partridge Decl., ¶ 18; *see also* Utah Code Ann. § 30-3-4.5 (2013) (disposition of property, maintenance of parties, determination of alimony, and other obligations upon divorce).

45.     Because of Utah's Marriage Discrimination Laws, without a will, Plaintiffs would not inherit the estate of their same-sex partner in the event of his or her death, and Plaintiffs would like to leave their estates to their life partners.  *See* Kitchen Decl., ¶¶ 8, 11; Sbeity Decl., ¶¶ 9, 12; Archer Decl., ¶¶ 9-12; Call Decl., ¶¶ 11, 13; Wood Decl., ¶¶ 16-17, 20; Partridge Decl., ¶¶ 13-15, 18; *see also* Utah Code Ann. § 75-2-102 (2013) (intestate share of surviving spouse is generally the entire intestate estate).

46.     Because of Utah's Marriage Discrimination Laws, Plaintiffs cannot make a medical decision as their partner's "spouse" without an advance medical directive, but each Plaintiff would like that protection, automatically by operation of law through marriage.  *See* Kitchen Decl., ¶¶ 8, 11; Sbeity Decl., ¶¶ 9, 12; Archer Decl., ¶¶ 9-12; Call Decl., ¶¶ 11, 13; Wood Decl., ¶¶ 17, 20; Partridge Decl., ¶¶ 13, 18.

47.     In particular, because of Utah's Marriage Discrimination Laws, and the State's refusal to recognize their Iowa marriage, Plaintiff Call cannot make medical decisions for Plaintiff Archer, who has two serious illnesses, if Archer becomes incapacitated or otherwise is unable to make such decisions for herself.  Archer Decl., ¶¶ 10-11.

48.     Because of Utah's Marriage Discrimination Laws, Plaintiffs have to go to great expense and effort to hire attorneys to create contracts and other documents to create the same rights and obligations between them that are automatically created for opposite-sex couples through marriage, which is unfair, and may still be challenged later by family members and others in the event that one spouse dies or becomes

incapacitated.  *See* Kitchen Decl., ¶¶ 8, 11; Sbeity Decl., ¶¶ 9, 12; Archer Decl., ¶¶ 10-11; Call Decl., ¶ 13; Wood Decl., ¶¶ 16-17, 20; Partridge Decl., ¶¶ 13-15, 18.

49.    Now that the Supreme Court has invalidated the Defense of Marriage Act ("DOMA"), Utah's Marriage Discrimination Laws also cause Plaintiffs Kitchen, Sbeity, Wood, and Partridge to be denied federal benefits to which they would be entitled if they were allowed to marry in Utah.  *See Kitchen* Decl., ¶ 11; Sbeity Decl., ¶ 12; Wood Decl., ¶ 20; Partridge Decl., ¶ 18; *see also United States v. Windsor*, 133 S. Ct. 2675, 2683 (2013) (there are "over 1,000 federal laws in which marital or spousal status is addressed as a matter of federal law")

50.    Plaintiffs feel shame, stigma, and humiliation as a result of Utah's Marriage Discrimination Laws.  Plaintiffs have been singled out for discriminatory treatment and treated as "second-class citizens."  Utah's laws reflect the State's rejection of their decision or desire to marry one another, and classify them, their relationships, and their families as inferior to those of opposite-sex couples, and not "good enough" for the State's sanction, and undeserving of recognition or protection. Plaintiffs are ashamed and embarrassed that they cannot marry the person they love or have their legal marriage from another state recognized in Utah; and it causes each of them great pain.  *See* Kitchen Decl., ¶¶ 7, 9; Sbeity Decl., ¶¶ 8-10; Archer Decl., ¶ 6; Call Decl., ¶¶ 6-9, 11; Wood Decl., ¶¶ 13-15, 18; Partridge Decl., ¶¶ 14-16.

II.  **PLAINTIFFS' RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE CONSTITUTION ARE VIOLATED BY DEFENDANTS' ENFORCEMENT OF UTAH'S MARRIAGE DISCRIMINATION LAWS**

51.    Plaintiffs Kitchen, Sbeity, Wood, and Partridge have been denied their fundamental right to marry the person of their choice, solely because they have chosen to marry a person of the same sex, which is prohibited by the Marriage Discrimination Laws. *See* Undisputed Material Facts, ¶¶ 22-24 & 36-38, *supra.*

52.    Plaintiffs Archer and Call have been denied their fundamental right to have their out-of-state legal marriage to the person of their choice recognized in the State of Utah, solely because they chose to marry a person of the same sex, which is prohibited by the Marriage Discrimination Laws. *See id.*, ¶¶ 29-31, *supra.*

53.    The State of Utah has not presented evidence of any narrowly-tailored, compelling governmental interest that is being served by denying Plaintiffs Kitchen, Sbeity, Wood, and Partridge their fundamental right to marry the person of their choice, based solely on the fact that these Plaintiffs desire to marry a person of the same sex.

54.    The State of Utah has not presented evidence of any narrowly-tailored, compelling governmental interest that is being served by refusing to recognize the out-of-state legal marriage of Plaintiffs Archer and Call to the person of their choice, based solely on the fact that they have chosen to marry a person of the same sex.

III.   **PLAINTIFFS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE CONSTITUTION ARE VIOLATED BY DEFENDANTS' ENFORCEMENT OF UTAH'S MARRIAGE DISCRIMINATION LAWS**

55.   Couples in Utah that are of the opposite sex may marry, if they otherwise meet the statutory requirements to be married, and receive, by operation of law, the rights and benefits that flow from marriage.  *See* Utah Code Ann. §§ 30-1-1 & 30-1-2 (a man and a woman may marry unless there is incest; one of the persons is married and not divorced, and their spouse is still living; they are not of suitable age; or one of the persons is getting divorced, but the divorce is not final).

56.   Plaintiffs Kitchen, Sbeity, Wood, and Partridge meet all of the statutory requirements to be married in Utah, except that they choose to marry a person of the same sex; accordingly, they are prohibited from being married under the Marriage Discrimination Laws, and from receiving the rights and benefits that flow from marriage. *See* Undisputed Material Facts, ¶¶ 22-24 & 36-38, *supra.*

57.   Heterosexual men and women legally married in another state have their marriage officially sanctioned by the State of Utah and receive, by operation of law, the rights and benefits that flow from marriage.  *See* Utah Code Ann. § 30-1-3 (2013) ("A marriage solemnized in any other country, state, or territory, if valid where solemnized, is valid here, unless it is a [prohibited] marriage [such as between persons of the same sex] . . . .").

58.   Plaintiffs Archer and Call were legally married in another state; however, the State of Utah refuses to recognize their legal marriage in another state under the

Marriage Discrimination Laws, denying them the rights and benefits that flow from marriage.  *See* Undisputed Material Facts, ¶¶ 29-31, *supra.*

59.	The Marriage Discrimination Laws were enacted to further private moral views that the relationships of gay and lesbian individuals are immoral or inferior to the relationships between opposite-sex couples, including because the purpose of Amendment 3, as officially stated, is to create a state-sponsored institution of inequality, and to prohibit gay and lesbian couples from enjoying the same protections and benefits under the law as those "automatically" given to different-sex couples, and to "maintain[] public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship," ensuring the continuation of "the ideal relationship where men, women and children thrive best and that is an enduring natural marriage between a man and a woman."  Pamphlet at 34-36, Ex. C to Parrish Decl., Ex. 1.

60.	The purpose of the Marriage Discrimination Laws to disadvantage Utah's gay and lesbian population has not only been stated, but achieved, as shown by the injuries to Plaintiffs.  *See* Undisputed Material Facts, ¶¶ 39-50, *supra.*

61.	Gay and lesbian people have endured a history of discrimination.  *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) ("Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal," and "[t]hese laws had the imprimatur of the Supreme Court."); *see also, e.g.*, Kitchen Decl., ¶ 9; Sbeity Decl., ¶¶

3, 10; Archer Decl., ¶ 5-6; Call Decl., ¶¶ 6-9; Wood Decl., ¶¶ 9, 15, 17-18, 18; Partridge

Decl., ¶¶ 6-7, 14-16.

    62.    Same-sex orientation has no relation to the ability to perform or contribute

to society.  *See, e.g.*, *Windsor*, 699 F.3d at 182 ("There are some distinguishing

characteristics, such as age or mental handicap, that may arguably inhibit an

individual's ability to contribute to society, at least in some respect.  But homosexuality

is not one of them."); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 320 (D.

