PHILIP S. LOTT (5750)
STANFORD E. PURSER (13440)
Assistant Utah Attorneys General
JOHN E. SWALLOW (5802)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah  84114-0856
Telephone:  (801) 366-0100
Facsimile: (801) 366-0101
Email:  phillott@utah.gov
Email:  spurser@utah.gov
*Attorneys for Defendants Gary R. Herbert and John E. Swallow*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DEREK KITCHEN, individually; MOUDI SBEITY, individually; KAREN ARCHER, individually; KATE CALL, individually; LAURIE WOOD, individually; and KODY PARTRIDGE, individually,<br><br>    Plaintiffs,<br><br>          vs.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah; and SHERRIE SWENSEN, in her official capacity as Clerk of Salt Lake County,<br><br>    Defendants. | **MOTION OF THE GOVERNOR AND ATTORNEY GENERAL FOR SUMMARY JUDGMENT**<br><br>**and**<br><br>**MEMORANDUM IN SUPPORT**<br><br>Civil Case No. 2:13-cv-00217-RJS<br><br>Judge Robert J. Shelby |

Defendants Governor Gary R. Herbert and Attorney General John Swallow (State

Defendants), pursuant to Rule 56(a), Federal Rules of Civil Procedure, move this Court for

1

summary judgment in their favor on all claims asserted in Plaintiffs' Complaint (Doc. 2).

The Plaintiffs ask this Court to declare that the age-old and still predominant definition of marriage as the union of a man and a woman is unconstitutional, irrational and/or bigoted.  In its place, Plaintiffs ask the Court to endorse the view that the Federal Constitution mandates a newer conception of marriage as the union of any two persons regardless of gender.

But the Constitution does not take sides in this ongoing public debate between traditional and same-sex marriage. *See, e.g., United States v. Windsor,* 133 S. Ct. 2675, 2714 (2013) (Alito, J., dissenting)  ("Same-sex marriage presents a highly emotional and important question of public policy—but not a difficult question of constitutional law.  The Constitution does not guarantee the right to enter into a same-sex marriage.  Indeed, no provision of the Constitution speaks to the issue.").  Likewise, the Court need not, and should not, choose between same-sex and traditional marriage.  This case is really about who decides, not who is right in this important policy debate.

The Constitution does not withhold from Utah the right to choose how to define marriage.  And Utah's choice to define marriage as a man-woman union does not violate either due process or equal protection principles.  Plaintiffs do not meet their burden of proof.  Under the rational basis standard that applies to Plaintiffs' claims, the traditional definition of marriage rationally promotes legitimate state interests in promoting responsible procreation, and in promoting the optimal mode of child-rearing, among others.  There are no disputes of material fact.  The Governor and Attorney General are entitled to judgment as a matter of law.

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................... V

II.     STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS .............. IX

III.    BACKGROUND - RELEVANT FACTS ...................................................... X

   A.   UTAH'S SOCIETAL CHOICES REGARDING MARRIAGE........................................ X

   B.   UTAH'S PUBLIC POLICY CHOICES REGARDING MARRIAGE. ............................... X

   C.   UTAH'S PUBLIC POLICY CHOICES REGARDING MARRIAGE IN RELATION TO THOSE OF
        OTHER STATES. ........................................................................................ XIV

IV.     SUMMARY JUDGMENT STANDARDS AND BURDEN OF PROOF................... XVI

V.      ARGUMENT ............................................................................................ 1

   A.   NULLIFYING UTAH'S LAWS DEFINING MARRIAGE WOULD DISRUPT THE
        FEDERAL BALANCE BY INTERFERING WITH THE STATE'S EXERCISE OF
        CONSTITUTIONALLY RESERVED POWERS. ........................................................ 1

   B.   THE FOURTEENTH AMENDMENT DOES NOT REQUIRE THE STATE OF UTAH
        TO RECOGNIZE MARRIAGE BETWEEN PERSONS OF THE SAME SEX............ 6

      1.    BAKER V. NELSON IS A BINDING SUPREME COURT DETERMINATION THAT THE
            FOURTEENTH AMENDMENT DOES NOT REQUIRE STATES TO RECOGNIZE SAME-SEX
            MARRIAGE. ........................................................................................ 6

      2.    SAME-SEX MARRIAGE IS NOT A FUNDAMENTAL RIGHT. ........................................ 8

         A.   THE RIGHT TO MARRY DOES NOT INCLUDE ANY RIGHT TO MARRY A PERSON OF
              THE SAME GENDER. ........................................................................... 9

         B.   SAME-SEX MARRIAGE IS NOT DEEPLY ROOTED IN THIS NATION'S HISTORY AND
              TRADITION. ........................................................................................ 14

      3.    DEFINING MARRIAGE AS ONLY THE UNION OF A MAN AND A WOMAN DOES NOT
            DENY ANYONE EQUAL PROTECTION OF THE LAWS. ............................................. 17

         A.   RATIONAL BASIS REVIEW IS THE CONTROLLING STANDARD FOR ADJUDICATING
              THE PLAINTIFFS' EQUAL PROTECTION AND DUE PROCESS CLAIMS. ...................... 17

         B.   SEXUAL ORIENTATION DOES NOT IMPLICATE A SUSPECT CLASS. ......................... 21

         C.   THERE IS NO GENDER OR SEX DISCRIMINATION.................................................... 23

         D.   UTAH'S MARRIAGE LAWS AMPLY SATISFY RATIONAL BASIS REVIEW. ................ 24

            I.    MULTIPLE REASONS SUSTAIN UTAH'S DECISION TO AFFIRM IN LAW THAT ONLY
                  THE UNION OF ONE MAN AND ONE WOMAN CAN BE DENOMINATED MARRIAGE.
                  ........................................................................................................ 24

1.)  THE TRADITIONAL DEFINITION OF MARRIAGE REINFORCES RESPONSIBLE
PROCREATION AND CARE FOR CHILDREN. ........................................................ 26

2.)  TRADITIONAL MARRIAGE PROMOTES OPTIMAL CHILD REARING. .................... 33

3.)  PROCEEDING WITH CAUTION WHEN CONSIDERING FUNDAMENTALLY ALTERING
THE NATURE OF TRADITIONAL MARRIAGE. ...................................................... 38

4.)  UTAH'S MARRIAGE LAWS ARE NOT BASED ON ANIMUS. .................................. 45

C.  THE STATE OF UTAH MAY LAWFULLY DENY RECOGNITION OF SAME-SEX
MARRIAGES PERFORMED ELSEWHERE. ............................................................. 48

1.  FEDERAL LAW AUTHORIZES THE STATE OF UTAH TO DENY RECOGNITION TO
SAME-SEX MARRIAGES. (28 U.S.C. § 1738C) ........................................................ 48

2.  THE CONSTITUTION DOES NOT REQUIRE THE STATE OF UTAH TO RECOGNIZE
SAME-SEX MARRIAGES CONTRARY TO ITS PUBLIC POLICY. ................................ 48

A.  FULL FAITH AND CREDIT CLAUSE ....................................................... 48

B.  EQUAL PROTECTION AND DUE PROCESS CLAUSES ................................ 50

D.  PLAINTIFFS CANNOT STATE A § 1983 CLAIM AND CANNOT RECOVER
DAMAGES OR ATTORNEY'S FEES  AGAINST THE STATE DEFENDANTS ..... 51

VI.  CONCLUSION ........................................................................................... 52

## MEMORANDUM IN SUPPORT

### I.   INTRODUCTION

Plaintiffs frame this civil action as a contest over competing visions of marriage.  But the primary question here is not who is right and who is wrong about what marriage *should* be, but who should decide.  Thus the legal dispute actually turns on the authority of States, the right of self-government, the role of the courts, and the Constitution.  It pits, on one hand, the right of the people of Utah through the deliberative political process to retain the near-universal understanding of marriage as the union of a man and a woman oriented to broad social purposes (with children's interests foremost) against, on the other hand, the desire of some to redefine marriage through the judicial process.  The resolution of this case will determine much more than whether marriage licenses will issue to some same-sex couples.  It will necessarily impact whether Utah or any other State can maintain the principle that children should be reared by a married mother and father whenever possible; the viability of interstate pluralism—the genius of our federal system—that allows citizens of each state to determine how they will be governed on matters of great import; the sovereignty of the State; and other matters central to our constitutional structure.

In the last term, the United States Supreme Court held that the National Government could not distinguish between the differing policy decisions of the people of different States regarding marriage when administering federal benefits.  In doing so, the Court repeatedly reaffirmed the right of states to define marriage and spoke of the New York laws involved in that case in ways that apply well to the present controversy:

- "In acting to [retain the man-woman definition of marriage, Utah] was responding 'to the initiative of those who [sought] a voice in shaping the destiny of their own times.'" *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013).

- "The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a *discrete* community treat each other in their daily contact and constant interaction with each other." *Id.* (emphasis added).

- "After a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same-sex marriage, [Utah] acted to [preserve the definition of marriage as the union of a man and a woman]." *Id.* at 2689.

The reality is that nothing in the United States Constitution prevents the people of Utah from shaping their destiny through a deliberative process that results in the reasoned judgment of the people that marriage, the union of a man and a woman, ought to be preserved in the laws of the State.

And Utah law is hardly unique. Since pre-history, nearly all human societies have understood marriage as "the union of a man and a woman" because the man-woman marriage institution has uniquely provided valuable social benefits necessary to the well-being and stability of society and the development of children.

In the latter part of the twentieth century, however, various individuals and groups began seeking to use the force of law to change the man-woman marriage institution and replace it with an institution that would still be called "marriage" but have a very different core meaning: "the union of two persons regardless of gender."

After a substantive and public deliberative process on the issue, a majority of Utah's citizen-voters (over 65%) gave the man-woman marriage institution in this State the strongest available protection: they added to Utah's constitution language saying that "[m]arriage consists

only of the legal union between a man and a woman" and that "[n]o domestic union, however

denominated, may be recognized as a marriage or given the same or substantially equivalent

legal effect." UTAH CONST. art. I, § 29 ("Amendment 3").  Utah's legislature has enacted

statutes consistent in language and purpose with Amendment 3.  Utah Code §§ 30-1-2(5); 30-1-

4.1.

The Plaintiffs, a group of three same-sex couples, make two challenges to the marriage

laws: that the laws discriminate on the basis of sexual orientation and sex (equal protection

claim) and that the laws infringe on substantive liberties (due process claim).  They ask this

Court to declare that the law may not recognize marriage as the union of a man and a woman,

which will necessarily mandate that in Utah "marriage" will mean the union of any two persons.

But Plaintiffs' claims do not withstand constitutional scrutiny.  Their substantive due

process claim fails because same-sex marriage is not a fundamental right—it is not deeply rooted

in this Nation's history and traditions, nor is it essential to the concept of ordered liberty.

Plaintiffs' equal protection claim also fails.  First, Utah's marriage laws do not

discriminate against either gender, they treat women as a class exactly the same as they treat men

as a class.  Both a man and woman may marry someone of the opposite sex.  Second, Utah's

marriage laws do not constitute unconstitutional sexual-orientation discrimination.  Binding

Supreme Court precedent bars that precise claim.  Further, binding Tenth Circuit precedent holds

that claims of sexual-orientation discrimination are reviewed under the rational basis test.

Utah has critical reasons for preserving and perpetuating the man-woman marriage

institution that easily satisfy the deferential rational basis standard and, indeed, that satisfy even

heightened levels of judicial scrutiny.  These include promoting responsible procreation and promoting the optimal mode of child rearing, among others.

In short, Utah's marriage laws are unquestionably constitutional, as many other courts have concluded.

Plaintiffs are free to advocate for their own version of marriage through the political process.  But they are not entitled to have their views imposed by judicial fiat.  This Court should grant summary judgment in favor of the Governor and the Attorney General on all of Plaintiffs' claims.

* * * * * * * * * * * *

This Memorandum sets forth both adjudicative facts and legislative facts.[1]  The adjudicative facts are set forth on a proper foundation that qualifies them as admissible evidence, whether by way of judicial notice, Federal Rules of Evidence ("FRE") 201, or expert testimony, FRE 702, or otherwise.  The relevant adjudicative facts are not genuinely contested or even controvertible (e.g., the demographics of Utah's marriage and family culture, the events leading to voter approval of Amendment 3, etc.).  The legislative facts are set forth throughout the body of this Memorandum and are substantiated by references to the literature that reasonable and informed people consider when addressing such wide-reaching social, political, and cultural matters.

Utah's Appendix – filed simultaneously with this Memorandum – is divided into four parts:  (1) legal materials, including the text of Utah's marriage laws, (2) the adjudicative facts

---

[1] *See State Defendants' Response to Plaintiffs' Statement of Scheduling Issues* (Doc. 23) for a discussion of the distinction between "adjudicative" facts and "legislative" facts.

(in admissible form), (3) some, though not all, of the literature explaining the legislative facts referenced in this Memorandum (not including referenced sources readily available to the Court - for example, through Westlaw or Lexis), and (4) referenced Canadian and British law journal articles (again, because they are not readily available).  In the case of monographs, the Appendix contains excerpts to avoid the problem of excessive length.  The Appendix is tabbed and Bates numbered, and this Memorandum cites it consistently with this example:  App. T7 at 144-159, with the "T7" referring to tab 7 and the "144-159" referring to the Bates numbers on the pages.

