PHILIP S. LOTT (5750)
STANFORD E. PURSER (13440)
Assistant Utah Attorneys General
JOHN E. SWALLOW (5802)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah  84114-0856
Telephone:  (801) 366-0100
Facsimile: (801) 366-0101
Email:  phillott@utah.gov
Email:  spurser@utah.gov
*Attorneys for Defendants Gary R. Herbert and John E. Swallow*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DEREK KITCHEN, individually; MOUDI SBEITY, individually; KAREN ARCHER, individually; KATE CALL, individually; LAURIE WOOD, individually; and KODY PARTRIDGE, individually,<br><br>          Plaintiffs,<br><br>                    vs.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah; and SHERRIE SWENSEN, in her official capacity as Clerk of Salt Lake County,<br><br>          Defendants. | **[ERRATA – TAB 75]**<br><br>**APPENDIX IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Civil Case No. 2:13-cv-00217-RJS<br><br>Judge Robert J. Shelby |

## TAB 75
## (1464 -1494)

# APPENDIX
# TABLE OF CONTENTS

| Tab # | Description | Page |
|---|---|---|
| | **PART ONE**<br>**LEGAL MATERIALS** | |
| 1. | Utah Code § 30-1-2 | 1 |
| 2. | Utah Code § 30-1-4.1 | 2 |
| 3. | Utah Constitution Art. 1, § 29 (Amendment 3) | 3 |
| 4. | H.J.R. 25, Joint Resolution on Marriage (as originally filed) | 4 |
| 5. | H.J.R. 25, Joint Resolution on Marriage (Senate Floor Amendments) | 6 |
| 6. | H.J.R. 25, Joint Resolution on Marriage (final, reflecting Senate amendments) | 7 |
| 7. | Chart:  The definition of marriage:  State statutory and constitutional provisions | 9 |
| 8. | Chart:  The definition of marriage:  State ballot measures | 13 |
| 9. | Chart:  The language of State constitutional bans on domestic partnership and other non-marital unions | 18 |
| 10. | Chart:  Court decisions on the marriage issue | 23 |
| 11. | Chart:  Pending cases on the marriage issue | 25 |
| 12. | Jurisdictional Statement, *Baker v. Nelson*, No. 71-1027 (U.S. Supreme Court Feb. 11, 1971) | 27 |
| 13. | *Amicus curiae* brief of Social Science Professors, *Hollingsworth v. Perry*, No. 12-144, and *United States v. Windsor*, No. 12-307 (U.S. Sup. Ct. January 2013) | 40 |
| 14. | *Amicus curiae* brief of Scholars of History and Related Disciplines, *Hollingsworth v. Perry*, No. 12-144 (U.S. Sup. Ct. January 2013) | 81 |
| 15. | [Reserved] | |
| 16. | [Reserved] | |

| | **PART TWO**<br>**MATERIALS ON ADJUDICATIVE FACTS** | |
|---|---|---|
| 17. | Affidavit of William C. Duncan and Exhibit 1 (*curriculum vitae*) | 127 |
| 18. | Excerpts from Utah Voter Information Pamphlet, General Election, November 2, 2004 | 150 |
| 19. | Vote count on Amendment 3, by county, with totals, and with percentages | 155 |
| 20. | Campaign materials for Amendment 3 | 156 |
| 21. | Campaign materials against Amendment 3 | 171 |
| 22. | New accounts, press releases, and editorials regarding Amendment 3 | 183 |
| 23. | Fund-raising and expenditures in the Amendment 3 campaign | 222 |
| 24. | Affidavit of Dr. Joseph P. Price and Exhibit 1 (*curriculum vitae*) | 223 |
| 25. | [Reserved] | |
| 26. | [Reserved] | |
| | **PART THREE**<br>**MATERIALS ON LEGISLATIVE FACTS** | |
| 27. | INSTITUTE FOR AMERICAN VALUES, WHY MARRIAGE MATTERS:  THIRTY CONCLUSIONS FROM THE SOCIAL SCIENCES (3d ed. 2011). | 232 |
| 28. | THE WITHERSPOON INSTITUTE, MARRIAGE AND THE PUBLIC GOOD: TEN PRINCIPLES (2008). | 280 |
| 29. | INSTITUTE FOR AMERICAN VALUES, MARRIAGE AND THE LAW: A STATEMENT OF PRINCIPLES (2006). | 318 |
| 30. | INSTITUTE FOR AMERICAN VALUES (DAN CERE, principal investigator), THE FUTURE OF FAMILY LAW: LAW AND THE MARRIAGE CRISIS IN NORTH AMERICA (2005). | 362 |
| 31. | INSTITUTE FOR AMERICAN VALUES ET AL. (ELIZABETH MARQUARDT, principal investigator), THE REVOLUTION IN PARENTHOOD: THE EMERGING GLOBAL CLASH BETWEEN ADULT RIGHTS AND CHILDREN'S NEEDS (2006). | 413 |
| 32. | COMMISSION ON PARENTHOOD'S FUTURE & INSTITUTE FOR AMERICAN VALUES (ELIZABETH MARQUARDT, principal investigator), ONE PARENT OR FIVE: A GLOBAL LOOK AT TODAY'S NEW INTENTIONAL FAMILIES (2011). | 457 |
| 33. | INSTITUTE FOR AMERICAN VALUES (ELIZABETH MARQUARDT, NOVAL D. GLENN, & KAREN CLARK, co-investigators), MY DADDY'S NAME IS DONOR: A NEW STUDY OF YOUNG ADULTS CONCEIVED THROUGH SPERM DONATION (2010). | 529 |

| 34. | Margaret Somerville, *What About the Children, in* DIVORCING MARRIAGE: UNVEILING THE DANGERS OF CANADA'S NEW SOCIAL EXPERIMENT 63-78 (Daniel Cere & Douglas Farrows eds., 2004). | 669 |
|---|---|---|
| 35. | Margaret Somerville, *Children's human rights and unlinking child-parent biological bonds with adoption, same-sex marriage and new reproductive technologies*, 13 J. FAM. STUD. 179-201 (2007). | 687 |
| 36. | Margaret Somerville, *Children's Human Rights to Natural Biological Origins and Family Structure*, 1 INT'L J. JURISPRUDENCE FAM. 35 (2010). | 710 |
| 37. | Don Browning & Elizabeth Marquardt, *What About the Children?  Liberal Cautions on Same-Sex Marriage, in* THE MEANING OF MARRIAGE: FAMILY, STATE, MARKET, AND MORALS 173-192 (Robert P. George & Jean Bethke Elshtain, eds., 2006). | 732 |
| 38. | Maggie Gallagher, *(How) Does Marriage Protect Child Well-Being?, in* THE MEANING OF MARRIAGE: FAMILY, STATE, MARKET, AND MORALS 197-212 (Robert P. George & Jean Bethke Elshtain, eds., 2006). | 752 |
| 39. | Seana Sugrue, *Soft Despotism and Same-Sex Marriage, in* THE MEANING OF MARRIAGE: FAMILY, STATE, MARKET, AND MORALS 172-96 (Robert P. George & Jean Bethke Elshtain, eds., 2006). | 770 |
| 40. | THE SOCIOLOGY OF GEORGE SIMMEL 128-32 (Kurt H. Wolff, trans. & ed., 1950). | 797 |
| 41. | CLAUDE LÉVI-STRAUSS, THE VIEW FROM AFAR 39-42 (Joachim Neugroschel & Phoebe Hoss trans. 1985) | 804 |
| 42. | G. ROBINA QUALE, A HISTORY OF MARRIAGE SYSTEMS 1-3 (1988). | 810 |
| 43. | EDWARD O. LAUMANN ET AL., THE SOCIAL ORGANIZATION OF SEXUALITY: SEXUAL PRACTICES IN THE UNITED STATES 310-13 (1994). | 815 |
| 44. | CONTEMPORARY MARRIAGE: COMPARATIVE PERSPECTIVES ON A CHANGING INSTITUTION 7-8 (Kingsley Davis, ed., 1985). | 819 |
| 45. | JAMES Q. WILSON, THE MARRIAGE PROBLEM 40-41, 168-170 (2002). | 823 |
| 46. | BRONISLAW MALINOWSKI, SEX, CULTURE, AND MYTH 10-11 (1962). | 831 |
| 47. | DADDY DEAREST? ACTIVE FATHERHOOD AND PUBLIC POLICY 57 (Kate Stanley ed., 2005). | 834 |
| 48. | DAVID POPENOE, LIFE WITHOUT FATHER: COMPELLING NEW EVIDENCE THAT FATHERHOOD AND MARRIAGE ARE INDISPENSABLE FOR THE GOOD OF CHILDREN AND SOCIETY 139-63 (1996). | 837 |
| 49. | William J. Doherty et al., *Responsible Fathering: An Overview and Conceptual Framework*, 60 J. MARRIAGE & FAM. 277-292 (1998). | 852 |
| 50. | KRISTIN ANDERSON MOORE ET AL., MARRIAGE FROM A CHILD'S PERSPECIVE: HOW DOES FAMILY STRUCTURE AFFECT CHILDREN, AND WHAT CAN WE DO ABOUT IT?, a Child Trends Research Brief (2002). | 868 |
| 51. | Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United States: incidence and disparities, 2006,* 84 CONTRACEPTION 478-85 (2011). | 876 |

