PHILIP S. LOTT (5750)
STANFORD E. PURSER (13440)
Assistant Utah Attorneys General
JOHN E. SWALLOW (5802)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah  84114-0856
Telephone:  (801) 366-0100
Facsimile: (801) 366-0101
Email:  phillott@utah.gov
Email:  spurser@utah.gov
*Attorneys for Defendants Gary R. Herbert and John E. Swallow*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DEREK KITCHEN, individually; MOUDI SBEITY, individually; KAREN ARCHER, individually; KATE CALL, individually; LAURIE WOOD, individually; and KODY PARTRIDGE, individually,<br><br>      Plaintiffs,<br><br>        vs.<br><br>GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah; and SHERRIE SWENSEN, in her official capacity as Clerk of Salt Lake County,<br><br>      Defendants. | **RESPONSE OF THE GOVERNOR AND ATTORNEY GENERAL IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>  Civil Case No. 2:13-cv-00217-RJS<br><br>  Judge Robert J. Shelby |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ iv

II.     RESPONSE TO PLAINTIFFS' STATEMENT OF ELEMENTS ............................... vi

    A.   Standing ...................................................................................................... vi

    B.   Plaintiffs' Substantive Due Process Claims.............................................. vi

    C.   Plaintiffs' Equal Protection Claim ........................................................... vii

III.  RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS viii

IV.     ARGUMENT ...................................................................................................... 1

    A.   Plaintiffs' Motion Asks this Court to Disregard Core Structural Features of the
         Constitution Based on Legal Theories It Is Bound to Reject......................... 1

      1. Relevant Supreme Court Decisions Deny That the Constitution Protects Plaintiffs'
          Asserted Right to Same-sex Marriage. ................................................... 1

      2. The Windsor Decision Affirms the State's Authority to Define and Regulate Marriage.
          .............................................................................................................. 2

    B.   A Claimed Liberty Interest in Marrying a Person of the Same Sex Is Not a
         Fundamental Right under the Fourteenth Amendment Due Process Clause. ................. 5

      1. The Required "Careful Description" of the Asserted Liberty Interest in Same-Sex
          Marriage Demonstrates that No Such Right Exists. ................................. 5

      2. The Asserted Right to Same-Sex Marrige is Not "Objectively, Deeply Rooted in this
          Nation's History and Tradition." ............................................................. 9

    C.   UTAH'S MARRIAGE LAWS DO NOT VIOLATE THE EQUAL PROTECTION
         CLAUSE BECAUSE THEY ARE RATIONALLY RELATED TO LEGITIMATE
         STATE INTERESTS ...................................................................................... 10

      1. Rational Basis Equal Protection Analysis Applies Because Utah's Marriage Laws do
          Not Infringe on a Fundamental Right nor Affect a Suspect Class....................... 10

         a.   Binding Tenth Circuit precedent requires rational basis review of sexual
              orientation classifications.................................................................... 11

         b.   Neither *Windsor* nor any other Supreme Court decision requires heightened
              scrutiny of sexual orientation classifications ...................................... 14

         c.   Sexual orientation does not meet the criteria for treatment as a protected class .. 15

         d.   Sexual orientation warrants only rational basis review in this context regardless of
              whether it merits heightened scrutiny in other contexts ...................... 24

      2. Utah's Marriage Laws do Not Discriminate Against Either Gender........................... 25

      3. Utah's Marriage Laws Satisfy Rational Basis Review. ................................................. 26

a.    Utah has identified rational bases for its marriage laws ...................................... 27

b.    *Windsor* did not reject Utah's rational bases for defining marriage as between a man and a woman ............................................................................................... 31

c.    Utah's marriage laws are not based on animus or private moral disapproval of same-sex relationships and those alleged motives do not negate the rational bases for traditional marriage ........................................................................................ 33

d.    Nothing Plaintiffs Argue Negates the Settled Rationales for Traditional Marriage ............................................................................................................................. 38

i.    Traditional marriage promotes the State's interests regardless of whether any particular married couple procreates ............................................................. 38

ii.   The traditional definition of marriage rationally advances the State's legitimate interests ........................................................................................ 40

iii.  The State need not prove that redefining marriage would harm its interests 42

4. Utah's Marriage Laws Survive Any Level of Scrutiny ................................................. 44

D.    THE STATE OF UTAH MAY LAWFULLY DENY RECOGNITION OF SAME-SEX MARRIAGES PERFORMED ELSEWHERE. ..................................................... 47

E.    STATE DEFENDANTS DID NOT VIOLATE § 1983 AND PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY'S FEES UNDER § 1988 ............................................. 48

V.    CONCLUSION ......................................................................................................... 48

# I.    INTRODUCTION

Plaintiffs are not entitled to summary judgment on their claims challenging the constitutionality of Utah's marriage laws.  The age-old definition of marriage as the union of a man and a woman does not violate either the Due Process Clause or Equal Protection Clause of the 14th Amendment.  Plaintiffs' assertion that the Constitution already protects the right to marry a person of the same sex has no basis in law.  *United States v. Windsor* reaffirms the authority of states like Utah to define and regulate marriage free of federal interference.  The only other Supreme Court decisions remotely touching on same-sex marriage are *Baker v. Nelson*, which summarily dismissed the same claims Plaintiffs assert here for lack of a substantial federal question, and *Lawrence v. Texas*, which stressed that the fundamental right of homosexuals to enter intimate relationships did not imply a right to formal recognition of those relationships—much less a right to the unique status of marriage.

Lacking precedent directly supporting their claims, Plaintiffs urge the Court to push beyond the confines of Supreme Court and Tenth Circuit jurisprudence by enshrining same-sex marriage as a fundamental right and sexual orientation as the first quasi-suspect class in almost 40 years.  The Supreme Court treats both doctrines with caution given their potential for abuse and interference with principles of federalism and separation of powers.  Indeed, declaring same-sex marriage a fundamental right or sexual orientation a quasi-suspect class would contradict the Constitution's structural principles of federalism and the separation of powers:  federalism by imposing a uniform federal definition of marriage on the States despite their historic authority to regulate and define marriage; the separation of powers by empowering courts to choose between

iv

two-competing views of marriage rather than leaving that deeply contentious issue to the democratic deliberations of the people and their elected representatives.  Properly applied, controlling standards of constitutional doctrine prevent the Court from taking either step.

Plaintiffs, as same-sex couples, have no fundamental right to obtain a marriage license. The right they seek, carefully described, consists of an asserted liberty interest in marrying a person of the same sex.  Vague conceptions of personal autonomy and dignity cannot overcome the fact that same-sex marriage is not implicit in the American scheme of ordered liberty or deeply rooted in American traditions.  A relationship still excluded from the definition of marriage in 34 states and recognized for the first time in this country only a decade ago is anything but "deeply rooted" in our traditions.  Plaintiffs' due process claim accordingly fails.

Plaintiffs likewise have no valid equal protection claim.  Any classification implicated by Utah's marriage laws is subject only to rational basis scrutiny.  Strict scrutiny does not apply because same-sex marriage is not a fundamental right and Utah's marriage laws do not discriminate against a suspect class.  Sexual orientation classifications are not subject to intermediate or heightened scrutiny, either.  Neither the Supreme Court nor the Tenth Circuit has ever recognized sexual orientation as the basis for a suspect class, and a straightforward application of the Court's four-part standard denies that sexual orientation merits extraordinary judicial protection.  Judged by rational-basis review, Utah's marriage laws amply satisfy the Equal Protection Clause. At the very least, man-woman marriage rationally promotes the State's legitimate interest in responsible procreation and the optimal mode for raising children.  Far from reflecting arbitrary classifications or animus, those laws embody Utah's profound commitment to

marriage and family as America has long understood them.

In short, the Constitution does not require Utah to give what Plaintiffs want.  An order directing the State of Utah to redefine marriage over its objections would disregard controlling Supreme Court standards governing claims under the Fourteenth Amendment and breach the Constitution's core structural features of federalism and separation of powers.  The Court should grant the State's motion for summary judgment and deny Plaintiffs' motion.

## II.        RESPONSE TO PLAINTIFFS' STATEMENT OF ELEMENTS

### A.        Standing

The State Defendants have not challenged Plaintiffs' standing.

### B.        Plaintiffs' Substantive Due Process Claims

The State Defendants agree that the Supreme Court decision in *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) sets forth the carefully limited standards for identifying fundamental rights protected by the Due Process Clause.  Plaintiffs have misstated that standard by omitting the "careful description" element of the *Glucksberg* analysis, however.  The Court's "*established method* of substantive due process analysis" has "two primary features." *Id.* (emphasis added).  First, the Due Process Clause provides protection only to "those fundamental rights and liberties which are objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720-21.  Second, identification of fundamental rights "require[s] … a careful description of the asserted fundamental liberty interest." *Id.* at 722.

Plaintiffs have failed to meet their burden of proof under this standard.  None of the cases

they cite establishes a "fundamental right and liberty interest" to marry a person of the same sex.

Instead, each case involved marriage between opposite sex couples and is otherwise

distinguishable on multiple grounds.

### C.    Plaintiffs' Equal Protection Claim

State Defendants agree that the Equal Protection Clause states that no State shall "deny to

any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, §1.

State Defendants disagree with the Plaintiffs' interpretation and application of *United*

*States v. Carolene Products. Co.* and *United States v. Windsor*.  Utah's marriage laws do not

demonstrate prejudice or single out any group to impose a disability on them or treat them

unequally in any constitutionally relevant sense.  Moreover, even if there were evidence of

animus, that alone would not invalidate Utah's marriage laws.  *See Bd. of Trs. of Univ. of Ala. v.*

*Garrett*, 531 U.S. 356, 367 (2001) ("[B]iases may often accompany irrational (and therefore

unconstitutional) discrimination, [but] their presence alone does not a constitutional violation

make.")  The limited relevance of animus follows from the "familiar principle of constitutional

law that [the Supreme] Court will not strike down an otherwise constitutional statute on the basis

of an alleged illicit legislative motive." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41,

48 (1986) (internal quotation marks omitted).

State Defendants maintain that rational-basis review is the controlling standard applicable

to Plaintiffs' equal protection claims. *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113-14 (10th

Cir. 2008) (holding that rational basis review applies to sexual orientation classifications),  Even

if it were an issue of first impression, the correct standard for adjudicating an equal protection

challenge to a classification based on sexual orientation is still rational basis review.  Plaintiffs

do not argue that strict scrutiny applies to their equal protection claims, and intermediate scrutiny

does not apply.  As explained below, Plaintiffs do not satisfy the criteria for identifying a suspect

class.  Sexual orientation is not the basis for the first new suspect class in nearly 40 years.

### III. RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

The State Defendants disagree that all of Plaintiffs' asserted facts are either "material" or

are even "facts."  The adjudicative facts that are material, however, are undisputed.  And, even if

Plaintiffs are able to dispute the legislative facts supporting Utah's marriage laws, summary

judgment for the State is still appropriate, and the challenged provisions would still be valid.  As

the Supreme Court has emphasized, "It makes no difference that the [legislative] facts may be

disputed or their effect opposed by argument and opinion of serious strength.  It is not within the

competency of the courts to arbitrate in such contrariety." *Vance v. Bradley*, 440 U.S. 93, 112

(1979) (quoting *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 357 (1916)).  In the summary

judgment context, if the facts determining a question that is subject to rational basis review are

"at least debatable," the State is entitled to summary judgment. See *Heller v. Doe*, 509 U.S. 312,

326 (1993); *Lupert v. Cal. State Bar*, 761 F.2d 1325, 1328 (1985); *Vance*, 440 U.S. at 110–11;

*United States v. Carolene Prods. Co.*, 304 U.S. 144, 154 (1938).