Conn. 2012) ("Sexual orientation is not a distinguishing characteristic like mental

retardation or age which undeniably impacts an individual's capacity and ability to

contribute to society.  Instead, like sex, race, or illegitimacy, homosexuals have been

subjected to unique disabilities on the basis of stereotyped characteristics not truly

indicative of their abilities."); *Golinski v. United States Office of Pers. Mgmt.*, 824 F.

Supp. 2d 968, 986 (N.D. Cal. 2012) ("[T]here is no dispute in the record of the law that

sexual orientation has no relevance on a person's ability to contribute to society."); *see

also* Am. Psychiatric Ass'n, Position Statement On Homosexuality and Civil Rights, 131

Am. J. Psychiatry 436, 497 (1974); *see also, e.g.*, Kitchen Decl., ¶ 5-6; Sbeity Decl., ¶ 5;

Archer Decl., ¶ 4; Call Decl., ¶¶ 4,8; Wood Decl., ¶¶ 4-7; Partridge Decl., ¶¶ 5, 8-10.

    63.    Gay and lesbian people are a discernible group with non-obvious

distinguishing characteristics.  *See Windsor*, 699 F.3d at 183 ("homosexuality is a

sufficiently discernible characteristic to define a discrete minority class," including

because there is a broad medical and scientific consensus that sexual orientation is

immutable); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 966 (N.D. Cal. 2010) ("No

credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *see also Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003) (decisions concerning the intimacies of the physical relationships of consenting adults are "an integral part of human freedom"); *see also In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008) ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 438 (Conn. 2008) ("In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing characteristic that defines them as a discrete group for purposes of determining whether that group should be afforded heightened protection . . . ."); *see also, e.g.*, Kitchen Decl., ¶ 4; Sbeity Decl., ¶ 3; Archer Decl., ¶ 5; Call Decl., ¶ 4; Wood Decl., ¶¶ 13-15, 18; Partridge Decl., ¶¶ 14-16.

64.     Gay and lesbian people are a minority and/or politically powerless.  *See Windsor*, 699 F.3d at 185 (while there have been recent successes in securing legislation to protect gay and lesbian individuals, those limited successes do not alter the conclusion that gay and lesbian individuals, as a group, "are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public"); *see also, e.g.*, Undisputed Material Facts, ¶¶ 1-9 (history of Utah's Marriage Discrimination Laws), *supra*.

65.     The State of Utah has not presented any evidence that denying gay and lesbian individuals, such as Plaintiffs Kitchen, Sbeity, Wood, and Partridge, is substantially related to an important governmental interest.

66.     The State of Utah has not presented any evidence that refusing to recognize the same-sex marriages of gay and lesbian individuals, such as Plaintiffs Archer and Call, is substantially related to an important governmental interest.

**ARGUMENT**

Utah's Marriage Discrimination Laws violate the Fourteenth Amendment to the United States Constitution, both because the laws infringe, without justification, Plaintiffs' fundamental liberties and privacy rights in violation of the Due Process Clause, and because the laws fail to provide each Plaintiff equal protection under the law in violation of the Equal Protection Clause.  Accordingly, this Court must strike down Amendment 3 and the Marriage Discrimination Statutes as contravening the Constitution.

I.       **SUMMARY JUDGMENT STANDARD**

This Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the initial burden of demonstrating to the Court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The non-movant(s) must then present specific facts by affidavit or other admissible form sufficient to raise a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If that evidence is "merely colorable," or "not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

II.      **UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE DUE PROCESS BECAUSE THEY INFRINGE ON EACH PLAINTIFFS' FUNDAMENTAL RIGHT TO MARRY A PERSON OF HIS OR HER CHOICE**

Utah's Marriage Discrimination Laws prevent each Plaintiff from marrying (or creating a similar union with), or from being recognized as married to, the person of his

1

or her choice.  *See* Undisputed Material Facts, ¶¶ 22-24, 29-31, 36-38, *supra.*  The choice of a marriage partner is protected by the Fourteenth Amendment from the State's unwarranted denial of that choice.  Utah's laws – prohibiting not only marriage, but any other law providing Plaintiffs even a substitute for marriage – invidiously discriminates, without justification, against Plaintiffs and others who seek to marry a person of the same sex, or who are legally married to someone of the same-sex under another state's laws, thereby denying their fundamental liberty and privacy rights in violation of the Constitution.

The Due Process Clause of the Fourteenth Amendment guarantees that "[No] State [shall] deprive any person of life, liberty, or property without due process of law . . . ."  U.S. Const. Amend. XIV, § 1.  Due Process requires not only basic procedural rights, but also protects the fundamental, substantive rights of individuals from arbitrary intrusions by the government into their private life and liberty interests.  *See Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) ("The Due Process Clause guarantees more than fair process . . . .  The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests.").  The freedom to marry has long been held to be one such fundamental liberty and privacy right protected by the Due Process Clause.   *See Lawrence v. Texas*, 539 U.S. 558, 574 (2003) ("[O]ur laws and tradition afford constitutional protection to personal decisions relating to marriage . . . .") (citation omitted).  The choice of whether to marry, and whom to marry, is protected by the Due Process Clause from intrusion by the State.  *See id.*; *see also, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("Under our Constitution, the

freedom to marry, or not to marry, a person of another race resides with the individual and cannot be infringed by the State.").

Fundamental liberties may not be submitted to vote by the general public; therefore, election outcomes do not determine fundamental rights protected by the Fourteenth Amendment, such as the right to choose a marriage partner.  *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 638 (1943).  Accordingly, laws like Amendment 3 may not override an individual's ability to make this important and vital choice – a choice that is guaranteed and protected by the Constitution.

Utah's Marriage Discrimination Laws violate Plaintiffs' fundamental rights because they prevent Plaintiffs from marrying (or even creating a similar union with) the person of their choice, or from having their legal marriage in another state recognized in Utah.  Where, as here, the State seeks to deny and infringe an individual's constitutionally-protected liberty and privacy rights, such laws are subject to strict scrutiny, and the State must prove that the laws are "narrowly tailored to serve a compelling state interest."  *Glucksberg*, 521 U.S. at 721.  The State of Utah cannot come forth with any compelling interest to survive strict scrutiny, and indeed, the State has not even made an attempt to do so.  Moreover, even if the State attempted to make some argument that it had a compelling state interest, it still would fail because the State cannot demonstrate that the Marriage Discrimination Laws are narrowly tailored to serve any compelling state interest.  Furthermore, when the Supreme Court recently struck down DOMA, it analyzed and rejected as irrational all of the very same rationales the State could possibly offer to support Utah's laws.  *See United State v. Windsor*, 133

S. Ct. 2675, 2696 (2013) ("The federal statute is invalid, for no legitimate purpose

overcomes the purpose and effect to disparage and to injure . . . .").

Utah's Marriage Discrimination Laws therefore violate the Due Process Clause

by infringing on Plaintiffs' fundamental liberty and privacy rights, without any

justification, and must be struck down.

### A.    Marriage Is a Fundamental Right Protected Under the Due Process Clause of the Fourteenth Amendment

The United States Supreme Court has held, in a line of decisions spanning more

than 80 years, that the freedom to marry is a fundamental, constitutionally-protected

right under the Due Process Clause of the Fourteenth Amendment.  *See Hodgson v.*

*Minnesota*, 497 U.S. 417, 435 (1990) (the decision of who a person shall marry is

constitutionally protected); *Turner v. Safley*, 482 U.S. 78, 95-96 (1987) (holding that

prison inmates have a fundamental right to marry protected by the Due Process

Clause); *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984) (the right of

intimate association limits the State's "power to control the selection of one's spouse");

*Zablocki v. Redhail*, 434 U.S. 374, 384-85 (1978) ("[T]he right to marry is part of the

fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process

Clause. . . . [I]t is clear that among the decisions that an individual may make without

unjustified government interference are personal decisions relating to marriage . . . .")

(quotation and citation omitted); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-

40 (1974) ("This Court has long recognized that freedom of personal choice in matters

of marriage and family life is one of the liberties protected by the Due Process Clause of

the Fourteenth Amendment."); *Loving v. Virginia*, 388 U.S. 1, 10-12 (1967) ("The

freedom to marry has long been recognized as one of the vital personal rights essential

to the orderly pursuit of happiness.  Marriage is one of the 'basic rights of man,'

fundamental to our very existence and survival."); *Griswold v. Connecticut*, 3811 U.S.