## II.  STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

1. The Plaintiffs are same-sex couples, with two of those couples desiring to marry in this State and with one of those couples having previously married in Iowa and now desiring this State to recognize that foreign marriage.  *Complaint* (Doc. 2) ¶¶ 1-2, 5-8.  Accordingly, the only issue is whether the Fourteenth Amendment's Equal Protection Clause or its Due Process Clause empowers this Court to change the State's definition of marriage from the union of a man and a woman to the union of two persons regardless of gender.

To prevail on their due process and equal protection claims, the Plaintiffs must prove that the definition of marriage as the union of a man and a woman is irrational; that it does not rationally relate to a legitimate State interest.  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *Heller v. Doe*, 509 U.S. 312, 320 (1993) *Heller v. Doe*, 509 U.S. 312, 320 (1993).

 Utah is therefore entitled to summary judgment by showing that the man-woman definition of marriage is rationally related to a legitimate state interest.

ix

## III. BACKGROUND - RELEVANT FACTS

### A. Utah's societal choices regarding marriage.

Utah's societal choices uniquely demonstrate commitment to the principle that marriage is the union of a man and a woman and the optimal setting for the bearing and rearing of children. Utah has the highest percentage of residents between the ages of 24 and 70 who are married. Affidavit of Dr. Joseph P. Price (Price Aff.) ¶ 5 (T24 at 223-24). It likewise has the highest percentage of residents in that age group who are in a first marriage. *Id.* Utah has the lowest percentage of households headed by cohabiting couples (1.3% compared to 2.4% nationally). Price Aff. ¶ 5 (T24 at 224).

Utah is the most child-centric of all States and the most successful in linking children to their mothers and fathers. Utah ranks first among all States with a birth rate of 18.2 per 1,000, compared to the national average at 12.7. Price Aff. ¶ 7 (T24 at 224 & n.5). Utah also has the lowest abortion ratio per 1,000 live births, at 66 compared to the national average of 234. Price Aff. ¶ 7 (T24 at 225). Even more important is the social link in Utah between marriage and children. Utah ranks first among all States in the percentage of children being raised by both parents, with 79.4% of children from birth to age 5 in this category and 78.6% of children ages 0 to 17. Price Aff. ¶ 8 (T24 at 225). Consequently, compared to children born in all of the States, a child born in Utah has the best chance of knowing and being reared by his or her own married mother and father. Price Aff. ¶ 9 (T24 at 225).

### B. Utah's public policy choices regarding marriage.

Utah's public policy choices regarding marriage coincide with its societal choices. First

x

in historical order is the fact that Utah's very existence as a State depended on its people's acceptance, in the new State's constitution, of an "ordinance" that "forever prohibited" polygamous marriage and that thereby made adherence to monogamous marriage (clearly understood as man-woman) the only alternative. UTAH CONST. art. I, § 3.  Utah's people duly accepted.

Consistently, the State has always adhered to a definition of marriage as the union of a man and a woman and has never recognized as a marriage any other kind of relationship.  Thus, since at least 1898 the State's definition was derived from the common law, Utah Code § 68-3-1 (adopting common law of England); *Hatch v. Hatch*, 46 Utah 116, 148 P. 1096, 1098-1099 (1915), which expressly defined marriage as "the voluntary union for life of one man and one woman, to the exclusion of all others." *Hyde v. Hyde*, [L.R.] 1 P. & D. 130 (1866) (Lord Penzance).  Subsequently, the legislature enacted further language to reinforce that definition. For example, in 1977 the legislature included on the list of prohibited and void "marriages" a union "[b]etween persons of the same sex." 1977 Utah Laws, 1st Special Session, Chap. 1, § 1; now codified at Utah Code § 30-1-2(5). (App. T1).

An important part of the historical context of Utah's marriage laws began in Hawaii in 1993 when advocates of same-sex marriage sought to change the definition of marriage by invoking *state* constitutional guarantees of equality and liberty.  As that campaign proceeded with litigation in more and more states, citizens and legislators supportive of man-woman marriage enacted statutes and adopted state constitutional amendments sustaining the man-woman meaning at the core of the marriage institution.  Then, in 2008, genderless marriage

proponents expanded the judicial front with a civil action attacking California's Proposition 8 and invoking *federal* constitutional guarantees of equality and liberty.  Similar challenges followed in other states.  Consequently, for the past 20 years the Nation's deep and intense engagement with the marriage issue has proceeded simultaneously along three legal tracks: legislation, amendments to state constitutions, and court actions.[2]

The developments most relevant to the 2004 Utah legislative and state constitutional engagement with the marriage issue were (1) the mandate by  the Vermont Supreme Court in *Baker v. State*, 744 A.2d 864, 886-87 (Vt. 1999), that the state begin offering all the benefits of marriage to same-sex couples (with which the legislature complied by creating a new legal status called "civil unions"[3]); and (2) the 2003 Massachusetts Supreme Judicial Court 4-3 vote in *Goodridge v. Department of Public Health*, 798 N.E.2d 941 (Mass. 2003), that the state constitution required the redefinition of marriage to include same-sex couples.

Against this background, in 2004 the Utah legislature enacted a provision entitled "Marriage recognition policy":

   (1)(a) It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
      (b) Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married.
   (2) Nothing in Subsection (1) impairs any contract or other rights, benefits, or duties that are enforceable independently of this section.

---

[2]   The Appendix contains charts tracking nationally the events on those three tracks. App. T17 (affidavit of William C. Duncan) and App. T7-T11.

[3]   *An Act Relating to Civil Unions*, Act 91 of 2000 (Vermont).

Utah Code Ann. § 30-1-4.1.[4]

      At the same time, the Utah Legislature approved a Joint House Resolution as amended by the Senate (App. T4-T5) to add an amendment to the State's constitution, subject to voter approval in the November 2004 general election. The proposed amendment stated:

> (1) Marriage consists only of the legal union between a man and a woman.
> (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Laws 2004, H.J.R. 25 § 1 (App. T6).

During the legislative debates leading to adoption of the proposed text of the constitutional amendment,

> the delegates in favor of the bill repeatedly expressed a feeling of toleration and concern for the welfare [of] homosexuals in the state. … The prevailing motivations among the delegates seemed to be a desire to ensure that the electorate, not the judiciary, had the opportunity to decide what policy should govern the institution of marriage.

Comment, Daniel H. Walker, *Are State Marriage Amendments Bills of Attainder?:  A Case Study of Utah's Amendment Three*, 2005 BYU L. Rev. 799, 828 n.136.

      The resulting campaign was robust and vigorous, with each side's campaign being well-financed, well-articulated, and well-supported by prominent political figures, scholars, and business, religious, and other community leaders and entities.  Affidavit of William C. Duncan (Duncan Aff.) ¶¶ 15-18 (App. T17 at 131-32); *see also* App. T20-T23.  The tenor of the political discourse tended toward the intellectual and legalistic, remarkably so in a campaign on an issue

---

    [4]   Also in 2004, the legislature provided that a "marriage which is not solemnized according to this chapter [chapter 30] shall be legal and valid if a court or administrative order establishes that it arises out of a contract between a man and a woman …."   Utah Code § 30-1-4.5(1).

that stirs strong and deep feelings among most citizens.  Duncan Aff. ¶ 15 (App. T17 at 131-32); *see also* App. T20-T23.

Regarding civil unions, influential proponents on both sides of the marriage issue made the case that the existence of civil union laws would weaken marriage.[5]  At the same time, influential proponents on both sides also argued that civil union laws would not weaken marriage.[6]

On November 2, 2004, Utah's voters enacted Amendment 3 by a vote of 593,297 to 307,488, or 65.9% to 34.1%.  Duncan Aff. ¶ 16 (App. T17 at 132); *see also* App. T19.

**C.  Utah's public policy choices regarding marriage in relation to those of other States.**

Utah's public policy choices regarding marriage coincide with those of a supermajority of all States.  Thirty-seven States by legislation define marriage as a man-woman union.[7]  Twenty-nine States have a constitutional provision so providing.[8]  Of those, twenty States have an

---

[5] *See* Jonathan Rauch, Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America at 49(1st ed. 2004) ("To whatever extent they mimic marriage,[civil union benefits] send the message that, from the law and society's point of view, marriage is no longer unique"); Lynn D. Wardle, *Counting the Costs of Civil Unions: Some Potential Detrimental Effects on Family Law*, 11 Widener J. Pub. L. 401 (2002) (highlighting 32 notable consequences of civil unions on family law).

[6] *See* M.V. Lee Badgett, *Will providing marriage rights to same-sex couples undermine heterosexual marriage?* Sexuality Research and Social Pol., Sept. 2004 at 1 (surveying five countries, four of which had some form of civil union laws, and concluding that such laws will have no impact on man-woman marriage); Elizabeth Bumiller, *Bush says his party is wrong to oppose gay civil unions*, N.Y. Times (October 26, 2004).

[7] Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico,, North Carolina, North Dakota, Ohio,, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, Wisconsin, and Wyoming .  For citations, see App. T7.

[8] Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Kansas,

additional constitutional provision protecting the marriage institution by precluding government

sanction of a marriage-like relationship other than man-woman marriage.[9]   State judiciaries have

mandated genderless marriage in only four States, including our most populous State, California,

where the people overruled that mandate by amending the state constitution. [10]   Later, a single

federal judge entered an order – deemed unreviewable for procedural and not substantive reasons

– mandating genderless marriage despite California's man-woman marriage amendment.

*Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) (holding that Prop 8 proponents lacked standing

to seek review of the district court's decision in *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921

(N.D. Cal. 2010)).   Only nine States have adopted genderless marriage through the political

process.[11]

\* \* \* \* \* \* \* \* \* \* \* \*

In sum, the State of Utah has always adhered to the legal definition of marriage as the

union of a man and a woman and has done so in harmony with a supermajority of her sister

States.   That adherence matches Utah society's deep and Nation-leading adherence-by-conduct

---

Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wisconsin. For citations, see App. T7.

   [9] Alabama, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and Wisconsin. For citations, see App. T9.

   [10] Massachusetts, California, Connecticut and Iowa.  *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003); In re *Marriage Cases*, 183 P.3d 384 (Cal. 2008), *superseded by constitutional amendment*, Cal. Const. art. I, § 7.5 (Proposition 8), *as recognized in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009). *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009).

   [11] Delaware, Maine, Maryland, Minnesota, New Hampshire, New York, Rhode Island, Vermont, and Washington. For citations, *see* App. T7.  The District of Columbia has also done so. *Id.*

to the traditional man-woman view (historical meaning and purpose) of marriage, its norms, and its practices.  Consequently, in Utah the traditional view (historical meaning and purpose) is a factually valid statement of what marriage *is* and, further, is a democratically valid expression of what marriage *ought to be*.

## IV. SUMMARY JUDGMENT STANDARDS AND BURDEN OF PROOF

The Court must grant summary judgment because there are no genuine issues of material fact and the State Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Supreme Court has explained "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  The Court "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.

To prevail on their due process and equal protection claims the Plaintiffs must prove that Utah's laws defining marriage as the union of one man and one woman fail the most lenient test under the Due Process and Equal Protection Clauses.  Heightened scrutiny does not apply. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *Heller v. Doe*, 509 U.S. 312, 320 (1993).  Binding Tenth Circuit precedent establishes claims of discrimination based on sexual orientation do not "implicate a protected class, which would warrant heightened scrutiny." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008).  Nor do Utah's marriage laws trigger intermediate scrutiny as classifications based on sex, because they treat women as a class neither better nor worse than men.  *See Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1098-99 (D. Hawaii 2012).  With that in mind, State Defendants are entitled to judgment as a matter of

law.

Rational basis review invests Utah's marriage laws with a strong presumption of validity, which the Plaintiffs can overcome only if they "negative every conceivable basis which might support it." *Heller*, 509 U.S. at 320 (quotation omitted). By contrast, the Defendants have no duty "to produce evidence to sustain the rationality of a statutory classification," *id.* at 320-321, since "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). Utah's laws preserving traditional marriage do not plausibly qualify as arbitrary or irrational. Again, the State Defendants are entitled to judgment as a matter of law.

Because the Plaintiffs cannot satisfy either due process or equal protection standards, their claims under 42 U.S.C. § 1983 similarly fail. Defendants are therefore entitled to judgment on all claims as a matter of law.

# V.  ARGUMENT

The Plaintiffs' claim that Amendment 3 to the Utah Constitution and Utah Code §§ 30-1-2(5) and 30-1-4.1 (1) violate the Due Process Clause of the Fourteenth Amendment, (2) violate the Equal Protection Clause of the Fourteenth Amendment, and (3) violate 42 U.S.C. § 1983 by depriving them of their federal rights under color of state law.  *Complaint* (Doc. 2) at 16-23. Based on these claims, and their allegation that enforcement of Utah marriage laws cause them irreparable harm, the Plaintiffs seek a declaratory judgment that Amendment 3 and other Utah marriage laws violate the Fourteenth Amendment, a permanent injunction prohibiting the State of Utah from enforcing these laws, as well as costs and fees.  *See id.* at 24-25.

Before explaining why State Defendants are entitled to summary judgment on the Plaintiffs' due process and equal protection claims, it is worth discussing how those claims invite the Court to disregard a central structural feature of the Constitution by interjecting federal power into an area of law uniquely within the province of States.  A judicial declaration that Utah's laws reserving marriage for the union of one man and one woman are unconstitutional would unavoidably nullify the State's exercise of powers reserved to it by the Constitution itself.

## A.  NULLIFYING UTAH'S LAWS DEFINING MARRIAGE WOULD DISRUPT THE FEDERAL BALANCE BY INTERFERING WITH THE STATE'S EXERCISE OF CONSTITUTIONALLY RESERVED POWERS.