| 52. | ELIZABETH WILDSMITH ET AL., CHILDBEARING OUTSIDE OF MARRIAGE: ESTIMATES AND TRENDS IN THE UNITED STATES, a Child Trends Research Brief (2011). | 884 |
| 53. | SAMUEL W. STURGEON, THE RELATIONSHIP BETWEEN FAMILY STRUCTURE AND ADOLESCENT SEXUAL ACTIVITY, a familyfacts.org Special Report (November 2008). | 890 |
| 54. | U.S. Dept. of Health and Human Servs., Administration for Children & Families, Office of Planning, Research & Evaluation, *Distribution of Abuse and Neglect by Family Characteristics, in* FOURTH NATIONAL INCIDENCE STUDY OF CHILD ABUSE AND NEGLECT (NIS-4) | 892 |
| 55. | Paul R. Amato, *The Impact of Family Formation Change on the Cognitive, Social, and Emotional Well-Being of the Next Generation,* 15 THE FUTURE OF CHILDREN 75-96 (2005). | 936 |
| 56. | Douglas W. Allen, *High school graduation rates among children of same-sex households,* 11 Rev. of Econ. Of the Household (published on-line September 26, 2013). | 959 |
| 57. | Mark Regnerus, *How different are the adult children of parents who have same-sex relationships?  Findings from the New Family Structures Study,* 41 SOCIAL SCIENCE RESEARCH 752-70 (2012). | 983 |
| 58. | Mark Regnerus, *Parental same-sex relationships, family instability, and subsequent life outcomes for adult children: Answering critics of the new family structures study with additional analyses,* 41 SOCIAL SCIENCE RESEARCH 1367-77 (2012). | 1002 |
| 59. | Loren Marks, *Same-sex parenting and children's outcomes:  A closer examination of the American psychological association's brief on lesbian and gay parenting,* 41 SOCIAL SCIENCE RESEARCH 735-51 (2012). | 1013 |
| 60. | WILLIAM C. DUNCAN, MISPLACED RELIANCE ON SOCIAL SCIENCE EVIDENCE IN THE PROPOSITION 8 CASE, Vol. 5, No. 6, an Institute for Marriage and Public Policy Research Brief (2012). | 1030 |
| 61. | JOHN R. SEARLE, THE CONSTRUCTION OF SOCIAL REALITY 4-5, 27-29, 31-37, 55-57, 59-60, 76-104, 117-120, 227-28 (1995). | 1035 |
| 62. | JOHN R. SEARLE, MAKING THE SOCIAL WORLD: THE STRUCTURE OF HUMAN CIVILIZATION 6-16, 84-93, 102-08, 143-44 (2010). | 1089 |
| 63. | Douglas Farrow, *Why Fight Same-Sex Marriage?*, TOUCHSTONE, Jan.—Feb. 2012 | 1121 |
| 64. | Ross Douthat, *Gay Parents and the Marriage Debate*, THE NEW YORK TIMES, June 11, 2002. | 1128 |
| 65. | INSTITUTE FOR AMERICAN VALUES (BENJAMIN SCAFIDI, PRINCIPAL INVESTIGATOR), THE TAXPAYER COSTS OF DIVORCE AND UNWED CHILDBEARING: FIRST-EVER ESTIMATES FOR THE NATION AND ALL FIFTY STATES (2008). | 1131 |
| 66. | BEYOND SAME-SEX MARRIAGE: A NEW STRATEGIC VISION FOR ALL OUR FAMILIES & RELATIONSHIPS (July 26, 2006). | 1175 |
| 67. | SHERIF GIRGIS, RYAN T. ANDERSON, AND ROBERT P. GEORGE, WHAT IS MARRIAGE?  MAN AND WOMAN: A DEFENSE 1-2, 6-12, 23-36 (2012). | 1202 |

| 68. | DAVID BLANKENHORN, THE FUTURE OF MARRIAGE 3-4, 11-21, 55, 91-106, 120-25, 171-75, 179-201 (2007). | 1227 |
|---|---|---|
| 69. | [Reserved] | |
| 70. | [Reserved] | |
| | **PART FOUR**<br>**CANADIAN AND BRITISH LAW JOURNAL ARTICLES** | |
| 71. | Matthew B. O'Brien, *Why Liberal Neutrality Prohibits Same-Sex Marriage: Rawls, Political Liberalism, and the Family*, 1 BRIT. J. AM. L. STUDIES (Issue 2, Summer/Fall 2012, May 1, 2012). | 1291 |
| 72. | F.C. DeCoste, *Courting Leviathan: Limited Government and Social Freedom in* Reference Re Same-Sex Marriage, 42 ALTA. L. REV. 1099 (2005). | 1352 |
| 73. | F.C. Decoste, *The Halpern Transformation: Same-Sex Marriage, Civil Society, and the Limits of Liberal Law*, 41 ALTA. L. REV. 619 (2003). | 1377 |
| 74. | Monte Neil Stewart, *Judicial Redefinition of Marriage*, 21 CAN. J. FAM. L. 11 (2004). | 1403 |
| | **PART FIVE**<br>**ERRATA** | |
| 75. | SHERIF GIRGIS, RYAN T. ANDERSON, AND ROBERT P. GEORGE, WHAT IS MARRIAGE?  MAN AND WOMAN: A DEFENSE 37-46, 53, 58-62, 115-125 (2012). | 1464 |

Dated this 15th day of October, 2013.

JOHN E. SWALLOW
Utah Attorney General

  /s/  Philip S. Lott
Philip S. Lott
Stanford E. Purser
Assistant Utah Attorneys General
*Attorneys for Defendants Gary R. Herbert and John Swallow*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of October, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

Peggy A. Tomsic                                    tomsic@mgplaw.com
James E. Magleby                                   magleby@mgplaw.com
Jennifer Fraser Parrish                            parrish@mgplaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101-3605


Ralph Chamness                                     rchamness@slco.org
Darcy M. Goddard                                   dgoddard@slco.org
Salt Lake County District Attorneys
2001 South State, S3500
Salt Lake City, Utah 84190-1210

                                                    /s/  Philip S. Lott
                                                   _____

# WHAT IS MARRIAGE?

## Man and Woman: A Defense

SHERIF GIRGIS

RYAN T. ANDERSON

ROBERT P. GEORGE

001464

# What Is Marriage?

## Man and Woman: A Defense



Sherif Girgis, Ryan T. Anderson,
and Robert P. George

ENCOUNTER BOOKS
New York · London

001465

© 2012 by Sherif Girgis, Ryan T. Anderson, and Robert P. George

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of Encounter Books, 900 Broadway, Suite 601, New York, New York 10003.

First American edition published in 2012 by Encounter Books, an activity of Encounter for Culture and Education, Inc., a nonprofit, tax-exempt corporation.
Encounter Books website address: www.encounterbooks.com

Manufactured in the United States and printed on acid-free paper. The paper used in this publication meets the minimum requirements of ANSI/NISO Z39.48–1992 (R 1997) (*Permanence of Paper*).

FIRST AMERICAN EDITION

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA
Girgis, Sherif, 1986–
What is marriage? : man and woman : a defense /
by Sherif Girgis, Ryan T. Anderson, and Robert P. George.
p.  cm.
Includes bibliographical references and index.
ISBN 978-1-59403-622-4 (hbk. : alk. paper) — ISBN 978-1-59403-623-1 (ebook)
1. Civil marriage  2. Marriage law.  3. Marriage.
I. George, Robert P.  II. Anderson, Ryan T., 1981–  III. Title.
HQ1001.G57 2012
306.81—dc23
2012007621

The extract from the poem "Epithalamion," by Sir Edmund Spenser, has been reproduced from *The Oxford Book of English Verse, 1250–1900*, edited by A. T. Quiller-Couch (Oxford: Clarendon Press, 1900).