### Utah's Marriage Laws

1.  State Defendants admit that in 1977 Utah passed the cited legislation.  (The State

Defendants object to the nonstatutory, argumentative term "1977 Marriage Discrimination

Statute.")

2.  State Defendants admit that in 2004 Utah passed the cited legislation.  (The State Defendants object to the nonstatutory, argumentative terms "2004 Marriage Discrimination Statutes" and "Marriage Discrimination Statutes.")

3.  State Defendants admit that in 2004 the Utah legislature passed the cited Joint Resolution on Marriage proposing to amend the Utah Constitution.

4.  State Defendants admit the proposed amendment was known as "Amendment 3" and was placed on the ballot in the November 2004 general election.

5.  State Defendants admit that the 2004 Utah Voter Information Pamphlet was prepared under the direction of the Lieutenant Governor.  The Pamphlet speaks for itself.  (The State Defendants object to the nonstatutory, argumentative term "Marriage Discrimination Statutes.")

6.  State Defendants admit that the 2004 Utah Voter Information Pamphlet speaks for itself.  The State Defendants dispute Plaintiffs' characterizations and conclusions regarding the language of the Pamphlet.  The Pamphlet does not constitute "the express and stated purpose of Amendment 3."

7.  State Defendants admit that some proponents *and* some opponents of Amendment 3 were given space in the 2004 Utah Voter Information Pamphlet to state their own individual arguments for and against Amendment 3.  Plaintiffs' cited quote from the Pamphlet is not given in context.  In full the cited paragraph states:

> This amendment does not promote intolerance, hatred or bigotry.  Earlier this year, the Federal Eleventh Circuit Court of Appeals upheld Florida's ban on homosexual adoptions.  The Court unequivocally recognized government's strong interest in maintaining public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship.  This amendment preserves that same historic understanding of

ix

marriage and the ability of Utahns to govern themselves.

[2004 Utah Voter Information Pamphlet at 36 (State Defendants' MSJ Appendix Tab 18, page 153 (hereinafter State Defendants' App. T18 at 153))]

8.  State Defendants dispute Plaintiffs' characterizations and conclusions regarding the language of the Pamphlet.  The Pamphlet speaks for itself.  The Pamphlet does not constitute "the express and stated purpose of Amendment 3."

9.  State Defendants admit that 66% of Utah voters voted for Amendment 3 and that it was added to the Utah Constitution as Article I, Section 29.

### Defendants

10.  State Defendants admit that Gary R. Herbert is the Governor of Utah.

11.  State Defendants admit that Governor Herbert is the chief executive officer of Utah and is responsible for ensuring that Utah laws are properly enforced.

12.  State Defendants admit that John Swallow is the Utah Attorney General.

13.  State Defendants admit that Attorney General Swallow is the chief legal officer of Utah and is responsible for ensuring that Utah laws are properly enforced.

14.  State Defendants admit that Sherrie Swensen is the Salt Lake County Clerk.

15.  State Defendants admit that Clerk Swensen is responsible for issuing marriage licenses and may perform civil marriage ceremonies in Salt Lake County.

16.  To the extent Plaintiffs are not seeking monetary damages, State Defendants admit that they are "persons" for purposes of 42 U.S.C. § 1983.

### Plaintiffs Kitchen and Sbeity

17 - 24.  State Defendants admit that Plaintiffs Kitchen and Sbeity are a same-sex couple who desire to marry in Utah.  State Defendants are without sufficient knowledge to admit or deny the remaining allegations of paragraphs 17 to 24.

### Plaintiffs Archer and Call

25 - 31.  State Defendants admit that Plaintiffs Archer and Call are a same-sex couple who desire to have their Iowa marriage recognized in Utah.  State Defendants are without sufficient knowledge to admit or deny the remaining allegations of paragraphs 25 to 31.

### Plaintiffs Wood and Partridge

32 - 38.  State Defendants admit that Plaintiffs Wood and Partridge are a same-sex couple who desire to marry in Utah.  State Defendants are without sufficient knowledge to admit or deny the remaining allegations of paragraphs 17 to 24.

### Effects of Utah's Marriage Laws on Plaintiffs

39. State Defendants are without sufficient knowledge to admit or deny the allegations of paragraph 39.

40.  State Defendants admit that the Plaintiffs may not file Utah State tax returns as either "married, filing jointly" or "married, filing separately."

41.  State Defendants are without sufficient knowledge to admit or deny the allegations of paragraph 41.

42.  State Defendants admit that Plaintiffs may not hold marital property with a same-sex partner.  State Defendants dispute, however, that the Plaintiffs are unable to jointly own property.

xi

43.  State Defendants are without sufficient knowledge to admit or deny the allegations of paragraph 43.

44.  State Defendants admit that Plaintiffs may not divorce.

45.  State Defendants admit that Plaintiffs may not inherit, without a will, property from a same-sex partner.  State Defendants affirmatively state, however, that Plaintiffs may, with a will or by joint ownership, devise property to their partner.

46.  State Defendants admit that Plaintiffs may, with an Advance Health Care Directive, name their partner as the authorized person to make health care decisions for them.

47.  State Defendants dispute the allegation that Plaintiffs Call and Archer may not, with an Advance Health Care Directive, name their partner as the authorized person to make health care decisions for each other.

48.  State Defendants admit that married couples receive certain rights and benefits by operation of law that are not available to same-sex couples.

49.  State Defendants are without sufficient knowledge to admit or deny the allegations of paragraph 49.

50.  State Defendants are without sufficient knowledge to admit or deny the allegations of paragraph 50 as to Plaintiffs' feelings.  State Defendants dispute Plaintiffs' characterizations and conclusions regarding the purposes of the subject laws.

<u>**Plaintiffs' Due Process Claims**</u>

51 - 54.  Paragraphs 51 to 54 set forth arguments and conclusions rather than assertions of material fact.

<u>**Plaintiffs' Equal Protection Claims**</u>

55.  State Defendants admit that in Utah opposite sex couples may marry if they meet the statutory requirements and that married couples receive rights and benefits that flow from marriage.

56.  State Defendants admit that in Utah same-sex couples may not marry and that they do not receive the rights and benefits that flow from marriage.

57.  State Defendants admit that a marriage solemnized in another state is valid in Utah unless it would be prohibited and declared void and unless it would be contrary to the public policy of Utah.

58.  State Defendants admit that the marriage of Plaintiffs Archer and Call is not recognized in Utah.

59 – 60.  Paragraphs 59 and 60 set forth arguments and conclusions rather than assertions of material fact.

61-64.  Paragraphs 61 through 64 set forth Plaintiffs' arguments and purported application of the factors for determining suspect class status.  State Defendants respond to these arguments below in the Argument section of this opposition brief.

65 – 66.  Paragraphs 65 and 66 set forth arguments and conclusions rather than assertions of material fact.  State Defendants also deny that intermediate scrutiny applies to Plaintiffs' claims.  If intermediate scrutiny did apply, the relevant inquiry would be whether the definition of marriage as between a man and a woman is substantially related to an important governmental interest.

# IV. ARGUMENT

**A. Plaintiffs' Motion Asks this Court to Disregard Core Structural Features of the Constitution Based on Legal Theories It Is Bound to Reject.**

### 1. Relevant Supreme Court Decisions Deny That the Constitution Protects Plaintiffs' Asserted Right to Same-sex Marriage.

The Plaintiffs have chosen to omit any reference to or discussion of *Baker v. Nelson*, 409 U.S. 810 (1972). *Baker* rejected, for lack of a substantial federal question, the same claims raised by Plaintiffs. Plaintiffs' motion does not explain how *Baker* can be distinguished or why a binding decision of the Supreme Court should be disregarded.[1] As a controlling decision, *Baker* alone supports the State's motion for summary judgment.

Beyond *Baker*, Plaintiffs' claims lack direct precedential support. No decision by the Supreme Court or the Tenth Circuit declares same-sex marriage a federal right. Without a controlling decision in their favor, plaintiffs ask the Court to break new constitutional ground by declaring same-sex marriage a fundamental right and sexual orientation a quasi-suspect class.

The Supreme Court has articulated standards to guard against the improper expansion of Fourteenth Amendment rights and protections. Specifically, it has emphasized that recognizing a new fundamental right or suspect class is not to be indulged in lightly, lest the exercise of judicial power breach the Constitution's structural principles of federalism and the separation of

---

[1] *United States v. Windsor*, 133 S. Ct. 2675 (2013) does not dilute the binding effect of *Baker* as it pertains to State law defining marriage. As the Second Circuit emphasized, the issue in *Windsor* is distinguishable in that it dealt with the constitutionality of *federal law* defining marriage, not *State* law. *See Windsor v. United States*, 699 F.3d 169, 178 (2nd Cir. 2012) ("The question whether the federal government may constitutionally define marriage . . . is sufficiently distinct from the question in *Baker*: whether same-sex marriage may be constitutionally restricted by the *states*.") (emphasis in original).

powers. *See Glucksberg*, 521 U.S. at 720.  Both principles, fundamental to the Constitution's

distribution of governmental powers, would be violated here by a decision announcing a federal

right to same-sex marriage.

### 2. The Windsor Decision Affirms the State's Authority to Define and Regulate Marriage.

The Plaintiffs have chosen to ignore the central support upon which the Supreme Court's

*Windsor* decision is based: that the States (*not* the federal government) have the sovereign

authority to define and regulate marriage.  The Court stated:

> *The State's power* in defining the marital relation is of *central relevance* in this case quite apart from principles of federalism. Here the *State's decision* to give this class of persons the right to marry *conferred* upon them a dignity and status of immense import. When *the State used its historic and essential authority to define* the marital relation in this way, *its role* and *its power* in *making the decision* enhanced the recognition, dignity, and protection of the class in their own community.

*Windsor*, 133 S. Ct. at 2692 (emphasis added).

The Court emphasized that "[t]he definition of marriage is the foundation of *the State's*

*broader authority* to regulate the subject of domestic relations with respect to the [p]rotection of

offspring, property interests, and the enforcement of marital responsibilities." 133 S. Ct. at 2692,

2691 (emphasis added) (internal quotation marks omitted).  And the Court noted that

"[c]onsistent with this allocation of authority, the Federal Government, through our history, has

*deferred* to state-law policy decisions with respect to domestic relations." *Id.* at 2691 (emphasis

added).  Specifically, the Court held that New York's recognition of same-sex marriage was

"without doubt a proper exercise of *its [the State's] sovereign authority* within our federal

system, all in the way that the Framers of the Constitution intended." *Id.* at 2692 (emphasis

added).  Congress went astray, the Court held, by "interfer[ing] with the equal dignity of same-sex marriages, a dignity *conferred by the States* in the exercise of *their sovereign power*."  *Id.* at 2693 (emphasis added).