479, 486  (1965) ("Marriage is a coming together for better or for worse, hopefully

enduring, and intimate to the degree of being sacred.  It is an association that promotes

a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not

commercial or social projects.  Yet it is an association for as noble a purpose as any

involved in our prior decisions."); *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923)

("Without doubt, [the Due Process Clause] denotes not merely freedom from bodily

restrain but also the right of the individual . . . to marry . . . according to the dictates of

his own conscience, and generally to enjoy those privileges long recognized at common

law as essential to the orderly pursuit of happiness by free men." ).

　　　　As the Supreme Court has explained, "Our laws and tradition afford constitutional

protection to personal decisions relating to marriage . . . ."  *Lawrence v. Texas*, 539 U.S.

558, 574 (2003).  This constitutional protection equally protects the decisions of those

citizens that may be unpopular, or viewed as immoral by the majority.  *See id.* at 571

("[The Supreme Court's] obligation is to define the liberty of all, not to mandate [its] own

moral code.") (quotation and citation omitted); *id.* at 577 ("the fact that the governing

majority in a State has traditionally viewed a particular practice as immoral is not a

sufficient reason for upholding a law prohibiting the practice") (quotation and citation

omitted).

Sexual orientation and gender are irrelevant to the marriage relationship.  *See Turner*, 482 U.S. at 95-96 (holding attributes of marriage, after considering  prison life limitations,  were sufficient to form constitutionally protected marital relationship). Moreover, the rights of gay and lesbian individuals are not distinct from those of heterosexual individuals with "respect [to what] the Constitution demands for the autonomy of the person in making [] choices [relating to marriage]":

> ". . . At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define attributes of personhood were they formed under compulsion of the State."  *Ibid.*

> Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.

*Lawrence*, 539 U.S. at 574 (quoting *Planned Parentood v. Casey*, 505 U.S. 833, 851 (1992)).

Accordingly, Utah's Marriage Discrimination Laws arbitrarily and capriciously prohibit each Plaintiff from exercising his or her constitutionally-protected right to make decisions about marriage, based solely on Plaintiffs' sexual orientation, and without a compelling state interest.   These laws are therefore invalid under the Constitution.

> 1.   Marriage Is a Fundamental Right to Marry the Person of Your Choice

The Constitution demands that individuals be free to marry the person of his or her choice, without having that choice infringed by the State.  *See Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) ("[T]he regulation of constitutionally protected decisions, such as . . . whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made.")

(emphasis added); *cf. Loving v. Virginia*, 388 U.S. 1, 12 ("The Fourteenth Amendment

requires that the freedom of choice to marry not be restricted by invidious racial

discriminations.  Under our Constitution, the freedom to marry, or not to marry, a person

of another race resides with the individual and cannot be infringed by the State.").  It is

beyond dispute that the State would have no right to intrude upon Plaintiffs' choice of a

marriage partner of suitable age and relation, if that person were the opposite sex.  *See*

*id.*  It is also beyond dispute that Plaintiffs may lawfully engage in sexual relations with

other individuals of the same sex, live together and form long-term committed

relationships with individuals of the same sex.  *See Lawrence v. Texas*, 539 U.S. 558,

567 (2003) ("When sexuality finds overt expression in intimate conduct with another

person, the conduct can be but one element in a personal bond that is more enduring.

The liberty protected by the Constitution allows homosexual persons the right to make

this choice.").

Moreover, the Supreme Court's basis for finding that the right to marry is a liberty

and privacy right protected by the Due Process Clause applies with equal force to the

right to choose a marriage partner, regardless of gender.  Marriage is a constitutionally

protected right because it implicates the "most intimate and personal choices a person

may make in a lifetime, choices central to personal dignity and autonomy. "  *Planned*

*Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 851 (1992).  Those

constitutionally protected choices would mean absolutely nothing if the constitutional

protection did not extend to the choice of a person's marriage partner.  The decision of

who a person marries, like the decision to marry itself, involves the "most intimate and

personal choices a person may make in a lifetime, choices central to personal dignity and autonomy." *Id.*

In fact, the Supreme Court, in decision after decision, describes the constitutionally protected marriage right broadly as including "personal decisions relating to marriage" and "freedom of personal choice in matters of marriage." *Casey,* 505 U.S. at 851; *Lawrence*, 539 U.S. at 574; *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974). The Supreme Court, in *Roberts v. United States Jaycees,* recognized the breadth of the constitutionally protected right to marry when it stated: "[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . . ." 468 U.S. 609, 620 (1984).

The conclusion that the constitutionally protected right to marry includes the right to choose a marriage partner, regardless of gender, flows not only from the underlying foundation for extending liberty and privacy protection to the right to marry, the Supreme Court's language describing the constitutionally protected right to marry, as well as common sense, but it is the clear import of the holding in *Loving.* If the constitutionally protected right to marry only extended to the decision to marry or the abstract right to marry, the Supreme Court could have simply invalidated the miscegenation law under the Equal Protection Clause, and not also gone on to hold that barring the choice of who the plaintiffs chose to marry was also unconstitutional under the Due Process Clause. *Loving*, 388 U.S. at 12. Moreover, the Supreme Court in *Zablocki v. Redhail*, made it clear that *Loving* is not limited to an individual's choice to marry a person of another race: "Although *Loving* arose in the context of racial discrimination, prior and

8

subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals."  434 U.S. 374, 383 (1978).

Further, the Supreme Court in *Lawrence* expressly stated that the liberty interest protected by the Due Process Clause, including the right to make decisions relating to marriage, applies to gay and lesbian individuals just as it does to heterosexuals.

> . . . The *Casey* decision again confirmed that our laws and tradition afford constitutional protect to personal decisions relating to marriage, procreation, contraception, family relations, child rearing, and education. . . . In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:
>
>> "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy are central to the liberty protected by the *Fourteenth Amendment*.  At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."  *Ibid.*
>
> Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.

*Lawrence,* 539 U.S. at 573-74.

The right to choose one's marriage partner is the very essence of the kind of decision our culture recognizes as personal and important.  Although there are some cultures in which the choice of a partner is not left to the individual, it is beyond question that in our culture that decision is no one else's to make.  In other words, the freedom to marry the person of one's choice, regardless of gender, is necessary to preserve "the

ability independently to define one's identity that is central to any concept of liberty."

*Roberts*, 478 U.S. at 619.

Further, same-sex couples' intimate relationships embody the very same attributes of marriage that the Supreme Court has identified as necessary to create a constitutionally protected marital relationship.  The Supreme Court in *Turner v. Safley* struck down a prison regulation denying inmates the right to marry as violating the fundamental right of due process.  482 U.S. 78 (1987).  In determining that the prison regulation, even under a deferential standard of review afforded to prison regulations, impermissibly burdened the fundamental right of marriage, the Court concluded the elements of marriage available to a prisoner "are sufficient to form a constitutionally protected marital relationship in the prison context."  *Id.*, 482 U.S. at 96.

The marriage attributes the unanimous Court in *Turner* found were sufficient to form a constitutionally protected marital relationship are:

> First, inmate marriages, like others, are expression of emotional support and public commitment. . . . In addition, many religions recognize marriage as having spiritual significance . . . . Third, most inmates eventually will be released by parole or commutation, and therefore, most inmate marriages are formed in the expectation that they ultimately will be fully consummated.  Finally, marital status often is a precondition to the receipt of government benefits . . ., property rights . . ., and other, less tangible benefits . . . . [[1]]

*Id.* at 95-96.

---

[1] *Turner* makes it clear that procreation is not an essential element for a marital relationship to be constitutionally protected.  Moreover, the Supreme Court's decision in *Griswold v. Connecticut* put any question in that regard to rest when it held that married couples have a constitutionally protected right to refrain from procreation through the use of contraceptives.  381 U.S. 479, 486 (1965).