Adjudicating the Plaintiffs' appeal to overturn Utah's laws preserving traditional marriage must begin with the fact that "our Constitution establishes a system of dual sovereignty between the States and the Federal Government."  *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  This fundamental principle of federalism, confirmed by the Tenth Amendment, dictates that "[i]n our federal system, the National Government possesses only limited powers; the States

1

and the people retain the remainder." *Nat'l Fed'n  Indep. Bus. v. Sebelius*,  132 S. Ct. 2566, 2577 (2012).[12]  When exercising their reserved powers, States "are as independent of the general government as that government within its sphere is independent of the States." *The Collector v. Day*, 78 U.S. 113, 124 (1871).  Federalism thus "'preserves the integrity, dignity, and residual sovereignty of the States,'" while it "secures to citizens the liberties that derive from the diffusion of sovereign power." *Shelby Co. v. Holder*, 133 S. Ct. 2612, 2623 (2013) (citations omitted).  Above all, federalism is intended to safeguard Americans from the abuse of power.  "Just as the separation and independence of the coordinate branches of the Federal government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

The Plaintiffs' constitutional challenge to Utah's laws defining and regulating marriage invokes federal power "at its lowest ebb." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Only a few months ago the Supreme Court explained that "'[t]he states, at the time of the adoption of the Constitution, possessed *full power* over the subject of marriage and divorce … [and] the Constitution delegated *no authority* to the Government of the United States on the subject of marriage and divorce.'" *Windsor*, 133 S. Ct. at 2691 (quoting *Haddock v. Haddock*, 201 U.S. 562, 575 (1906)) (emphasis added).   The High Court acknowledged that "'when the Constitution was adopted the common understanding was

---

[12]  The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

2

that the domestic relations of husband and wife and parent and child were matters *reserved to the States*.'" *Id.* at 2680-81 (quoting *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383-384 (1930)) (emphasis added).  Marriage, almost uniquely, is an area of law where the limits on federal power and the substance of reserved powers together confirm the primacy if not exclusivity of State authority. *Compare United States v. Morrison*, 529 U.S. 598, 613 (2000) (an expansive reading of the Commerce Clause would wrongly authorize Congress to regulate "family law (including marriage, divorce, and child custody)") (internal quotation marks omitted); *with Sosna v. Iowa*, 419 U.S. 393, 404 (1975) ("[D]omestic relations, [is] an area that has long been regarded as a virtually exclusive province of the States ...."); *and Ex parte Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States.").

Reserving to the States power over marriage and family relations serves substantial purposes, beyond the general benefits of federalism.  "Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders." *Williams v. North Carolina*, 317 U.S. 287, 298 (1942).  "It is within the States that [the people] live and vote and rear their children under laws passed by their elected representatives. The States provide for the stability of their social order, for the good morals of all their citizens, and for the needs of children from broken homes." *Boddie v. Connecticut*, 401 U.S. 371, 389-90 (1971) (Black, J., dissenting).  Indeed, as Justice Harlan discerned, "[t]he laws regarding marriage ... form a pattern so deeply pressed into the substance of our social life that any constitutional doctrine in this area must build upon that basis." *Poe v. Ullman*, 367 U.S. 497, 546 (1961) (Harlan, J., dissenting).

3

The States' reserved power to regulate marriage, as an aspect of federalism, played a central role in the Supreme Court's decision last term declaring section 3 of the Defense of Marriage Act unconstitutional.  In *Windsor* the Court held that Congress violated the Fifth Amendment's Due Process Clause, *see* 133 S. Ct. at 2695, by amending the Dictionary Act to provide that for the purpose of interpreting federal law "the word 'marriage' means only a legal union between one man and one woman as husband, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7.  In reaching that conclusion the Court emphasized the States' "historic and essential authority to define the marital relation," on the understanding that "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" 133 S. Ct. at 2692, 2691 (quoting *Williams*, 317 U.S. at 298).  And the Court noted that "[c]onsistent with this allocation of authority, the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." *Id.* at 2691. Specifically, the Court held that New York's recognition of same-sex marriage was "without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended." *Id.* at 2692.  Congress went astray, the Court held, by "interfer[ing] with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of *their sovereign power*.." *Id.* at 2693 (emphasis added).  Given this reasoning, it is "undeniable" that the Court's judgment in *Windsor* "is based on federalism." *Id.* at 2697 (Roberts, C.J., dissenting).

4

The Plaintiffs' challenge to Utah's definition of marriage invites the Court to make the same error committed by Congress in enacting section 3 of DOMA—by creating a "federal intrusion on state power" with its resulting "disrupt[ion] [to] the federal balance." *Id.* at 2692. *Windsor* affirms that Utah's laws defining marriage deserve this Court's respect and deference, no less than New York's.  Like New York, Utah adopted its definition of marriage "[a]fter a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same sex marriage," and its laws reflect "the community's considered perspective on the historical roots of the institution of marriage." *Id.* at 2689, 2692-93.  That the State of Utah chose to keep and preserve the traditional heterosexual definition of marriage, while New York decided to allow marriage between persons of the same sex, does not detract from the validity of Utah's choice.  *Windsor* reaffirms "the long-established precept that the incidents, benefits, and obligations of marriage … may vary, subject to constitutional guarantees, from one State to the next." *Id.* at 2692.  Singling out Utah's marriage laws for less respect or deference than the Supreme Court gave New York's laws would contradict the Court's endorsement of nationwide diversity on the States' consideration of same-sex marriage, as well as violating the "'fundamental principle of equal sovereignty' among the States." *Shelby Co.*, 133 S. Ct. at 2623 (quoting *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

In brief, fundamental principles of federalism reserve for Utah the sovereign authority to define and regulate marriage.  A judicial declaration nullifying Utah's definition of marriage would disrupt the federal balance, just as section 3 of DOMA did, by interjecting federal power into an area of law recognized as uniquely belonging to State authority.

5

### B.  THE FOURTEENTH AMENDMENT DOES NOT REQUIRE THE STATE OF UTAH TO RECOGNIZE MARRIAGE BETWEEN PERSONS OF THE SAME SEX.

### 1.   *Baker v. Nelson* **Is a Binding Supreme Court Determination that the Fourteenth Amendment Does Not Require States to Recognize Same-sex Marriage.**

The United States Constitution does not require Utah to abandon the age-old, deeply rooted definition of marriage as the union of a man and a woman for a genderless definition that severs the link between marriage and the vital societal purposes it has always and everywhere served.  Indeed, in *Baker v. Nelson*, 409 U.S. 810 (1972), the United States Supreme Court summarily rejected the very claims made by Plaintiffs in this case.  *Baker* is binding and mandates dismissal of Plaintiffs' claims.

In *Baker*, the Minnesota Supreme Court rejected plaintiffs' claims that same-sex marriage was a fundamental right.[13]  The court also ruled that "[t]he equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry" and that there was "no irrational or invidious discrimination." *Id. at 187*.

On appeal the United States Supreme Court summarily dismissed the case "for want of a substantial federal question." *See Baker*, 409 U.S. at 810.  Not a single Justice found the couple's constitutional claims—the same ones at issue here—substantial enough to warrant plenary review.  App. T12 (Jurisdictional Statement, *Baker v. Nelson*, No. 71-1027 (U.S. Supreme

---

[13] *Baker v. Nelson*, 191 N.W.2d 185, 186-87 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972).

6

Court)).  This dismissal constitutes a ruling on the merits and is binding on the issues addressed.

"[L]ower courts are bound by summary decisions by this Court until such time as the Court

informs [them] that [they] are not." *Hicks v Miranda*, 422 U.S. 332, 344-45 (1975); *see also*

*Neely v. Newton*, 149 F.3d 1074, 1078 (10th Cir. 1998) ("summary affirmances and summary

dismissals for want of a substantial federal question are considered decisions on the merits, and

lower courts are thereby bound by the summary actions").  Even "[i]f a precedent of this Court

has direct application in a case, yet appears to rest on reasons rejected in some other line of

decisions, [lower courts] should follow the case which directly controls, leaving to this Court the

prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/*

*American Express, Inc.*, 490 U.S. 477, 484 (1989).

     Though it has had many opportunities to do so, including earlier this year, the Supreme

Court has never informed lower courts that they are no longer bound by *Baker*.[14]  The First

Circuit recently recognized that subsequent Supreme Court opinions may open the door to some

"gay rights" claims, but *Baker* "limit[s] the arguments to ones that do not presume or rest on a

---

[14] Neither *Romer v. Evans*, 517 U.S. 620 (1996), nor *Lawrence v. Texas*, 539 U.S. 558 (2003), addressed the constitutionality of state marriage laws, and neither mentions *Baker*. *Romer* had nothing to do with marriage laws; rather, it involved the elimination of all basic legal protections and rights of access to the ordinary political process normally available to all people within Colorado.  And *Lawrence*, which was decided after *Romer*, expressly informed lower courts that the case did "not involve whether the government must give formal recognition to any relationship that homosexual persons may seek to enter." 539 U.S. at 578.  The Supreme Court's decision in *Windsor*, 133 S. Ct. 2675, also makes no mention of *Baker* and certainly does not inform lower courts that they are no longer bound by *Baker*.  *Windsor* is distinguishable in that it dealt with the constitutionality of a *federal law* defining marriage, not a state law. *See Windsor v. United States*, 699 F.3d 169, 178 (2nd Cir. 2012) ("The question whether the federal government may constitutionally define marriage . . . is sufficiently distinct from the question in *Baker*: whether same-sex marriage may be constitutionally restricted by the *states*.").

constitutional right to same-sex marriage." *Massachusetts v. U.S. Dept. of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012); *accord McConnell v. Nooner*, 547 F.2d 54, 56 (8th Cir. 1976) (following *Baker* and holding that "the Supreme Court's dismissal of the appeal for want of a substantial federal question constitutes an adjudication on the merits which is binding on the lower federal courts").

Because *Baker* rejected the same claims raised in this lawsuit, it is binding here and dictates dismissal of Plaintiffs' claims. Recent federal district court decisions addressing constitutional challenges to State marriage laws have concluded that *Baker* remains binding.[15]

**2.      Same-sex Marriage Is Not a Fundamental Right.**

Even if *Baker* were not binding, its rejection of a claimed constitutional right to same-sex marriage is still constitutionally correct. The Plaintiffs invoke the much-criticized doctrine of substantive due process to argue that Utah's Marriage Laws violate the Due Process Clause. Because of its "reluctan[ce] to expand the concept of substantive due process," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)), the Supreme Court has carefully limited the standard for identifying fundamental rights protected by the Due Process Clause. The Court's "established method of substantive due

---

[15]   *See Jackson v. Abercrombie*, 884 F. Supp. 2d 1065 (D. Hawaii 2012) (due process and equal protection claims barred by Supreme Court's dismissal of *Baker v. Nelson*); *Sevcick v. Sandoval*, 911 F. Supp. 2d 996 (D. Nev. 2012) (equal protection claim barred by Supreme Court's dismissal of *Baker v. Nelson*); *see also Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 870-71 (8th Cir. 2006); *Walker v. Mississippi*, No. 3:04-cv-140 LS, 2006 U.S. Dist. LEXIS 98320, at *4 (S.D. Miss. April 11, 2006) ("until the United States Supreme Court makes a different pronouncement on the issues decided in *Baker*, other federal courts must reach the same result on those issues"); *Wilson v. Ake*, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) ("Although *Baker v. Nelson* is over thirty (30) years old, the decision addressed the same issues presented in this action and this Court is bound to follow the Supreme Court's decision.").

8

process analysis" has "two primary features." *Id.* First, the Due Process Clause provides protection only to "those fundamental rights and liberties which are objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720-21. "Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decision making and restrain judicial exposition of the Due Process Clause." *Id.* at 721. Second, identification of fundamental rights "require[s] … a careful description of the asserted fundamental liberty interest." *Id.* at 722.

This reluctance is based on the Court's recognition that under our constitutional system of government some issues are properly decided, not by judges, but in "the arena of public debate and legislative action." *Id.* Judicial recognition of a new right "place[s] the matter outside the arena of public debate and legislative action." *Id.* Consequently, courts "exercise the utmost care whenever [they] are asked to break new ground in this field." *Collins*, 503 U.S. at 125. Otherwise, the rights "protected by the Due Process Clause [can] be subtly transformed into the policy preferences of the [court]." *Glucksberg*, 521 U.S. at 720.[16]

### a. The Right to Marry Does Not Include Any Right To Marry a Person of the Same Gender.

The "careful description" of an asserted fundamental right must be precise and not overly broad. In *Reno v. Flores*, 507 U.S. 292 (1993), the Supreme Court determined the right at issue

---

[16] The Ninth Circuit Court of Appeals has observed: "[W]hen a right is not rooted in our constitutional text, traditions, or history, our authority as judges is at its end. We must then leave the task of identifying and protecting new rights where the Constitution leaves it—with the political branches and the people." *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1170 (9th Cir. 2011).

in a challenge to a regulation governing release of detained alien juveniles was not the right to be free from physical restraint, but was the narrower "alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government operated or government-selected child care institution." *Id*. at 302. Similarly, in *Glucksberg* the Court criticized a lower federal court for broadly defining the claimed right as a "right to die," when the right at issue was really the asserted "right to commit suicide" and to have assistance in doing so. *Glucksberg*, 521 U.S. at 722-723.