PRODUCED BY WILSTED & TAYLOR PUBLISHING SERVICES
*Designer and composito*r Yvonne Tsang
*Proofreader* Melody Lacina

≋ 3 ≋

# The State and Marriage

THE CONJUGAL VIEW BETTER DESCRIBES WHAT DISTIN-
guishes marriage from other human goods, other ways of
thriving—something that the revisionist view is helpless to do.
That was the theme of our first two chapters. Like nonmarital
friendship, of course, marriage is a type of bond. But marriage
is a bond of a special kind. It unites spouses in body as well as
mind and heart, and it is especially apt for, and enriched by,
procreation and family life. In light of both these facts, it alone
objectively calls for commitments of permanence and exclusiv-
ity. Spouses vow their *whole* selves for their *whole* lives. This
comprehensiveness puts the value of marriage in a class apart
from the value of other relationships.

Against this, some on the libertarian Right say that mar-
riage has no *public* value, and call for the state to get out of
the marriage business altogether. Voices on the Left say that
marriage has no *distinctive* public value; they say the state may
work it like clay, remaking marriage to fit our preferences. Here
we show where both go wrong.

001467

### WHY *CIVIL* MARRIAGE?

The more intimate a relationship, the *less* it tends to attract the state's attention. Business dealings are regulated, but the law does not set terms for our friendships or allow us to sue over their neglect. There are no civil ceremonies for forming friendships or legal obstacles to ending them. Why is marriage different? The answer is that friendship does not affect the common good in structured ways that warrant legal recognition and regulation; marriage does.

This is the only way to account for the remarkable fact that almost all cultures have regulated male-female sexual relationships. These relationships alone produce new human beings. For these new and highly dependent people, there is no path to physical, moral, and cultural maturity without a long and delicate process of ongoing care and supervision—one to which men and women typically bring different strengths, and for which they are better suited the more closely related they are to the children. Unless children do mature, they will never become healthy, upright, productive members of society; and that state of economic and social development we call "civilization" depends on healthy, upright, productive citizens. But regularly producing such citizens is nearly impossible unless men and women commit their lives to each other and any children they might have. So it is a summary, but hardly an exaggeration, to say that civilization depends on strong marriages.

Maggie Gallagher captures this insight with the slogan that "sex makes babies, society needs babies, and children need mothers and fathers." She develops the idea: "The critical public or 'civil' task of marriage is to regulate sexual relationships between men and women in order to reduce the likelihood that children (and their mothers, and society) will face the burdens of fatherlessness, and increase the likelihood that there will be a next generation that will be raised by their mothers and fathers in one family, where both parents are committed to each other and to their children."[1]

Even now, this claim is not partisan. Thus David Blanken-horn, a liberal Democrat:

> If you've been trained, as anthropology field researchers typically are, to begin at the beginning—to start with the most fundamental issues—you will report a cluster of related facts: Humans are social; they live in groups. They strongly seek to reproduce themselves. They are sexually embodied. They carry out sexual (not asexual) reproduction. And they have devised an institution to bridge the sexual divide, facilitate group living, and carry out reproduction. All human societies have this institution. They call it "marriage."[2]

But if marriage is everywhere necessary, it is also everywhere costly and fragile. People therefore tend to require social pressures to get and stay married: a strong marriage culture. In the words of University of Pennsylvania law professor Amy Wax, such a culture creates and sustains "simple rules for simple people."[3] It provides settled patterns of thought and action—a *script*—to guide people's choices toward their own long-term interest and the common good of all.

This is especially important in realms of life where our most powerful motivations do not naturally serve our true good. As the late eminent sociologist James Q. Wilson wrote, "Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve."[4] While personal problems give rise to personal solutions, marriage—like any social institution—addresses needs that can only be resolved socially. The universal social need presented by relationships that can produce new, dependent human beings explains why every society in the history of our race has regulated men and women's sexual relationships: has recognized marriage.

To be sure, civic associations should bear most of the burden (or, as we think, the honor) of upholding marriage culture.

Churches, synagogues, mosques, and temples, schools and recreation leagues, Boy Scouts and Camp Fire, and countless other voluntary associations form each generation's habits of mind and heart for marriage (and much else). Nevertheless, the state should lend a supporting hand. By regulating marriage entry and exit, and by helping and sometimes requiring the government as well as individuals and civic institutions to treat certain couples as a unit, marriage law sends a strong public message about what it takes to make a marriage—what marriage *is*. This in turn affects people's beliefs, and therefore their expectations and choices, about their own prospective or actual marriages. The mutual influence of law and culture is confirmed by empirical evidence on the effects of no-fault divorce laws.[5] But if *easing the legal obstacles* to divorce has had an effect, surely removing even the hassle and stigma of a legal divorce would. The state's influence on marriage is extensive.

Indeed, it cannot be otherwise. Abolishing civil marriage is practically impossible. Strike the word "marriage" from the law, and the state will still license, and attach duties and benefits to, certain bonds. Abolish these forward-looking forms of regulation, and they will only be replaced by messier, retroactive regulation—of disputes over property, custody, visitation, and child support. What the state once did by efficient legal presumptions, it will then do by burdensome case-by-case assignments of parental (especially paternal) responsibilities.[6]

The state will only discharge these tasks more or less efficiently—that is, less or more intrusively. It can't escape them. Why not? Because the *public* functions of marriage—both to require and to empower parents (especially fathers) to care for their children and each other—require society-wide coordination. It is not enough if, say, a particular religion presumes a man's paternity of his wife's children, or recognizes his rights and duties toward their mother; or if the man and his wife contract to carry out certain tasks. For private institutions can bind only their own; private contracts bind only those who are party

to them. A major function of marriage law is to bind *all third parties* (schools, adoption agencies, summer camps, hospitals; friends, relatives, and strangers) presumptively to treat a man as father of his wife's children, husbands and wives as entitled to certain privileges and sexually off-limits, and so on. This only the state can do with any consistency.

But more than inevitable or necessary, it is *fitting* that the state should do this. Consider a comparison. Why don't even the strictest libertarians decry traffic laws? First, orderly traffic protects health and promotes efficiency, two great goods. Second, these goods are *common* in two senses: private efforts cannot adequately secure them, and yet failure to secure them has very public consequences. It is not as if we would have had the same (or even just *slightly less*) safety and efficiency of travel if people just did as they pleased, some stopping only at red lights and others only at green. Nor would damage from the resulting accidents (and slower shipments, etc.) be limited to those responsible for causing it. To ensure safe and efficient travel at all, and to limit harm to third parties, we need legal coordination. Indeed, it is no stretch to say that the state *owes* its citizens to keep minimum security and order: to these we have a *right*. Finally, unlike private associations, the state *can* secure these goods, without intolerable side effects. All this makes it appropriate for the state to set our traffic laws.

In an essay solely on political theory we might argue the details, but here we can extract from this example a widely acceptable rule: If something would serve an important good, if people have a right to it, if private groups cannot secure it well, everyone suffers if it is lost, and the state *can* secure it without undue cost, then the state may step in—and should.

All these conditions are met in the case of marriage. Marriage is not just about private problems and rewards, for which private solutions are enough. At stake are *rights*, and costs and benefits (externalities) for all society. Rights, because wherever reasonably possible, parents are entitled to bring up their

own children—and children have a right to their own two parents' care, as affirmed by the United Nations Convention on the Rights of the Child.[7] And externalities are in play because failed marriages burden innocent bystanders, including children and ultimately all society. As we have seen, not only is it impossible for private groups to secure well the interests at stake but it is also many times more effective, less intrusive, and less costly for the state to do so by reinforcing marital norms than by picking up the pieces from a shattered marriage culture. Finally, promoting conjugal marriage need not and should not involve prohibiting any consensual relationship. For all these reasons, libertarians should *favor* the regulation of marriage—which is, again, practically inevitable anyway.

Let us take a closer look at the social benefits. Common sense and reliable evidence both attest to the facts that marriage benefits children, benefits spouses, helps create wealth, helps the poor especially, and checks state power.