The *Windsor* decision is replete with deferential references to the *State's* (New York's) *finding*, the *State's decision*, the *State's power*, the *State's authority*, and the *State's conferral*.  Same-sex marriage was not *made lawful* by the operation of federal law.  Rather, "same-sex marriages [were] *made lawful by the State*."  The Court recognized and deferred to "*[t]he State's power* in defining the marital relation" and "*the State's decision* to give this class of persons the right to marry" and "*the State['s]* use[] [of] its historic and essential *authority* to define the marital relation."  *Id.* at 2692 (emphasis added).  The Court further stated:

> The class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages *made lawful by the State*.  DOMA singles out a class of persons *deemed by a State* entitled to recognition and protection to enhance their own liberty.  It imposes a disability on the class by refusing to acknowledge a status *the State finds* to be dignified and proper.

*Id.* at 2695-96 (emphasis added).

The Court held that "[t]he dynamics of state government in the federal system are to *allow the formation of consensus* respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other."  *Id.* at 2692 (emphasis added).[2]

---

[2]  The Court found the federal statute served "no legitimate purpose" and held it was unconstitutional under the Fifth Amendment.  *Windsor*, 133 S. Ct. at 2695-96.  Importantly, however, the Court expressly limited the scope of its opinion: "This opinion and its holding are confined to those lawful marriages," meaning those same-sex marriages in States where same-sex marriage has been made legal.  *Id.* at 2696.  Nothing in *Windsor* limits or restricts in any way

The Supreme Court criticized the federal government's efforts "to influence or interfere with *state sovereign choices* about who may be married" and "to put a thumb on the scales and influence *a state's decision* as to how to shape its own marriage laws." *Id.* at 2693 (emphasis added).

If New York's "*find[ing]*," New York's "*decision*," New York's "*power*" and New York's "*exercise of its sovereign authority within our federal system*" to define marriage to include same-sex marriage is respected and deferred to by the federal courts, Utah's "*find[ing]*," Utah's "*decision*," Utah's "*power*" and Utah's "*exercise of its sovereign authority within our federal system*" to *not* include same-sex marriage is entitled to the same respect and deference. To not accord the same respect and deference to Utah's sovereign authority would be to quash "[t]he dynamics of state government in the federal system" and to impose rather than to "*allow the formation of consensus.*" *Id.* at 2692 (emphasis added).

To not accord respect and deference to Utah's sovereign authority would also violate the "'fundamental principle of *equal* sovereignty' among the States." *Shelby Co.*, 133 S.Ct. at 2623 (quoting *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). In *Shelby County* the Supreme Court observed:

> Over a hundred years ago, this Court explained that our Nation "was and is a union of States, equal in power, dignity and authority." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). Indeed, "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.*, at 580. . . . [T]he fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States. [*Northwest Austin*,] 557 U.S., at 203.

*Id.* at 2623-24.

---

Utah's sovereign right to define and regulate the marriage of its citizens.

4

Utah has the sovereign authority to define and regulate marriage.  Absent a clear constitutional mandate establishing a right to same-sex marriage, which does not exist, federal intrusion upon this authority and right would disrupt the "balance" and "harmonious operation of the scheme upon which the Republic was organized."  Unless rejected, Plaintiffs' claims would overturn Utah's marriage laws and, by extension, the marriage laws of 34 states on a legal theory no federal appellate court has ever accepted.

> **B.  A Claimed Liberty Interest in Marrying a Person of the Same Sex Is Not a Fundamental Right under the Fourteenth Amendment Due Process Clause.**

Utah's marriage laws do not infringe the Due Process Clause.  No decision by the Supreme Court or the Tenth Circuit ever has held that the guarantee of due process includes the right to marry a person of one's own gender.

Plaintiffs correctly cite to Supreme Court precedent which sets forth the "established method of substantive-due-process analysis," Plaintiffs' MSJ (Doc. 32) at 2 (citing *Glucksberg, 521 U.S. at 720*, for determining the existence of a fundamental right.  Plaintiffs then proceed to ignore the two part inquiry of that analysis.

> **1. The Required "Careful Description" of the Asserted Liberty Interest in Same-Sex Marriage Demonstrates that No Such Right Exists.**

First, the "*established method*" requires a "careful description" of the asserted liberty interest which is precise and not overly broad. *Glucksberg, 521 U.S. at 722-723* (emphasis added); *Reno v. Flores, 507 U.S. 292, 302 (1993)*.  In case after case, the Supreme Court has insisted on "carefully formulating the interest at stake in substantive due process cases." *Id. at*

5

722.  In *Glucksberg*, for instance, the Court rejected broad statements of the asserted interest, such as "a liberty interest in determining the time and manner of one's own death" or "the right to choose a humane, dignified death," in favor of the more precise formulation "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so."  *Id*. at 722, 723 (citations omitted).

Plaintiffs' asserted liberty interest here is imprecisely and broadly described at various times as the right "to marry the person of his or her choice, without having that choice infringed by the State" or "[t]he decision of who a person marries," or, more concretely, "the right to choose a marriage partner, regardless of gender."  *Plaintiffs' MSJ* (Doc. 32) at 6, 7, 8.  This last description—"the right to choose a marriage partner, regardless of gender"—approaches the degree of descriptive care *Glucksberg* demands, with a minor modification.  *See Glucksberg*, 521 U.S. at 722 (refusing to describe medically assisted suicide as "the right to choose a humane, dignified death").  Because Plaintiffs allege that Utah withholds marriage from them, not that the State interferes in their choice of a partner, the more careful way of describing their asserted interest is as the right to marry a person of the same sex.

So described, plaintiffs' asserted interest is distinguishable from the Supreme Court's decisions affirming a right to marry.  Those decisions were premised on the relationship between a man and a woman.  In addition, this case is wholly unlike *Loving v. Virginia*, 388 U.S. 1, 10-12 (1967), which involved an invidious marriage system bent on racial oppression.  Racial discrimination is uniquely odious, given America's history and the text of the Civil War Amendments.  Plaintiffs beg the question when they presume that gays and lesbians are entitled

to the same judicial protection accorded racial minorities, especially where the traditional definition of marriage exists not to oppress homosexuals but to further other vital social ends. *Zablocki* and *Turner* hold no relevance at all.  Each decision invalidated a state law or prison regulation withholding marriage from opposite-sex couples for reasons that have nothing to do with this case. *Turner v. Safley*, 482 U.S. 78, 95-96 (1987); *Zablocki v. Redhail*, 434 U.S. 374, 384-85 (1978).

   *Lawrence* is irrelevant to the issue of legal recognition of same-sex unions.  The Court majority expressly stated the case "does *not* involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578 (emphasis added).  *Lawrence did* address the criminalization of private adult consensual homosexual conduct, but the Court did not even declare a fundamental right for that conduct. *See* 539 U.S. at 586 (Scalia, J., dissenting) ("nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause").  Further the Court in *Lawrence* did *not* subject the law at issue to the standard of review (heightened scrutiny) that Plaintiffs seek and that would have applied had a fundamental right been involved. *Id.* at 578. ("The Texas statute furthers no legitimate state interest.").

   In her concurring opinion Justice O'Connor pointed out that *Lawrence* did "*not* involve public conduct . . .  It does *not* involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring) (emphasis added).  Justice O'Connor also emphasized that in such a case, "preserving the traditional institution of marriage" *would itself* constitute a legitimate state

7

interest under rational basis review and that "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group." *Id*.

Plaintiffs likewise cannot derive a fundamental right to same-sex marriage from vague conceptions of personal autonomy.  They cite *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), for the contention that "[m]arriage is a constitutionally protected right because it implicates 'the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy.'"  *Plaintiffs' MSJ* (Doc. No. 32) at 7 (quoting *Casey*, 505 U.S. at 851).  Yet the Supreme Court has expressly denied that its "liberty jurisprudence, and the broad, individualistic principles it reflects" safeguards a range of interests derived from "a general tradition of 'self-sovereignty'" or "deduced from abstract concepts of personal autonomy."  *Glucksberg*, 521 U.S. at 724, 725 (citation omitted).  Instead, the Court has taught, "[t]hat many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected, and *Casey did not suggest otherwise*."  *Id*. at 727-28 (emphasis added) (citations omitted).

As set forth above, nothing in *Windsor* justifies the Court in declaring Utah's marriage laws unconstitutional.  *Windsor* affirms the states' traditional authority to define and regulate marriage.  It overturned an act of Congress considered an "unusual" federal intrusion into that authority.  *Windsor* does not question Utah's authority to preserve traditional marriage but rather affirms it; the Court's reasoning from principles of autonomy and dignity was directed at showing why Congress's intervention into the area was invalid, not why every state must permit

8

same-sex marriage.  Indeed, the majority took pains to stress that its holding extended only to same-sex marriages now authorized by state law.  That New York permits same-sex couples to marry and Utah does not has no bearing on the constitutional authority of each state to make that choice for itself.

### 2. The Asserted Right to Same-Sex Marrige is Not "Objectively, Deeply Rooted in this Nation's History and Tradition."

The second factor to be considered in the *Glucksberg* "established method" is to recognize only "those fundamental rights and liberties which are objectively, deeply rooted in this Nation's history and tradition."  *Glucksberg,* 521 at 720-21.  "Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decision making and restrain judicial exposition of the Due Process Clause."  *Id.* at 721.

Plaintiffs fail to address "objectively" whether same-sex marriage is "deeply rooted in this Nation's history and tradition."  While it is undisputed that marriage between qualified persons of opposite genders *is* "deeply rooted in this Nation's history and tradition," Plaintiffs must "objectively" concede that it is equally undisputed that same-sex marriage is *not* "deeply rooted in this Nation's history and tradition."

No State permitted same-sex marriage until 2003. *Goodridge v. Dep't of Public Health,* 798 N.E.2d 941 (2003).  Even abroad, no foreign nation allowed same-sex marriage until the Netherlands in 2000. *Windsor,* 133 S. Ct. at 2715 (Alito, J., dissenting).  The fact that, in the last 10 years of this Nation's 237 year history, a minority of States have permitted same-sex marriage does not transform same-sex marriage into a "deeply rooted" historical and traditional right. Rather, the very novelty of Plaintiffs' claim is reason enough to conclude that substantive due

process does not sustain it. _Flores_, 507 U.S. at 303 ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it."). To hold for the Plaintiffs, the Court "would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice" of a majority of States. _Glucksberg_, 521 U.S. at 723 (citing _Jackman v. Rosenbaum Co._, 260 U.S. 22, 31 (1922) ("If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.")). No interest still inconsistent with the laws of 34 states and with the ubiquitous legal traditions of this country until a decade ago can be called "deeply rooted."

In sum, it is undisputed that the Supreme Court _has_ recognized the right of opposite gender couples to marry as being fundamental. It is equally undisputed that _neither_ the Supreme Court _nor_ the Tenth Circuit Court of Appeals _has ever_ recognized the claimed right to marry a person of the same gender as being fundamental.

### C. UTAH'S MARRIAGE LAWS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE BECAUSE THEY ARE RATIONALLY RELATED TO LEGITIMATE STATE INTERESTS

#### 1. Rational Basis Equal Protection Analysis Applies Because Utah's Marriage Laws do Not Infringe on a Fundamental Right nor Affect a Suspect Class.