Those same marriage attributes apply to same-sex marriage.  Gay and lesbian couples desire to express their "emotional support and public commitment" through marriage.  *Id.*; *see, e.g.*, Kitchen Decl., ¶ 2; Sbeity Decl., ¶ 2; Archer Decl., ¶ 9; Wood Decl., ¶ 2; Partridge Decl., ¶ 2.  Many religions sanctify marriages of same-sex couples, and marriage has substantial spiritual significance for many same-sex couples.  Same-sex couples are as capable of sexual intimacy as heterosexual couples.  *See Lawrence,* 539 U.S. at 567("When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice").   Finally, same-sex couples, if permitted to legally marry, would qualify for attendant government benefits, property rights, and other less tangible benefits.  *See* Undisputed Material Facts, ¶¶ 40-49, *supra*.  Just as the Supreme Court in *Turner* held that "these incidents of marriage . . . are unaffected by the fact of confinement," these incidents of marriage are unaffected by the sex of the individuals involved in the relationship itself.  *Turner*, 482 U.S. at 96.

Notwithstanding, Utah's Marriage Discrimination Laws advance the view that, while gay and lesbian individuals have the fundamental right to form enduring,  private bonds of mutual love and support under the Constitution, they do not have the right to have these relationships recognized by the State as equal in respect and dignity to the marriages of opposite-sex couples.  However, marriage is not merely about sex.  *See Lawrence*, 539 U.S. at 567 (to say "marriage is simply about the right to have sexual intercourse" would "demean a married couple").  The State's view also runs contrary to

11

the well-established principle that the Constitution "define[s] the liberty of all," and is not merely a tool to "mandate[] [a] moral code."  *Id.* at 571.

The Supreme Court has never drawn any distinction between the fundamental rights of heterosexual individuals and gay and lesbian individuals.  In fact, the Supreme Court has indicated the opposite:  that laws substantially burdening the private relationships of gay and lesbian individuals should be scrutinized under substantive due process analysis.  *See Lawrence*, 539 U.S. at 578 (laws criminalizing same-sex conduct violate "right to liberty under the Due Process Clause").  This analysis applies equally to the liberty of gay and lesbian individuals to choose a marriage partner of the same sex.

Indeed, the concept of liberty is ubiquitous throughout the recent case of *United States v. Windsor*, 133 S. Ct. 2675 (2013).  In the first instance, the Supreme Court framed the issue as whether the "resulting injury and indignity [from section 3 of DOMA] is a deprivation of an essential part of the liberty protected by the Fifth Amendment."  *Id.* at 2692.  Ultimately, the Court held that Congress could not "deny the liberty protected by the Due Process Clause of the Fifth Amendment," and "that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution."  *Id.* at 2695.  The Court then concluded its analysis by tying this liberty interest into equal protection – a connection previously seen in *Lawrence*:

> The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws. . . .  While the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment

makes that Fifth Amendment right all the more specific and all the better understood and preserved.

*Id.* (internal citation omitted); *compare with Lawrence*, 539 U.S. at 575 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests.").

In sum, the Supreme Court's decision in *Windsor* to strike down DOMA was based on the liberty of individuals to form intimate relationships without being demeaned or degraded by the government, based upon the personal, private, and constitutionally protected choices, such as those set forth in *Loving* and *Lawrence*:

> . . . [DOMA] tells [same-sex] couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, *see Lawrence*, 539 U. S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508, and whose relationship the State has sought to dignify. And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

*Windsor*, 133 S. Ct. at 2694.

The denigration and humiliation suffered by legally married same-sex couples and the children who they are raising in *Windsor* as the result of DOMA is in fact the same denigration and humiliation suffered by same-sex couples in Utah that are excluded from marriage as a result of Utah's Marriage Discrimination Laws. It is also the same denigration and humiliation suffered by same-sex couples living in Utah who were legally married in another state but whose marriage the State of Utah refuses to

13

recognize as lawful.  Under the Due Process Clause of the Fourteenth Amendment,

such state-sponsored disparagement cannot stand.

**B.** **Utah's Marriage Discrimination Laws Cannot Survive Strict Scrutiny, as the State of Utah Has Failed to Meet Its Burden of Showing That the Laws Are Narrowly Tailored to Achieve a Compelling State Interest**

Utah's Marriage Discrimination Laws injure each Plaintiff by denying these

individuals the right to marry the person of his or her choice.  Each Plaintiff has

attempted to obtain a marriage license to marry a person of the same sex, or sought to

have Utah recognize their legal marriage in another state between two persons of the

same sex, but have been denied the right to marry or have their marriage recognized as

a result of the Marriage Discrimination Laws.  *See* Undisputed Material Facts, ¶¶ 22-24,

29-31, 36-38, *supra.*  In particular, Utah's refusal to let the Plaintiffs marry the person of

their choice, or recognize their legal marriage performed in another state, has: (1)

deprived Plaintiffs of all the rights, protections, and benefits  that flow, as a matter of

course, to married heterosexual couples under Utah state law and federal law; (2)

deprived Plaintiffs and their families of the same dignity, respect, and stature afforded to

officially-recognized opposite-sex family relationships; and (3) stigmatized Plaintiffs, as

well as their families, and subjected them to severe humiliation, emotional distress,

pain, and psychological harm.  *See id.*, ¶¶ 39-50, *supra.*

To offset this injury, the burden is on the State of Utah to prove that its

discrimination against Plaintiffs is justified.  Where, as here, a fundamental liberty and

privacy interest is at issue, strict scrutiny applies, and the State must show that the

Marriage Discrimination Laws are narrowly tailored – i.e., the least restrictive means – to meet a compelling governmental interest.  *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("[T]he Fourteenth Amendment forbids the government to infringe . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (quotation and citation omitted).

In this case, the State has not presented any governmental interest in barring marriages between consenting adults of the same sex – let alone a compelling interest.[2] The State has not identified a single harm that it, or anyone else, would suffer as a result of allowing Plaintiffs to exercise their constitutionally-protected autonomy to choose a marriage partner of the same sex.  Indeed, the only harms in the record are to Plaintiffs, including because the obvious purpose and effect of Utah's Marriage Discrimination Laws is to stigmatize Plaintiffs, and ensure that they are "unequal to everyone else."  *Romer v. Evans*, 517 U.S. 620, 635 (1996).

More importantly, even if the State attempted to justify its discrimination, the controlling Supreme Court precedent in *Windsor* requires the Court to find that the State

---

[2] As discussed, *supra*, the burden is on the State of Utah to show that its Marriage Discrimination Laws are narrowly tailored to meet a compelling state interest. Accordingly, the State must come forward with a compelling interest, and also show that its laws are the least restrictive means of meeting that interest.  At the time of the filing of this motion, the State of Utah has not identified any state interest to be analyzed, under any standard of review.  Accordingly, the State has not met its burden of coming forward with affirmative evidence to show that it is justified in infringing Plaintiffs' fundamental liberties, and Plaintiffs are entitled to summary judgment under a substantive due process analysis.

has not and cannot meet its burden.  When the Supreme Court recently struck down DOMA, it analyzed and rejected as irrational all of the very same rationales the State could possibly offer to support its discriminatory laws.  *See United State v. Windsor*, 133 S. Ct. 2675, 2696 (2013) ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure . . . ."); *see also*  Brief on the Merits for Respondent the Bipartisan Legal Advisory Group ("BLAG") of the U.S. House of Representatives at 28-49 (list of potential state interests rejected by the Supreme Court in *Windsor* as not sufficient to "overcome[] the purpose and effect to disparage and injure" same-sex couples) (Feb. 2013), *United States v. Windsor*, No. 12-307 before the United States Supreme Court.

Accordingly, the State of Utah has failed to meet its burden, and the Marriage Discrimination Laws must be invalidated by this Court under the Due Process Clause of the Fourteenth Amendment.

**III.   UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE THEY DENY EQUAL ACCESS TO A FUNDAMENTAL RIGHT, AND THE STATE CANNOT MEET THE APPLICABLE STRICT SCRUTINY STANDARD**

The Supreme Court has made clear that "[e]quality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests."  *Lawrence v. Texas*, 539 U.S. 558, 575 (2003); *cf. United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying any person the equal

protection of the laws. . . . While the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way [DOMA] does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved."); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("[T]he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. . . . [A]s this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.").