Here, Plaintiffs' Complaint broadly asserts that "[t]he *freedom to marry* is one of the fundamental liberties protected by the Due Process Clause of the Fourteenth Amendment." *Complaint* (Doc. No. 2) ¶ 46 (emphasis added). It is undisputed that marriage – as traditionally defined – is a fundamental right. *See Loving v. Virginia*, 388 U.S. 1, 12 (1967) (marriage is a "fundamental freedom" that may "not be restricted by invidious racial descriptions"); *Glucksberg*, 521 U.S. at 719 (citing *Loving* as establishing a fundamental right to marry). But Plaintiffs' Complaint goes further by alleging that Amendment 3 "violate[s] this fundamental right protected by the Due Process Clause because it prevents Plaintiffs from marrying the person of his or her choice and from having their legal marriage in another state from being legally recognized in Utah …." *Complaint* (Doc. No. 2) ¶ 46 (emphasis added). There is no such fundamental right. Supreme Court decisions recognize the right to enter into a legally recognized union only with a qualified person of the opposite sex. Precedents touching on the fundamental right to marry have always involved opposite-sex couples with the unquestionable

intent of protecting the procreative interests that can only exist naturally between one man and one woman.  *Maynard v. Hill*, 125 U.S. 190, 211 (1888) (Marriage "is the foundation of the family and of society, without which there would be neither civilization nor progress."); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."); *Zablocki v. Redhail*, 434 U.S. 374, 384-86 (1978) ("[A] decision to marry and raise the child in a traditional family setting  must  receive . . . protection.").  When the Supreme Court has spoken of a fundamental right to marry, it clearly had in mind this universal historical definition.  State courts have repeatedly relied on this understanding of marriage and its purposes.[17]

_____

[17] *See, e.g.*, *Wray v. Wray*, 19 Ala. 522, 525 (1851); *Standhardt v. Superior Court*, 77 P.3d 451, 458 (Ariz. Ct. App. 2003); *Fattibene v. Fattibene*, 441 A.2d 3, 6 (Conn. 1981); *A. v. A.*, 43 A.2d 251, 252 (Del. 1945); *Zoglio v. Zoglio*, 157 A.2d 627 (D.C. 1960); *Kennedy v. Kennedy*, 101 Fla. 239, 245 (1931); *Head v. Head*, 2 Ga. 191, 205 (1847); *Howay v. Howay*, 74 Idaho 492, 499 (1953); *Hamaker v. Hamaker*, 18 Ill. 137 (1856); *O'Connor v. O'Connor*, 253 Ind. 295, 310 (1969); *In re Estate of Oldfield*, 175 Iowa 118, 131 (1916); *State v. Walker*, 36 Kan. 297, 307 (1887); *Ledoux v. Her Husband*, 10 La. Ann. 663, 664 (La. 1855); *Conaway v. Deane*, 932 A.2d 571, 619-20 (Md. Ct. App. 2007); *Deblois v. Deblois*, 158 Me. 24, 30 (1962); *Inhabitants of Milford v. Inhabitants of Worcester*, 7 Mass. 48, 52 (1810); *Sissung v. Sissung*, 65 Mich. 168, 171 (1887); *Baker v. Nelson*, 191 N.W.2d at 186; *Walker v. Walker*, 140 Miss. 340, 351 (1925); *State use of Gentry v. Fry*, 4 Mo. 120, 181 (1835); *In re Rash's Estate*, 21 Mont. 170, 174 (1898); *Collins v. Hoag & Rollins*, 122 Neb. 805, 807 (1932); *Bascomb v. Bascomb*, 25 N.H. 267 (1852); *Davis v. Davis*, 106 A. 644, 645 (N.J. Ch. 1919); *Poteet v. Poteet*, 114 P.2d 91, 93 (N.M. 1941); *Mirizio v. Mirizio*, 150 N.E. 605, 607 (N.Y. 1926); *Allen v. Baker*, 86 N.C. 91, 97 (1882); *Mahnken v. Mahnken*, 9 N.D. 188, 192 (1900); *Hine v. Hine*, 25 Ohio App. 120, 123 (Ohio Ct. App. 1927); *Sam v. Sam*, 172 Okla. 342, 345 (1935); *Westfall v. Westfall*, 100 Or. 224, 237 (1921); *Matchin v. Matchin*, 6 Pa. 332, 337 (1847); *Rymanowski v. Rymanowski*, 105 R.I. 89, 97 (1969); *McCreery v. Davis*, 44 S.C. 195, 203 (1895); *Goodner v. Goodner*, 147 Tenn. 517, 536 (1923); *In re Marriage of J.B. and H.B.,* 326 S.W.3d 654, 674-75 (Tex. Ct. App. 2010, pet. granted); *Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753, 756 (Utah 1984); *Ryder v. Ryder*, 66 Vt. 158, 162 (1892); *Pretlow v. Pretlow*, 14 S.E.2d 381, 385 (Va. 1941); *Grover v. Zook*, 44 Wash. 489, 493-94 (1906); *Wills v. Wills*, 74 W. Va. 709, 712 (1914); *Heup v. Heup*, 172 N.W.2d 334, 336 (Wis. 1969); *In re St. Clair's Estate*, 46 Wyo. 446, 461 (1934).

Marriage defined as the relationship between a man and a woman was reflected in prominent dictionaries from the time of the framing and ratification of the Fourteenth Amendment.  *See, e.g.*, Noah Webster, *Etymological Dictionary* 130 (1st ed. 1869); Joseph E. Worcester, *A Primary Dictionary of the English Language* 176 (1871); John Bouvier, A Law Dictionary Adapted to the Constitution and Laws of the United States 105 (1868).  Indeed, the country's leading expert on family law during that era unambiguously rejected the validity of same-sex marriage:  "Marriage between two persons of one sex could have no validity, as none of the ends of matrimony could be accomplished thereby.  It has always, therefore, been deemed requisite to the entire validity of every marriage … that the parties should be of different sex."  Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* § 225 (1st ed. 1852).

This historic understanding of marriage and its purpose of uniting members of the opposite sex and their children into family units recognized by civil society has been identified by leading thinkers of every stripe, from legal scholars to philosophers and sociologists.  *See* 1 William Blackstone, *Commentaries on the Laws of England* *410 (describing the relationship between parent and child as "consequential to that of marriage, being its principal end and design: and it is by virtue of this relation that infants are protected, maintained, and educated"); John Locke, *The Second Treatise of Civil Government* §§ 78, 79 (defining marriage as "a voluntary compact between man and woman" and opining that "this conjunction betwixt male and female ought to last, even after procreation, so long as is necessary to the nourishment and support of the young ones, … who are to be sustained by those that got them, till they are able to

12

shift and provide for themselves.")[18]; Noah Webster, *An American Dictionary of the English Language* (1st ed. 1828) (marriage "was instituted … for the purpose of preventing the promiscuous intercourse of the sexes, for promoting domestic felicity, and for securing the maintenance and education of children"); Bronislaw Malinowski, *Sex, Culture, and Myth* 11 (1962) (App. T46 at 833) ("the institution of marriage is primarily determined by the needs of the offspring, by the dependence of children upon their parents").  In the words of sociologist Kingsley Davis:

> The family is the part of the institutional system through which the creation, nurture, and socialization of the next generation is mainly accomplished…. The genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and for their offspring.  By identifying children with their parents … the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring.

*The Meaning and Significance of Marriage in Contemporary Society, in Contemporary Marriage: Comparative Perspectives on a Changing Institution* 7-8 (Kingsley Davis, ed. 1985) (App. T44 at 821-22); *see also Amicus Curie Brief of Scholars of History and Related Disciplines* at 11-22, Case No. 12.144, U.S. Supreme Court (App. T14 at 100-111) .

American society is not alone in conceiving of marriage as the union of a man and a woman for the protection of their children.  Until a decade ago, "it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex."  *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006).  In the words of Claude Levi-Strauss, "the family—based on a union, more or less durable, but socially approved, of two individuals of opposite sexes who establish a household

---

[18] *See* App. T39 at 775-781 for an analysis of Locke's views on this topic.

and bear and raise children—appears to be a practically universal phenomenon, present in every type of society." *The View From Afar* 40-41 (1985) (App. T41 at 807-08).  Marriage thus understood is "a social institution with a biological foundation."  1 Claude Levi-Strauss, *Introduction, in A History of the Family: Distant Worlds, Ancient Worlds* 5 (Andre Burguiere, et al. eds., 1996); *see generally* App. T40, T42-T43 for similar views.

When Plaintiffs broadly invoke the "freedom to marry" they cannot escape the history and meaning of the right – which has always been tied to the procreative purposes of marriage between a man and a woman.  *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (The right to "marry, establish a home and bring up children … [is] essential to the orderly pursuit of happiness by free men.").  Carefully described, as *Glucksberg* and the Supreme Court's other substantive due process decisions require, Plaintiffs' asserted right is the novel and quite different right to marry a person of the same gender.

   **b.   Same-Sex Marriage Is Not Deeply Rooted in this Nation's History and Tradition.**

Substantive due process dictates that "[a] fundamental right or liberty interest is one that is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'"  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003)).  "Without these rights, 'neither liberty nor justice would exist.'"  *Seegmiller*, 528 F.3d at 767 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

The right asserted by the Plaintiffs to marry a person of the same sex plainly fails this test.  Far from being "objectively, deeply rooted in this Nation's history and tradition," same-sex

marriage was unknown in the laws of this Nation before 2003.[19]  *See Goodridge v. Department of Public Health*, 798 N.E.2d 941 (Mass. 2003).  Since then a dozen States have approved same-sex marriage through the "exercise of [their] sovereign authority within our federal system."  *Windsor*, 133 S. Ct. at 2692.  But these very recent developments among a minority of States hardly transform same-sex marriage into a "deeply rooted" historical and traditional right.  Further, these innovations provoked a reaffirmation of the traditional understanding of marriage in a significant majority of States.  In sum, there is no long history of the claimed right.  "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it."  *Flores*, 507 U.S. at 303.  To declare the due process right sought by the Plaintiffs, this Court "would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State."  *Glucksberg*, 521 U.S. at 723 (citing *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922) (Holmes, J.) ("If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.")).  Here, just as in *Glucksberg*, "[t]he history of [the asserted right] in this country has been and continues to be one of the rejection of nearly all efforts to permit it.  That being the case … the asserted 'right' … is not a fundamental liberty interest protected by the Due Process Clause."  *Id.* at 728.

Windsor offers no help to the Plaintiffs.  Both majority and dissenting members of the Court conceded the novelty of same-sex marriage.  *Windsor*, 133 S. Ct. at 2689 ("marriage between a man and woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization"); *id.* at

_____

[19]  Even abroad, no foreign nation allowed same-sex marriage until the Netherlands in 2000. *Windsor*, 133 S. Ct. at 2715 (Alito, J., dissenting).

2696 (Roberts C.J., dissenting) (DOMA "retain[ed] the definition of marriage that, at that point, had been adopted by every State in our Nation, and every nation in the world"); *id.* at 2706-07 (Scalia J., dissenting) (noting that the majority opinion "does not argue that same-sex marriage is 'deeply rooted in this Nation's history and tradition …, a claim that would of course be quite absurd'); *id.* at 2715 (Alito J. dissenting) ("It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition.").

But *Windsor* does identify a practice deeply rooted in our constitutional tradition—the "historical and essential authority" of the states "to define the marital relation …." *Id.* at 2692. The power to define marriage, the Court said, "is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the protection of offspring, property interests, and the enforcement of marital responsibilities.  The states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce …." *Id.* at 2691 (internal quotation marks and brackets omitted).   This power, the Court said, was "of central relevance" to the outcome of *Windsor.  Id.* at 2692.  Thus, far from recognizing a deeply-rooted right to same-sex marriage that trumps contrary state definitions, *Windsor* reaffirmed the long-established authority of states (including Utah) to define marriage.

Failing both elements of the *Glucksberg* standard, the Plaintiffs' asserted right to marry a person of the same sex is not entitled to heightened protection under the Due Process Clause. *Glucksberg*, 521 U.S. at 720-21.

16

3.     **Defining Marriage as Only the Union of a Man and a Woman Does not Deny Anyone Equal Protection of the Laws.**

The Plaintiffs also claim that Utah's Marriage Laws "violate the Equal Protection Clause of the Fourteenth Amendment." *Complaint* (Doc. No. 2) ¶¶ 51-61.  State Defendants show why that claim fails as a matter of law by first discussing the deferential rational basis analysis the Court must apply and then outlining several ways that Utah's marriage laws satisfy that standard because they are rationally related to a legitimate state interest.

a.   **Rational Basis Review Is the Controlling Standard for Adjudicating the Plaintiffs' Equal Protection and Due Process Claims.**

The Fourteenth Amendment's promise of equal protection has always been grounded in the practical reality that "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

The Equal Protection Clause therefore has never provided "a license for courts to judge the wisdom, fairness, or logic of [these] legislative choices." *F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993).  Rather, equal protection normally affords legislative decisions considerable deference.  Thus, a legislative classification that neither affects a fundamental right nor targets a suspect class "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993).  Such a classification will not violate the Equal Protection Clause so long as it rationally relates to some legitimate governmental purpose. *Id.*; *Romer*, 517 U.S. at 631.  In

17

other words, "[a] statutory classification fails rational-basis review only when it rests on grounds wholly irrelevant to the achievement of the State's objective." *Heller,* 509 U.S. at 324 (internal quotation marks omitted).[20]

Under rational basis review, the burden rests on Plaintiffs to "negative every conceivable basis which might support" the legislative classification. *Beach Commc'ns,* 508 U.S. at 315 (internal quotation marks omitted). In contrast, the State Defendants need not produce any evidence to show the rationality of the challenged classification. *Heller,* 509 U.S. at 320. Statutes concerning social policy "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns,* 508 U.S. at 313; *see also City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude."). This remains true even if the conceivable legislative facts are legitimately contested. *Vance v. Bradley,* 440 U.S. 93, 112 (1979) ("It makes no difference that the [legislative] facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." (internal quotation marks omitted)).