First, as we have seen by reflection that procreation uniquely extends and perfects marriage (see chapter 2), so the best available social science suggests that children tend to do best when reared by their married mother and father. Studies that control for other factors, including poverty and even genetics, suggest that children reared in intact homes do best on the following indices:[8]

*Educational achievement:* literacy and graduation rates
*Emotional health:* rates of anxiety, depression, substance abuse, and suicide
*Familial and sexual development:* strong sense of identity, timing of onset of puberty, rates of teen and out-of-wedlock pregnancy, and rates of sexual abuse
*Child and adult behavior:* rates of aggression, attention deficit disorder, delinquency, and incarceration

Consider the conclusions of the left-leaning research institution Child Trends:

> [R]esearch clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage. Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes. . . . There is thus value for children in promoting strong, stable marriages between biological parents. . . . [I]t is not simply the presence of two parents, . . . but the presence of *two biological parents* that seems to support children's development.[9]

According to another study, in the *Journal of Marriage and Family*, "[t]he advantage of marriage appears to exist primarily when the child is the biological offspring of both parents."[10] Recent literature reviews conducted by the Brookings Institution, the Woodrow Wilson School of Public and International Affairs at Princeton University, the Center for Law and Social Policy, and the Institute for American Values corroborate the importance of intact households for children.*[11]

Single-motherhood, cohabitation, joint custody after divorce, and stepparenting have all been reliably studied, and the result is clear: Children tend to fare worse under every one of

---

*Note that for a relationship to be ordered to procreation in this principled and empirically manifested way, sexual orientation is not a disqualifier. The union of a husband and wife bears this connection to children even if, say, the husband is also attracted to men. What is necessary is rather sexual complementarity—which two men lack even if they are attracted only to women. It is not individuals who are singled out—as being less capable of affectionate and responsible parenting, or anything else. What are instead favored as bearing a special and valuable link to childrearing are certain arrangements and the acts that complete or embody them—to which, to be sure, individuals are more or less inclined.

these alternatives to married biological parenting.[12] To make marriages more stable is to give more children the best chance to become upright and productive members of society. Note the importance of the link between marriage and children in both stages of our argument: just as it provides a powerful reason to hold the conjugal view of marriage, so it provides the central reason to make marriage a matter of public concern.

But this link is no idiosyncrasy of our view. It is amply confirmed in our law. Long before same-sex civil marriages were envisioned, courts declared that marriage "is the foundation of the family and of society, without which there would be neither civilization nor progress."[13] They recalled that "virtually every Supreme court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation."[14] In their account, not just ours, "the first purpose of matrimony, by the laws of nature and society, is procreation";[15] "the procreation of children under the shield and sanction of the law" is one of the "two principal ends of marriage."[16] In fact, "marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race."[17] Examples can be multiplied ad nauseam.[18]

A second public benefit of marriage is that it tends to help spouses financially, emotionally, physically, and socially. As the late University of Virginia sociologist Steven Nock showed, it is not that people who are better off are most likely to marry, but that marriage makes people better off. More than signal maturity, marriage can promote it. Thus men, after their wedding, tend to spend more time at work, less time at bars, more time at religious gatherings, less time in jail, and more time with family.[19]

The shape of marriage as a permanent and exclusive union ordered to family life helps explain these benefits. Permanently committed to a relationship whose norms are shaped by its aptness for family life, husbands and wives gain emotional insurance against life's temporary setbacks. Exclusively committed,

they leave the sexual marketplace and thus escape its heightened risks. Dedicated to their children and each other, they enjoy the benefits of a sharpened sense of purpose. More vigorously sowing in work, they reap more abundantly its fruits. So the state's interest in productivity and social order creates an interest in marriage.[20]

Third, these two benefits of marriage—child and spousal well-being—support the conclusion of a study led by Professor W. Bradford Wilcox as part of the University of Virginia's National Marriage Project: "The core message . . . is that the wealth of nations depends in no small part on the health of the family."[21] The same study suggests that marriage and fertility trends "play an underappreciated and important role in fostering long-term economic growth, the viability of the welfare state, the size and quality of the workforce, and the health of large sectors of the modern economy."[22] These are legitimate state interests if anything is; so too, then, is marriage.

Fourth, given its economic benefits, it is no surprise that the decline of marriage most hurts the least well-off. As Kay Hymowitz argues in *Marriage and Caste in America*, the decline of the marriage culture has hurt lower-income communities and African Americans the most.[23] In fact, a leading indicator of whether someone will know poverty or prosperity is whether she knew growing up the love and security of her married mother and father.

Finally, since a strong marriage culture is good for children, spouses, indeed our whole economy, and especially the poor, it also serves the cause of limited government. Most obviously, where marriages never form or easily break down, the state expands to fill the domestic vacuum by lawsuits to determine paternity, visitation rights, child support, and alimony.

But the less immediate effects are even more extensive. As absentee fathers and out-of-wedlock births become common, a train of social pathologies follows, and with it greater demand for policing and state-provided social services. Sociologists David Popenoe and Alan Wolfe's research on Scandinavian coun-

tries shows that as marriage culture declines, the size and scope of state power and spending grow.[24]

In fact, a study by the Left-leaning Brookings Institution finds that $229 billion in welfare expenditures between 1970 and 1996 can be attributed to the breakdown of the marriage culture and the resulting exacerbation of social ills: teen pregnancy, poverty, crime, drug abuse, and health problems.[25] A 2008 study found that divorce and unwed childbearing cost taxpayers $112 billion each year.[26] And Utah State University scholar David Schramm has estimated that divorce alone costs local, state, and federal government $33 billion each year.[27]

Thus, although some libertarians would give marriage no more legal status than we give baptisms and bar mitzvahs,[28] privatizing marriage would be a catastrophe for limited government. Almost every human interest that might justify state action—health, security, educational development, social order—would also justify legally regulating marriage. A state that will not support marriage is like a doctor who will not encourage a healthy diet and exercise. Each passes over what is basic and paramount in a misplaced zeal for supplements and remedies.

### IS MARRIAGE ENDLESSLY MALLEABLE?

We can now address the arguments of those on the Left who think marriage malleable to no end (call them "constructivists").[29] Marriage is for them whatever we decide to make it. There are no criteria that your relationship must meet to be a marriage—to realize the value specific to marriage as a human good. There is only the vast and gradual spectrum of more and less affectionate relations, plus our (and every) society's peculiar habit of carving out an arbitrary region on the far end of that spectrum for special social and legal treatment.[30] Hence there is no "right answer" for the state's marriage policy, any more than for the national bird: different proposals are just more or less preferable.[31]

≈ 4 ≈

# What's the Harm?

Hᴀᴠɪɴɢ ᴄᴏᴍᴘᴀʀᴇᴅ ᴛʜᴇ ᴄᴏɴᴊᴜɢᴀʟ ᴀɴᴅ ʀᴇᴠɪꜱɪᴏɴɪꜱᴛ views of marriage and seen the benefits of recognizing marriage at all, some simply ask, *What's the harm?* Their appeal to practicality runs something like this:

> Suppose your view is coherent and even superior to the alternative as an account of the good of marriage. So what? Why not let a few thousand same-sex partners get a certificate and a certain legal status? No one would actually be worse off. *How would gay civil marriage affect your lives, liberties, or opportunities, or your own marriages?*[1]

We said in the Introduction that this debate is not about homosexuality, but about marriage. Accordingly, in chapter 6, we will show how the conjugal view respects same-sex-attracted people's equal dignity and basic needs. Here we show how the revisionist proposal would harm the institution of marriage and much else besides.

*53*

legal changes that harmed conjugal marriage.[8] For that matter, we oppose no-fault divorce laws. We are focusing here on the issue of same-sex civil marriage not because it alone matters, but because it is the focus of a live debate whose results have important consequences. Underlying people's adherence to the marital norms already in decline, after all, are the deep (if implicit) connections in their minds between marriage, bodily union, and children. Redefining marriage as revisionists propose would not just wear down but sever these ties, making it immeasurably harder to reverse other damaging recent trends and restore the social benefits of a healthy marriage culture.

### MAKING MOTHER OR FATHER SUPERFLUOUS

Conjugal marriage laws reinforce the idea that the union of husband and wife is, on the whole, the most appropriate environment for rearing children—an ideal supported by the best available social science.* Recognizing same-sex relationships as marriages would legally abolish that ideal. No civil institution would reinforce the notion that men and women typically have different strengths as parents; that boys and girls tend to benefit from fathers and mothers in different ways.

To the extent that some continued to see marriage as apt for family life, they would come to think—indeed, our law, public schools, and media would teach them, and variously penalize them for denying—that it matters not, even as a rule, whether children are reared by both their mother and their father, or by a parent of each sex at all. But as the connection between marriage and parenting is obscured, as we think it would be eventually, *no* arrangement would be proposed as ideal.

And here is the central problem with either result: it would diminish the social pressures and incentives for husbands to

---

*The need for adoption (and its immense value) where the ideal is practically impossible is no argument for redefining civil marriage, a unified structure of incentives meant precisely to *reinforce* the ideal—to minimize the need for alternative, case-by-case provisions.

remain with their wives and children, or for men and women having children to marry first. Yet the resulting arrangements— parenting by divorced or single parents, or cohabiting couples —are demonstrably worse for children, as we have seen in chapter 3. So even if it turned out that studies showed no differences between same- and opposite-sex parenting, redefining marriage would undermine marital stability in ways that we know do hurt children.