A legislative classification that neither affects a fundamental right nor targets a suspect class "is accorded a strong presumption of validity." _Heller_, 509 U.S. at 319. Such a classification will not violate the Equal Protection Clause so long as it rationally relates to some legitimate governmental purpose. _Id._; _Romer_, 517 U.S. at 631. In other words, "[a] statutory classification fails rational-basis review only when it rests on grounds wholly irrelevant to the

achievement of the State's objective." *Heller*, 509 U.S. at 324 (internal quotation marks omitted). Plaintiffs try to avoid this deferential standard of review by arguing that Utah's marriage laws are subject to intermediate scrutiny because they discriminate based on sexual orientation and/or gender.  But binding Tenth Circuit precedent holds that sexual orientation is not a protected class and the marriage laws do not discriminate against either gender.

### a.  Binding Tenth Circuit precedent requires rational basis review of sexual orientation classifications

*Price-Cornelison* held that sexual orientation is not a protected class warranting heightened scrutiny.  *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113  (10th Cir. 2008).  The court also reiterated Tenth Circuit precedent holding that sexual orientation is not a suspect class requiring strict scrutiny.  *Id.* at 1114, n.9.  Then, as if there could be any question that rational basis scrutiny applied after the other two options had been eliminated, the court expressly stated that government "can, therefore, distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end."  *Id.* at 1114; *see also Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir. 1992) ("prior to *Hardwick* we twice applied rational basis review to classifications which disparately affected homosexuals.") (citing *Rich v. Sec'y of the Army*, 735 F.2d 1220, 1229 (10th Cir.1984); *Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1273 (10th Cir.1984), *aff'd by an equally divided court*, 470 U.S. 903 (1985)).

Plaintiff's brief never mentions this controlling authority, implicitly inviting this Court to ignore it and apply heightened scrutiny.  But regardless of whether Plaintiffs ignore the law, this Court cannot do so.  *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279 (10th Cir. 2010) ("a district court is bound by decisions made by its circuit court.").  Plaintiffs' amici, the

11

ACLU, at least acknowledges the precedent but shrugs it off as mere dicta and expressly invites

the Court to ignore it.  Both approaches are wrong:  Plaintiffs for pretending it does not exist and

the ACLU for pretending it does not matter.

While admitting that the Tenth Circuit has held sexual orientation is not a suspect class,

the ACLU argues "there is no binding precedent . . . holding that sexual orientation

classifications must be subjected to rational-basis review instead of the intermediate scrutiny

standard for quasi-suspect classifications."  ACLU Br. at 4.  This claim rests, at least in part, on

the notion that over the past decades multiple panels of apparently inattentive and careless Tenth

Circuit judges have "mischaracterized" Tenth Circuit precedent as applying rational basis

scrutiny to sexual orientation classifications.  *Id.* at 6.  Even if that dubious theory were correct,

it is irrelevant.  A holding from the Tenth Circuit remains a holding from the Tenth Circuit—no

matter how wrong the ACLU or any other litigant thinks it may be—and binds both district

courts and subsequent Tenth Circuit panels.  *Dobbs*, 600 F.3d at 1279 (district court bound by its

circuit court's decisions); *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam) (Tenth

Circuit panel is bound by precedent of prior panels absent en banc reconsideration or a

superseding contrary decision by the Supreme Court).  And *Price-Cornelison* unquestionably

held, in a 2008 decision, that rational basis review applies to sexual orientation classifications.

*Price-Cornelison*, 524 F.3d at 1113-14.  Price-Cornelison, a lesbian, sued the defendant for

violating her equal protection rights by failing to enforce a protective order on her behalf the

same way he enforced protective orders on behalf of heterosexuals.  The defendant asserted

qualified immunity in a motion for summary judgment, which the district court denied.  On

interlocutory appeal, the Tenth Circuit had to determine, in relevant part, whether Price-Cornelison had sufficiently established an equal protection violation to overcome the assertion of qualified immunity.  The court first outlined the three tiers of equal protection scrutiny and then, after thoroughly discussing the facts, concluded that Price-Cornelison had adequately alleged unequal treatment.  But the court still had to choose a level of scrutiny for her claims to determine whether her sexual orientation discrimination she had suffered amounted to a constitutional violation. Notably, the court held that the plaintiff's claim did not "implicate a protected class, which would warrant heightened scrutiny." *Id.* at 1113.  To erase any potential doubt that rational basis review applied, the court stated that a "government official can, therefore, distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end." *Id.* at 1114.  Applying that standard, the court noted that defendant had not asserted, and the Court itself could not find on the record, any rational reason for the defendant's unequal treatment of the plaintiff.  Accordingly, the court found that Price-Cornelison had "sufficiently established that [defendant] violated her constitutional rights." *Id*.  The court's pointed rejection of any form of heightened scrutiny (and the court's opinion demonstrates that it was obviously aware of both strict and intermediate scrutiny), its express statement requiring rational basis review, and its application of that standard to the facts before it all lead to but one conclusion:  the Tenth Circuit has held that sexual orientation classifications are reviewed under rational basis scrutiny.  The ACLU cannot change that fact.  Nor should this Court accept the ACLU's and the Plaintiffs' invitation to change the law.

13

**b. Neither *Windsor* nor any other Supreme Court decision requires heightened scrutiny of sexual orientation classifications**

Plaintiffs assert that *Windsor* endorses application of heightened scrutiny to sexual orientation classes because the Court "let stand" the Second Circuit's use of intermediate scrutiny and noted that "discriminations of an unusual character especially suggest careful consideration."  Plaintiffs' MSJ (Doc. No. 32) at 27 (internal quotation marks omitted).  But neither fact suggests the Supreme Court was encouraging lower courts to apply heightened scrutiny, especially when the Court did not do so itself.  In the first place, the Supreme Court affirmed only the Second Circuit's judgment, not the circuit court's reasoning.  *Windsor*, 133 S. Ct. at 2696 ("The judgment of the Court of Appeals for the Second Circuit is affirmed.").  Had the Court wanted to affirm or otherwise endorse the Second Circuit's equal protection approach, it could have done so.  Instead, the Supreme Court conducted its own analysis along federalism and due process lines.  *Id*. at 2695 (holding "DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment").  If anything, the fact that the Supreme Court noted, only as a background fact, *Id*. at 2684, the Second Circuit's application of heightened scrutiny and affirmed on different grounds would seem to be an implicit rejection of the Second Circuit's approach.  At any rate, to the extent *Windsor* suggested what level of equal protection scrutiny might apply to sexual orientation, it used terms associated with rational basis review.  *Id*. at 2696 (stating DOMA was invalid "for no legitimate purpose overcomes" its discriminatory purpose and effect of injuring those whom New York state law had deemed married).

14

Likewise, the Court's statement that DOMA required "careful consideration" hardly means that sexual orientation warrants heightened scrutiny under the Equal Protection Clause. Whatever "careful consideration" entails, the Court applied it to DOMA only because that law was a "discrimination of an unusual character." *Windsor*, 133 S.Ct at 2692, 2693. And as the Court made clear, DOMA was an unusual federal law "because of its reach and extent, [it] departs from this history and tradition of [federal] reliance on state law to define marriage." *Id.* at 2692; *see also id.* at 2693 (noting "DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage"). The opposite is true here. Utah's laws defining marriage pursuant to its constitutional prerogatives are the epitome of usual, according to *Windsor*, and therefore do not require "careful consideration."

Nor do the Supreme Court's other two decisions addressing the constitutional rights of gays and lesbians endorse sexual orientation as a (quasi-) suspect class. *Romer* expressly applied "conventional" rational basis review in holding that a Colorado amendment violated equal protection by placing a "[s]weeping" and "unprecedented" ban on state and local laws offering gays and lesbians common protections from discrimination. 517 U.S. at 631-32, 627, 633. Likewise, *Lawrence* applied rational basis review and struck down Texas' law criminalizing sodomy based on due process principles. *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) ("The Texas statute furthers no legitimate state interest.").

### c.  Sexual orientation does not meet the criteria for treatment as a protected class

Ignoring Tenth Circuit precedent that rejects their argument, the Plaintiffs urge the Court to conduct its own analysis of whether sexual orientation meets the criteria for treatment as a

15

quasi-suspect class.  But even if the Court were not constrained by binding precedent, the conclusion would be the same.  Sexual orientation is not a protected class; it does not require heightened scrutiny to insulate it from the normal democratic process.

For multiple reasons, Supreme Court decisions express considerable caution about adding new suspect classes to equal protection jurisprudence.  "[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued."  *City of Cleburne*, 473 U.S. at 441-42.

The Court has also explained that federalism concerns may justify applying a lower level of scrutiny.  While "[q]uestions of federalism are always inherent in the process of determining whether a State's laws are to be accorded the traditional presumption of constitutionality, or are to be subjected instead to rigorous judicial scrutiny," federalism concerns counsel against application of strict scrutiny where a court is urged to strike down widely prevailing laws pertaining to areas of traditional state deference.  *San Antonio Ind. Sch. Dist. v. Rodriquez*, 411 U.S. 1, 44 (1973) ('it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State.").

The Court has also expressed reluctance about creating a new protected class based on the type of arguments that Plaintiffs employ here because "it would be difficult to find a

principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large." *City of Cleburne,* 473 U.S. at 44-45[3]; *see also Save Palisade Fruitlands v. Todd,* 279 F.3d 1204, 1212 n.5 (10th Cir. 2002) (declining to apply strict scrutiny to one class because the court would presumably "be forced to apply the same level of scrutiny" to various other classes).  The Court's hesitancy has meant that no new suspect class has been added to the equal protection canon in more than 35 years.  *See* Kenji Yoshino, *The New Equal Protection,* 124 HARV. L. REV. 747, 757-58 (2011) ("[T]he last classification accorded heightened scrutiny by the Supreme Court was that based on nonmarital parentage in 1977.  *At least with respect to federal equal protection jurisprudence, this canon has closed.*" (emphasis added)).

In particular, the Supreme Court's continuing reluctance to create new (quasi-) suspect classes extends directly to sexual orientation.  In *Windsor,* the Court did not adopt the Second Circuit's holding that sexual orientation was a quasi-suspect despite the fact that both parties— Ms. Windsor and the United States—and "influential scholars of constitutional law,"  Plaintiffs' MSJ (Doc. 32) at 27 n.4, were all pressing the Court to make sexual orientation the first protected class in decades.  *Id.* at 2716 (Alito, J. dissenting) (noting that Ms. Windsor and the

---

[3] In *City of Cleburne,* the Court rejected the Fifth Circuit's holding that the "mentally retarded" were a quasi-suspect class. 473 U.S. at 442-446.  As noted in the text above, the Court was concerned that the Fifth Circuit's reasoning would justify protected status for "a variety of other groups." *Id.* at 445.  Notably, the Fifth Circuit's reasons sound very much like the arguments that Plaintiffs currently propound:  a history of "unfair and often grotesque mistreatment," a lack of political power, an immutable condition, and the fact that the challenged ordinance withheld a benefit that was very important albeit not fundamental.  *Id.* at 438.

United States argued that "classifications based on sexual orientation should trigger a form of 'heightened' scrutiny'" but that "the Court [wa]s careful not to adopt most of Windsor's and the United States' argument."); *see also Massachusetts v. U.S. Dep't of Health and Human Servs., 682 F.3d 1, 9 (1ˢᵗ Cir. 2012)* (noting that the Supreme Court "conspicuously failed" to declare sexual orientation a suspect class "in *Romer*—a case that could readily have been disposed by such a demarche").

Plaintiffs are expressly inviting this Court to adopt the arguments from the Second Circuit and the Supreme Court briefing that the Supreme Court already declined to accept. Plaintiffs' MSJ (Doc. 32) at 27-33 & n.4.  This Court should show the same restraint exhibited by the Supreme Court on this same issue and reject Plaintiffs' efforts to expand the limited and long-standing number of protected classes.