Due Process and Equal Protection are linked in an important respect in this case. They are linked because, if a class of citizens – regardless of the characteristics of the class – is denied equal access to a fundamental right protected by the Due Process Clause, the state's denial of that fundamental right is subject to strict scrutiny under the Equal Protection Clause.   That is, the State must prove that the denial of access to the fundamental due process right is narrowly tailored to achieve a compelling state interest.  *See, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 383-91 (1978) (declaring Wisconsin statute unconstitutional under Equal Protection Clause of the Fourteenth Amendment based on strict scrutiny because classification created under statute – even though not subject to heightened scrutiny – significantly interfered with the exercise of fundamental right to marry protected by the Due Process Clause);  *see also Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7(1972) ("if we were to conclude that the Massachusetts statute [treating married and unmarried persons differently] impinges upon fundamental freedoms under *Griswold*, the statutory classification would have to be not merely

*rationally related* to a valid public purpose but *necessary* to achievement of a *compelling* state interest.") (emphasis in original).

Here, the Marriage Discrimination Laws deny a class of Utah citizens – same-sex couples – access to legal marriage in Utah and access to legal recognition in Utah of their legal marriage in another state.  Because the right to marry and the right to choose a spouse are constitutionally protected liberty and privacy rights, the denial of access to those rights is subject to strict scrutiny.  That is, the State must prove that the denial of access to that fundamental right is narrowly tailored to achieve a compelling state interest.  As discussed, *supra*, the State has not and cannot meet that burden.

The Court should declare the Marriage Discrimination Laws unconstitutional on this basis alone.

### IV.   UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE THEY DENY GAY AND LESBIAN INDIVIDUALS EQUAL PROTECTION OF THE LAW

Plaintiffs' claims under the Equal Protection Clause are resolved by the recent precedent from the Supreme Court in *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013), holding that DOMA – the federal equivalent of Utah's Marriage Discrimination Laws – violated the Equal Protection Clause of the Fifth Amendment.  Under the *Windsor* decision, Utah's Marriage Discrimination Laws are unconstitutional under any standard of review.  Even if this were not the case, these laws fail, as a matter of law, because the State cannot justify classifications based on sexual orientation or gender as being substantially related to an important government interest.

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[No State shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.  Equal protection requires that "all persons similarly circumstanced shall be treated alike," *F.S. Royster Guano Co. v. Virginia*, 253 U.S.412, 415 (1920), as the Constitution "neither knows nor tolerates classes among citizens," *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).  Courts must closely scrutinize, and not simply defer to the State's judgment where there is reason to suspect "prejudice against discrete and insular minorities . . . which tends seriously to curtail the operation of those political processes ordinarily relied upon to protect minorities."  *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938).

Utah's Marriage Discrimination Laws deny Plaintiffs equal protection under the law, discriminating on the basis of both sexual orientation and gender, both factors that "generally provide[] no sensible ground for differential treatment."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  By denying each Plaintiff the marriage afforded to opposite-sex couples, or failing to recognize their legal marriage in another state, the State stigmatizes their committed relationships.  Marriage inequality also denies Plaintiffs the same dignity, respect, and stature afforded opposite-sex family relationships and households, and further denies them the legal protections and benefits afforded by Utah law and federal law to opposite-sex married couples.  The State's disparate treatment of this politically unpopular group is based on a desire to harm that group, and no legitimate purpose overcomes the State's purpose and effect of disparaging and injuring Utah's gay and lesbian citizens.

19

Under the holding and analysis of *Windsor*, as well as other Supreme Court precedent, the Court should grant Plaintiffs' motion for summary judgment on the grounds that the Marriage Discrimination Laws violate the Equal Protection Clause.

### A.    Post *Windsor*, Utah's Marriage Discrimination Laws Fail Under Any Standard of Review Because Prejudice Is Irrational, and These Laws Are Based on Prejudice

The State of Utah is discriminating against gay and lesbian individuals based on prejudice, and under *Windsor*, this discrimination fails under any standard of review. *Windsor* is the binding precedent applicable to this case, because it is the only ruling of the Supreme Court on the issue of same-sex marriage, and because the Supreme Court in *Windsor* struck down DOMA's limitation on marriage to a union between a man and a woman as a violation of Equal Protection for reasons that require Utah's discriminatory laws to be struck down as well.  *United States v. Windsor*, 133 S. Ct. 2675, 2695-96 (2013).  In striking down DOMA, the Supreme Court held that DOMA "injure[s]," "stigma[tizes]," "demean[s]," and "degrade[s]" same -sex couples, treating their relationships as "second-class," "second-tier," and "unworthy of [] recognition."  *Id.* at 2692-94 & 2695-96.  In addition, the Supreme Court held that DOMA "humiliates tens of thousands of children now being raised by same-sex couples" and "financial[ly] harm[s]" them by denying them federal benefits.  *Id.* at 2694-95.  The Supreme Court further emphasized that by denying recognition to same-sex couples, DOMA had a "substantial societal impact . . . in the daily lives and customs" of people.  *Id.* at 2693.

In this case, the State of Utah seeks to uphold a definition of marriage which is even more far-reaching and injurious than the definition of marriage found

unconstitutional in DOMA.  While the Supreme Court held that denying same-sex couples federal benefits under DOMA was unconstitutional, Utah's laws actually prohibit these couples from marrying in the first instance, or even from forming civil unions or domestic partnerships, having even more of a "substantial impact" on the "daily lives and customs" of Utah's citizens.  *Windsor*, 133 S. Ct. at 2693.  The analysis of this case under *Windsor* is dispositive, showing that Plaintiffs are entitled to summary judgment on their Equal Protection claim.

1.   Utah's Marriage Discrimination Laws Were Enacted to Further Private Moral Views That the Relationships of Gay and Lesbian Individuals Are Immoral and Inferior – Not to Further Any Legitimate Purpose

The Supreme Court held in *Windsor* that "the design, purpose, and effect of DOMA should be considered as the beginning point in deciding whether it is valid under the Constitution."  *United States v. Windsor*, 133 S. Ct. 2675, 2689 (2013).  Here, as in *Windsor*, Utah's Marriage Discrimination Laws were plainly designed to injure, stigmatize, demean, degrade, and humiliate same-sex couples, as the classification at issue is undertaken for its own sake, and to disadvantage Utah's gay and lesbian population, and not to further any other legitimate purpose.[3]

---

[3] In this case, the State of Utah has made no attempt to justify it discriminatory marriage laws.  However, even if this were not the case, the Supreme Court in *Windsor* already considered and rejected any possible "legitimate purpose" the State might try to advance.  In particular, BLAG presented a long list of justifications for DOMA, which are the same justifications that Plaintiffs expect that the State will cite in their briefing.  *See* Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives at 28-49 (list of potential state interests) (Feb. 2013), United States v. Windsor, No. 12-307 before the United States Supreme Court.  The Supreme Court expressly rejected these claims when it held in *Windsor* that "no legitimate

(continued...)

The Court can look to the stated reasons for the passage of Amendment 3 to determine "the design, purpose, and effect" of Utah's Marriage Discrimination Laws.  *Id.* These reasons are set forth in the voter information Pamphlet, prepared under the direction of the Lieutenant Governor, which reads:

> [T]he Amendment prohibits any other domestic union from being given the same or substantially equal legal effect as is given to a marriage between a man and a woman.  Presently when a man and a woman marry, they receive certain rights, benefits, and obligations provided in the law.  A married man and woman receive those rights, benefits, and obligations automatically, by operation of law and solely by virtue of being married.  The Amendment prohibits a domestic union from being given those same or similar rights, benefits, and obligations.  The scope of that prohibition may be more precisely defined by Utah courts as they interpret the provision in the context of lawsuits that may arise.

Pamphlet at 35, Ex. C to Parrish Decl., Ex. 1.

The purpose of Amendment 3, as officially stated, is to create a state-sponsored institution of inequality, and to prohibit gay and lesbian couples from enjoying the same protections and benefits under the law as those "automatically" given to different-sex couples.  *Id.*  The Pamphlet further explains that Amendment 3 was necessary to "maintain[] public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship."  *Id.*  The Pamphlet further states that Amendments 3 would ensure the continuation of "the ideal relationship where men, women and children thrive best and that is an enduring natural marriage between a man and a woman."  *Id.*  Thus,

---

(...continued)
purpose overcomes the purpose and effect to disparage and to injure" same-sex couples.  133 S. Ct. at 2696.

the express and stated purpose of Amendment 3 was to further privately-held moral

views that same-sex couples are immoral and inferior to heterosexual couples, by

disadvantaging them in comparison to opposite-sex couples in the eyes of the law.