Moreover, the legislature need not have ever articulated any rational basis for its

---

[20] Of course, there are other levels of scrutiny that apply to laws that classify according to certain characteristics. *Clark v. Jeter,* 486 U.S. 456, 461 (1988). Strict scrutiny is reserved for laws that classify based on so-called suspect classes such as "race, alienage, or national origin." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985). And classifications based on "sex or illegitimacy" receive an "intermediate scrutiny." *Id.* at 440-41; *Clark,* 486 U.S. at 461. Neither level of scrutiny applies in this case as explained *infra.*

decision, nor does it matter whether the "conceived reason" for the classification "actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315; *see also id.* at 318 ("Whether the posited reason for the challenged distinction actually motivated Congress is constitutionally irrelevant." (internal quotation marks omitted)).  A lack of legislative facts on the record explaining the legislature's reasoning therefore has no significance under rational basis review. *Id.* at 315.  In short, the Legislature's choice "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.*  Even if the law was allegedly based on an improper motive, it cannot be struck down so long as any conceivable rational basis exists to support the statute. *See, e.g.,* *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." (citation omitted)).

Finally, rational basis review "compels" the Court to accept any legislative "generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.  As the Supreme Court recently reiterated: "the Constitution does not require the [State] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2083 (2012); *see also Dandridge v. Williams,* 397 U.S. 471, 485 (1970) (classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality" (internal quotation marks omitted)); *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69–70 (1913) ("The problems

19

of government are practical ones and may justify, if they do not require, rough

accommodations—illogical, it may be, and unscientific"); *Heath & Milligan Mfg. Co. v. Worst,*

*207 U.S. 338, 354 (1907)* (the "logical appropriateness of the inclusion or exclusion of objects or

persons" and "exact wisdom and nice adaptation of remedies are not required").  Courts "must

remember that the machinery of government would not work if it were not allowed a little play

in its joints." *Bain Peanut Co. v. Pinson,* 282 U.S. 499, 501 (1931).

     In sum, rational-basis review "is a paradigm of judicial restraint." *Beach Commc'ns,  508*

*U.S. at 314.*  It forbids the judiciary from sitting "as a superlegislature to judge the wisdom or

desirability of legislative policy determinations." *Heller,* 509 U.S. at 319 (internal quotation

marks omitted).  "'The Constitution presumes that, absent some reason to infer antipathy, even

improvident decisions will eventually be rectified by the democratic process and that judicial

intervention is generally unwarranted no matter how unwisely we may think a political branch

has acted.'" *Beach Commc'ns,* 508 U.S. at 314 (quoting *Vance v. Bradley,* 440 U.S. 93, 97

(1979) (footnote omitted)); *see also Romer,* 517 U.S. at 632-33  ("In the ordinary case, a law will

be sustained if it can be said to advance a legitimate government interest, even if the law seems

unwise or *works to the disadvantage of a particular group*, or if the rationale for it seems

tenuous." (emphasis added)); *U.S. R.R.  Ret. Bd. v. Fritz,* 449 U.S. 166, 175-76 (1980) (as long

as "the classification has some 'reasonable basis,' it does not offend the Constitution simply

because . . . in practice it results in some inequality" and the rational-basis test does not change –

in theory or application – just because the classification "would undoubtedly seem inequitable to

some members of a class . . . ." (citations omitted)).

Rational basis review must be applied with an unusually delicate touch here.  Equal protection "'scrutiny will not be so demanding where [it] deal[s] with matters resting firmly within a State's constitutional prerogatives.'" *Gregory*, 501 U.S. at 462 (quoting *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973)).  Because the Plaintiffs' constitutional attack on Utah's definition of marriage targets "an area that has long been regarded as a virtually exclusive province of the States," *Sosna*, 419 U.S. at 404, that definition is entitled to unusual deference. *Bruning*, 455 F.3d at 867 (stating rational basis review must be particularly deferential to state marriage laws which are "the predominant concern of state government.").   Deferring to Utah's "constitutional prerogatives," *Gregory*, 501 U.S. at 462, follows from the limits on judicial power—that "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy," *Dandridge*, 397 U.S. at 486.

### b.  Sexual Orientation Does Not Implicate a Suspect Class.

Plaintiffs attempt to avoid rational-basis review by arguing that sexual orientation is a type of class meriting strict or heightened scrutiny.  *Complaint* (Doc. 2) ¶¶ 54-55.  But binding Tenth Circuit precedent expressly holds that sexual orientation does not implicate a suspect, or otherwise protected, class.  *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008).  Government "can, therefore, distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end." *Id.* at 1114 (internal quotation marks omitted).  That alone negates Plaintiffs' argument.  *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279 (10th Cir. 2010) (noting "general rule that a

district court is bound by decisions made by its circuit court.").  Almost every other circuit court

has come to the same conclusion. *Price-Cornelison*, 524 F.3d at 1113 n.9 (collecting cases from

other circuits).[21]

No intervening Supreme Court precedent has superseded the Tenth Circuit's holdings on

this matter.  *Romer* applied "conventional" rational basis review in holding that a Colorado

constitutional amendment violated equal protection by placing a "[s]weeping" and

"unprecedented" ban on state and local laws offering gays and lesbians common protections

from discrimination. *Romer, 517 U.S. at 631-32, 627, 633, 635*.  And the Court's other decisions

addressing rights relevant to gays and lesbians did not address which level of review was

appropriate for laws discriminating on the basis of sexual orientation because their holdings

rested on due process rights available to all.  *Lawrence v. Texas*, 539 U.S. 558, 578 (2003)

("Their right to liberty under the Due Process Clause gives them the full right to engage in their

[intimate sexual] conduct without intervention of the government" and "The Texas statute

furthers no legitimate state interest which can justify its intrusion into the personal and private

life of the individual."); *Windsor*, 133 S. Ct. at 2695. ("DOMA is unconstitutional as a

deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution.").

Unless, and until, the en banc Tenth Circuit or the United States Supreme Court reverses

course, sexual orientation is not a suspect class and this Court must apply rational-basis scrutiny.

---

[21] In its decision striking down part of DOMA, the Second Circuit recently held that
homosexuals are a quasi-suspect class subject to heightened scrutiny. *Windsor v. United States*,
699 F.3d 169, 185 (2nd Cir. 2012).  But in reviewing the Second Circuit's decision, the Supreme
Court's majority opinion did not address the status of a sexual orientation class.  *Windsor*, 133 S.
Ct. at 2689-2696.

*In re Smith,* 10 F.3d 723, 724 (10th Cir.1993) (per curiam) ("We cannot overrule the judgment of another panel of this court.  We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").[22]

### c.  There Is No Gender or Sex Discrimination

Plaintiffs also attempt to avoid rational-basis review by arguing that the man-woman definition of marriage constitutes gender discrimination, which would, if true, require heightened (but not strict) scrutiny.  *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 441 (1985).  Plaintiffs might have a point if the marriage statutes actually treated the genders differently, say, by forbidding a man from marrying another man while allowing a woman to marry another woman, or vice versa.  But the Utah marriage statutes do not do that.  The provisions are generally and neutrally applicable to both genders.  Neither a man nor a woman may marry a person of the same sex.  That meaning does not constitute sex discrimination because it treats men and women equally. *See*, *e.g.*, *Sevcik,* 911 F. Supp. 2d at 1005*; Jackson,* 884 F. Supp. 2d at 1098-99 (citing at least nine other cases and noting agreement with the "vast majority of courts considering the issue" that the traditional definition of marriage "does not constitute gender discrimination.").

\* \* \* \* \* \* \* \* \* \* \* \*

---

[22]  *See also* Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 756-57 (2011) ("All classifications based on other characteristics – including age, disability, and *sexual orientation* – currently receive rational basis review.  Litigants still argue that new classifications should receive heightened scrutiny.  Yet these attempts have an increasingly antiquated air in federal constitutional litigation, as the last classification accorded heightened scrutiny by the Supreme Court was that based on nonmarital parentage in 1977.  At least with respect to federal equal protection jurisprudence, *this canon has closed*." (emphasis added and footnotes omitted)).

23

Because this case involves neither a "fundamental right" nor a "suspect" classification, it "falls directly within the scope of [Supreme Court] precedents holding such a law constitutionally valid if 'there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" *Armour,* 132 S. Ct. at 2080 (citations omitted).  "And it falls within the scope of [Supreme Court] precedents holding that there is such a plausible reason if 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (citations omitted).

### d.   Utah's Marriage Laws Amply Satisfy Rational Basis Review.

### i.   Multiple reasons sustain Utah's decision to affirm in law that only the union of one man and one woman can be denominated marriage.

Utah has a legitimate, even compelling, interest in protecting and preserving the man-woman definition of marriage, which is "one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving*, 388 U.S. at 12 (quoting *Skinner,* 316 U.S. at 541). Even before Utah became a State, the Supreme Court emphasized the important interests a state had in families arising from the marriage of one man and one woman:

> [C]ertainly no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the idea of the family, *as consisting in and springing from the union for life of one man and one woman* in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization.

*Murphy v. Ramsey,* 114 U.S. 15, 45 (1885) (emphasis added).

These Supreme Court statements, and others like them, get to the core of the State's interest in marriage and the rational bases for the long-standing man-woman definition of marriage:  the continuing vitality and success of any society depends on the procreation, care for, and all-around well-being of children.  The relationship between this crucial interest and man-woman marriage has been aptly summarized:

> A liberal democratic society needs sufficient children and it needs them to be educated. Therefore, a liberal democratic society needs families headed by two married parents who are the biological mother and father of the children, because such families are (a) intrinsically generative and (b) optimal for childrearing.  In other words, sex between men and women makes babies; society needs sufficient babies; babies need moms and dads.  Every family arrangement in which children are raised need not and cannot conform to this pattern, but the state has a legitimate interest in encouraging people to form families that do so, which the state can accomplish by enshrining this conception of marriage in the law, as conferring unique social status, and promoting it with material benefits.

Matthew B. O'Brien, *Why Liberal Neutrality Prohibits Same-Sex Marriage: Rawls, Political Liberalism, and the Family,* Brit. J. Am. L. Studies, Vol. 1, Issue 2 at 31 (Summer/Fall 2012) (footnote omitted) (App. T71 at 1321).

Accordingly, and as many courts have concluded, Utah's legislature and populace could reasonably believe that the definition of marriage as only the union between a man and a woman rationally relates to that legitimate (and compelling) state interest.[23]  That rational relationship is further outlined below.

---

[23] Considering the compelling government interests that the traditional definition of marriage has always served, Utah's adherence to the traditional definition of marriage would satisfy any level of scrutiny.  *See, e.g., Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 628 (1995) (noting that "history, consensus, and simple common sense" can provide adequate grounds to survive strict scrutiny (internal quotation marks omitted)).

25

**1.)   The traditional definition of marriage reinforces responsible procreation and care for children.**

The State does not regulate and define marriage simply to publicly recognize the romantic or other emotional bonds between two consenting adults.  Rather the State's interest in opposite-sex marriage has always been rooted in promoting responsible procreation and care-giving for the resulting child(ren), planned and particularly unplanned, of such marriages.

Only sexual relationships between a man and a woman are capable of creating a child. Heterosexual sex always has been and still remains, even considering scientific advances in alternative ways to create human life, the sole viable means by which the human race and any society perpetuates itself.  But though procreation may preserve the species, it does not automatically benefit society, and in fact can cause great social burdens if society is left to care for the resulting children.  Thus, "marriage's vital purpose in our societies is not to mandate man/woman procreation but to ameliorate its consequences."  Monte Neil Stewart, *Judicial Redefinition of Marriage,* 21 Can. J. Fam. L. 11, 47 (2004) (App. T74 at1421).  Traditional marriage as a public institution exists primarily (and perhaps exclusively) as society's way to promote responsible, i.e., socially beneficial, procreation.  It is "the institution developed in our society, its predecessor societies, and by nearly all societies on Earth throughout history to solidify, standardize, and legalize the relationship between a man, a woman, and their offspring." *Sevcik*, 911 F. Supp. 2d at 1015; *see also Windsor,* 133 S. Ct. at 2718 (Alito, J., dissenting) ("the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing," "that marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life,

even if it does not always do so," and that "marriage has been viewed as an institution …

inextricably linked to procreation and biological kinship.").

    As discussed above, traditional marriage has always been closely linked to procreation by

leading thinkers. Likewise, the Supreme Court has repeatedly made the procreation link in

discussing the importance of marriage.  *See Zablocki,* 434 U.S. at 383 ("[Marriage] is the

foundation of the family in our society.... [I]f appellee's right to procreate means anything at all,

it must imply some right to enter the only relationship in which the State of Wisconsin allows

sexual relations legally to take place."); *Loving,* 388 U.S. at 12 ("Marriage is one of the 'basic

civil rights of man,' fundamental to our very existence and survival."); *Skinner,* 316 U.S. at 541

("Marriage and procreation are fundamental to the very existence and survival of the race.");

*Maynard,* 125 U.S. at 211 ("[Marriage] is an institution, in the maintenance of which in its purity

the public is deeply interested, for it is the foundation of the family and of society, without which

there would be neither civilization nor progress."); *Murphy,* 114 U.S. at 45 (stating importance of

laws to establish a state "on the basis of the idea of the family, as *consisting* in and springing

from *the union for life of one man and one woman in the holy estate of matrimony.*" (emphasis

added)).