That said, in addition to the data on child outcomes summarized in chapter 3, there is significant evidence that mothers and fathers have different parenting strengths—that their respective absences impede child development in different ways. Girls, for example, are likelier to suffer sexual abuse and to have children as teenagers and out of wedlock if they do not grow up with their father.[9] For their part, boys reared without their father tend to have much higher rates of aggression, delinquency, and incarceration.[10] As Rutgers University sociologist David Popenoe concludes, "The burden of social science evidence supports the idea that gender-differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable."[11] He continues: "[W]e should disavow the notion that 'mommies can make good daddies,' just as we should disavow the popular notion . . . that 'daddies can make good mommies.' . . . The two sexes are different to the core, and each is necessary— culturally and biologically—for the optimal development of a human being."[12] In a summary of the relevant science, University of Virginia sociologist W. Bradford Wilcox finds much the same:

> Let me now conclude our review of the social scientific literature on sex and parenting by spelling out what should be obvious to all. The best psychological, sociological, and biological research to date now suggests that—on average—men and women bring different gifts to the parenting enterprise, that children benefit from having

parents with distinct parenting styles, and that family breakdown poses a serious threat to children and to the societies in which they live.[13]

Of course, the question of which arrangements our policies should privilege is normative; it cannot be settled by the cause-and-effect descriptions of social science alone. But that point scarcely matters here, because it is impossible to generalize from the available studies purporting to find no differences between same-sex and married biological parenting outcomes.

Not one study of same-sex parenting meets the standard of research to which top-quality social science aspires: large, random, and representative samples observed longitudinally. Only one—studying only rates of primary-school progress—is even just large and representative.[14] Several that are most frequently cited in the media actually compare same-sex parenting outcomes with single-, step-, or other parenting arrangements already shown to be suboptimal.[15] Few test for more than one or two indicators of well-being. Most resort to "snowball sampling," in which subjects recruit their friends and acquaintances for the study.[16] With this technique, "those who have many interrelationships with . . . a large number of other individuals" are strongly over-represented.[17]

As a result, psychologist Abbie Goldberg notes, studies of same-sex parent households have focused on "white, middle-class persons who are relatively 'out' in the gay community and who are living in urban areas." They have overlooked "working-class sexual minorities, racial or ethnic sexual minorities, [and] sexual minorities who live in rural or isolated geographical areas."[18] Yet such favorably biased samples of same-sex parents are often compared to representative (and thus more mixed) opposite-sex parent samples.[19] As Loren Marks observes in a literature review of all fifty-nine studies on which the American Psychological Association relied in declaring no differences between same- and opposite-sex parenting, "The available data, which are drawn primarily from small convenience

samples, are insufficient to support a strong generalizable claim either way. . . . Such a statement would not be grounded in science. To make a generalizable claim, representative, large-sample studies are needed—many of them."[20]

By contrast, consider the findings of a recent study in this area that *was* based on a large, random, and nationally representative sample, regarding outcomes in adulthood of various family structures. Compared to children of parents at least one of whom had had a gay or lesbian relationship, those reared by their married biological parents were found to have fared better on dozens of indicators, and worse on none.[21] In a critique noting some of the study's limitations, Pennsylvania State University Professor Paul Amato maintained that the study's methodological advantages still make it "probably the best that we can hope for, at least in the near future."[22]

Furthermore, the scientific literature on child well-being and same-sex parenting includes very little, reliable or otherwise, on children reared by two men. Prominent same-sex parenting scholars Timothy Biblarz and Judith Stacey, in a 2010 literature review, admitted that they "located no studies of planned gay fathers that included child outcome measures and only one that compared gay male with lesbian or heterosexual adoptive parenting."[23]

The upshot is what revisionists William Meezan and Jonathan Rauch concede in a review of the parenting literature: "What the evidence does not provide, because of the methodological difficulties we outlined, is much knowledge about whether those studied are typical or atypical of the general population of children raised by gay and lesbian couples."[24]

Ultimately, however, we have two reasons to expect that same-sex parenting is generally less effective. First, every alternative to married biological parenting that *has* been examined in high-quality studies has consistently been shown less effective: this is true of single- and stepparenting as well as parenting by cohabiting couples.[25] As Princeton and Wisconsin sociologists Sara McLanahan and Gary Sandefur found, based on four

longitudinal studies of nationally representative samples including 20,000 subjects, "Children who grow up in a household with only one biological parent are worse off, on average, than children who grow up in a household with both of their biological parents . . . regardless of whether the resident parent remarries."[26] This point reinforces the idea that the state's primary interest is in upholding marital norms *to keep biological parents together*, and not simply in promoting two-parent households. Second, again, reliable studies suggest that mothers and fathers foster—and their absences impede—child development in different ways.

In short, then: redefining civil marriage might make it more socially acceptable for fathers to leave their families, for unmarried parents to put off firmer public commitment, or for children to be created for a household without a mother or father. But whatever the cause, there will be a cost to depriving children of the love and knowledge of their married mother and father.

Finally, to state the obvious: None of these points about parenting implies that men and women in same-sex relationships have weaker devotion, or less capacity for affection. After all, it is no insult to heroic single parents to point to data showing that parenting by mother and father together is more effective. What are compared in all cases are the outcomes of various parenting combinations, not individual parents.

### THREATENING MORAL AND RELIGIOUS FREEDOM

The harms of redefining civil marriage would extend beyond couples and their children, to anyone who holds the conjugal view.

We Americans are not patient with those we regard as enemies of equality. People whose social attitudes and views remind us of Jim Crow, Chinese exclusion laws, and disenfranchised women experience none of the social tolerance and civility that most of us are happy to extend across vast moral and political gulfs. They are polite society's exiles, barred from the public

1265, http://jfi.sagepub.com/content/29/7/944.short. For a study
showing the importance of fidelity for marital stability, see Paul R.
Amato and Stacy J. Rogers, "A Longitudinal Study of Marital Problems and Subsequent Divorce," *Journal of Marriage and the Family*
59 (August 1997): 612–24, http://www.jstor.org/stable/353949.

## CHAPTER 3: THE STATE AND MARRIAGE

1. Corvino and Gallagher, *Debating Same-Sex Marriage* (cited in chap. 1, n. 1), 96.

2. David Blankenhorn, *The Future of Marriage* (2007; New York: Encounter Books, 2009), 5. Blankenhorn recently announced that "the time has come for me to accept gay marriage." In his announcement, however, he also stated that he stands by all the claims and arguments made in his book—retracting nothing, including the point here quoted.

3. Amy L. Wax, "Diverging Family Structure and 'Rational' Behavior: The Decline in Marriage as a Disorder of Choice," in *Research Handbook on the Economics of Family Law*, edited by Lloyd R. Cohen and Joshua D. Wright, 15–71 (Cheltenham, U.K., and Northampton, Mass.: Elgar, 2011), 59, 61.

4. James Q. Wilson, *The Marriage Problem: How Our Culture Has Weakened Families* (New York: HarperCollins, 2002), 41.

5. Douglas W. Allen and Maggie Gallagher, "Does Divorce Law Affect the Divorce Rate? A Review of Empirical Research, 1995–2006," *IMAPP Research Brief* 1, no. 1 (July 2007), http://www.marriagedebate.com/pdf/imapp.nofault.divrate.pdf.

6. See Jennifer Roback Morse, "Privatizing Marriage Is Impossible," *Public Discourse*, April 2, 2012, http://www.thepublicdiscourse.com/2012/04/5069.

7. United Nations Convention on the Rights of the Child, http://www.unicef.org/crc/.

8. For the relevant studies, see *Marriage and the Public Good: Ten Principles* (Princeton, N.J.: The Witherspoon Institute, 2008), 9–19, http://www.winst.org/family_marriage_and_democracy/WI_Marriage.pdf. This report, signed by some seventy scholars, corroborates the philosophical case for marriage with extensive evidence from the social sciences about the welfare of children and adults.

9. Kristin Anderson Moore, Susan M. Jekielek, and Carol Emig, "Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?" *Child Trends Re-*

*search Brief* (June 2002): 1–2, 6, http://www.childtrends.org/files/MarriageRB602.pdf.

10. Wendy D. Manning and Kathleen A. Lamb, "Adolescent Well-Being in Cohabiting, Married, and Single-Parent Families," *Journal of Marriage and Family* 65, no. 4 (November 2003): 876, 890.

11. See Sara McLanahan, Elisabeth Donahue, and Ron Haskins, "Introducing the Issue," *The Future of Children* 15 (2005): 3; Mary Parke, "Are Married Parents Really Better for Children?: What Research Says about the Effects of Family Structure on Child Well-Being," *CLASP Policy Brief* no. 3 (May 2003); W. Bradford Wilcox, William J. Doherty, Helen Fisher, et al., *Why Marriage Matters: Twenty-Six Conclusions from the Social Sciences*, 2nd ed. (New York: Institute for American Values, 2005), 6.