Given Tenth Circuit precedent holding that rational basis scrutiny applies and the *Windsor* Court's refusal to adopt the Plaintiffs' arguments for heightened scrutiny, there is no need to exhaustively discuss the criteria that have been used to determine whether a class is quasi-suspect (or suspect).[4]  The Supreme Court has considered 4 factors to assess whether a particular class should be treated as suspect: (1) is the class politically powerless; (2) is it characterized by an immutable trait; (3) is the trait relevant to legitimate interests the State can

---

[4] In general, *Sevcik* thoroughly examined the issue along with relevant democratic concerns and concluded that sexual orientation classifications do not require heightened scrutiny. *Sevcik, 911 F. Supp. 2d at 1007-1013*; *see also id.* at 1013-14 ( "Where there is no clear prohibition of discrimination according to a particular category, and where the group complaining of discrimination has meaningful political power to protect its own interests, it is inappropriate for a court to remove the issue from legislative control.").  *Sevcik* also points out some of the flaws in the Second Circuit's analysis upon which the Plaintiffs rely.  *Id.* at 1007-1013.

regulate; and (4) has the class endured and does it continue to endure invidious or purposeful discrimination. *City of Cleburne,* 473 U.S at 442-46; *Rodriguez,* 411 U.S. at 28; *see also Bowen v. Gilliard,* 483 U.S. 587, 602 (1987).   But it must be remembered that these "traditional indicia of suspectness" are meant to identify classes "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protections from the majoritarian political process." *Rodriguez,* 411 U.S. at 28; *see also Save Palisade Fruitlands v. Todd,* 279 F.3d 1204, 1210 (10th Cir. 2002) (same).   For it is when the ordinary political processes are seriously curtailed that a judicial incursion into democratic self-governance is possibly justified. *Carolene Prods.,* 304 U.S. at 152 n.4.   Viewed properly, none of the factors adequately supports—and the important political power factor weighs heavily against—making sexual orientation the first new protected class in almost 40 years.

First, plaintiffs are surely not "politically powerless in the sense that they have *no ability* to attract the attention of the lawmakers." *City of Cleburne,* 473 U.S. at 445 (emphasis added). Gay and lesbian interest groups are attracting the attention of lawmakers with remarkable success.  The President, Vice President, the U.S. Department of Justice, the Democratic Party, and even portions of the Republican Party publicly support same-sex marriage.  The President and Attorney General even took the unusual step of refusing to defend and then successfully attacking DOMA.  Sixteen States and the District of Columbia now recognize same-sex marriage—a remarkable advance for same-sex couples over the legal and political situation even five years ago.  Last year's elections resulted in the adoption of same-sex marriage in Maine,

where it had been previously rejected, as well as Maryland and Washington. Just in the time between the filing of the parties' motions for summary judgment and their replies, New Jersey, Illinois and Hawaii decided to allow same-sex marriage (and in Hawaii's case despite a recent federal court decision upholding Hawaii's prior law allowing only traditional marriage). Moreover, polling indicates that a majority of Americans favor same-sex marriage, with the percentage in favor having doubled since 1996. Gallup.com (July 29, 2013) available at http://www.gallup.com/poll/163730/back-law-legalize-gay-marriage-states.aspx. Aside from marriage, Congress repealed the military's Don't Ask Don't Tell policy. *See* Don't Ask Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515, 10 U.S.C. § 654 note. It would be hard to identify many groups on the national scene that are more politically powerful than gays and lesbians.[5]

 This record of significant achievement belies Plaintiffs' assertion of political powerlessness. Because "[a]ny minority can be said to be powerless to assert direct control over the legislature," *City of Cleburne*, 473 U.S. at 445, the inability of gays and lesbians to achieve predictable political outcomes signifies the health of the democratic process in a pluralistic republic. Their inability to achieve guaranteed political results does not justify treating them as a

_____

 [5] Gays and lesbians have also demonstrated their access to local lawmakers too. Salt Lake City and Salt Lake County have enacted ordinances forbidding discriminatory housing or employment decisions based on a person's sexual-orientation, Salt Lake City Ord. 10.04.070 & 10.05.070; Salt Lake County Ord. 10.13.070 & 10.14.070 and instituting mutual commitment registries. Salt Lake City Ord. 10.03.010 to .060; Salt Lake County Ord. 2.10 to 2.10.070. At least 12 other Utah cities or counties have likewise prohibited employment and housing discrimination against gays and lesbians. *See, e.g.,* "Harrisville becomes 14th Utah locale to ban anti-gay bias," available at http://www.sltrib.com/sltrib/politics/53374411-90/discrimination-utah-utahns-gay.html.csp.

suspect class.  *Sevcik*, 911 F. Supp. 2d at 1009 ("The question of 'powerlessness' under an equal

protection analysis requires that the group's chances of democratic success be virtually hopeless,

not simply that its path to success is difficult or challenging because of democratic forces.").  To

the contrary, Plaintiffs' undeniable political power weighs heavily against any conclusion that

federal courts must protect Plaintiffs from the normal functioning of representative democracy.

Unable to argue that they are politically powerless, Plaintiffs try to change the standard

and argue that they do not have as much power as women did when gender became a protected

class.  Plaintiffs' MSJ (Doc. 32) at 33.  But the political power of women (who are not even a

political minority) is clearly an exception to the powerlessness factor explained by other

historical incidents and legal disabilities not applicable to Plaintiffs.  Throughout the nineteenth

century "the position of women in our society was, in many respects, comparable to that of

blacks under the pre-Civil War slave codes."  *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973)

(plurality op.).  Women could not vote, hold public office, serve on juries, own property (if

married), or even serve as the legal guardians for their own children.  *Id.* at 685.  These severe

legal disabilities prevented their full participation in and influence on fundamental political

processes, and left statute books laden with outdated stereotypes.  *Id.* at 685; *see also Sevcik*, 911

F. Supp. 2d at 1011 (discussing *Frontiero*).  Homosexuals and lesbians have never been similarly

and categorically excluded from the political process.  And their argument to be treated like

women would allow virtually any other class to claim a lack of political power too.

Second, homosexuality is an attribute of same-sex relationships that is relevant to the

legitimate interests pursued by Utah lawmakers in defining marriage.  *See City of Cleburne*, 473

U.S. at 441 (approving of differential treatment "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement").  However irrelevant it might be in other contexts, homosexuality is directly relevant to marriage's historical focus on childbearing and mother-father childrearing and to the problem of unplanned and unintended children.  The sexual conduct of male-female relationships can produce children; the sexual conduct of homosexual relationships cannot.  Male-female marriage supports the State's strong interest in having a child raised by the father and mother who brought him into the world; same-sex marriage does not.

Third, the "immutability" of sexual orientation—as that term gets used in Supreme Court jurisprudence—is disputed, or at least different from the immutable characteristics recognized in the protected classes.  For instance, the Supreme Court has recognized that "sex [meaning gender, not sexual orientation], like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686 (plurality op.).  And unlike race or gender or the immutable characteristics of other protected classes, sexual orientation is defined (at least in part) by a propensity to engage in certain conduct.  *See Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989).  Never before has the Supreme Court endorsed a suspect class whose defining characteristic includes conduct, particularly conduct of a private and intimate kind for which problems of consistency and proof are bound to frustrate efforts at defining the class with any precision.  *See Rodriguez*, 411 U.S. at 19 ("the class of disadvantaged 'poor' cannot be identified or defined in customary equal protection terms").

22

Plaintiffs argue that Supreme Court precedent does not distinguish between gay and lesbian status and gay and lesbian conduct.  Plaintiffs MSJ (Doc. 32) at 32.  But none of the cases discuss immutability for purposes of equal protection.  *Christian Legal Society v. Martinez,* 130 S. Ct. 2971, 2990 (2010), involved a First Amendment challenge to a university's anti-discrimination policy, not an equal protection challenge much less whether homosexuality was immutable.  *Jackson,* 884 F. Supp. 2d at 1101.  Nor does Plaintiffs' cite to *Lawrence* help their argument.

Fourth, the history of homosexual discrimination was relatively short-lived and is quickly being eclipsed by wide acceptance.  Since "the concept of the homosexual did not emerge until the late 19th century," *Lawrence,* 539 U.S. at 568, "antigay discrimination … is [at most] a unique and relatively short-lived product of the twentieth century."  George Chauncey, *Why Marriage?:  The History Shaping Today's Debate Over Gay Equality* 14 (2004).   A decade ago the Supreme Court confirmed that "there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter."  *Lawrence*, 539 U.S. at 568.  Since then American culture has grown ever more tolerant of gays and lesbians.  Considering gays' and lesbians' political power and the rapidly increasing number of legislative triumphs, it seems apparent that "lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary."  *City of Cleburne,* 473 U.S. at 443.

23

### d. Sexual orientation warrants only rational basis review in this context regardless of whether it merits heightened scrutiny in other contexts

The State Defendants categorically deny that heightened scrutiny applies to Plaintiffs' equal protection claim.  Even if the Court is inclined to consider heightened scrutiny for classifications based on sexual orientation despite contrary Tenth Circuit precedent, Utah's definition of marriage is not an appropriate candidate to apply closer judicial scrutiny for the first time.

Supreme Court precedent shows that even where a heightened level of scrutiny generally applies to laws affecting a fundamental right or a suspect class, context matters and circumstances may justify applying less stringent scrutiny. *See Grutter v. Bollinger,* 539 U.S. 306, 327 (2003) ("Context matters when reviewing race-based governmental action under the Equal Protection Clause" and it is the "fundamental purpose" of "strict scrutiny" to " take relevant differences into account." (internal quotation marks omitted.")); *Cabell v. Chavez-Salido,* 454 U.S. 432, 438-39 (1982) (while alienage classifications are normally subject to strict scrutiny, "strict scrutiny is out of place when the [classification] primarily serves a political function" because "citizenship . . . is a relevant ground for determining membership in the political community."); *Zablocki v. Redhail,* 434 U.S. 374, 386 (1978) ("By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny."); *Sugarman v. Dougall,* 413 U.S. 634, 647-48 (1973) (in case reviewing classification based on the normally suspect class of alienage, the Court held that "our

24

scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives.").

Marriage is the wrong context for applying especially searching judicial review of sexual orientation classifications for the first time, even if heightened scrutiny of such classifications were appropriate in other contexts.  Utah's definition and regulation of marriage fall within "'an area that has long been regarded as a virtually exclusive province of the States,'" *Windsor*, 133 S. Ct. at 2680 (quoting *Sosna v. Iowa*, 419 U.S. 393, 404 (1975)), while assertions of federal power that interfere with a state's "historic and essential authority to define the marital relation" are correspondingly difficult to justify.  *Id.* at 2692.  Moreover, heightened scrutiny is "out of place" in addressing the traditional definition of marriage because heterosexual couples' unique ability and tendency to procreate is a "relevant ground" for determining (and indeed explaining) the State's interest in marriage.

In sum, Tenth Circuit precedent holds that sexual orientation is not a protected class and that laws distinguishing between citizens on that basis are subject only to rational basis review.  Neither *Windsor* nor any other Supreme Court precedent dictates otherwise.  And even if this Court could decide in the first instance what level of scrutiny to apply, sexual orientation does not meet the criteria to be treated as a protected quasi-suspect class.