The purpose of the Marriage Discrimination Laws to disadvantage Utah's gay

and lesbian population has not only been stated, but achieved, as demonstrated by the

injuries of the Plaintiffs in this case.  *See* Undisputed Material Facts, ¶¶ 39-50, *supra.*

2.    Utah's Marriage Discrimination Laws Are Unconstitutional
Under *Windsor*

As already discussed, the Supreme Court held in *Windsor* that "the design,

purpose, and effect" of laws burdening same-sex couples "should be considered as the

beginning point in deciding whether [they are] valid under the Constitution," and "at the

very least," Equal Protection "mean[s] that a bare . . . desire to harm a politically

unpopular group cannot justify disparate treatment of that group."  *United States v.*

*Windsor*, 133 S. Ct. 2675, 2689 & 2693 (2013) (quotation omitted).  Like DOMA, Utah's

Marriage Discrimination Laws' "avowed purpose and practical effect are to impose a

disadvantage, a separate status, and so a stigma upon all who [desire to] enter into

same-sex marriages . . . ."  *Id.* at 2693.

Further, as in *Windsor*, the State of Utah justifies its Marriage Discrimination

Laws as measures to defend "public morality" and "the justified preference for

heterosexual marriage."  Pamphlet at 36.  But in *Windsor*, the Supreme Court expressly

rejected Congress's claim that DOMA was justified by the need "to defend the institution

of traditional heterosexual marriage," to express "moral disapproval of homosexuality,"

and to promote "an interest in protecting the traditional moral teachings reflected in

23

heterosexual-only marriage laws." 133 S. Ct. at 2693. After reviewing these purported justifications, the Supreme Court held that DOMA was not justified by any "legitimate purpose." *Id.* at 2696. As such, this Court is likewise bound to reject the furtherance of privately-held moral views as a basis for disadvantaging Utah's same-sex couples.

Moreover, here, as in *Windso*r, the State of Utah's purpose is "to restrict the freedom and choice of [same-sex] couples," including same-sex couples like Plaintiffs Archer and Call who have already married under another state's laws. *Id.* at 2693. Here, as in *Windsor*, the State of Utah's purpose is to treat same-sex marriages "as second-class marriages." *Id.* Accordingly, here, as in *Windsor*, "[t]his raises a most serious question under the Constitution's [equal protection guarantees]." *Id.* at 2694.

The Supreme Court explained that DOMA's "principal effect [was] to identify a subset" of relationships "and make them unequal." *Id.* at 2694. Like DOMA, Utah's Marriage Discrimination Laws' "principle purpose is to impose inequality, not for other reasons like governmental efficiency." *Id.* By this dynamic, Utah's laws "undermine[] both the public and private significance of . . . same-sex marriages," including marriages sanctioned by other states such as Iowa, and indeed, all same-sex couples who reside in Utah. *Id.* "[I]t tells those couples, and all the world," that their relationships are "unworthy" of recognition in our state. *Id.* "This places same-sex couples in an unstable position of being in a second-tier marriage." *Id.* "The differentiation demeans the couple, whose moral and sexual choices the Constitution protects." *Id.* (citing *Lawrence v. Texas*, 539 U.S. 558 (2003)).

Utah's Marriage Discrimination laws further injure and "humiliate[] . . . children now being raised by same-sex couples," by making it "more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and their daily lives."  *Id.* at 2694.  Moreover, as in *Windsor*, these laws "also bring[] financial harm to children of same-sex couples," by raising "the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex [partners]," and by denying or reducing state "benefits allowed to families upon the loss of a spouse and parent, benefits that are an integral part of family security."  *Id.* at 2695.  In sum, these laws "single[] out a class of persons," and "impose[] a disability on the class."  They "instruct[] all [state] officials, and indeed all persons with whom same-sex couples interact, including their own children, that their [relationship] is less worthy than the [relationships] of others."  *Id.* at 2695-96.

As acknowledged in *Windsor*, "[b]y history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States."  *Id.* at 2689-90.  However, the Supreme Court emphasized, as it has before, that "State laws defining and regulating marriage, of course, must respect the constitutional rights of persons."  *Id.* at 2691; *see also, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967).

In conclusion, as in *Windsor*, Utah's discrimination against same-sex couples "is invalid, for no legitimate purpose overcomes the purpose and effect [of the Marriage Discrimination Laws] to disparage and to injure" Utah's same-sex couples.  *Windsor*, 133 S. Ct. at 2696.  Because Utah's Marriage Discrimination Laws treat these couples

as "less respected than others," they violate the Equal Protection Clause, and must be struck down under the binding precedent of *Windsor*.  *Id.*

> **B.   Utah's Marriage Discrimination Laws Also Fail Under the Heightened Scrutiny Applicable to Classifications Based Upon Sexual Orientation and Gender**

Based on *Windsor*, this Court need not reach the issue of whether Utah's Marriage Laws implicate at least a quasi-suspect class to find the laws unconstitutional under the Equal Protection Clause.  However, even if this Court were to reach this issue, under the Supreme Court's case law, Utah's Marriage Discrimination Laws also fail because they are not substantially related to a significant governmental interest.

> 1.   Under the Supreme Court's Binding Precedent, Classifications Based on Sexual Orientation Meet the Criteria for a Quasi-Suspect Class

The faithful application of the Supreme Court's established criteria compels this Court to conclude that sexual orientation must be recognized as at least a quasi-suspect class, thereby subjecting Utah's Marriage Discrimination Laws to heightened scrutiny.  This same conclusion has recently been reached by a number of federal and state courts.  *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 310-33 (D. Conn. 2012); *Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 985-90 (N.D. Cal. 2012); *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010); *Varnum v. Brien*, 763

N.W.2d 862, 885-96 (Iowa 2009); *In re Marriage Cases*, 183 P.3d 384, 441-44 (Cal.

2008); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008).[4]

In fact, the Supreme Court in *Windsor* let stand the Second Circuit's holding that

heightened scrutiny applies to classifications based on sexual orientation.  *See United*

*States v. Windsor*, 133 S. Ct. 2675, 2684 ("[T]he Court of Appeals for the Second Circuit

affirmed the District Court's judgment.  It applied heightened scrutiny to classifications

based on sexual orientation, as both the Department and Windsor had urged.").  The

Court in *Windsor* also acknowledged that heightened scrutiny applies to classifications

based on sexual orientation when it stated, not once, but two times, that,

"'[D]iscriminations of an unusual character especially suggest careful consideration to

determine whether they are obnoxious to the constitutional provision.'"  *United States v.*

*Windsor*, 133 S. Ct. 2675, 2692 (2013) (quoting *Romer v. Evans*, 517 U.S. 620, 633

(1996)); *see also Windsor*, 133 S. Ct. at 2693 ("The Constitution's guarantee of equality

must at the very least mean that a bare congressional desire to harm a politically

unpopular group cannot justify disparate treatment of that group.  In determining

whether a law is motivated by an improper animus or purpose, [d]iscriminations of an

---

[4] This conclusion has also been urged by the current Department of Justice, in
addition to well-known and influential scholars of constitutional law.  *See* Brief of the
United States on the Merit Question at 35-36 ("The government has not lightly
concluded that the Court's decisions dictate that heightened scrutiny applies to
classifications based on sexual orientation.") (Feb. 2013) & Brief of Constitutional Law
Scholars Bruce Ackerman, et al., as *Amici Curiae* Addressing the Merits at 33 ("[L]aws
that classify individuals for disparate treatment on the basis of their sexual orientation
trigger heightened scrutiny") (Feb. 2013), *United States v. Windsor*, No. 12-307 before
the United States Supreme Court.

unusual character especially require careful consideration.") (quotation and citation omitted).

As the courts, the current Presidential administration, and learned constitutional scholars have found, the criteria mandated by the Supreme Court to determine whether classifications should receive heightened scrutiny applies to classifications based on sexual orientation.  Those criteria include:

> A) whether the class has been historically "subjected to discrimination,"; B) whether the class has a defining characteristic that "frequently bears [no] relation to ability to perform or contribute to society,"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group,"; and D) whether the class is "a minority or politically powerless."