    Traditional marriage uniquely matters to the State because the children that result

uniquely from inevitable heterosexual coupling matter to the State.[24]  *Palmore v. Sidoti,* 466 U.S.

---

[24] The State's interest in *responsible* procreation can also be seen in the fact that, while
Utah defines marriage as between only a man and a woman, Utah will not let just any man and
woman marry.  Rather, the State prohibits certain man-woman marriages—such as between
certain relatives or involving an underage minor—that would presumably lead to irresponsible
and/or socially detrimental procreation.  Utah Code § 30-1-1 (declaring as void certain defined

429, 433 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years."); *Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (noting that a State has "legitimate interests, well within the power of the State to implement[,]" in protecting the moral, emotional, mental and physical welfare of children.). Children are crucial to the very survival and progress of society. And, as explained more fully below, children generally do best when nurtured, raised and socialized by their biological parents in a stable family unit. Traditional marriage with its accompanying governmental benefits provides an incentive for opposite-sex couples to commit together to form just such a stable family in which their planned, and especially unplanned, biological children may be raised. *See, e.g.*, Sherif Girgis et al., *What is Marriage? Man and Woman: A Defense* 38-39 (2012) (App. T67); James Q. Wilson, *The Marriage Problem: How Our Culture Has Weakened Families* 41 (2002) (App. T45 at 827) ("Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve."); *see also* Utah Code § 30-1-30 ("It is the policy of the state of Utah to enhance the possibility of couples to achieve more stable, satisfying and enduring marital and family relationships by providing opportunities for and encouraging the use of premarital counseling prior to securing a marriage license . . . .").

But, importantly, traditional marriage does much more than just benefit the children. Society benefits from an institution that provides the best opportunity for a child to reach his or

---

incestuous marriages while allowing first cousins to marry if both parties are over 65 years old, or if both parties are over 55 years old and one of the parties is unable to reproduce); *id.* § 30-1-2(2) – (3) (prohibiting marriages by persons under a certain age).

her personal potential as an individual and as a productive citizen all the while minimizing the cost to society of caring for and rearing the child. *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944) ("it is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose *primary function* and freedom include preparation for obligations the state can neither supply nor hinder." (emphasis added)); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 535 (1925) (noting that the "child is not the mere creature of the state; those who nurture him and direct his destiny have the right, *coupled with the high duty, to recognize and prepare him for additional obligations.*" (emphasis added)); *see also Parham v. J.R.,* 442 U.S. 584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.").  In other words, traditional marriage is society's best means of maximizing private welfare to the vast majority of children.  Channelling procreation into a social institution that assures – to the largest practical extent – procreation's consequences (children) begin and continue life with adequate private welfare is thus a fundamental and originating purpose of marriage.  The immediate beneficiaries of this private welfare purpose are the child and the often vulnerable mother, but society rationally sees itself as the ultimate beneficiary.

It is by now well documented that society bears a great cost—$112 billion nationally and $276 million in Utah each year by one estimate—and children themselves face increased risks of poor outcomes if they are born out of wedlock or otherwise not raised by their married biological

29

parents.  *See* Benjamin Scafidi, Principal Investigator, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and All Fifty States* 5, 38 (2008) (App. T65 at 135, 168) (estimating societal costs due to divorce and unwed childbearing); Sherif Girgis et al., *What is Marriage?* at 46 (App. T67) (noting other studies calculating $229 billion in welfare expenditures between 1970 and 1996 are attributable to the breakdown of marriage, and estimating that divorce costs state and federal governments $33 billion a year); Kristen Anderson Moore, et al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, Child Trends Research Brief 6 (June 2002) (App. T50 at 873) ("research clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage.  Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes than do children in intact families headed by two biological parents.  Parental divorce is also linked to a range of poorer academic and behavioral outcomes among children.  There is thus value for children in promoting strong, stable marriages between biological parents.").  In particular, President Obama has highlighted some of the problems facing society and children who grow up without a father—they are five times more likely to live in poverty and commit crime, and twenty times more likely to end up in prison; they are more likely to drop out of school, have behavioral problems, run away from home and become teenage parents themselves—and concluded that "the foundations of our community are weaker because of it."  Barack Obama, Speech on Fatherhood (June 15, 2008).

Because "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies," the government "may secure this against impeding restraints and dangers, within a broad range of selection." *Prince,* 321 U.S. at 168.  Accordingly, Utah could rationally "find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born.  [Utah] thus could choose to offer an inducement—in the form of marriage and its attendant benefits—to opposite-sex couples who make a solemn, long-term commitment to each other."  *Hernandez,* 855 N.E.2d at 7 (plurality op.).  Many other judicial decisions have reached the same conclusion.  *Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 867-68 (8th Cir. 2006); *Sevcik,* 911 F. Supp. 2d at 1015-16; *Jackson,* 884 F. Supp. 2d at 1111-1114; *In re Kandu,* 315 B.R. 123, 145-146 (Bankr. W.D. Wash. 2004) ; *Adams v. Howerton,* 486 F. Supp. 1119, 1124-25 (C.D. Cal. 1980), *aff'd on other grounds,* 673 F.2d 1036 (9thh Cir. 1982); *Standhardt v. Superior Court,* 77 P.3d 451, 461-65 (Ariz. Ct. App. 2003); *Dean v. District of Columbia,* 653 A.2d 307, 363 (D.C. 1995) (Steadman, A.J., concurring); *Morrison v. Sadler,* 821 N.E.2d 15, 23-31 (Ind. Ct. App. 2005); *Conaway v. Deane,* 932 A.2d 571, 630-34 (Md. 2007); *Baker,* 191 N.W.2d at 186-87; *In re Marriage of J.B. & H.B.*, 326 S.W.3d at 677-78; *Andersen v. King County,* 138 P.3d 963, 982-83 (Wash. 2006) (plurality op.); *id.* at 1002-03 (J.M. Johnson, J., separate op. concurring in judgment only); *Singer v. Hara,* 522 P.2d. 1187, 1195 (Wash. Ct. App. 1974); *see also* Goodridge, 798 N.E.2d at 995-1004 (Cordy, J., dissenting).

Same-sex marriage proponents usually respond to the responsible-procreation rationale by arguing that same-sex marriage will not harm the State's interests in traditional marriage, i.e.,

no heterosexual couple will avoid marriage and responsible procreation simply because same-sex couples are allowed to marry.  But that argument misses the point and misstates the law.  Even under a strict scrutiny analysis, Utah would not have to prove the harm that eliminating the traditional definition of marriage might cause.  *See, e.g., Burson v. Freeman,* 504 U.S. 191, 208 (1992) (noting in strict scrutiny analysis of long-standing statute that "[t]he fact that these laws have been in effect for a long period of time also makes it difficult for the States to put on witnesses who can testify as to what would happen without them.").  The focus, particularly under rational basis review, remains on whether the challenged statute rationally supports a State interest, not whether expanding the class of statutory beneficiaries would harm the State's interest.  Thus, a classification will be upheld if "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not." *Johnson v. Robison,* 415 U.S. 361, 383 (1974).  Traditional man-woman marriage promotes the State's interest in responsible procreation (and in the ideal family life described below).  Same-sex couples, who cannot procreate, do not promote the State's interests in responsible procreation (regardless of whether they harm it).  Utah's choice to define marriage as between a man and a woman is therefore constitutional. *Bruning,* 455 F.3d at 867 (noting the "responsible procreation" rationale "justifies conferring the inducements of marital recognition and benefits on opposite-sex couples, who can otherwise produce children by accident, but not on same-sex couples, who cannot."); *see also Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 366-67 (2001) ("where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not

give rise to a constitutional violation." (internal quotation marks omitted)); *City of Cleburne,* 473 U.S. at 441-42 ("where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued."); *Tigner v. Texas,* 310 U.S. 141, 147 (1940) ("the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.").

### 2.) Traditional marriage promotes optimal child rearing.

As a related but distinct matter, Utah can also rationally choose to define marriage as only the union of a man and a woman because that definition promotes the ideal that children born within a state-sanctioned marriage will be raised by both a mother and father in a stable family unit. And Utah could rationally conclude that, all things being equal, it is better for children to grow up being raised by both a mother and a father.[25] *See, e.g., Lofton v. Secretary of the Dep't of Children & Family Servs.,* 358 F.3d 804, 819 (11th Cir. 2004) ("It is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society."). Indeed, society (and Supreme Court jurisprudence) have "always

---

[25] This rational conclusion undergirds other areas of the law too. For example, in explaining the need for a court to find "compelling" reasons to transfer custody of a child from the child's natural parents, Utah law expressly states that "[i]t is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents [because a] child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents." Utah Code 78A-6-503(8).

presumed [biological parents] to be the preferred and primary custodians of their minor children." *Flores, 507 U.S. 292 at 310*; *see also Bowen v. Gilliard,* 483 U.S. 587, 614 (1987) (Brennan, J., dissenting) ("'[t]he optimal situation for the child is to have both an involved mother and an involved father.'" (quoting Henry B. Biller, *Paternal Deprivation* 10 (1974)).

This best-interest-of-the-child rationale is based in tradition, common-sense, experience, and empirical data.  As various family law scholars put it:  "The intact, biological, married family remains the gold standard for family life in the United States, insofar as children are most likely to thrive – economically, socially, and psychologically – in this family form."  W. Bradford Wilcox et al., *Why Marriage Matters:  Thirty Conclusions from the Social Sciences* 11 (3rd ed. 2011) (App. T27 at  242); *see also, Hernandez,* 855 N.E. 2d at 7 (plurality op.) ("[i]ntuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like."); *In re Marriage of J.B. & H.B.,* 326 S.W.3d at 678 ("[t]he state also could have rationally concluded that children are benefited by being exposed to and influenced by the beneficial and distinguishing attributes a man and a woman individually and collectively contribute to the relationship."); *Anderson,* 138 P.3d at 983 ("the legislature was entitled to believe that providing that only opposite-sex couples may marry will encourage procreation and child-rearing in a 'traditional' nuclear family where children tend to thrive."); Lynn D. Wardle, Essay, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation,* 24 Harv. J.L. & Pub. Pol'y 771 (2001) ("Heterosexual marriage reasonably may be assumed to provide the most advantageous environment in which children can be reared, providing profound benefits of dual gender

34

parenting to model intergender relations and show children how to relate to persons of their own and the opposite gender.").

Though unnecessary for rational basis review, there are numerous studies that support the rationale that children benefit from being raised by both a mother and a father. *See, e.g., Jackson,* 884 F. Supp. 2d at 1115; Mark Regnerus, *How Different Are the Adult Children of Parents Who Have Same–Sex Relationships? Findings from the New Family Structures Study,* 41 Soc. Sci. Research 752 (2012) (App. T57 at 992-997) (finding that children raised by married biological parents fared better than children raised in same-sex households in a range of significant outcomes); David Popenoe, *Life Without Father: Compelling New Evidence that Fatherhood and Marriage Are Indispensable for the Good of Children and Society* 146 (1996) (App. T48 at 843) ("The burden of social science evidence supports the idea that gender differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable."); Girgis, *What is Marriage?* at 42-43 (App. T67) (summarizing studies and noting that "the best available social science suggests that children tend to do best when reared by their married mother and father."); Douglas W. Allen, *High school graduation rates among children of same-sex households,* 11 Rev. Econ. of the Household (first published on-line Sept. 2013) (App. 56 at 959) (concluding that Canadian children living with gay and lesbian families in 2006 were about 65% as likely to graduate compared to children living in opposite sex marriage families); *see also* the studies and articles in the Appendix at T27-T38, T45 at 828-830, T47, T49, T50, T53-T56, T58-T59.  Many studies were also cited and discussed in an amicus brief submitted to the Supreme Court by a group of

35

social science professors.  Amicus Curiae Brief of Social Science Professors at 4-13, Case Nos. 12-144, 12-307, U.S. Supreme Court (App. T13 at 55-64).  The professors note that while much more study must be done comparing same-sex and opposite-sex parenting, "there is no dispute that a biological mother and father provide, on average, an effective and proven environment for raising children [a]nd it is reasonable to conclude that a mother and a father function as a complementary parenting unit and that each tends to contribute something unique and beneficial."  Brief at 4 (App. T13 at 55).

To be sure, other studies, which Plaintiffs will undoubtedly cite, have reached the conclusion that children suffer no ill-effects from being raised by same-sex parents.  *See, e.g., Jackson,* 884 F. Supp. 2d at 1115 (citing American Psychological Association, APA Policy Statement: Sexual Orientation, Parents, & Children ("[R]esults of research suggest that lesbian and gay parents are as likely as heterosexual parents to provide supportive and healthy environments for their children")).  And both sides of the debate criticize the others' methods and conclusions. *See, e.g., Jackson,* 884 F. Supp. 2d at 1115; Loren D. Marks, *Same–Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting,* 41 Soc. Sci. Research 735, 748 (2012) (App. T59 at 1026) (explaining flaws in 59 studies conducted on same-sex parenting, including the involvement of small, non-random, convenience samples, and concluding that the generalized claim of "no difference" was "not empirically warranted"); Mark Regnerus, *Parental same-sex relationships, family instability, and subsequent life outcomes for adult children: Answering critics of the new family structure study with additional analyses* 41 Social Science Research

36

1367-1377 (2012) (App. T58 at 1002-1012); *see also* Amici Curiae Brief of Social Science

Professors at 13-29 (App. T13 at 64-80) (critiquing same-sex parenting studies); App. T60

(critiquing use of social science evidence in the Prop. 8 case); App. T64 (discussing conclusions

and criticisms of the Regnerus study); *Lofton,* 358 F.3d at 825 (noting critiques of some of the

same-sex parenting studies).