12. For a discussion of the social science on same-sex parenting, and for studies on the alternative arrangements mentioned here, see chapter 4.

13. *Maynard v. Hill*, 125 U.S. 190, 211 (1888).

14. *Conaway v. Deane*, 903 A.2d 416, 620 (Md. 2007).

15. *Baker v. Baker*, 13 Cal. 87, 103 (1859).

16. *Sharon v. Sharon*, 75 Cal. 1, 33 (1888) (quoting Stewart on *Marriage and Divorce*, sec. 103).

17. *Singer v. Hara*, 522 P.2d 1187, 1195 (Wash. App. 1974).

18. "Nearly all United States Supreme Court decisions declaring marriage to be a fundamental right expressly link marriage to fundamental rights of procreation, childbirth, abortion, and child-rearing." *Andersen v. King County*, 138 P.3d 963, 978 (Wash. 2006). "The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people. Since the family is the core of our society, the law seeks to foster and preserve marriage." *De Burgh v. De Burgh*, 39 Cal.2d 858, 863–64 (1952). Procreation is "[o]ne of the prime purposes of matrimony." *Maslow v. Maslow*, 117 Cal.App.2d 237, 241 (1953). "Procreation of offspring could be considered one of the major purposes of marriage." *Poe v. Gerstein*, 517 F.2d 787, 796 (5th Cir. 1975).

19. Steven Nock, *Marriage in Men's Lives* (New York: Oxford University Press, 1998).

20. Obviously, none of this is to suggest that any marriage is perfect or that spouses never fail to live up to their vows. We are speaking here in generalities, in light of the accumulated social-scientific evidence.

21. W. Bradford Wilcox and Carlos Cavallé, *The Sustainable Demographic Dividend: What Do Marriage and Fertility Have to Do with the Economy?* (Charlottesville, Va.: The National Marriage Project), http://sustaindemographicdividend.org/articles/the-sustainable-demographic.

22. W. Bradford Wilcox, quoted in H. Brevy Cannon, "New Report: Falling Birth, Marriage Rates Linked to Global Economic Slowdown," October 3, 2011, http://www.virginia.edu/uvatoday/news Release.php?id=16244.

23. Kay S. Hymowitz, *Marriage and Caste in America: Separate and Unequal Families in a Post-Marital Age* (Chicago: Ivan R. Dee, 2006). See also W. Bradford Wilcox, "The Evolution of Divorce," *National Affairs* 1 (2009): 81, 88–93.

24. David Popenoe, *Disturbing the Nest: Family Change and Decline in Modern Societies* (New York: A. de Gruyter, 1988), xiv–xv; Alan Wolfe, *Whose Keeper? Social Science and Moral Obligation* (Berkeley: University of California Press, 1989), 132–42.

25. Isabel V. Sawhill, "Families at Risk," in *Setting National Priorities: The 2000 Election and Beyond*, edited by Henry J. Aaron and Robert D. Reischauer (Washington, D.C.: Brookings Institution Press, 1999), 97, 108; see also *Marriage and the Public Good* (cited above, n. 8), 15.

26. Benjamin Scafidi, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and for All Fifty States* (New York: Institute for American Values, 2008), http://www.americanvalues.org/pdfs/COFF.pdf.

27. David Schramm, *Preliminary Estimates of the Economic Consequences of Divorce* (Utah State University, 2003).

28. See, e.g., David Boaz, "Privatize Marriage: A Simple Solution to the Gay-Marriage Debate," *Slate*, April 25, 1997, http://www.slate.com/articles/briefing/articles/1997/04/privatize_marriage.html.

29. See, e.g., William N. Eskridge, Jr., "A History of Same-Sex Marriage," *Virginia Law Review* 79 (1993): 1421–22: "A social constructivist history emphasizes the ways in which marriage is 'constructed' over time, the institution being viewed as reflecting larger social power relations."

30. See ibid., 1434: "[M]arriage is not a naturally generated institution with certain essential elements. Instead it is a construction

001485

that is linked with other cultural and social institutions, so that the old-fashioned boundaries between the public and private life melt away."

31. See *Hernandez v. Robles*, 805 N.Y.S.2d 354, 377 (N.Y. App. Div. 2005) (Saxe, J., dissenting) ("Civil marriage is an institution created by the state. . . ."); and *Andersen v. King County*, 138 P.3d 963, 1018 (Wash. 2006) (Fairhurst, J., dissenting) ("[M]arriage draws its strength from the nature of the civil marriage contract itself and the recognition of that contract by the State.").

32. Andrew Koppelman, "What Marriage Isn't," *Balkinization*, December 18, 2010, http://balkin.blogspot.com/2010/12/what-marriage-isnt.html.

33. Other examples of such basic goods include critical aesthetic appreciation, knowledge, and—to cite another social practice—friendship. See our discussion of basic goods in chapter 2.

34. See John Finnis, "Law, Morality, and 'Sexual Orientation,'" in *Same Sex: Debating the Ethics, Science, and Culture of Homosexuality*, edited by John Corvino, 31–43 (Lanham, Md.: Rowman and Littlefield, 1997). John Finnis, "The Good of Marriage and the Morality of Sexual Relations: Some Philosophical and Historical Observations," *American Journal of Jurisprudence* 42 (1998): 97–134. Both essays are reprinted in *Collected Essays of John Finnis*, vol. 3 (Oxford and New York: Oxford University Press, 2011).

35. Andrew Koppelman, "That Elusive Timeless Essence of Marriage," *Balkinization*, December 31, 2010, http://balkin.blogspot.com/2010/12/that-elusive-timeless-essence-of.html.

36. Bennett, "Only You. And You. And You" (cited in chap. 1, n. 8).

37. Mark Oppenheimer, "Married, with Infidelities," *New York Times*, June 30, 2011, http://www. nytimes.com/2011/07/03/magazine/infidelity-will-keep-us-together.html?pagewanted=all.

CHAPTER 4: WHAT'S THE HARM?

1. See, e.g., "A Vermont Court Speaks," editorial, *Boston Globe*, December 22, 1999: "[Gay marriage] no more undermine[s] traditional marriage than sailing undermines swimming."

2. But for evidence, see Mary Douglas, *How Institutions Think* (New York: Syracuse University Press, 1986). See also Robert P. George, *Making Men Moral: Civil Liberties and Public Morality* (Oxford: Clarendon Press, 1993).

3. Joseph Raz, "Autonomy and Pluralism," in *The Morality of Freedom* (Oxford: Clarendon Press, 1988): 393.

001486

4. Patrick Lee, Robert P. George, and Gerard V. Bradley, "Marriage and Procreation: Avoiding Bad Arguments," *Public Discourse*, March 30, 2011, http://www.thepublicdiscourse.com/2011/03/2637.

5. See also Andrew Cherlin, *The Marriage-Go-Round* (New York: Knopf, 2009), for a discussion of the link between the rise of expressive individualism and the divorce revolution.

6. For recent research showing that an expressive model of relationships is associated with an increased risk of divorce, see W. Bradford Wilcox and Jeffrey Dew, "Is Love a Flimsy Foundation? Soulmate versus Institutional Models of Marriage," *Social Science Research* 39 (2010): 687, http://www.sciencedirect .com/science?ob=ArticleURL&_udi=B6WX8-506W6K9-1&_ user=709071&_coverDate. For research showing that same-sex unions tend more often to eschew sexual exclusivity, see Scott James, "Many Successful Gay Marriages Share an Open Secret," *New York Times*, January 28, 2010, http://www.nytimes .com/2010/01/29/us/29sfmetro.html?ref=us.

7. Temporary marriage licenses have recently been considered in Mexico City: see Christina Ng, "Mexico City Considers Temporary Marriage Licenses," September 30, 2011, http://abcnews.go .com/blogs/headlines/2011/09/mexico-city-considers-temporary -marriage-licenses/.

8. Richard Doerflinger, "Family Policy in the United States" (1980), http://www.usccb.org/prolife/tdocs/FaithfulForLife.pdf. Maggie Gallagher, *The Abolition of Marriage: How We Destroy Lasting Love* (Washington, D.C.: Regnery Publishing, 1996). *Promises to Keep: Decline and Renewal of Marriage in America*, edited by David Popenoe, Jean Bethke Elshtain, and David Blankenhorn (Lanham, Md.: Rowman and Littlefield Publishers, 1996). *The Book of Marriage: The Wisest Answers to the Toughest Questions*, edited by Dana Mack and David Blankenhorn (Grand Rapids, Mich.: Eerdmans Publishing, 2001). *The Fatherhood Movement: A Call to Action*, edited by Wade F. Horn, David Blankenhorn, and Mitchell B. Pearlstein (Lanham, Md.: Lexington Books, 1999). United States Conference of Catholic Bishops, "Marriage and Family Life" (1975), http://www.usccb.org/prolife/programs/ rlp/Marriage&FamilyLife75.pdf. Maggie Gallagher and Barbara Dafoe Whitehead, "End No-Fault Divorce?" *First Things* 75 (1997): 24.