### 2. Utah's Marriage Laws do Not Discriminate Against Either Gender.

Plaintiffs also attempt to avoid rational-basis review by arguing that the man-woman definition of marriage constitutes gender discrimination, which would, if true, require intermediate scrutiny.  *City of Cleburne,*, 473 U.S. at 441.  But the Utah marriage statutes do not

25

discriminate between men and women.  In prohibiting any person—man or woman—from marrying a person of the same sex, Utah law treats men and women equally. *See*, *e.g.*, *Sevcik, 911 F. Supp. 2d at 1005*; *Jackson, 884 F. Supp. 2d at 1098-99* (citing at least nine other cases and noting agreement with the "vast majority of courts considering the issue" that the traditional definition of marriage "does not constitute gender discrimination.").

### 3. Utah's Marriage Laws Satisfy Rational Basis Review.

State Defendants explained at length rational basis review in their motion for summary judgment and will not belabor the point here.  State Defendants' MSJ (Doc. 33) at 17-21.  But it is worth emphasizing that rational basis review (1) begins with a strong presumption that the challenged law is valid; (2) credits any plausible legitimate governmental purpose, regardless of whether it was articulated when the law was enacted and whether it was articulated by the lawmaker or by the court itself; and (3) demands only that the classification advances a legitimate governmental purpose *rationally*, meaning not arbitrarily.  *See*, *e.g.*, *Heller, 509 U.S. at 319 (1993)* (Kennedy, J.); *F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)*.  A classification is not arbitrary so long as "the question is at least debatable."  *Heller, 509 U.S. at 326* (citations omitted).

As both the plaintiffs challenging the constitutionality of Utah's marriage laws and the movants for summary judgment, Plaintiffs bear a heavy burden to negate every conceivable rationale supporting the definition of marriage as between a man and a woman.  *Beach Commc'ns, 508 U.S. 315.* The primary rationales are well-known and have been upheld for years by state and federal courts around the country.  Yet, remarkably, Plaintiffs do not directly

address any of the stated, much less the conceivable, rational bases for traditional marriage. Instead, Plaintiffs try to side-step their burden and the justifications for traditional marriage with misplaced arguments about the scope of *Windsor* and the alleged bigotry and morality of the Utah electorate, legislators and governor who voted in favor of the marriage laws.

### a. Utah has identified rational bases for its marriage laws

The State Defendants' Motion for Summary Judgment describes at length a few of the ways that Utah's marriage laws are rationally related to a legitimate state interest.  State Defendants' MSJ (Doc. 33) at 24-45.  In short, man-woman marriage promotes the State's compelling interest in the care and well-being of children (and society) by facilitating responsible procreation and the ideal mode of child-rearing. *See, e.g., Lofton v. Secretary of the Dep't of Children & Family Servs., 358 F.3d 804, 819 (11th Cir. 2004)* ("It is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society.").

First, because "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies," the government "may secure this against impeding restraints and dangers, within a broad range of selection." *Prince v. Massachusettes, 321 U.S. 158, 168 (1944)*.  Accordingly, Utah could rationally "find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born. [Utah] thus could choose to offer an inducement—in the form of marriage and its attendant benefits—to opposite-sex couples who

make a solemn, long-term commitment to each other." *Hernandez v. Nobles,* 855 N.E.2d 1, 7 (N.Y. 2006) (plurality op.).  Many other judicial decisions have reached the same conclusion. *Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 867-68 (8th Cir. 2006); *Sevcik,* 911 F. Supp. 2d at 1015-16; *Jackson,* 884 F. Supp. 2d at 1111-1114; *In re Kandu,* 315 B.R. 123, 145-146 (Bankr. W.D. Wash. 2004) ; *Adams v. Howerton,* 486 F. Supp. 1119, 1124-25 (C.D. Cal. 1980), *aff'd on other grounds,* 673 F.2d 1036 (9th Cir. 1982); *Standhardt v. Superior Court,* 77 P.3d 451, 461-65 (Ariz. Ct. App. 2003); *Dean v. District of Columbia,* 653 A.2d 307, 363 (D.C. 1995) (Steadman, A.J., concurring); *Morrison v. Sadler,* 821 N.E.2d 15, 23- 31 (Ind. Ct. App. 2005); *Conaway v. Deane,* 932 A.2d 571, 630-34 (Md. 2007); *Baker,* 191 N.W.2d at 186-87; *In re Marriage of J.B. & H.B.,* 326 S.W.3d at 677-78; *Andersen v. King County,* 138 P.3d 963, 982-83 (Wash. 2006) (plurality op.); *id.* at 1002-03 (J.M. Johnson, J., separate op. concurring in judgment only); *Singer v. Hara,* 522 P.2d. 1187, 1195 (Wash. Ct. App. 1974); *see also* Goodridge, 798 N.E.2d at 995-1004 (Cordy, J., dissenting).

Second, traditional marriage increases the likelihood that children will be raised by their biological parents.  And Utah could rationally conclude that, all things being equal, it is better for children to grow up being raised by both their mother and a father. *Hernandez,* 855 N.E. 2d at 7 (plurality op.) ("[i]ntuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like."); *In re Marriage of J.B. & H.B.,* 326 S.W.3d at 678 ("[t]he state also could have rationally concluded that children are benefited by being exposed to and influenced by the beneficial and distinguishing attributes a man and a woman individually and collectively contribute to the relationship."); *Anderson,* 138

28

P.3d at 983 ("the legislature was entitled to believe that providing that only opposite-sex couples may marry will encourage procreation and child-rearing in a 'traditional' nuclear family where children tend to thrive.").  Indeed, society (and Supreme Court jurisprudence) have "always presumed [biological parents] to be the preferred and primary custodians of their minor children." *Flores,* 507 U.S. 292 at 310; *see also Bowen,* 483 U.S. at 614 (Brennan, J., dissenting) ("'[t]he optimal situation for the child is to have both an involved mother and an involved father.'" (quoting Henry B. Biller, *Paternal Deprivation* 10 (1974)).

This best-interest-of-the-child rationale is based in tradition, common-sense, experience, and empirical data.  As various family law scholars put it: "The intact, biological, married family remains the gold standard for family life in the United States, insofar as children are most likely to thrive – economically, socially, and psychologically – in this family form." W. Bradford Wilcox et al., *Why Marriage Matters: Thirty Conclusions from the Social Sciences* 11 (3rd ed. 2011) (State Defendants' App. T27 at 242).  The fact that there exists some debate about the relative merits of being raised by one's biological parents does not negate the State's rationale.  If it's debatable it is still rational and will support the State's definition of marriage.  *See, e.g., Jackson,* 884 F. Supp. 2d at 1115-1116 (upholding traditional definition of marriage because parties' conflicting evidence showed that the optimal parenting rational was at least debatable); *see also Sevcik,* 911 F. Supp. 2d at 1016 (finding persuasive the reasoning in *Jackson* concerning the rational bases for Hawaii's marriage laws); *Hernandez,* 855 N.E. 2d at 8 ("in the absence of conclusive scientific evidence, the Legislature could rationally proceed on the commonsense premise that children will do best with a mother and father in the home.").

Defining marriage as the union of one man and one woman also serves the State's legitimate interest in preserving the socially and historically valuable meaning of the term "marriage."  That term will likely lose some of its intelligibility if it's used to describe relationships that fall outside the People's traditions and common understandings of marriage, and with a loss of intelligibility the word "marriage" will lose some of its power to attract broad social allegiance and support and to guide potentially procreative heterosexual couples into stable marriages.  Until a decade ago, when Massachusetts became the first state to accept same-sex marriage, it was practically inconceivable to associate the word "marriage" with same-sex relationships.  In Utah, that is still largely the case.  Utah's decision to reaffirm traditional marriage ensures that the word "marriage" will continue to exercise its unique power to attract broad social allegiance by remaining popularly intelligible.

Words matter, to be sure, which is why Plaintiffs seek access to the term "marriage" and not merely equal tax benefits.  But not every intimate relationship, however worthy or meaningful, can be deemed a "marriage," and it is no disparagement toward anyone to reserve that unique term to the unique meaning it has had for millennia throughout all cultures.  The Constitution's guarantee of "equal protection of the laws" does not require the government to treat different things alike, much less name them the same thing.  *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").  Physical differences distinguish men and women, if nothing else; and the Supreme Court has acknowledged that "'a community made up exclusively of one [sex] is different from a

community composed of both.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting

*Ballard v. United States*, 329 U.S. 187, 193 (1946)).  Substitute the word "marriage relationship"

for "community" and the same point holds: a union composed of same-sex partners is

fundamentally different from a marriage composed of opposite-sex spouses.

Acknowledging that difference is no more demeaning to same-sex relationships than

acknowledging the difference between marriage and other relationships central to human

experience, such as friendship or kinship; but without that acknowledgment the power of the

word "marriage" to operate as a viable social institution will be diminished, if not destroyed.

*See* Sherif Girgis, Ryan T. Anderson, and Robert P. George, What Is Marriage? 92 (2012) ("even

among worthy bonds, the state must keep clear distinctions where blurring them would harm the

common good.").  It follows that Utah's marriage laws rationally advance the State's legitimate

interest in maintaining a definition of "marriage" that preserves its intelligibility and its power to

attract and maintain broad social allegiance and support.

>   **b.   *Windsor* did not reject Utah's rational bases for defining marriage as
>   between a man and a woman**

Plaintiffs try to avoid their burden of negating any conceivable ground supporting the

traditional definition of marriage by repeatedly arguing that *Windsor* "analyzed and rejected as

irrational all of the very same rationales the State could possibly offer."  *Plaintiffs' MSJ* (Doc.

32) at 16; *see also id.* at 3-4, 21-22 n.3, 34 n.5, 36-37.  But that only confuses the important

federal-state distinction the Supreme Court took such lengths to emphasize and which formed the

backbone of the Court's holding:  the federal government has no legitimate interest in denying

31

marriages that a State, which does have historic and constitutionally preserved interests in defining marriage, has declared valid.

In *Windsor* the Supreme Court did *not* review the purposes for any State's marriage laws and it did *not* hold any State's marriage laws to have no legitimate purpose. Rather, as the Second Circuit expressly recognized in the underlying *Windsor* opinion, "when it comes to marriage, legitimate regulatory interests of a state differ from those of the federal government . . . [and] analysis of DOMA's marital classification under federal law is distinct from the analysis necessary to determine whether the marital classification of a state would survive such scrutiny." *Windsor*, 699 F.3d at 179. The Second Circuit even went so far as to state that "We agree that promotion of procreation can be an important government objective. But we do not see how DOMA is substantially related to it." *Id.* at 188.

Both the Second Circuit's and the Supreme Court's reviews of DOMA were limited to a *federal* statute that distinguished between lawfully married opposite-sex couples and lawfully married same-sex couples. The Supreme Court held only that "[t]he *federal statute* is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom *the State, by its marriage laws*, sought to protect in personhood and dignity." *Windsor*, 133 S. Ct. at 2696 (emphasis added). If that statement was not limiting enough, the Court went on to emphasize that the *Windsor* "opinion and its holding are confined to those lawful marriages," meaning those same-sex marriages in States where same-sex marriage has been made legal. *Id.* at 2696. Nothing in *Windsor* limits or restricts Utah's sovereign authority to define and regulate

32

the marriage of its citizens.  Nor does *Windsor* hold that Utah's "legitimate regulatory interests" relating to marriage, which "differ from those of the federal government," are illegitimate.