*Windsor*, 699 F.3d at 181 (quoting *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) & *City of Cleburne v. Cleburne Living Ctr.*, 472 U.S. 432, 440-41(1985)) (citation omitted).  Of these four criteria, the last two "are not strictly necessary factors to identify a suspect class," but are nevertheless, "indicative."  *Windsor*, 699 F.3d at 181.  In any case, sexual orientation meets all four factors.

        a.      Gay and Lesbian People Have Historically Endured Discrimination

It is beyond dispute that gay and lesbian individuals have historically been, and continue to be, subjected to persecution and discrimination.  "Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal," and "[t]hese laws had the imprimatur of the Supreme Court."  *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (citing *Bowers v. Hardwick*, 478 U.S. 186, 196 (1986)); *see also* Utah Code Ann.

§ 76-5-403 (2013) (Utah's criminal sodomy statute, which remains on the books to this day, even after *Lawrence* overruled *Bowers*).  Indeed, every court to consider this question has held that gay and lesbian people have suffered a history of discrimination, and thus, that this factor is satisfied.  *See, e.g.*, *Windsor*, 699 F.3d 169; *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012); *Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012); *In re Balas*, 449 B.R. 567 (Bankr. C.D. Cal. 2011); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008).  Accordingly, this factor favors a finding that classifications based on sexual orientation are at least quasi-suspect.

> **b.**   **Same-Sex Orientation Has No Relation to the Ability to Perform or Contribute to Society**

In addition, courts agree that sexual orientation is irrelevant to a person's ability to perform or contribute to society.  *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 182 (2d Cir. 2012) ("There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respect.  But homosexuality is not one of them."); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 320 (D. Conn. 2012) ("Sexual orientation is not a distinguishing characteristic like mental retardation or age which undeniably impacts an individual's capacity and ability to contribute to society.  Instead, like sex, race, or illegitimacy, homosexuals have been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities."); *Golinski v. United*

*States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 986 (N.D. Cal. 2012) ("[T]here is no dispute in the record of the law that sexual orientation has no relevance on a person's ability to contribute to society."); *see also* Am. Psychiatric Ass'n, Position Statement On Homosexuality and Civil Rights, 131 Am. J. Psychiatry 436, 497 (1974); *see also, e.g.*, Kitchen Decl., ¶ 5-6; Sbeity Decl., ¶ 5; Archer Decl., ¶ 4; Call Decl., ¶¶ 4,8; Wood Decl., ¶¶ 4-7; Partridge Decl., ¶¶ 5, 8-10.  Accordingly, this factor also favors a finding that sexual orientation is at least a quasi-suspect classification.

        c.     Gay and Lesbian People Are a Discernible Group with Non-Obvious Distinguishing Characteristics

An immutable characteristic is not *per se* required for heightened scrutiny under the Supreme Court's Equal Protection jurisprudence.  *See Windsor v. United States*, 699 F.3d 169, 181 n.4 (2d Cir. 2012) (alienage and illegitimacy, both subject to heightened scrutiny, are subject to change).  Nevertheless, "homosexuality is a sufficiently discernible characteristic to define a discrete minority class," including because there is a broad medical and scientific consensus that sexual orientation is immutable.  *Id.* at 183;  *see also Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 966 (N.D. Cal. 2010) ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual  orientation."); *see also, e.g.*, Kitchen Decl., ¶ 4; Sbeity Decl., ¶ 3; Archer Decl., ¶ 5; Call Decl., ¶ 4; Wood Decl., ¶¶ 13-15, 18; Partridge Decl., ¶¶ 14-16.

However, even if sexual orientation were subject to change, the "immutability" factor is not just about whether a person *could* abandon the characteristic at issue, but also about whether a person *should* be required to do so.  *See Fatin v. INS*, 12 F.3d

1233, 1240 (3d Cir. 1993) (characteristic is "immutable" when "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities and consciences") (citation omitted); *Watkins v. United States Army*, 875 F.2d 699, 726 (9th Cir. 1989) (Norris, J., concurring in the judgment) ("It is clear that by 'immutability' the [Supreme] Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class . . . . the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

Importantly, the Supreme Court has now stated that sexual orientation is so fundamental to a person's identity that an individual cannot be forced to choose between it and that person's civil rights – even if such choice could be made.  *See Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003) (decisions concerning the intimacies of the physical relationships of consenting adults are "an integral part of human freedom"); *see also In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008) ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 438 (Conn. 2008) ("In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing characteristic that defines them as a

discrete group for purposes of determining whether that group should be afforded

heightened protection . . . .").

In addition, the Supreme Court has clarified that although a person's sexual

behavior may be controlled, the Court is not willing to distinguish between a person's

gay and lesbian status, and gay and lesbian sexual conduct. *See, e.g.*, *Christian Legal*

*Soc'y v. Martinez*, 130 S. Ct. 2971, 2990 (2010) ("Our decisions have declined to

distinguish between status and conduct in this context."); *Lawrence* v. *Texas*, 539 U. S.

558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State,

that declaration in and of itself is an invitation to subject homosexual persons to

discrimination."); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that

the law applies only to conduct, the conduct targeted by this law is conduct that is

closely correlated with being homosexual. Under such circumstances, [the] law is

targeted at more than conduct. It is instead directed toward gay persons as a class.").

In sum, while not required, this third factor also favors a finding that

classifications based on sexual orientation demand heightened scrutiny.

> d.    Gay and Lesbian People Are a Minority and/or
>        Politically Powerless

Finally, it is undisputed that gay and lesbian people constitute a minority.

Further, while a lack of political power is not required for a class to be quasi-suspect,

*see Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), this factor is also met

with regard to gay and lesbian people.  While there have been recent successes in

securing legislation to protect gay and lesbian individuals (including marriage equality in

some states), those limited successes do not alter the conclusion that gay and lesbian

individuals, as a group, "are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public." *Id.* at 185. As discussed, *supra*, this is true in the State of Utah. Moreover, at the national level, more than two-thirds of the ballot initiatives in the past two decades that proposed to enact (or prevent the repeal of) antidiscrimination measures for gay and lesbian individuals have failed. Barbar S. Gamble, *Putting Civil Rights to a Popular Vote*, 41 Am. J. Pol. Sci. 245, 257 (1997).

Further, any limited political power of gay and lesbian individuals, as a group, pales in comparison to that of women when the Supreme Court held that gender-based classifications required heightened scrutiny. *See Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality). At the time of the Supreme Court's decision in *Frontiero*, Congress had already passed laws protecting women from discrimination in the workplace, *see Frontiero* at 687-88, proving that women, as a group, could effectively usher through major federal legislation – something that people of same-sex orientation, as a group, have been unable to accomplish. To this day, there is still no federal ban on discrimination in employment, housing, or public accommodations based on sexual orientation, and the majority of states do not have these protections either. *See Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 988-89 (N.D. Cal. 2012); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 326-27 (D. Conn. 2012).

Accordingly, while not essential, this factor also favors a finding that classifications based on sexual orientation are suspect, or at least quasi-suspect.

2.    Utah's Marriage Discrimination Laws, Which Burden a Suspect Classification Based on Sexual Orientation, Cannot Survive Heightened Scrutiny

Utah's Marriage Discrimination Laws dictate access to marriage based solely on an individual's sexual orientation.  Because sexual orientation is at least quasi-suspect, this Court must review these laws under heightened scrutiny.

In this case, the State has not presented any governmental interest in preventing gay and lesbian individuals the same access to marriage as heterosexual individuals – let alone a significant interest.[5]  The State has not identified a single harm that it, or anyone else, would suffer as a result of marriage equality.  Indeed, the only harms in the record are to Plaintiffs, including because the obvious purpose and effect of Utah's Marriage Discrimination Laws is to stigmatize Plaintiffs, and ensure that they are "unequal to everyone else."  *Romer v. Evans*, 517 U.S. 620, 635 (1996).

Accordingly, the State of Utah has failed to meet its burden, and the Marriage Discrimination Laws must be invalidated by this Court under the Equal Protection Clause of the Fourteenth Amendment.

---

[5] As discussed, *supra*, under heightened scrutiny, the burden is on the State of Utah to show that its Marriage Discrimination Laws are substantially related to an important state interest.  Accordingly, the State must come forward with an important interest, and also show that its laws are substantially related to that interest.  At the time of the filing of this motion, the State of Utah has not identified any state interest to be analyzed, under any standard of review.  Accordingly, the State has not met its burden of coming forward with affirmative evidence to show that it is justified in treating Plaintiffs as unequal, and Plaintiffs are entitled to summary judgment under an equal protection analysis. However, even if this were not the case, the Supreme Court in *Windsor* already considered and rejected any possible "legitimate purpose" the State might try to advance, as already discussed, *supra*.  *United States v. Windsor*, 133 S. Ct. 2675, 2696 (2013).