       Be that as it may, the conflicting studies at best show the optimal heterosexual parenting

rationale is at least debatable.  Under rational basis review, the Court must therefore uphold

Utah's definition of marriage. *Vance,* 440 U.S. at 112; *see also Jackson,* 884 F. Supp. 2d at

1115-1116 (upholding traditional definition of marriage because parties' conflicting evidence

showed that the optimal parenting rational was at least debatable); *see also Sevcik,* 911 F. Supp.

2d at 1016 (finding persuasive the reasoning in *Jackson* concerning the rational bases for

Hawaii's marriage laws); *Hernandez,* 855 N.E. 2d at 8 ("in the absence of conclusive scientific

evidence, the Legislature could rationally proceed on the commonsense premise that children

will do best with a mother and father in the home."); *cf. Lofton,* 358 F.3d at 822 (concluding that

Florida had a rational basis to prohibit adoption by homosexuals because, in part, the benefits of

heterosexual role models "ultimately involve[s] empirical disputes not readily amenable to

judicial resolution—as well as policy judgment best exercised in the legislative arena." (internal

quotation marks omitted)); *Wilson,* 354 F. Supp. 2d at 1309 (stating the court "is bound by the

Eleventh Circuit's holding that encouraging the raising of children in homes consisting of a

married mother and father is a legitimate state interest).

### 3.)   Proceeding with caution when considering fundamentally altering the nature of traditional marriage.

It is well-settled that the ancient and ongoing tradition of marriage between a man and a woman resulting in the procreation and care of children inside that family unit has proven to be both "fundamental to our very existence and survival," *Loving*, 388 U.S. at 12, and the "foundation of the family and society, without which there would be neither civilization nor progress." *Murphy*, 114 U.S. at 45.  That explains, at least in part, why the man-woman definition of marriage has endured for so long virtually unquestioned until very recent times.  It also helps explain Utah's and the majority of other States' attempts to protect the traditional definition of marriage by codification and/or constitutional amendment.  Utah could rationally conclude that changing the foundations of society in such a fundamental way will most likely cause changes in society itself.  And it could also have rationally decided that approaching this issue cautiously—taking a wait-and-see-approach while constitutionally buttressing the traditional definition of marriage—makes the most sense for Utah.

No one can seriously question the fact that "[p]ast changes in the understanding of marriage . . . have had far-reaching consequences." *Windsor*, 133 S. Ct. at 2715 (Alito, J. dissenting).  For almost any such change, the resulting consequences and whether they are good or bad are not immediately clear and often depend on numerous variables.  As Justice Alito pointed out, it sometimes takes years to understand the impact social changes have on children and society.  *Id.* at 2715 & n.5.  Specifically as to same-sex marriage, some respectable voices warn that it will seriously harm the institution of marriage and society, while others appear to hope that it does.  *Id.* at 2715-16 & n.6.  Still others opine that same-sex marriage can strengthen

38

a weakening institution.  *Id.* at 2715-16.  No one knows right now the precise impact same-sex marriage will have on traditional marriage, children, and society at large.  But given the crucial role man-woman marriage has played in building society to this point and the uncertainty surrounding the impact of same-sex marriage, Utah can rationally choose to proceed with caution.  *See, e.g., Sevcik,* 911 F. Supp. 2d at 1016 ("Because the family is the basic societal unit, the State could have validly reasoned that the consequences of altering the traditional definition of marriage could be severe."); *Jackson,* 884 F. Supp. 2d at 1117 ("[I]t is not beyond rational speculation to conclude that fundamentally altering the definition of marriage to include same-sex unions might result in undermining the societal understanding of the link between marriage, procreation, and family structure."); *Anderson,* 138 P.3d at 1005 (J.M. Johnson, J., concurring in judgment) ("Before redefining a social institution [like man-woman marriage], the legislature should consider ramifications flowing from all three . . . couple communities [, i.e., male couples, female couples, and male-female couples,] and the resulting impact on the social fabric and on children."); *id.* at 1006 ("it is rational that [the] legislature insists upon compelling evidence before making a sweeping alteration in marriage."); *cf. Lofton,* 358 F.3d at 826 ("Nor is it irrational for the legislature to proceed with deliberate caution before placing adoptive children in an alternative, but unproven, [same-sex] family structure that has not yet been conclusively demonstrated to be equivalent to the marital family structure that has established a proven track record spanning centuries.").

### a.)   Changing the definition of traditional marriage will inevitably change the institution and its societal impact.

Focusing on traditional marriage as an institution helps show some ways that redefinition

39

could impact society.  Social institutions are constituted by shared public meanings which

provide valuable social benefits.  The law has the power to suppress such meanings, and when

the law's power is so used, society loses the social benefits provided by those meanings.

Marriage is a vital social institution,[26] and like all social institutions, is constituted by a

unique web of shared public meanings.[27]  Such social institutions affect individuals profoundly.[28]

Those meanings inherent in social institutions are the source of the social benefits that any

institution provides because they teach and transform individuals across society.[29]  These social

benefits justify the institution's perpetuation.[30]  Society can also change its social institutions by

changing the shared public meanings that constitute them.  When those meanings are changed or

are no longer sufficiently shared, the social institution is changed.[31]  If the change in public

meanings and norms is significant enough, the social institution constituted by those meanings and

---

[26]   *E.g.*, *Williams v. North Carolina*, 317 U.S. 287, 303 (1942) ( "[T]he marriage relation [is] an institution more basic in our civilization than any other."); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 948 (Mass. 2003) ("Marriage is a vital social institution.").

[27]   *See, e.g.*, John R. Searle, *The Construction of Social Reality* 32 (1995) (App. T61); *see also* Monte Neil Stewart, *Genderless Marriage, Institutional Realities, and Judicial Elision*, 1 Duke J. Const. L. & Pub. Pol'y 1, 8-28 (2006).

[28]   *See, e.g.*, Helen Reece, *Divorcing Responsibly* 185 (2003); Stewart, *Judicial Redefinition of Marriage*, 21 Can. J. Fam. L. 11 (App. T74).

[29]   *See, e.g.*, App. T30; Monte Neil Stewart, *Marriage, Fundamental Premises, and the California, Connecticut, and Iowa Supreme Courts,* 2012 BYU L. Rev. 193, 205.

[30]   Richard R. Clayton, *The Family, Marriage, and Social Change* 19, 22 (2d ed. 1979) (defining an institution as: "An organized system of social relationships (roles, positions, norms) that is pervasively implemented in the society and that serves certain basic needs of the society" and noting that society would hardly expend the vast energy needed to accomplish that "pervasive implementation" unless the resulting institution indeed served "certain basic needs of the society."); *see also* Monte Neil Stewart, *Eliding in Washington and California*, 42 Gonzaga L. Rev. 501, 503 (2007).

[31]   *See, e.g.*, Eerik Lagerspetz, *The Opposite Mirrors: An Essay on the Conventionalist Theory of Institutions* 28 (1995); Eerik Lagerspetz, *On the Existence of Institutions*, *in On the Nature of Social and Institutional Reality* 70, 82 (Eerik Lagerspetz et al. eds., 2001).

norms disappears (or is de-institutionalized).[32]

As discussed earlier, across time and cultures, a core and essential meaning that makes up the marriage institution has virtually always been the union of a man and a woman. Marriage's man-woman *meaning* provides materially and even uniquely a number of valuable social benefits.

The social reality is that a society can have *only one* social institution called *marriage*. Society cannot simultaneously have as shared, core, constitutive meanings of the marriage institution *both* "the union of a man and a woman" *and* "the union of any two persons"— any more than it can have monogamy as a core meaning if it also allows polygamy—since one meaning necessarily displaces or at least precludes the other.[33]  Plaintiffs' core argument is that the federal Constitution requires this Court to order the State of Utah to adopt a novel conception of marriage.

Though the law did not create the marriage institution,[34]  it has the power to de-institutionalize it by suppressing the shared public meanings that constitute it[35] (through its authoritative expressive or educative function).[36]  The reach of that power to suppress is

---

[32]  *See, e.g., id.*; App. T61.

[33]  *See, e.g.,* Stewart, *Institutional Realities,* 1 Duke J. Const. L. & Pub. Pol'y at 24-25. Society could opt for no normative marriage institution at all, and many influential voices are urging just that.  *See, e.g.,* App. T66.

[34]  *See, e.g.,* App. T37-T39; Richard W. Garnett, *Taking* Pierce *Seriously: The Family, Religious Education, and Harm to Children*, 76 Notre Dame L. Rev. 109, 114 n.29 (2000) (the law's provisions regulating marriage no more "created" the marriage institution than the Rule Against Perpetuities "created" dirt).

[35]  *See, e.g.,*, App. T28-T30; Nancy F. Cott, *The Power of Government in Marriage* 11 The Good Society 88 (2002).

[36]  *See, e.g.,* Joseph Raz, *The Morality of Freedom* 162 (1986); Cass R. Sunstein,

tremendous because after redefinition, the old meaning would be deemed "unconstitutional" and the new meaning would be deemed a "civil right."[37]

The social reality is that such a law-mandated change could have material consequences. Genderless marriage is a profoundly different institution than man-woman marriage.[38] There may be overlap between the two possible marriage institutions but the divergence could possibly be significant.  For example, man-woman marriage advances the norm that the procreation of the child is a primary basis for the status, identity, rights, and duties of parenthood, while genderless marriage does just the opposite.  "The legalization of same-sex marriage, while sometimes seen as a small change affecting just a few people, raises the startling prospect of fundamentally breaking the legal institution of marriage from any ties to biological parenthood."[39]  That prospect is a reality in Canada; the same bill redefining marriage to the union of any two persons also contained, in order to maintain the coherence of the scheme, a provision ending in law the concept of "natural parent" and replacing it with the concept of "legal parent" (a child's parents are who the state says the parents are).[40]  After implementation of genderless marriage, a child knowing and being raised by her biological parents is a mere fortuity, not the result of cultural, political, and institutional aspirations and objectives.

---

*Foreword: Leaving Things Undecided*, 110 Harv. L. Rev. 4, 69-71 (1996); App. T71; *see also* App. T28-T30, T63.
[37] Stewart, *Fundamental Premises,* 2012 BYU L. Rev. at 218-19.
[38]  *See, e.g*., Monte Neil Stewart, *Marriage Facts*, 31 Harv. J.L. & Pub. Pol'y 313, 323-24 (2008).
[39] App. T30 at 444.
[40]  *See id.* at 422-23.

Further, the man-woman marriage institution is essentially child-centered,[41] while genderless marriage "neutralizes the law's ability to say that children need their mothers and fathers and reifies a new conception of marriage that is centered on the couple rather than children," teaching that marriage is a "private relationship between two people created primarily to satisfy the needs of adults."[42]

Well-informed observers of marriage – regardless of their position on the issue of redefining marriage – uniformly acknowledge the differences between the two possible institutions of marriage.[43]  Changing the meaning of marriage to that of "any two persons" will likely transform the institution, if not immediately then certainly over time as the new meaning is mandated in texts, in schools, and in many other parts of the public square and voluntarily published by the media and other institutions, with society, especially its children, thereby losing

---

[41]  *See, e.g.*, App. T29, T38, T68.

[42]  App. T30 at 141, 142.

[43]  *See, e.g.*, David Blankenhorn, The Future of Marriage 167 (2007); Daniel Cere, *War of the Ring*, *in Divorcing Marriage: Unveiling the Dangers in Canada's New Social Experiment* 9, 11-13 (Daniel Cere & Douglas Farrow eds., 2004); Douglas Farrow, *Canada's Romantic Mistake*, *in Divorcing Marriage at 1-5; Ladelle McWhorter, Bodies and Pleasures: Foucault and the Politics of Sexual Normalization* 125 (1999); Joseph Raz, *The Morality of Freedom* 393 (1986); Judith Stacey, *In the Name of the Family: Rethinking Family Values in the Postmodern Age* 126-28 (1996); Katherine K. Young & Paul Nathanson, *The Future of an Experiment*, *in Divorcing Marriage* at 48-56; Angela Bolt, *Do Wedding Dresses Come in Lavender? The Prospects and Implications of Same-Sex Marriage*, 24 Soc. Theory & Prac. 111, 114 (1998); Devon W. Carbado, *Straight Out of the Closet*, 15 Berkeley Women's L.J. 76, 95-96 (2000); Maggie Gallagher, *(How) Will Gay Marriage Weaken Marriage as a Social Institution: A Reply to Andrew Koppelman*, 2 St. Thomas L.J. 33, 53 (2004); E.J. Graff, *Retying the Knot*, The Nation, June 24, 1996, at 12; Nan D. Hunter, *Marriage, Law, and Gender: A Feminist Inquiry*, 1 Law & Sexuality 9, 12-19 (1991); Andrew Sullivan, *Recognition of Same-Sex Marriage*, 16 Quinnipiac L. Rev. 13, 15-16 (1996).

the ability to discern the meanings of the old institution.[44]

      If the law were to suppress the man-woman *meaning* at the core of the marriage institution (as the law has the power to do), the consequence would first be the diminution over time and then the loss of the valuable social benefits that that meaning uniquely provides.  Those valuable social benefits have no source in our society other than the man-woman marriage institution, and genderless marriage will not likely produce them.