9. Sara McLanahan and Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* (Cambridge, Mass.: Harvard University Press, 1994). Bruce J. Ellis, John E. Bates, Kenneth A.

Dodge, et al., "Does Father Absence Place Daughters at Special Risk for Early Sexual Activity and Teenage Pregnancy?" *Child Development* 74 (2003): 801–21. Wilcox, Doherty, Fisher, et al., *Why Marriage Matters* (cited in chap. 3, n. 11). Lorraine Blackman, Obie Clayton, Norval Glenn, et al., *The Consequences of Marriage for African Americans: A Comprehensive Literature Review* (New York: Institute for American Values, 2005).

10. Elizabeth Marquardt, *Family Structure and Children's Educational Outcomes* (New York: Institute for American Values, 2005). Paul R. Amato, "The Impact of Family Formation Change on the Cognitive, Social, and Emotional Well-Being of the Next Generation," *The Future of Children* 15 (2005): 75–96. Cynthia Harper and Sara McLanahan, "Father Absence and Youth Incarceration," *Journal of Research on Adolescence* 14 (2004): 369–97.

11. David Popenoe, *Life without Father: Compelling New Evidence That Fatherhood and Marriage Are Indispensable for the Good of Children and Society* (New York: Free Press, 1996), 146.

12. Ibid., 197.

13. W. Bradford Wilcox, "Reconcilable Differences: What Social Sciences Show about the Complementarity of the Sexes and Parenting," *Touchstone* 18, no. 9 (November 2005): 36.

14. Michael J. Rosenfeld, "Nontraditional Families and Childhood Progress through School," *Demography* 47 (2010): 755–75, http://www.stanford.edu/~mrosenfe/Rosenfeld_Nontraditional_Families_Demography.pdf.

15. See, e.g., Charlotte J. Patterson, "Children of Lesbian and Gay Parents," in *Advances in Clinical Child Psychology*, vol. 19, edited by Thomas H. Ollendick and Ronald J. Prinz, 235–82 (New York: Plenum, 1997). Fiona Tasker, "Lesbian Mothers, Gay Fathers, and Their Children: A Review," *Developmental and Behavioral Pediatrics* 26, no. 3 (2005): 224–40.

16. For studies that use snowball sampling, see, e.g., Henny M. W. Bos, Frank van Balen, and Dymphna C. van den Boom, "Child Adjustment and Parenting in Planned Lesbian Parent Families," *American Journal of Orthopsychiatry* 77 (2007): 38–48. Anne Brewaeys, Ingrid Ponjaert, Eylard V. Van Hall, and Susan Golombok, "Donor Insemination: Child Development and Family Functioning in Lesbian Mother Families," *Human Reproduction* 12 (1997): 1349–59. Megan Fulcher, Erin L. Sutfin, and Charlotte J. Patterson, "Individual Differences in Gender Development: Associations with Parental Sexual Orientation, Attitudes, and Division of Labor," *Sex*

*Roles* 57 (2008): 330–41. Theodora Sirota, "Adult Attachment Style Dimensions in Women Who Have Gay or Bisexual Fathers," *Archives of Psychiatric Nursing* 23, no. 4 (2009): 289–97. Katrien Vanfraussen, Ingrid Ponjaert-Kristoffersen, and Anne Brewaeys, "Family Functioning in Lesbian Families Created by Donor Insemination," *American Journal of Orthopsychiatry* 73, no. 1 (2003): 78–90.

17. Sven Berg, "Snowball Sampling," in *Encyclopedia of Statistical Sciences,* vol. 8, edited by Samuel Kotz and Norman L. Johnson, 528–32 (New York: Wiley-Interscience, 1988).

18. Abbie E. Goldberg, *Lesbian and Gay Parents and Their Children: Research on the Family Life Cycle* (Washington, D.C.: APA Books, 2010), 12–13.

19. See, e.g., Nanette K. Gartrell, Henny M. W. Bos, and Naomi G. Goldberg, "Adolescents of the U.S. National Longitudinal Lesbian Family Study: Sexual Orientation, Sexual Behavior, and Sexual Risk Exposure," *Archives of Sexual Behavior* 40 (2011): 1199–1209.

20. Loren Marks, "Same-sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting," *Social Science Research* 41 (2012): 735–51, 748, http://ac.els-cdn.com/S0049089X12000580/1-s2.0-S0049089X12000580-main.pdf?_tid=8b0a9f5c-04d1-11e2-9a3e-00000aacb35f&acdnat=1348331060_c1ca19d8556b56fd70caafb54ea54c69.

21. Mark Regnerus, "How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study," *Social Science Research* 41 (2012): 752–70.

22. Paul Amato, "The Well-Being of Children with Gay and Lesbian Parents," *Social Science Research* 41 (2012): 771–74.

23. Timothy J. Biblarz and Judith Stacey, "How Does the Gender of Parents Matter?" *Journal of Marriage and Family* 72 (2010): 3. For other criticisms of the samples on which available studies have been based, see Steven L. Nock, "Affidavit of Steven Nock," *Halpern et al. v. Canada and MCCT v. Canada.* ON S.C.D.C. (2001), http://marriagelaw.cua.edu/Law/cases/Canada/ontario/halpern/aff_nock.pdf. Ellen C. Perrin, "Technical Report: Coparent or Second-Parent Adoption by Same-Sex Partners," *Pediatrics* 109 (2002): 341–44. Richard R. Redding, "It's Really about Sex: Same-Sex Marriage, Lesbigay Parenting, and the Psychology of Disgust," *Duke Journal of Gender Law and Policy* 16 (2008): 127–93.

24. William Meezan and Jonathan Rauch, "Gay Marriage, Same-Sex Parenting, and America's Children," *Future of Children* 15 (2005): 97–115.

25. Susan L. Brown, "Family Structure and Child Well-Being: The Significance of Parental Cohabitation," *Journal of Marriage and Family* 66, no. 2 (2004): 351–67. Wendy D. Manning, Pamela J. Smock, and Debarun Majumdar, "The Relative Stability of Cohabiting and Marital Unions for Children," *Population Research and Policy Review* 23 (2004): 135–59. McLanahan and Sandefur, *Growing Up with a Single Parent* (cited above, n. 9).

26. McLanahan and Sandefur, *Growing Up with a Single Parent* (cited above, n. 9), 1.

27. For example, the Internal Revenue Service revoked the tax-exempt status of Bob Jones University because of its racially discriminatory practices, and the Supreme Court upheld this action as compatible with the university's First Amendment rights.

28. "TV Host Fired over Sean Avery Debate," *ESPN.com*, May 13, 2011, at http://sports.espn.go.com/new-york/nhl/news/story?id=6532954.

29. *Walden v. Centers for Disease Control*, Case No. 1:08-cv-02278-JEC, U.S. District Court, Northern District of Georgia, March 18, 2010, http://www.telladf.org/UserDocs/WaldenSJorder.pdf.

30. Jill P. Capuzzo, "Group Loses Tax Break over Gay Union Issue," *New York Times*, September 18, 2007, http://www.nytimes.com/2007/09/18/nyregion/18grove.html?_r=0.

31. George F. Will, "The Tangled Web of Conflicting Rights," *Washington Post,* September 14, 2012, http://www.washingtonpost.com/opinions/george-f-will-the-tangled-web-of-conflicting-rights/2012/09/14/95b787c2-fddc-11e1-b153-218509a954e1_story.html.

32. Marc D. Stern, "Same-Sex Marriage and the Churches," in *Same-Sex Marriage and Religious Liberty: Emerging Conflicts*, edited by Douglas Laycock, Anthony Picarello, and Robin Fretwell Wilson, 1–57 (Lanham, Md.: Rowman and Littlefield, 2008), 1, 11–14. This collection of essays includes the views of scholars on both sides of the same-sex marriage question, who conclude that conflicts with religious liberty are inevitable when marriage is extended to same-sex couples.

33. Maggie Gallagher, "Banned in Boston: The Coming Conflict between Same-Sex Marriage and Religious Liberty," *The Weekly*

001490

*Standard*, May 5, 2006, http://www.weeklystandard.com/Content/Public/Articles/000/000/012/191kgwgh.asp.