> **c.  Utah's marriage laws are not based on animus or private moral disapproval of same-sex relationships and those alleged motives do not negate the rational bases for traditional marriage**

Plaintiffs also try to avoid their burden to negate every rationale for traditional marriage by arguing that Utah's marriage laws are based on prejudice and/or private morals and are therefore unconstitutional under any standard of review.  *See generally Plaintiffs' MSJ* (Doc. 32) at 20-25.  This argument fails, too, as it relies on Plaintiffs' misunderstanding of (1) *Windsor*, (2) a few lines from a 2004 Voter Pamphlet, and (3) the effect of animus (or any improper motive) in constitutional analysis.

First, Plaintiffs argue that Utah's marriage laws are just like DOMA and therefore *Windsor's* observations about DOMA's discriminatory purpose and effect necessarily invalidate Utah's definition of marriage.  *Plaintiffs' MSJ* (Doc. 32) at 23-26.  But, again, the argument completely misses the federal-state distinctions so crucial to *Windsor's* reasoning.  The Court repeatedly emphasized that DOMA's discriminatory purposes and effect arose from the "unusual" situation of federal law rejection of valid state law marriages.  *Windsor,* 133 S. Ct. at 2693 ("DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage . . . . is strong evidence of a law having the purpose and effect of disapproval of" same-sex couples); *id.* at 2693-94 ("The Act's demonstrated purpose is to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages for purposes of federal law.  This raises a most serious question under the

33

Constitution's Fifth Amendment."); *id.* at 2694 ("By creating two contradictory marriage regimes within the same State, DOMA forces same-sex couples to live as married for the purpose of state law but unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect. . . . This places same-sex couples in an unstable position of being in a second-tier marriage.  The differentiation demeans the couple . . ."); *id.* at 2695 ("the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage").  Thus, as noted above, the Court held only that the federal government had "no legitimate purpose" for a federal law that's "purpose and effect" disparaged and injured "those whom the State, by its marriage laws, sought to protect in personhood and dignity."  *Id.* at 2696.

Even a cursory reading of *Windsor* precludes the type of analogy Plaintiffs attempt to draw between DOMA and Utah's marriage laws.  DOMA took the unusual step of federal rejection of marriages deemed valid by a state.  Utah's marriage laws simply define marriage within its borders as *Windsor* recognizes States have the historic and constitutional prerogative to do.  Unlike DOMA, Utah's marriage laws do not reject any marriage that is valid under Utah law or otherwise create "second-tier marriage[s]."  In short, Plaintiffs cannot simply transfer DOMA's discriminatory intent and purpose to State marriage laws.  It would defy the Supreme Court's reasoning and turn *Windsor* on its head.

Second, the Plaintiffs similarly overstate the meaning of the 2004 Voter Information pamphlet.  *Plaintiffs' MSJ* (Doc. 32) at 22.  According to Plaintiffs, a few select sentences from the pamphlet show that the purpose of Amendment 3 was "to create a state-sponsored institution

of inequality" and "to further privately-held moral views that same-sex couples are immoral and inferior to heterosexual couples." *Id*. at 22-23.  But the pamphlet does no such thing.  In relevant part, the pamphlet contains three sections pertaining to Amendment 3:  an "impartial analysis," an "argument for" signed by two proponents and an "argument against" signed by four individuals against the Amendment, plus rebuttals from each side.  State Defendants' App. T18 at 151-154.  Plaintiffs do not explain how these voter pamphlet sections prove the purpose of Amendment 3 or show the intent of all of the state officials who voted for the Joint Resolution that appeared on the ballot as Amendment 3.

Regardless of the pamphlet's relevance, it does not show any prejudice or intent to push private moral views.  The paragraph the Plaintiffs quote comes from the "impartial analysis" section and simply explains that the Amendment also prohibits civil unions from obtaining marriage-like rights. State Defendants' App. T18 at 151-152.  It is not clear that Plaintiffs have even challenged that provision, but at any rate, it does not create "a state-sponsored institution of inequality," Plaintiffs' MSJ (Doc. No. 32) at 22, much less show that the traditional definition of marriage is bigoted and moralistic.

The other quotes that Plaintiffs select from the pamphlet are taken from the "argument for" section explaining an Eleventh Circuit decision.  The entire paragraph states:

> This amendment does not promote intolerance, hatred or bigotry. Earlier this year, the Federal Eleventh Circuit Court of Appeals upheld Florida's ban on homosexual adoptions. The Court unequivocally recognized government's strong interest in maintaining public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship. This amendment preserves that same historic understanding of marriage and the ability of Utahns to govern themselves.

2004 Voter Pamphlet at 36 (State Defendants' App. T18 at 153).   Nothing about this language shows prejudicial intent or a purpose to further privately held moral beliefs.

Third, even if the enactment of Utah's marriage laws exhibited animus or any other improper motive, which the State Defendants deny, that alone would not render the laws unconstitutional.  The Supreme Court has stressed that evidence of animus alone does not invalidate a law.  *See Garrett*, 531 U.S. at 367 ("[B]iases may often accompany irrational (and therefore unconstitutional) discrimination, [but] their presence alone does not a constitutional violation make.").  The limited relevance of animus follows from the "familiar principle of constitutional law that [the Supreme] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *City of Renton*, 475 U.S. at 48; *accord City of Mobile v. Bolden*, 446 U.S. 55, 92 (1980) (Stevens, J., concurring in the judgment) ("[A] political decision that is supported by valid and articulable justifications cannot be invalid simply because some participants in the decisionmaking process were motivated by a purpose to disadvantage a minority group.").  *Windsor* follows this principle for the reasons discussed above.  So too does *Romer*.  *Romer* relied on animus to explain a state constitutional amendment withdrawing and prohibiting distinctive legal protection for gays and lesbians, only because its "breadth" was "so far removed from [its] particular justifications that [the Court found] it impossible to credit them." 517 U.S. at 635.  Lacking any other credible justification, the Court concluded that the amendment "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else." *Id.*; *see also id.* at 632 (stating that the challenged provision "seems inexplicable by anything but animus toward the class it affects;

36

it lacks a rational relationship to legitimate state interests.").  The mere presence of animus did not undo the law; animus without any reason to justify the classification rendered it arbitrary and therefore unconstitutional.  Unlike the Colorado provision, Utah's marriage laws are narrow provisions supported by multiple rational grounds.  *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring) ("preserving the traditional institution of marriage" would constitute a legitimate state interest and "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.").

Finally, no one can dispute that throughout the history of every civilization, until very recent times, marriage has always been considered as the union between a man and a woman.  *See, e.g., Windsor*, 133 S. Ct. at 2689 ("marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization").  It would be implausible to infer from this undisputed history that marriage was invented thousands of years ago, and subsequently maintained over the centuries by governments all across the globe, as a tool to discriminate against homosexuals.  It is just as implausible to infer that Utah's (and many other States') decision to codify the longstanding, traditional definition of marriage somehow suddenly bespeaks animus towards homosexuals.  *See Hernandez, 855 N.E.2d at 8* (plurality) ("Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.  A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted.").

37

### d. Nothing Plaintiffs Argue Negates the Settled Rationales for Traditional Marriage

#### i. Traditional marriage promotes the State's interests regardless of whether any particular married couple procreates

While trying to compare same-sex marriages to inmate marriages, Plaintiffs observe in a footnote that "procreation is not an essential element for a marital relationship to be constitutionally protected." Plaintiffs' MSJ (Doc. 32) at 10 n.1. To be sure, the State will not prohibit a particular heterosexual couple from marrying because they cannot or do not want to procreate. But that example at the micro-level says nothing about the macro societal interests at stake. Traditional marriage remains a fundamental right primarily because of the procreative abilities of heterosexual couples.[6] *See* *Zablocki,* 434 U.S. at 383 ("[Marriage] is the foundation of the family in our society.... [I]f appellee's right to procreate means anything at all, it must imply some right to enter the only relationship in which the State of Wisconsin allows sexual relations legally to take place."); *Loving,* 388 U.S. at 12 ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival."); *Skinner,* 316 U.S. at 541 ("Marriage and procreation are fundamental to the very existence and survival of the race.").

---

[6] *Turner v. Safley,* 482 U.S. 78 (1987), which Plaintiffs reference, actually supports the marriage-procreation link. Among the reasons the Supreme Court found to support an inmate's constitutionally protected interest to marry a woman was the fact that "most inmates eventually will be released . . . and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated." *Id.* at 96. Notably, the Court expressly distinguished *Turner* from its decision in *Butler v. Wilson,* 415 U.S. 953 (1974), summarily affirming a decision to uphold a state law that prohibited inmates incarcerated for life from marrying. *Johnson v. Rockefeller,* 365 F. Supp. 377 (S.D.N.Y. 1973). The affirmed decision reasoned that a prohibition on marriage did not violate the Constitution because "[t]hose aspects of marriage which make it one of the basic civil rights of man—cohabitation, sexual intercourse, and the begetting and raising of children—are unavailable to those in [the inmate's] situation because of the fact of their incarceration." *Id.* at 380 (citation and internal quotation marks omitted).

And the fact that some married couples do not procreate does not undermine the State's rationales for traditional marriage.   In the absence of any marriage institution, biology dictates that heterosexual couples will still engage in sexual intercourse which uniquely can produce children.  Thus, "marriage's vital purpose in our societies is not to mandate man/woman procreation but to ameliorate its consequences."  Monte Neil Stewart, *Judicial Redefinition of Marriage,* 21 Can. J. Fam. L. 11, 47 (2004) (State Defendants' App. T74 at1421).  Traditional marriage as a public institution is society's way to promote responsible, i.e., socially beneficial, procreation.  It is "the institution developed in our society, its predecessor societies, and by nearly all societies on Earth throughout history to solidify, standardize, and legalize the relationship between a man, a woman, and their offspring."  *Sevcik*, 911 F. Supp. 2d at 1015; *see also Windsor,* 133 S. Ct. at 2718 (Alito, J., dissenting) ("the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing," "that marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so," and that "marriage has been viewed as an institution … inextricably linked to procreation and biological kinship.").

To the extent Plaintiffs are simply pointing out that a married couple has a constitutionally protected privacy right to decide whether to have children, they are correct. *Eisenstadt v. Baird*, 405 U.S. 438, 453-54 (1972) (" If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a

child.").  But the principle does not advance their claims or negate the State's interests in traditional marriage.

### ii. The traditional definition of marriage rationally advances the State's legitimate interests

In a similar vein, Plaintiffs are also wrong to the extent they suggest, as have other proponents of same-sex marriage, that the man-woman definition of marriage goes farther than rationally needed to promote the State's interests by allowing opposite-sex couples to marry who lack the ability and/or desire to procreate.  Any imprecision between the definition of marriage and the State's interest does not render the definition constitutionally infirm.  Rational basis review "compels" the Court to accept any legislative "generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.  As the Supreme Court recently reiterated: "the Constitution does not require the [State] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2083 (2012); *see also Dandridge v. Williams,* 397 U.S. 471, 485 (1970) (classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality" (internal quotation marks omitted)); *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69–70 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific"); *Heath & Milligan Mfg. Co. v. Worst,* 207 U.S. 338, 354 (1907) (the "logical appropriateness of

the inclusion or exclusion of objects or persons" and "exact wisdom and nice adaptation of remedies are not required").