3.   Utah's Marriage Discrimination Laws Also Fail Under the
Heightened Scrutiny Applicable to Classifications Based on
Gender

Utah's Marriage Discrimination Laws also violate the Equal Protection Clause

because they discriminate on the basis of gender.  They distinguish between couples

consisting of a man and a woman and couples consisting of individuals of the same sex.

Thus, the limitation on civil marriage depends upon an individual's gender; a man who

wishes to marry a man may not do so because he is a man; a woman many not marry a

woman because she is a woman.  Such distinctions require heightened scrutiny. *See*

*Concrete Works v. City & County of Denver*, 36 F.3d 1513, 1519 (10th Cir. 1994)

("Gender-based classifications . . . are evaluated under the intermediate scrutiny rubric,

which provides that the law must be substantially related to an important government

objective."); *see also United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *Mississippi*

*Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190,

197 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (plurality opinion).

The Equal Protection Clause prohibits the "differential treatment or denial of

opportunity" based on a person's sex that is found in Utah's Marriage Discrimination

Laws, in the absence of an "exceedingly persuasive" justification.  *Virginia*, 518 U.S. at

532–33 (internal quotation omitted).  In this case, without any justification, each of the

persons in the same-sex relationship are denied the constitutionally-protected and

fundamental right to marry the person of their choice because the State limits that

choice to only individuals of a certain gender, depending on the gender of the individual

exercising his or her choice. The result is the denial of opportunity for these individuals

to choose each other as marriage partners (and conversely, to be chosen as a marriage partner), based solely on an unwarranted restriction by the State that discriminates on the basis of gender.  This type of discrimination is not unlike the race restrictions previously imposed by Virginia which were found unconstitutional in *Loving v. Virginia*, 388 U.S. 1, 12 (1967), and the laws at issue here must also be invalidated.

The State has not presented any governmental interest in preventing each Plaintiff's choice of who they wish to marry based on the gender of that person – let alone a significant interest.  The State has not identified a single harm that it, or anyone else, would suffer as a result of gender-neutral marriage laws.  Indeed, the legislative history of Utah's marriage statutes demonstrate the State has a policy of favoring gender-neutral marriage laws, including by revising old laws to be neutral with regard to sex.  *See, e.g.*, Act of July 15, 1977, ch. 1, § 1, 1977 (1st Spec. Sess.) Utah Laws (providing for removal of certain age distinctions based upon sex with respect to prohibited and void marriages) (codified as amended at Utah Code Ann. § 30-1-2), Ex. A to Parrish Decl.  Further, the record demonstrates that the only harm is that caused to Plaintiffs because they cannot marry, including because the obvious purpose and effect of Utah's Marriage Discrimination Laws is to stigmatize Plaintiffs, and ensure that they are "unequal to everyone else," simply because they desire to marry a woman if they are a woman, and marry a man if they are a man.  *Romer v. Evans*, 517 U.S. 620, 635 (1996).  Furthermore, as already discussed *ad nauseam*, any possible interest the State of Utah might try to advance to support its discriminatory laws has already been

considered and rejected by the Supreme Court.  *See United States v. Windsor*, 133 S.

Ct. 2675, 2696 (2013).

Accordingly, the State of Utah has failed to meet its burden, and the Marriage

Discrimination Laws must be invalidated by this Court under the Equal Protection

Clause of the Fourteenth Amendment as prohibited discrimination based solely on

gender.

### V.    UTAH'S REFUSAL TO RECOGNIZE SAME-SEX MARRIAGES FROM OTHER JURISDICTIONS IS UNCONSTITUTIONAL UNDER THE SUPREME COURT'S DECISION IN *WINDSOR*

Utah's Marriage Discrimination Laws prohibit recognition of same-sex marriages

from other jurisdictions.  This means that married couples who relocate to Utah for

personal or professional reasons are stripped not only of all of the legal rights and

protections conferred by marriage, but also of the unique social recognition, dignity, and

privacy that the status of being legally married provides.  Plaintiffs Archer and Call each

have a reasonable expectation that they will be recognized as married and to enjoy all

of the protections, benefits, and responsibilities conferred by marriage regardless of the

fact that they, like so many other Americans, chose to get married in another state.  And

yet, because Utah's laws treat Plaintiffs' marriages as a legal nullity, "[f]or practical

purposes, the parties have been divorced against their will by operation of law."  Steve

Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 Mich. L.

Rev. 1421, 1423 (2012).

In *Windsor*, the Supreme Court held that same-sex spouses who have entered

into legal marriages have a protected liberty interest in their marital status, and that the

government's refusal to recognize their marital status impermissibly infringed upon that interest. *United States v. Windsor*, 133 S.Ct. 2675, 2695 (2013). Although *Windsor* involved the federal government's refusal to respect an existing marital status, the same reasoning applies equally to the State's refusal to recognize an existing marital relationship here. Plaintiffs Archer and Call have exactly the same protected liberty interest in their continuing marital relationship, and the impact of the State's refusal to recognize that relationship is just as profound as that in *Windsor*, since it effectively renders their lawful marital status a nullity under state law.

In all relevant constitutional respects, Utah's refusal to recognize same-sex marriages from other jurisdictions is just like Section 3 of DOMA, and it violates the Constitution's equality and due process guarantees for the same reasons identified by the Supreme Court in *Windsor*. Section 3 of DOMA, just like Utah's Marriage Discrimination Laws, took the unusual step of carving out an entire class of legally married couples and excluding them from federal recognition. Similarly here, Utah law takes the unusual step of carving out an entire class of couples who entered into legal marriages in other states and categorically excluding those couples from the otherwise general rule that a marriage valid where celebrated will be treated as valid in Utah as well. Just like DOMA, Utah's laws' "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with" legal recognition of their marriage. *Id.* at 2693. For both Utah's Marriage Discrimination Laws and DOMA, the "principal effect is to identify a subset of state-sanctioned marriages and make them

38

unequal. The principal purpose is to impose inequality[.]"  *Id.*  Just like DOMA, Utah's

laws "force[] same-sex couples to live as married for the purpose of" some jurisdictions'

laws but unmarried for purposes of Utah's law.  *Id.* at 2694.

## VI.   UTAH'S MARRIAGE DISCRIMINATION LAWS ARE ACTIONABLE UNDER 42 U.S.C. §1983

The Defendants, acting under color of state law, are depriving and will deprive

Plaintiffs of numerous rights secured by the Fourteenth Amendment of the Constitution

in violation of 42 U.S.C. § 1983.  Utah's Marriage Discrimination Laws therefore are

actionable, and Plaintiffs seek a declaration that the laws at issue are invalid and an

injunction against their enforcement.

### CONCLUSION

For all of the reasons discussed in this motion, Plaintiffs are entitled to summary

judgment, and this Court must strike down Amendment 3 and the Marriage

Discrimination Statutes as contravening the Constitution, and enjoin Defendants from

enforcing Utah's unconstitutional Marriage Discrimination Laws.

DATED this 11th day of October, 2013.

MAGLEBY & GREENWOOD, P.C.

Peggy A. Tomsic
James E. Magleby
Jennifer Fraser Parrish

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** was delivered to the following

this 11th day of October, 2013, by:

[  ]    Hand Delivery

[X]    Depositing the same in the U.S. Mail, postage prepaid

[X]    CM/ECF System

[X]    Electronic Mail

Philip S. Lott                                    Ralph Chamness
  phillott@utah.gov                         rchamness@slco.org
Stanford E. Purser                         Darcy Goddard
  spurser@utah.gov                          dgoddard@slco.org
John E. Swallow                             SALT LAKE COUNTY DISTRICT ATTORNEYS
UTAH ATTORNEY GENERAL               2001 South State Street, S3500
160 East 300 South, Sixth Floor      Salt Lake City, Utah 84190-1210
P.O. Box 140856
Salt Lake City, Utah84114-0856

*Attorneys for Defendants Gary R. Herbert*    *Attorneys for Defendant Sherrie Swensen*
*and John Swallow*

40