<div align="center">

**b.) Caution is also appropriate where the proposed redefinition is arguably irreversible.**

</div>

      The cautious approach to same-sex marriage seems particularly rational given the alleged one-way direction of the road.   According to some arguments made by same-sex marriage proponents, Utah could not retract same-sex marriage rights once they were given even if the redefinition of marriage proved to be unwise.  For example, the Ninth Circuit held Proposition 8 violated the federal constitution because it took away the right to marry from same-sex couples after that right had already been given.  *Perry v. Brown,* 671 F.3d 1052, 1092-93 (9th Cir. 2012). That decision was vacated by the Supreme Court for lack of standing rather than on the merits, *Hollingsworth v. Perry,* 133 S. Ct. 2652, 2659-68 (2013), which means the Ninth Circuit's can't-rescind-a-right-once-given rationale was neither addressed nor rejected.  Similarly, some same-sex marriage advocates have forwarded arguments suggesting that a state cannot even take an incremental step towards same-sex marriage by enacting civil-union laws—extending to same-sex couples many, if not all, of the benefits of marriage—because such laws only prove the State

---

[44] Stewart, *Judicial Redefinition of Marriage,* 21 Can. J.  Fam. L. at 111 (App. T74 at 1437).

has no rational basis to define marriage as between a man and a woman.  *See, e.g. Sevcik,* 911 F. Supp. 2d at 1017-18;  *Jackson,* 884 F. Supp. 2d at 1107-1111.  That argument was rejected but it still highlights the care with which a state like Utah must proceed in considering same-sex marriage issues.

### 4.)   Utah's marriage laws are not based on animus.

The Plaintiffs try to avoid the natural conclusion that Utah's definition of marriage amply satisfies rational basis review by alleging that that definition "is the result of disapproval or animus against a politically unpopular group" and that Utah's laws reserving marriage for opposite-sex couples "single out gay men and lesbians for a disfavored legal status."  *Complaint* [Doc. 2] ¶ 59.  But mischaracterizing Utah law as the product of animus toward gays and lesbian cannot save the Plaintiffs' equal protection claims.  Neither *Romer* nor *Windsor*, the Supreme Court's decisions discussing animus in the context of laws affecting gays and lesbians, makes animus relevant here.

*Romer* relied on animus to explain a state constitutional amendment withdrawing and prohibiting distinctive legal protection for gays and lesbians, only because its "breadth" was "so far removed from [its] particular justifications that [the Court found] it impossible to credit them."  517 U.S. at 635.  Lacking any other credible justification, the Court concluded that the amendment "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else." *Id.*; *see also id.* at 632 (stating that the challenged provision "seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests.").  *Romer* does not apply here because nothing like that unalloyed

45

hostility toward gays and lesbians appears in Utah's laws defining marriage in the same terms by which it has been defined throughout the history of Western civilization. Those laws are supported by legitimate and rational purposes described above.

*Windsor* is no more helpful to the Plaintiffs. There, New York had granted the right to same-sex marriage to its citizens, marriages which the federal government under DOMA did not recognize. The Court inferred improper "disapproval" of gays and lesbians because of "DOMA's *unusual deviation* from the usual tradition of recognizing and accepting state definitions of marriage." 133 S. Ct. at 2693 (emphasis added); *accord id.* at 2692 (DOMA's definition of marriage is a "[d]iscrimination[ ] of an unusual character" because it "departs from this history and tradition of reliance on state law to define marriage") (internal quotation marks omitted). But there is no occasion to consider animus here, given that the validity of Utah's laws reserving marriage for opposite-sex couples is perfectly consistent with "the usual tradition of recognizing and accepting state definitions of marriage." *Id.* at 2693.

Moreover, and more generally, the Supreme Court has stressed that evidence of animus alone does not invalidate a law. *See Garrett*, 531 U.S. at 367 ("[B]iases may often accompany irrational (and therefore unconstitutional) discrimination, [but] their presence alone does not a constitutional violation make."). The limited relevance of animus follows from the "familiar principle of constitutional law that [the Supreme] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *City of Renton*, 475 U.S. at 48; *accord City of Mobile v. Bolden*, 446 U.S. 55, 92 (1980) (Stevens, J., concurring in the judgment) ("[A] political decision that is supported by valid and articulable justifications

46

cannot be invalid simply because some participants in the decisionmaking process were motivated by a purpose to disadvantage a minority group.").  Animus was relevant in *Romer* and *Windsor* simply because there was no other way to explain the sharp departure of the laws in those cases from long-established legal precedent.  Nothing remotely analogous is at issue with Utah's traditional and utterly ordinary marriage laws.

Finally, no one can dispute that throughout the history of every civilization, until very recent times, marriage has always been considered as the union between a man and a woman. *See, e.g., Windsor*, 133 S. Ct. at 2689 ("marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization").  It would be implausible to infer from this undisputed history that marriage was invented thousands of years ago, and subsequently maintained over the centuries by governments all across the globe, as a tool to discriminate against homosexuals.  It is just as implausible to infer that Utah's (and many other States') decision to codify the longstanding, traditional definition of marriage somehow suddenly bespeaks animus towards homosexuals.  *See Hernandez*, 855 N.E.2d at 8 (plurality) ("Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted.").

* * * * * * * * * * * * *

Utah has provided multiple rational bases for adopting the traditional definition of

47

marriage.  Plaintiffs' due process and equal protection claims therefore fail and must be

dismissed.

### C.  THE STATE OF UTAH MAY LAWFULLY DENY RECOGNITION OF SAME-SEX MARRIAGES PERFORMED ELSEWHERE.

1.  **Federal Law Authorizes the State of Utah to Deny Recognition to Same-sex Marriages. (28 U.S.C. § 1738C)**

"Section 2 [of DOMA], which has not been challenged here, allows States to refuse to

recognize same-sex marriages performed under the laws of other States."  *Windsor*, 133 S. Ct. at

2682-83.  Section 2 of DOMA provides:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to
> give effect to any public act, record, or judicial proceeding of any other State, territory,
> possession, or tribe respecting a relationship between persons of the same sex that is
> treated as a marriage under the laws of such other State, territory, possession, or tribe, or
> a right or claim arising from such relationship.

28 U.S.C. § 1738C.

This wholly unremarkable measure codifies what has always been federal law:  one state

may reject a marriage performed in another when that marriage violates the public policy of the

forum state.

2.  **The Constitution Does Not Require the State of Utah to Recognize Same-sex Marriages Contrary to its Public Policy.**

a.  **Full Faith and Credit Clause**

Plaintiffs Archer and Call do not make a claim to recognition of their Iowa marriage

based on the Full Faith and Credit Clause of the United States constitution, but an understanding

of that Clause puts their claim in proper context.  "[T]he Full Faith and Credit Clause does not

require a State to apply another State's law in violation of its own legitimate public policy."

*Nevada v. Hall*, 440 U.S. 410, 422 (1979).  "Full Faith and Credit does not . . . enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it." *Id.* at 423-24 (quoting *Pac. Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 504-05 (1939)).

Even before DOMA, it was thoroughly well-settled that Utah need not recognize out-of-state marriages that are illegal if performed in Utah.  Black letter law states that "[t]he general rule that 'a marriage valid where solemnized is valid everywhere' does not apply.  To that rule, there is a proviso or exception, recognized, it would seem, by all the States, as follows: 'unless contrary to the prohibitions of natural law or the express prohibitions of a statute.'" *In re May's Estate*, 114 N.E.2d 4, 8 (N.Y. App. 1953).  This is because "the Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Franchise Tax Bd. of California v. Hyatt*, 538 U.S. 488, 494 (2003).  Forcing a state to recognize same-sex marriages performed elsewhere "would be the most astonishingly undemocratic, counter-majoritarian political development in American history."  Patrick J. Borchers, Baker v. General Motors: *Implications for Interjurisdictional Recognition of Non-Traditional Marriages*, 32 Creighton L. Rev. 147, 150 (1998).

Utah law unambiguously forbids recognition of same-sex marriages.  Utah Code § 30-1-4.1 (1)(a) ("It is the policy of [Utah] to recognize as marriage only the legal union of a man and a woman . . . .");  *see also* UTAH CONST., art. I, § 29.  And, "[Utah] will not recognize, enforce, or

give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married." Utah Code § 30-1-4.1(b). Because Utah's public policy prohibits the recognition of same-sex marriages, wherever performed, the Full Faith and Credit Clause does not obligate Utah to recognize a same-sex marriage performed in Iowa.

### b. Equal Protection and Due Process Clauses

Plaintiffs' claim to recognition rests on the assertion that Utah's policy against same-sex marriage is constitutionally invalid. The claim of Archer and Call to recognition of their Iowa marriage is subsumed in their claim to a constitutional right to same-sex marriage. But the Due Process Clause does not create a fundamental right to same-sex marriage, and they have no claim under the Equal Protection Clause. As explained, sexual orientation does not implicate a suspect class, and Utah's refusal to recognize same-sex marriages performed elsewhere readily satisfies rational basis review by rationally advancing legitimate state interests, including reinforcement of responsible procreation and care for children and the rearing of children by both of their biological parents. *See Wilson*, 354 F. Supp. 2d 1298 (State law not recognizing same-sex marriages performed elsewhere did not violate equal protection or due process guarantees); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654 (State law proscribing consideration of a petition for divorce by a party to a same-sex marriage performed elsewhere did not violate Equal Protection Clause); *but see Obergefell v. Kasich*, 2013 WL 3814262 (S.D. Ohio 2013) (Temporary restraining order issued ordering Ohio Registrar to recognize marriage of Ohio same-sex couple lawfully married in Maryland).

50

*Windsor* does not change this result.  It required the federal government to recognize same-sex marriages performed in states where such marriages are legal, but "[t]he State's power in defining the marital relation" – and the federal government's lack of such power – was "of central relevance" to that conclusion.  *Windsor*, 133 S. Ct. at 2692.  The Court underscored its understanding that regulating marriage "has long been regarded as a virtually exclusive province of the States" and criticized DOMA, in part, precisely because it *"*departs from this history and tradition of reliance on state law to define marriage." *Id*. at 2691, 2692.  DOMA's departure from the baseline of state authority over marriage provided a central reason for holding the law invalid.  But *Windsor* leaves Utah's authority over marriage untouched.  Nowhere does the decision remotely suggest that one sovereign state must recognize same-sex marriages performed in another state.  *See Windsor*, 699 F.3d at 179 ("when it comes to marriage, legitimate regulatory interests of a state differ from those of the federal government").

In short, neither the Due Process Clause nor the Equal Protection Clause requires Utah to recognize a same-sex marriage performed in Iowa.

### D.  PLAINTIFFS CANNOT STATE A § 1983 CLAIM AND CANNOT RECOVER DAMAGES OR ATTORNEY'S FEES  AGAINST THE STATE DEFENDANTS

Plaintiffs' Complaint alleges violations of 42 U.S.C. § 1983 and requests an award of attorney's fees under 42 U.S.C. § 1988.  *Complaint* (Doc. 2) at 23, 25.  Section 1988 allows a district court to award reasonable attorney's fees to a party that prevails on a § 1983 claim.  42 U.S.C. § 1988(b).  But Plaintiffs are ineligible for fees because they have no claim.  Not only do their constitutional claims fail on the merits, but the Plaintiffs cannot state a § 1983 claim against the State Defendants in their official capacities.  *Complaint* (Doc. 2) ¶¶ 16, 17 (naming Governor

51

Herbert and Attorney General Swallow in their official capacities).  Section 1983 creates a cause

of action against a "person" as that term has been interpreted.  *Will v. Michigan Dept. of State*

*Police*, 491 U.S. 58, 71 (1989)).  "Neither the state . . . nor a state official who acts in his or her

official capacity, is a 'person' within the meaning of § 1983."  *Harris v. Champion*, 51 F.3d 901,

905-06 (10th Cir. 1995); *see also Will*, 491 U.S. at 71.

To the extent Plaintiffs seek damages against the State Defendants, those claims likewise

fail.  The Eleventh Amendment bars suits in federal court against Utah and any other federal suit

that would require payment of public funds directly from the state treasury.  *Will*, 491 U.S. at 66;

*Edelman v. Jordan*, 415 U.S. 651, 662-63, 673 (1974); *Ambus v. Granite Bd. of Educ*., 995 F.2d

992, 996 (10th Cir. 1993) (en banc).

## VI. CONCLUSION

The Fourteenth Amendment does not require States to recognize same-sex marriage.  The

Plaintiffs have not met their burden of proof.  Utah's definition of marriage as a union between a

man and a woman is rationally related to a legitimate State interest.   State Defendants are

therefore entitled to summary judgment on all of the Plaintiffs' claims.

Dated this 11th day of October, 2013.

JOHN E. SWALLOW
Utah Attorney General

  /s/  Philip S. Lott                              
Philip S. Lott
Stanford E. Purser
Assistant Utah Attorneys General
*Attorneys for Defendants Gary R. Herbert
and John Swallow*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2013, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which sent notification of such filing to the

following:

| | |
|---|---|
| Peggy A. Tomsic | tomsic@mgplaw.com |
| James E. Magleby | magleby@mgplaw.com |
| Jennifer Fraser Parrish | parrish@mgplaw.com |
| MAGLEBY & GREENWOOD, P.C. | |
| 170 South Main Street, Suite 850 | |
| Salt Lake City, UT 84101-3605 | |
| | |
| Ralph Chamness | rchamness@slco.org |
| Darcy M. Goddard | dgoddard@slco.org |
| Salt Lake County District Attorneys | |
| 2001 South State, S3500 | |
| Salt Lake City, Utah 84190-1210 | |

  /s/  Philip S. Lott

54