34. See, e.g., *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).

35. Becket Fund for Religious Liberty, *Same-Sex Marriage and State Anti-Discrimination Laws* (Washington, D.C.: Becket Fund for Religious Liberty, January 2009), 2, http://www.becketfund.org/wp-content/uploads/2011/04/Same-Sex-Marriage-and-State-Anti-Discrimination-Laws-with-Appendices.pdf.

36. Monica Hesse, "Opposing Gay Unions with Sanity and a Smile," *Washington Post*, August 28, 2009.

37. Andrew Alexander, "'Sanity and a Smile' and an Outpouring of Rage," *Washington Post*, September 6, 2009.

38. Frank Rich, "The Bigots' Last Hurrah," Op-Ed Columnist, *New York Times*, April 19, 2009.

39. See, e.g., Human Rights Campaign, http://www.hrc.org (self-identifying the organization as a 501(c)(4) advocacy group "working for lesbian, gay, bisexual, and transgender equal rights"); Annie Stockwell, "Stop the Hate: Vote No on 8," Advocate.com, August 20, 2008, http://www.advocate.com/Arts_and_Entertainment/People/Stop_the_Hate (framing opposition to California's Proposition 8, which provides that "only marriage between a man and a woman is valid or recognized in California," as a struggle against hate).

40. *Perry v. Brown*, 671 F.3d 1052, February 7, 2011, 36.

41. For more on the effects of a sexualized culture on friendship, see Anthony Esolen, "A Requiem for Friendship: Why Boys Will Not Be Boys and Other Consequences of the Sexual Revolution," *Touchstone* 18 (September 2005): 21, http://www.touchstonemag.com/archives/article.php?id=18-07-021-f.

42. 2 Samuel 1:26; Augustine, *Confessions* 4.75–77.

43. Traditional marriage laws, by contrast, merely encourage adherence to norms in relationships where those norms already have a rational basis. See chapter 2 on comprehensive commitment.

44. See Gallagher, "(How) Will Gay Marriage Weaken Marriage as a Social Institution" (cited in chap. 1, n. 3), 62.

45. "Beyond Same-Sex Marriage" (cited in chap. 1, n. 7).

46. Brake, "Minimal Marriage" (cited in chap. 1, n. 12), 336, 323.

47. Andrew Sullivan, "Introduction," in *Same-Sex Marriage: Pro and Con: A Reader*, edited by Andrew Sullivan, 1st ed. (New York: Vintage Books, 1997), xvii, xix.

48. E.J. Graff, "Retying the Knot," in ibid., 134, 136.
49. Ibid., 137.
50. Andrew Sullivan, *Virtually Normal: An Argument about Homosexuality* (New York: Vintage Books, 1996), 202–3.
51. Ari Karpel, "Monogamish," *The Advocate*, July 7, 2011, http://www.advocate.com/Print_Issue/Features/Monogamish/.
52. See http://www.advocate.com/arts-entertainment/features?page=7.
53. Victoria A. Brownworth, "Something Borrowed, Something Blue: Is Marriage Right for Queers?" in *I Do/I Don't: Queers on Marriage*, edited by Greg Wharton and Ian Philips (San Francisco: Suspect Thoughts Press, 2004), 53, 58–59.
54. Ellen Willis, "Can Marriage Be Saved? A Forum," *The Nation*, July 5, 2004, 16.
55. Michelangelo Signorile, "Bridal Wave," *Out* 42 (December–January 1994): 68, 161.
56. Ibid.
57. "Mexico City Proposes Temporary Marriage Licenses" (cited in chap. 1, n. 10).
58. Julia Zebley, "Utah Polygamy Law Challenged in Federal Lawsuit," *Jurist*, July 13, 2011, http://jurist.org/paperchase/2011/07/utah-polygamy-law-challenged-in-federal-lawsuit.php.
59. "Three-Person Civil Union Sparks Controversy in Brazil" (cited in chap. 1, n. 9).
60. See generally Jonathan Rauch, *Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America* (New York: Henry Holt & Co., 2005).
61. David P. McWhirter and Andrew M. Mattison, *The Male Couple: How Relationships Develop* (Englewood Cliffs, N.J.: Prentice-Hall Trade, 1984), 252–53.
62. Ibid., 3.
63. James, "Many Successful Gay Marriages Share an Open Secret" (cited above, n. 6).
64. Ibid.
65. Trevor A. Hart and Danielle R. Schwartz, "Cognitive-Behavioral Erectile Dysfunction Treatment for Gay Men," *Cognitive and Behavior Practice* 17 (February 2010): 66.
66. Alfred DeMaris, "Distal and Proximal Influences on the Risk of Extramarital Sex: A Prospective Study of Longer Duration Marriages," *Journal of Sex Research* 46 (2009): 597.
67. Julie H. Hall and Frank D. Fincham, "Psychological Distress: Precursor or Consequence of Dating Infidelity," *Personality and So-*

*cial Psychology Bulletin* 35 (2009): 143, http://psp.sagepub.com/content/35/2/143.short.

68. Popenoe, *Life without Father* (cited above, n. 11). Mark Regnerus and Jeremy Uecker, *Premarital Sex in America* (New York: Oxford University Press, 2011).

69. C. H. Mercer, G. J. Hart, A. M. Johnson, and J. A. Cassell, "Behaviourally Bisexual Men as a Bridge Population for HIV and Sexually Transmitted Infections? Evidence from a National Probability Survey," *International Journal of STD and AIDS* 20 (2009): 87, 88.

70. Edward O. Laumann, J. H. Gagnon, R. T. Michael, and S. Michaels, *The Social Organization of Sexuality: Sexual Practices in the United States* (Chicago: University of Chicago Press, 1994), 314–16.

71. Ibid.

72. James, "Many Successful Gay Marriages Share an Open Secret" (cited above, n. 6).

## CHAPTER 5: JUSTICE AND EQUALITY

1. Macedo, "Homosexuality and the Conservative Mind" (cited in Introduction, n. 3), 261, 279. Andrew Koppelman, *The Gay Rights Question in Contemporary American Law* (Chicago: University of Chicago Press, 2002), 87–88.

2. Andrew Koppelman has argued that "[a] sterile person's genitals are no more suitable for generation than an unloaded gun is suitable for shooting. If someone points a gun at me and pulls the trigger, he exhibits the behavior which, as behavior, is suitable for shooting, but it still matters a lot whether the gun is loaded and whether he knows it"; Koppelman, ibid.

Koppelman's objection is mistaken and misses an important point. We can properly say that man-made objects and artificial processes are ordered or directed toward certain goals only so long as we use them for those goals. This in turn presupposes that we think them capable of actually realizing those goals. That is, the function of man-made objects and processes is imposed on them by the human beings who use them. Thus, a piece of metal becomes a knife—an artifact whose function is to cut—only when we intend to use it for cutting. When it is no longer capable of cutting and we no longer intend to use it for cutting, it is no longer really a knife.

The same does not hold for the union between a man and a woman's bodies, however, because natural organs are what they are independently of what we intend to use them for and even of

SHERIF GIRGIS is a Ph.D. student in philosophy at Princeton University and a J.D. candidate at Yale Law School. After graduating Phi Beta Kappa and summa cum laude from Princeton, where he won prizes for best senior thesis in ethics and best thesis in philosophy, as well as the Dante Society of America's national Dante Prize, he obtained a B.Phil. in moral, political, and legal philosophy from the University of Oxford as a Rhodes Scholar.

RYAN T. ANDERSON is William E. Simon Fellow at the Heritage Foundation and the editor of *Public Discourse: Ethics, Law, and the Common Good*, the online journal of the Witherspoon Institute. A Phi Beta Kappa and magna cum laude graduate of Princeton University, he is a Ph.D. candidate in political philosophy at the University of Notre Dame. He has worked as assistant editor of *First Things* and was a Journalism Fellow of the Phillips Foundation. His writings have appeared in the *Harvard Journal of Law and Public Policy*, *First Things*, the *Weekly Standard*, *National Review*, the *New Atlantis*, and the *Claremont Review of Books*.

ROBERT P. GEORGE is a Visiting Professor at Harvard Law School and McCormick Professor of Jurisprudence and Director of the James Madison Program in American Ideals and Institutions at Princeton University. He is a member of the United States Commission on International Religious Freedom, and previously served on the President's Council on Bioethics and as a presidential appointee to the United States Commission on Civil Rights. He is a former Judicial Fellow at the Supreme Court of the United States, where he received the Justice Tom C. Clark Award. He is a recipient of the United States Presidential Citizens Medal and the Honorific Medal for the Defense of Human Rights of the Republic of Poland.

Cover design by Yvonne Tsang at
Wilsted & Taylor Publishing Services



ENCOUNTER BOOKS
900 Broadway, Suite 601
New York, New York 10003-1239
www.encounterbooks.com

001494