Second, for those married couples that have the ability but not the desire for children, accidental births still happen and couples can and do change their minds about wanting children. *Jackson,* 884 F. Supp. 2d at 1113 (citing *Morrison,* 821 N.E.2d at 24-25); State Defendants' App. T52 at 887 (noting 20% of births to married women are unintended).   Traditional marriage "both encourages opposite-sex couples to form a relatively stable environment for the 'natural' procreation of children . . . [and] encourages them to stay together to raise a child or children together if there is a 'change in plans.'" *Jackson,* 884 F. Supp. 2d at 1113 (internal quotation marks omitted).

Third, the State could not realistically ask each prospective married couple whether they were able and/or wanted to have children as a pre-condition to marriage, much less ensure the couple was telling the truth.  Aside from the substantial pragmatic problems, the inquiries would interfere with the constitutionally protected privacy rights and the fundamental right of opposite-sex couples to marry as explained above.  The State's marriage laws need not be Orwellian to be constitutional.

Finally, allowing infertile or elderly opposite sex-couples to marry makes sense considering their ability to adopt, the rising number of grandparents who must raise their grandchildren for one reason or another, and the fact that childless couples can still model stable marriage and child-rearing relationships.  *See, e.g., Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 505 (1977) (plurality) ("Decisions concerning child rearing, which [Court precedent

41

has] recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household indeed who may take on major responsibility for the rearing of the children.  Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life." (footnotes omitted)); Children's Service Society Fact Sheet, available at cssutah.org/fact-sheet (in Utah 20,655 grandparents are responsible for their own grandchildren under the age of 18 and the number of children being raised by a relative increased 51% between 2000 and 2010).

### iii. The State need not prove that redefining marriage would harm its interests

Plaintiffs argue that the "State has not identified a single harm that it, or anyone else, would suffer as a result of gender-neutral marriage laws."  Plaintiffs' MSJ (Doc. 32) at 36.  But that is not the test (or even a relevant factor) in determining the constitutionality of Utah's marriage laws.  The focus, particularly under rational basis review, remains on whether the challenged statute rationally supports a State interest, not whether expanding the class of statutory beneficiaries would harm the State's interest.  *Jackson,* 884 F. Supp. 2d at 1106; *see also Burson v. Freeman,* 504 U.S. 191, 208 (1992) (noting in strict scrutiny analysis of long-standing statute that "[t]he fact that these laws have been in effect for a long period of time also makes it difficult for the States to put on witnesses who can testify as to what would happen without them.").  Thus, a classification will be upheld if "the inclusion of one group promotes a

legitimate governmental purpose, and the addition of other groups would not." *Johnson v. Robison,* 415 U.S. 361, 383 (1974).

Traditional man-woman marriage promotes the State's interest in responsible procreation and in the optimal mode of child-rearing.  Same-sex couples, who cannot procreate, do not promote the State's interests in responsible procreation (regardless of whether they harm it).  Utah's choice to define marriage as between a man and a woman is therefore constitutional.  *Bruning,* 455 F.3d at 867 (noting the "responsible procreation" rationale "justifies conferring the inducements of marital recognition and benefits on opposite-sex couples, who can otherwise produce children by accident, but not on same-sex couples, who cannot."); *Jackson,* 884 F. Supp. 2d at 1114 ("opposite-sex couples, who can naturally procreate, advance the interest in encouraging natural procreation to take place in stable relationships and same-sex couples do not to the same extent."); *Standhardt,* 77 P.3d at 463 ("Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships."); *Morrison,* 821 N.E.2d at 25 ("the legislative classification of extending marriage benefits to opposite-sex couples but not same-sex couples is reasonably related to a clearly identifiable, inherent characteristic that distinguishes the two classes: the ability or inability to procreate by 'natural' means."); *see also  Garrett,* 531 U.S. at 366-67 ("where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." (internal quotation marks omitted)); *Tigner v. Texas,* 310 U.S.

43

141, 147 (1940) ("the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.").

### 4. Utah's Marriage Laws Survive Any Level of Scrutiny

Enough has been said to explain why Utah's marriage laws must be reviewed under the rational basis test. Applying heightened scrutiny would be incorrect. Having said that, Utah's marriage laws serve such fundamental State interests that they should survive any level of scrutiny properly applied.

Strict scrutiny requires that the legislative classifications "'are narrowly tailored measures that further compelling governmental interests.'" *Price-Cornelison,* 524 F.3d at 1109 (quoting *Johnson v. California,* 543 U.S. 499, 505 (2005)). And a law that satisfies strict scrutiny would necessarily satisfy intermediate scrutiny, which requires that the classification "serves 'important governmental objectives' and is 'substantially related to achievement of those objectives.'" *Price-Cornelison,* 524 F.3d at 1109 (quoting *Concrete Works of Colo., Inc. v. City and County of Denver,* 321 F.3d 950, 959 (10th Cir.2003)). Applying a heightened level of scrutiny, even strict scrutiny, does not *a fortiari* doom the classification. "Strict scrutiny is not strict in theory, but fatal in fact." *Grutter,* 539 U.S. at 326; *see also id.* at 326-27 (noting that "[a]lthough all governmental uses of race are subject to strict scrutiny, not all are invalidated by it."); *Virginia,* 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification .... Physical differences between men and women ... are enduring").

Regardless of the level of scrutiny, the Equal Protection Clause requires only that a State "treat similarly situated persons similarly, not that it engage in gestures of superficial equality."

44

_Rostker v. Goldberg_, 453 U.S. 57, 79 (1981). "Context matters" and even "strict scrutiny must take relevant differences into account." _Grutter,_ 539 U.S. at 327 (citing _Gomillion v. Lightfoot,_ 364 U.S. 339, 343–344 (1960) (admonishing that, "in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts")). Indeed, "[n]ot every decision influenced by [a suspect class] is equally objectionable, and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of [suspect classification] in that particular context." _Id._ Plaintiffs' equal protection challenge to Utah's marriage laws necessarily implicates relevant differences between men and women; a context that should influence how those laws are judged. _Nguyen v. INS_, 533 U.S. 53, 73 (2001) ("To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it.").

It would be hard to overstate the importance of Utah's interest in maintaining and preserving society and the welfare and well-being of children within its jurisdiction. That interest is compelling, even fundamental.

The traditional definition of marriage furthers Utah's compelling interests. Marriage between a man and a woman facilitates responsible procreation and the orderly reproduction of society and maintains the social institution most likely to best provide the optimal child-rearing,

the security and long-term welfare of children.[7]   Numerous authorities cited here and in State

Defendants' motion for summary judgment buttress this point.  State Defendants' MSJ (Doc. 33)

at 24-45. History and common sense lead to the same conclusion.  *See, e.g., Florida Bar v. Went*

*For It, Inc.,* 515 U.S. 618, 628 (1995) (noting that "history, consensus, and simple common

sense" can provide adequate grounds to survive strict scrutiny (internal quotation marks

omitted)); *Burson v. Freeman,* 504 U.S. 191, 208 (1992) (noting in strict scrutiny analysis of

long-standing statute that "[t]he fact that these laws have been in effect for a long period of time

also makes it difficult for the States to put on witnesses who can testify as to what would happen

without them.").

   Finally, the definition of marriage as only the union of a man and a woman is as narrowly

tailored as the Constitution allows or requires to further the Sates' interests.  As described above,

the fundamental right to marry and constitutionally protected privacy rights constrain how

aggressive any State could be in trying to narrow the definition of marriage to only those couples

who can and are willing to procreate.  *Zablocki*, 434 U.S. at 385 ("it is clear that among the

decisions that an individual may make without unjustified government interference are personal

decisions relating to marriage, procreation, contraception, family relationships, and child rearing

and education." (internal quotation marks and citations omitted)).  Moreover, traditional

marriage is more narrowly tailored to the State's interest in protecting children than its sole

---

   [7] In asserting its surpassing interest in preserving the traditional institution of marriage for the welfare of children, the State certainly does not intend to cast aspersions on the worthy efforts of same-sex couples to rear children.  But it is the State's judgment, supported by social-science research conducted over many decades and millennia of human experience, that children generally thrive best when raised by the married mother and father who brought them into this world.

alternative, the adult-oriented genderless conception.  And regardless of how much more narrow the State made its definition of marriage, it would not affect the laws' impact on Plaintiffs.  The definition of marriage could be defined to exclude various opposite-sex couples, yet same-sex couples would still not be able to marry.

### D.  THE STATE OF UTAH MAY LAWFULLY DENY RECOGNITION OF SAME-SEX MARRIAGES PERFORMED ELSEWHERE.

The Plaintiffs cite the Supreme Court *Windsor* decision as the sole supporting authority for their argument that Utah must recognize same-sex marriages performed elsewhere.  Plaintiffs again ignore the central support, detailed above, upon which the *Windsor* decision is based: that the States (*not* the federal government) have the sovereign authority to define and regulate marriage.  Rather than mandating States to recognize same-sex marriages performed elsewhere, *Windsor* expressly defers to "*[t]he State's power* in defining the marital relation" and "*the State's decision*" and "*the State['s]* use[] [of] its historic and essential *authority* to define the marital relation." *Windsor*, 133 S. Ct. at 2692 (emphasis added).

Plaintiffs also have chosen to ignore *Windsor's* express recognition that "Section 2 [of DOMA], which has not been challenged here, allows States to refuse to recognize same-sex marriages performed under the laws of other States." *Windsor*, 133 S. Ct. at 2682-83.  Section 2 of DOMA provides:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

28 U.S.C. § 1738C.

47

**E.  STATE DEFENDANTS DID NOT VIOLATE § 1983 AND PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY'S FEES UNDER § 1988**

For the reasons explained herein and in State Defendants Motion for Summary Judgment, Utah's marriage laws do not violate the Constitution.  State Defendants have not deprived the Plaintiffs of any federal rights in violation of 42 U.S.C. § 1983.  Consequently, Plaintiffs are not entitled to attorney's fees under 42 U.S.C. § 1983.

Moreover, to any extent that the Plaintiffs seek, or may seek, monetary damages against State Defendants, they cannot state such a claim against State Defendants in the their official capacity under § 1983, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989); and such damage claims are barred by the State's Eleventh Amendment immunity.  *Edelman v. Jordan*, 415 U.S. 651, 662-63, 673 (1974).

**V.  CONCLUSION**

For the foregoing reasons, and those stated in State Defendants' Motion for Summary Judgment, the Court should deny Plaintiffs' Motion for Summary Judgment.

Dated this 22nd day of November, 2013.

JOHN E. SWALLOW
Utah Attorney General

/s/ Philip S. Lott
Philip S. Lott
Stanford E. Purser
Assistant Utah Attorneys General
*Attorneys for Defendants Gary R. Herbert
and John Swallow*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2013, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system which sent notification of such

filing to the following:

Peggy A. Tomsic                              tomsic@mgplaw.com
James E. Magleby                           magleby@mgplaw.com
Jennifer Fraser Parrish                    parrish@mgplaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101-3605

Ralph Chamness                               rchamness@slco.org
Darcy M. Goddard                         dgoddard@slco.org
Salt Lake County District Attorneys
2001 South State, S3500
Salt Lake City, Utah 84190-1210

                                     /s/ Philip S. Lott