Peggy A. Tomsic (3879)
  tomsic@mgpclaw.com
James E. Magleby (7247)
  magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
  parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DEREK KITCHEN, individually; MOUDI SBEITY, individually; KAREN ARCHER, individually, KATE CALL, individually; LAURIE WOOD, individually; and KODY PARTRIDGE, individually,**<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>**GARY R. HERBERT, in his official capacity as Governor of Utah; JOHN SWALLOW, in his official capacity as Attorney General of Utah; and SHERRIE SWENSEN, in her official capacity as Clerk of Salt Lake County,**<br><br>     **Defendants.** | **PLAINTIFFS' OPPOSITION TO MOTION OF THE GOVERNOR AND ATTORNEY GENERAL FOR SUMMARY JUDGMENT**<br><br><br><br><br><br><br><br><br><br>**Case No.  2:13-cv-00217-RJS**<br><br>**Honorable Robert J. Shelby** |

## TABLE OF CONTENTS

Page

INTRODUCTION...........................................................................................................ix

RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL
     FACTS................................................................................................................ x

RESPONSE TO THE STATE DEFENDANTS' BACKGROUND ...................................xv

STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ............................xv

ARGUMENT................................................................................................................. 1

I.     THIS COURT MUST DECIDE WHETHER UTAH'S MARRIAGE
     DISCRIMINATION LAWS VIOLATE THE FOURTEENTH AMENDMENT,
     AS DOING SO IS REQUIRED BY, COMPORTS WITH, AND DOES NOT
     DISRUPT, THE FEDERAL BALANCE OF POWERS........................................... 1

     A.     The Federal Balance Requires That This Court Decide This Case ........... 2

     B.     The Regulation of Marriage Is Not Exclusively the Province of the
          States, as State Laws Are Subject to Constitutional Guarantees,
          Including Under the Fourteenth Amendment ............................................... 3

     C.     The *Windsor* Decision Is Not Based on Federalism, Nor Does
          *Windsor* Mandate This Court's Deference to Utah's Unconstitutional
          Laws .......................................................................................................... 4

     D.     *Windsor* Requires This Court To Invalidate Utah's Marriage
          Discrimination Laws ................................................................................... 6

II.     *BAKER v. NELSON* IS IRRELEVANT ................................................................. 8

III.     THE FUNDAMENTAL RIGHT TO MARRIAGE PROTECTED BY THE
     DUE PROCESS CLAUSE ENCOMPASSES THE RIGHT OF PLAINTIFFS
     TO MARRY THE PERSON OF THEIR CHOICE ................................................ 11

     A.     Plaintiffs Are Not Advocating a "New" Fundamental Right, But
          Equal Access to an Already-Existing Fundamental Right ........................ 12

     B.     That the Right to Marry Itself Is Deeply Rooted in This Nation's
          History and Tradition Is Sufficient for This Court To Determine That

the Marriage Discrimination Laws Violate Plaintiffs' Fundamental Right to Marriage Under the Due Process Clause .................................. 14

C.   Civil Marriage Is Not a Static Institution, and the Fundamental Right to Marriage Is Not *Per Se* Bound to Any Particular Historical or Traditional Form ..................................................................................... 16

D.   This Court Must Invalidate Utah's Marriage Discrimination Laws Under the Due Process Clause of the Fourteenth Amendment .............. 20

IV.   POST *WINDSOR*, UTAH'S MARRIAGE DISCRIMINATION LAWS FAIL UNDER THE EQUAL PROTECTION CLAUSE BECAUSE PREJUDICE IS IRRATIONAL, AND UTAH'S LAWS ARE BASED ON PREJUDICE ................. 21

A.   Under *Windsor*, the State of Utah Bears the Burden of Showing Its Marriage Discrimination Laws Are Not Based Solely on Prejudice and Cannot Do So ................................................................................ 23

V.   CLASSIFICATIONS BASED ON SEXUAL ORIENTATION REQUIRE HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE ...... 28

A.   Faithful Application of the Supreme Court's Binding Precedent Requires Heightened Scrutiny of Classifications Based on Sexual Orientation ............................................................................................ 29

B.   The Relevant Supreme Court Case Law Suggests That Heightened Scrutiny Should Apply to Classifications Based on Sexual Orientation ............................................................................................ 31

C.   The Tenth Circuit's Decision in *Price-Cornelison v. Brooks* Does Not Prohibit This Court From Finding Sexual Orientation Classifications Are at Least Quasi-Suspect ............................................. 35

VI.   CLASSIFICATIONS BASED ON GENDER ALSO REQUIRE HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE ...... 39

VII.   UTAH'S MARRIAGE DISCRIMINATION LAWS FAIL EVEN UNDER RATIONAL BASIS REVIEW .............................................................................. 41

A.   There Is No Rational Relationship Between Excluding Same-Sex Couples From Marriage and the Promotion of Opposite-Sex Marriage ................................................................................................ 43

1.   The Relevant Rational Relationship Inquiry Is Not Whether It Is Rational for Utah to Permit Opposite-Sex Marriage, But

Rather Whether It Is Rational for Utah to Exclude Same-Sex
Couples from Civil Marriage to Achieve That Goal....................... 44

2.  As a Matter of Law, Any Purported Interest in Encouraging
Opposite-Sex Couples to Marry (and Encouraging the
Incidents of Such Marriages) Is Not Rationally Related to
Utah's Marriage Discrimination Laws ............................................. 46

B.  Utah's Marriage Discrimination Laws Are Not Rationally Related to
*Any* Interest in Bettering the Lives of Utah's Children .............................. 50

1.  Utah's Marriage Discrimination Laws Are Not Rationally
Related to any Interest in Promoting Responsible
Procreation.................................................................................... 53

2.  Utah's Marriage Discrimination Laws Are Not Rationally
Related to an Interest in Promoting Optimal Parenting and
Childrearing.................................................................................. 60

C.  Preserving Tradition, and Avoiding the Consequences of Change,
Are Not – In and of Themselves – Legitimate Goals of the State ............ 65

1.  Preserving "Traditional" Marriage, Solely for Tradition's
Sake, Is Not a Legitimate Goal of the State ................................... 66

2.  Utah's Marriage Discrimination Laws Are Not Rationally
Related to the Purported Interest in Proceeding with Caution
When Implementing Social Changes ............................................. 68

D.  Utah's Marriage Discrimination Laws Damage the State and Same-
Sex Couples ........................................................................................... 70

VIII.  THE STATE OF UTAH MAY NOT CATEGORICALLY DENY
RECOGNITION OF SAME-SEX MARRIAGES PERFORMED IN OTHER
STATES ......................................................................................................... 72

IX.  THE STATE DEFENDANTS DO NOT DENY THAT INJUNCTIVE RELIEF
IS AVAILABLE TO PLAINTIFFS UNDER 42 U.S.C. § 1983, AND A
DETERMINATION AS TO WHETHER PLAINTIFFS WOULD BE
ENTITLED TO ANY MONETARY AMOUNT IS PREMATURE ......................... 75

CONCLUSION .......................................................................................................... 76

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993) (plurality) ..................................................... 40

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed w/o op.*, 409 U.S. 810

    (1972) ................................................................................................... 8, 9, 10, 11

*Baker v. State*, 744 A.2d 864 (Vt. 1999) ....................................................................... 64

*Bates v. Dep't of Corr. of Kan.*, 81 F.3d 1008 (10th Cir. 1996) ...................................... 37

*Bo Hae Lee v. Mukasey*, 527 F.3d 1103 (10th Cir. 2008) .............................................. 44

*Bond v. United States,* 131 S. Ct. 2355 (2011) ....................................................... 72, 73

*Bowers v. Hardwick*, 478 U.S. 186 (1986)............................................................... 3, 32

*Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487 (10th Cir. 1998) ...................... 75

*Carey v. Population Services Int'l*, 431 U.S. 678 (1977).................................................. 9

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................................ 56, 68

*Collins v. Harker Heights*, 503 U.S. 115 (1992)............................................................ 12

*Craig v. Boren*, 429 U.S. 190 (1976) ............................................................................ 40

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ................................................................. 9, 56

*Ex Parte Young*, 209 U.S. 123 (1908) ......................................................................... 75

*Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (plurality) ....................................... 40

*Garden State Equality v. Dow*, No. Civ. A. MER-L-1729-11, 2012 WL 540608  (N.J.

    Super. Ct. Feb. 21, 2012) ........................................................................................ 9

*Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012)

........................................................................................................ 29, 46

*Goodridge v. Dep't Pub. Health*, 79 N.E.2d 941 (Mass. 2003) ................................ 54, 64

*Griswold v. Connecticut*, 381 U.S. 479 (1965), ................................................. 14, 19, 55

*Heller v. Doe*, 509 U.S. 312 (1993) .............................................................xii, 42, 54, 66

*Hicks v. Miranda*, 422 U.S. 332 (1975)....................................................................... 8, 11

*Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) ............................................................ 69

*Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985)......................................... 56

*Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173 (1979) ......................... 11

*In re Balas*, 449 B.R. 567 (Bankr. C.D. Cal. 2011) ....................................................... 29

*In re Kandu*, 315 B.R.123 (Bankr. W.D. Wash. 2004) ..................................................... 9

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) ........................................................... 29

*Johnson v. Robinson*, 415 U.S. 361 (1974)................................................... 56, 57, 58, 59

*Jones v. Bates*, 127 F.3d 839 (9th Cir. 1997) ................................................................ 11

*Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008)..................... 29

*Lawrence v. Texas*, 539 U.S. 558 (2003) .................................................................passim

*Loving v. Virginia*, 388 U.S. 1 (1967).......................................................................passim

*Lyng v. Int'l Union*, 485 U.S. 360 (1988)....................................................................... 41

*Mandel v. Bradley*, 432 U.S. 173 (1979) ...................................................................... 10

*Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1 (1st Cir. 2012) .... 46

*McLaughlin v. Florida*, 379 U.S. 184 (1964) ................................................................. 10

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982)........................................ 40

*Muller v. Oregon*, 208 U.S. 412 (1908)..........................................................................67

*Naim v. Naim*, 350 U.S. 985 (1956)...............................................................................10

*Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012)........29, 54, 65

*Perry v. Brown*, 671 F.3d 1052 (2012) ..........................................................................69

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921(N.D. Cal. 2010)...........................passim

*Plessy v. Ferguson*, 163 U.S. 537 (1896)......................................................................67

*Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259 (2d Cir.
     1967) ........................................................................................................................8

*Price-Cornelison v. Brooks*, 524 F.3d 1103 (10th Cir. 2008) ......................35, 36, 37, 38

*Roe v. Wade*, 410 U.S. 113 (1973) .................................................................................9

*Romer v. Evans*, 517 U.S. 620 (1996).....................................................................passim

*Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005)...........................9, 11

*Soto-Lopez v. N.Y. City Civil Serv. Comm'n*, 755 F.2d 266 (2d Cir. 1985)...................11

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002)...............11

*Turner v. Safley*, 482 U.S. 78 (1987)........................................................9, 13, 14, 18, 54

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ..........................42, 56, 58

*United States v. Graham*, 87 F. Supp. 237 (D. Mich. 1949) ..........................................17

*United States v. Rickett*, No. 11-2165, 2013 U.S. App. LEXIS 18464, at *23-24 (10th Cir.
     Sept. 5, 2013) ........................................................................................................37

*United States v. Virginia*, 518 U.S. 515 (1996)........................................................39, 40

*United States v. Windsor*, 133 S. Ct. 2675 (2013)..................................................passim

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009)......................................................29, 46

*Walmer v. Department of Defense*, 52 F.3d 851 (10th Cir. 1995) ........................... 36, 38

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ......................................... xii, 14, 15, 16

*Williams v. Illinois*, 399 U.S. 235 (1970) ....................................................... 66

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) .......................................... passim

*Zablocki v. Redhail*, 434 U.S. 374 (1978) .................................................. 3, 9, 12, 13, 55

## Constitutional Provisions

U.S. Const., Art. III ...................................................................................... 2, 6

U.S. Const., Amend. I ...................................................................................... ix

U.S. Const., Amend. V ................................................................................... passim

U.S. Const., Amend. X ................................................................................ 1, 2, 5

U.S. Const., Amend. XI ...................................................................................... 75

U.S. Const., Amend. XIV ............................................................................... passim

Utah Const., Art. I, § 29 ................................................................................. passim

## Statutes

1 U.S.C. § 7 (DOMA § 3) ............................................................................... passim

28 U.S.C. § 1738C (DOMA § 2) ........................................................................... 72

42 U.S.C. § 1983 ........................................................................................... 75

42 U.S.C. § 1988 ........................................................................................... 76

Utah Code § 30-1-2 .................................................................................. x, 28, 44

Utah Code § 30-1-4 ........................................................................................ 10

Utah Code § 30-1-4.1 ............................................................................... x, 28, 45

**Rules**

Local Rule DUCivR 56-1 ....................................................................... x, xii, xv

Plaintiffs Derek Kitchen, Moudi Sbeity, Karen Archer, Kate Call, Laurie Wood, and Kody Partridge (collectively, "Plaintiffs"), by and through their counsel of record, Magleby & Greenwood, P.C., respectfully submit this Plaintiffs' Opposition to Motion of the Governor and Attorney General for Summary Judgment.

## INTRODUCTION

Defendants Gary R. Herbert and John Swallow (collectively, the "State Defendants") incorrectly contend that this case is about "who decides," and whether permitting opposite-sex couples to marry is rational.  However, contrary to these assertions, the issue for this Court to decide is whether the State of Utah's exclusion of same-sex couples from civil[1] marriage, and any equivalent for civil marriage, violates the Fourteenth Amendment of the United States Constitution (the "Constitution").  Such constitutional questions are expressly relegated to this Court under our federal system of government.

---

[1] To be clear, this case does not implicate any First Amendment right of individuals or institutions that oppose same-sex marriage on religious or moral grounds. Plaintiffs seek the right to civil marriage sanctioned by the State, not religious marriage. Religious groups can, of course, refuse any couple's request to be married or otherwise decline to recognize, for religious purposes, a civil marriage permitted by law.  Religious organizations opposed to same-sex marriage may and do refuse to recognize such marriages, which are now legal in many states.  This is no different than the long-standing refusal of the Roman Catholic Church to recognize second marriages of Catholics who divorce, or refusal of Orthodox Judaism to perform religious marriages between Jews and non-Jews.  The marriage equality sought by Plaintiffs will not change the rights of religious individuals or groups.  However, "[t]o the extent [the State] argue[s] that one of the rights of those morally opposed  to same-sex unions is the right to prevent same-sex couples from marrying . . . those individuals' moral views are an insufficient basis upon which to enact a legislative classification." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1000 (N.D. Cal. 2010).

For the reasons set forth, *infra*, and in Plaintiffs' Motion for Summary Judgment, Docket No. 32 ("Plaintiffs' Motion"), which is expressly incorporated herein, the State Defendants are not entitled to summary judgment under *United States v. Windsor*, 133 S. Ct. 2675 (2013), and because the State of Utah has not made a showing that its Marriage Discrimination Laws[2] survive heightened scrutiny.  Rational basis review is not the applicable standard.  Even if it were, the question would not be whether the union of a man and woman in marriage is rationally related to a legitimate state interest, but whether the exclusion of same-sex couples from marriage (or its equivalent) is rationally related to a legitimate state interest.  As explained in this opposition, including for the same reasons the Defense of Marriage Act ("DOMA") was found unconstitutional by the United States Supreme Court (the "Supreme Court") in *Windsor*, Utah's Marriage Discrimination Laws do not survive even this lowest level of constitutional scrutiny.

Accordingly, this Court must deny the State Defendants' motion.

## RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule DUCivR 56-1(c)(2)(A) & (B), Plaintiffs provide a response to each legal element and material fact stated by the State Defendants:

1.       "The Plaintiffs are same-sex couples, with two of those couples desiring to marry in this State and with one of those couples having previously married in Iowa and now desiring this State to recognize that foreign marriage.  *Complaint* (Doc. 2) ¶¶ 1-2, 5-8[.]"

---

[2] "Marriage Discrimination Laws" refers, collectively, to (1) Utah Code § 30-1-2; (2) Utah Code § 30-1-4.1; and (3) Utah Constitution, Article I, § 29 ("Amendment 3").

RESPONSE:  Undisputed.

2.      "Accordingly, the only issue is whether the Fourteenth Amendment's Equal Protection Clause or its Due Process Clause empowers this Court to change the State's definition of marriage from the union of a man and a woman to the union of two persons regardless of gender."

RESPONSE:  Disputed.

In the first instance, Plaintiffs object to the State Defendants' continued mischaracterization of marriage between individuals of the same sex as merely a marriage of "any two persons."  Just as with marriage between people of the opposite sex, gay and lesbian individuals seeking to marry desire to have the State sanction their long-term, loving, and committed relationships with the partner of their choice, and to have the protections, responsibilities, and benefits that flow from marriage.  The selection of that partner is not fortuitous or random, but the result of a deeply personal, and constitutionally-protected, choice.  Same-sex couples seeking to enter into marriage are not just "any two persons," any more than opposite-sex couples seeking to enter marriage are just "any two persons," and the Court should reject this language, which belittles and disparages Plaintiffs' relationships.

Plaintiffs further object to the State Defendants' continued mischaracterization of Utah's Marriage Discrimination Laws as simply a "definition of marriage [as] the union of a man and a woman."  Plaintiffs do not seek to change, impede, or denigrate the union of a man and a woman through marriage.  They merely want to be able to marry, too.  As such, Plaintiffs do not seek to change that marriage may be the union of a man and

woman, but to strike down the State's mandate that marriage may *only* be the union of a man and a woman, and that same-sex couples may not even enter into a relationship that is legally equivalent to marriage.

Accordingly, the issue in this case is whether the State of Utah's exclusion of same-sex couples from marriage (and any equivalent for marriage) violates the Fourteenth Amendment.

3.      "To prevail on their due process and equal protection claims, the Plaintiffs must prove that the definition of marriage as the union of a man and a woman is irrational; that it does not rationally relate to a legitimate State interest.  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *Heller v. Doe*, 509 U.S. 312, 320 (1993) . . . ."

RESPONSE:  Disputed.

Under rational basis review, the question is not whether the union between a woman and a man is "irrational," as the State Defendants contend, but whether mandating that marriage be *only* between a woman and a man is rationally related to a legitimate governmental interest.  However, as discussed in Plaintiffs' Motion, rational basis review is not the applicable standard.[3][4]

---

[3] Pursuant to Local Rule DUCivR 56-1(c)(2)(D), "If there are additional legal elements not stated by the moving party that the non-moving party contends preclude summary judgment," then the non-moving party is to "state each such element along with citation to legal authority that supports the element (without argument)."  Plaintiffs have already set forth in their pending motion for summary judgment the legal elements and undisputed material facts which entitle them to summary judgment, and which also preclude the Court from granting the State Defendants' motion for summary judgment.  In lieu of repeating this information in this opposition, Plaintiffs refer the Court to the "Statement of Elements" and "Statement of Undisputed Material Facts" in their pending motion for summary judgment.  *See* Plaintiffs' Motion at viii-xxxi.  In addition, Plaintiffs

(continued...)

First, under the binding analysis in *United States v. Windsor*, 133 S. Ct. 2675 (2013), Plaintiffs prevail because Utah's Marriage Discrimination Laws violate the Equal Protection Clause of the Fourteenth Amendment under any standard of review, because the design, purpose, and effect of these laws are to single out same-sex couples to impose a disability on them, and to treat them unequally.   *See* Plaintiffs' Motion at 18-26.   Under the analysis of the Supreme Court in *Windsor*, such laws are irrational, and no legitimate purpose overcomes their purpose and effect to disparage and injure.   *See id.*  Furthermore, the State's refusal to recognize same-sex marriages performed in other states is likewise unconstitutional under *Windsor*.   *See id.* at 37-39.

Second, Utah's Marriage Discrimination Laws burden Plaintiffs' fundamental right to marry the person of their choice, or to have their out-of-state marriage to the person of their choice recognized by the State.   *See id.* at 1-16.   Therefore, under the Due Process Clause of the Fourteenth Amendment, the State must show that its laws are narrowly tailored to meet a compelling governmental interest, or Plaintiffs prevail.   *See id.*  As shown in Plaintiffs' Motion and this opposition, the State Defendants have not met that burden.

_____

(...continued)

now provide, *infra*, additional undisputed material facts to rebut the arguments of the State.

[4] For the reasons stated in this section (which are discussed in more detail in this opposition, *infra*, and in Plaintiffs' Motion), Plaintiffs do not agree with the State Defendants that the burden of proof is on Plaintiffs.  However, as also discussed in this opposition, even if rational basis were the proper level of scrutiny, Utah's Marriage Discrimination Laws fail even under this analysis.

Third, because Utah's Marriage Discrimination Laws deny Plaintiffs equal access to a fundamental right, under the Equal Protection Clause of the Fourteenth Amendment, the State must show that its laws are narrowly tailored to meet a compelling governmental interest, or Plaintiffs prevail.  *See id.* at 16-18.  Again, the State Defendants have not met their burden, as demonstrated in this opposition and Plaintiffs' Motion.

Finally, Utah's Marriage Discrimination Laws create classifications based on gender and/or sexual orientation that are subject to heightened scrutiny, requiring that the State at least demonstrate the classifications are substantially related to an important governmental interest, or Plaintiffs prevail.  *See id.* at 26-37.  As shown in this opposition and Plaintiffs' Motion, the State Defendants have not met their burden.

4.      "Utah is therefore entitled to summary judgment by showing that the man-woman definition of marriage is rationally related to a legitimate state interest."

RESPONSE:  Disputed.

*See* Responses to 2. and 3., *supra*.

The State of Utah is not entitled to summary judgment under *Windsor*, and because the State of Utah has not made a showing that its Marriage Discrimination Laws survive heightened scrutiny.  Again, rational basis review is not the applicable standard.  Even if it were, the question would not be whether the union of a man and woman in marriage is rationally related to a legitimate state interest, but whether the exclusion of same-sex couples from marriage (or its equivalent) is rationally related to a

legitimate state interest.  As shown in this opposition, Utah's Marriage Discrimination

Laws do not survive even this lowest level of scrutiny.

## <u>RESPONSE TO THE STATE DEFENDANTS' BACKGROUND</u>

Pursuant to Local Rule DUCivR 56-1(b), the State Defendants have provided a

background section, "whether disputed or not, for the limited purpose of providing

background and context for the case . . . ."  Because such facts are not presented for

the purposes of supporting judgment as a matter of law, Plaintiffs do not respond to this

background, for the sake of brevity, and because no response is required under the

local rules of this Court.  Accordingly, the lack of a response to these background

statements should not be construed or deemed as either agreement or disagreement by

Plaintiffs.

## <u>STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS</u>

Pursuant to Local Rule DUCivR 56-1(c)(2)(C) & (D), Plaintiffs provide the

following additional undisputed material facts to rebut the arguments of the State

Defendants:

### The State of Utah Has No Interest in Differentiating Between
### Same-Sex and Opposite-Sex Unions

1.      Being gay or lesbian has no inherent association with a person's ability to

lead a happy, healthy, and productive life or to contribute to society.  8/20/12 Decl. of

L.A. Peplau, Ph.D., in *Sevcik v. Sandoval*, No. 2:12-cv-00578-RCJ-PAL in the United

States District Court for the District of Nevada ("Peplau Decl."), ¶¶ 11 & 29-32, attached

hereto as Exhibit 5.

2. Same-sex couples closely resemble opposite-sex couples, including in the ability to form loving, long-lasting relationships. *Id.*, ¶¶ 12 & 33-37; 10/12/12 Supp. Decl. of L.A. Peplau, Ph.D., in *Sevcik v. Sandoval*, No. 2:12-cv-00578-RCJ-PAL in the United States District Court for the District of Nevada ("Supp. Peplau Decl."), ¶¶ 8-9, attached hereto as Exhibit 6; *see also* Brief of the American Psychological Association, the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, the American Pyschoanalytic Association, the California Medical Association, the National Association of Social Workers and Its New York City and State Chapters, and the New York State Psychological Association as *Amici Curiae* on the Merits in Support of Affirmance  ("APA Brief"), empirical data and scientifically vetted publications cited at 11-13 (Mar. 2013) (discussing sexual orientation and relationships), *United States v. Windsor*, No. 12-307 before the United States Supreme Court, attached hereto as Exhibit 10.

3. Marriage provides a range of social and other benefits and protections to spouses, which contribute to enhanced psychological well-being, physical health, and longevity among married individuals, which benefits and protections are being denied to gay and lesbian individuals through bans on same-sex marriage. Peplau Decl., ¶¶ 13 & 38-52.

4. There is no scientific or empirical support for the notion that allowing same-sex couples to marry has harmed, or would harm, opposite-sex marriages. *Id.*, ¶¶ 15 & 56-63; Supp. Peplau Decl., ¶¶ 4-7; *see also* 10/9/13 Decl. of M.V.L. Badgett, Ph.D. ("Badgett Decl."), ¶¶ 69-77 (discussing the empirical data of states and countries

allowing same-sex marriage), attached hereto as Exhibit 1; Brief of Massachusetts,

California, Connecticut, Delaware, District of Columbia, Illinois, Iowa, Maine, Maryland,

New Hampshire, New Mexico, New York, Oregon, Vermont, and Washington as *Amici*

*Curiae* in Support of Appellants ("15 States' Brief"), empirical data and scientifically

vetted publications cited at 22-31 (Oct. 2013) (concluding that, based on the experience

of states allowing same-sex marriage, "Speculation About the Erosion of the Institution

of Marriage Is Demonstrably False"), Docket No. 24 in *Sevcik v. Sandoval*, Case No.

12-17668 in the United States Court of Appeals for the Ninth Circuit, attached hereto as

Exhibit 13.

      5.      Children and adolescents brought up by same-sex couples are as likely to

be well-adjusted as are children brought up by opposite-sex couples.  11/21/13 Decl. of

C.J. Patterson, Ph.D. ("Patterson Decl."), ¶¶ 11 & 13-36, attached hereto as Exhibit 4;

*see also* APA Brief, empirical data and scientifically vetted publications cited at 18-26

("There Is No Scientific Basis for Concluding That Gay and Lesbian Parents Are Any

Less Fit or Capable Than Heterosexual Parents, or That Their Children Are Any Less

Psychologically Healthy and Well Adjusted"); Brief of the Amicus Curiae American

Sociological Association in Support of Respondent Kristin M. Perry and Respondent

Edith Schlain Windsor  ("ASA Brief"), empirical data and scientifically vetted publications

cited at 6-14 (Feb. 2013) ("Scholarly Consensus Is Clear:  Children of Same-Sex

Parents Fare Just as Well as Children of Opposite-Sex Parents"), *United States v.*

*Windsor*, No. 12-307 before the United States Supreme Court, attached hereto as

Exhibit 11.[5]

6.      Parental gender and sexual orientation are not related to the ability to be a

good parent or to the likelihood of healthy development among children and

adolescents; further, no empirical evidence support has emerged for the view that the

presence of both male and female role models in the home promotes children's

adjustment or well-being.  Patterson Decl., ¶¶ 12 & 26-36; *see also* APA Brief, empirical

data and scientifically vetted publications cited at 14-18 ("The Factors That Affect the

Adjustment of Children Are Not Dependent on Parental Gender of Sexual Orientation").

7.      There were 3,861 same-sex couples living together in Utah in 2008,

raising approximately 2,900 children under 18 years of age; these children would benefit

if their parents were permitted to marry.  Patterson Decl., ¶¶ 40; *see also* Badgett Decl.,

¶ 13 (3,909 same-sex couples living together in Utah in 2010).

8.      Utah's Marriage Discrimination Laws deprive same-sex couples in Utah,

and their children, of significant economic benefits associated with marriage, and

impose substantial economic harm on them.  Badgett Decl., ¶¶ 11 & 32-68.

---

[5] The literature cited by the State Defendants and included in their Appendix
does not constitute "legislative fact" – it is *not* "literature that reasonable and informed
people consider when addressing such wide-reaching social, political and cultural
matters."  State Defendants' Motion at viii.  Reasonable and informed people consider
empirical data and scientific consensus, not moral viewpoints based on studies that do
not pass scientific muster.  *See, e.g.*, Patterson Decl.; *see also* APA Brief & ASA Brief.
There is no genuine dispute on these issues, as the State Defendants contend.

9.      Utah's Marriage Discrimination Laws also harm the State of Utah economically, including because, over the next three years, the State of Utah will lose approximately $15.5 million in business revenue and $1 million in tax revenue that would have accrued as a result of weddings by same-sex couples, and the State's economy will also suffer as Utah remains a comparatively less attractive location for highly qualified workers and business as a result of Utah's discriminatory laws, among other harms to the State.  *Id.*, ¶¶ 15-31

10.     Marriage is not a fixed institution, as marriage has changed dramatically over time in the United States to meet changing social needs.  9/4/12 Decl. of N.F. Cott, Ph.D., in *Sevcik v. Sandoval*, No. 2:12-cv-00578-RCJ-PAL in the United States District Court for the District of Nevada ("Cott Decl."), ¶¶ 9 & 29-72, attached hereto as Exhibit 3.

**ARGUMENT**

For reasons set forth more fully in Plaintiffs' Motion, Plaintiffs are entitled to summary judgment.  These reasons also require the Court to deny the State Defendants' motion for summary judgment.  The State of Utah is not entitled to summary judgment under *United States v. Windsor*, 133 S. Ct. 2675 (2013), and because the State of Utah has not made a showing that its Marriage Discrimination Laws survive heightened scrutiny.  Rational basis review is not the applicable standard.  Even if it were, the question would not be whether the union of a man and woman in marriage is rationally related to a legitimate state interest, as the State Defendants contend, but whether the exclusion of same-sex couples from marriage (or its equivalent) is rationally related to a legitimate state interest.  As shown in this opposition, Utah's Marriage Discrimination Laws do not survive even this lowest level of scrutiny, and the State Defendants are not entitled to summary judgment.  Accordingly, the instant motion must be denied.

**I.     THIS COURT MUST DECIDE WHETHER UTAH'S MARRIAGE DISCRIMINATION LAWS VIOLATE THE FOURTEENTH AMENDMENT, AS DOING SO IS REQUIRED BY, COMPORTS WITH, AND DOES NOT DISRUPT, THE FEDERAL BALANCE OF POWERS**

This case is not about federalism or the Tenth Amendment.  Like *United States v. Windsor*, 133 S. Ct. 2675 (2013), this case is about equal protection and due process, and whether Utah's Marriage Discrimination Laws run afoul of the guarantees provided to all United States citizens, wherever they reside, under the Fourteenth Amendment to the Constitution.  As such, this is a case and controversy that is delegated to, and must

be resolved by, this Court.  Moreover, under the binding analysis in *Windsor*, this Court

must deny the State Defendants' motion, and decide this case in Plaintiffs' favor.

### A.     The Federal Balance Requires That This Court Decide This Case

The State Defendants maintain that this case is about "who should decide."  In

other words, they argue this Court should decline to analyze and decide this case under

the Fourteenth Amendment, out of deference to the State of Utah.  The State

Defendants further claim this Court risks interfering with the State's exercise of its

constitutionally reserved powers, if it decides this case.  However, the Constitution

reserves to the federal judiciary the power to interpret the Constitution in cases before it,

including under the Fourteenth Amendment.  *See* U.S. Const. Art. III, § 2, cl. 1 ("The

judicial Power shall extend to all Cases, in Law and Equity, arising under this

Constitution . . . .").  As such, this case is delegated to the federal judiciary and not

reserved to the State of Utah under the Tenth Amendment.  *See* U.S. Const. Amend. X

("The powers not delegated to the United States by the Constitution, nor prohibit by it to

the States, are reserved to the States respectively, or to the people.").  Indeed, this

Court *must* decide whether Utah's Marriage Discrimination Laws violate the Fourteenth

Amendment.  If it does not, that failure would disrupt the federal balance as set forth in

the Constitution -- not the other way around.

Plaintiffs agree with the State Defendants that our federal system is intended to

safeguard the nation's citizens from the abuse of power, and part of that system is the

power of the Constitution to provide individuals, wherever they reside, equal protection

of the law, and protection of their fundamental rights, even where infringement is the

desire of the majority of citizens in a state.[6]  Utah is no exception, and the majority of

this State cannot use their political power to discriminate against a politically unpopular

minority that does not share the majority's religious and/or moral view in terms of the

fundamental right, and equal access, to marriage.

> **B.     The Regulation of Marriage Is Not Exclusively the Province of the States, as State Laws Are Subject to Constitutional Guarantees, Including Under the Fourteenth Amendment**

In arguing that regulation of marriage is the exclusive province of the State, the

State Defendants rely on antiquated opinions and case law, and ignore the patent

statements in *Windsor* to the contrary.

First, the State Defendants' recognition that power over the subject of marriage

resided exclusively with the states at the time of the adoption of the Constitution, as also

acknowledged in the dicta of *Windsor*, is a nonstarter.  The Fourteenth Amendment at

issue in this case did not exist at the time of the adoption of the Constitution, nor did the

Supreme Court's body of law interpreting that amendment, including cases relating to

marriage, such as  *Loving v. Virginia*, 388 U.S. 1 (1967) and *Zablocki v. Redhail*, 434

U.S. 374 (1978).  Furthermore, most of the cases cited by the State Defendants to

---

[6] The fact Amendment 3 passed a public vote does not immunize Utah's Marriage Discrimination Laws from constitutional scrutiny.  *See, e.g.*, *Romer v. Evans,* 517 U.S. 620 (1996) (Supreme Court invalidated Colorado's state constitutional amendment barring laws providing protection to homosexuals, which amendment was adopted by voters in statewide referendum, under the Equal Protection Clause of the Fourteenth Amendment); *see also Bowers v. Hardwick*, 478 U.S. 186, 210-11 (1986) (Blackmun, J., dissenting) ("[N]either the length of time a majority has held its convictions or the passions with which it defends them can withdraw legislation from this Court's scrutiny.").

support their argument are either from non-binding, dissenting opinions, or decisions that are outdated.  No binding, contemporary authority supports the State Defendants' position that marriage is *exclusively* and *absolutely* delegated to the states, including because this is not the law.

Marriage, while primarily the province of the states, is not exclusively so.  The State Defendants' gloss over the key statements in the *Windsor* decision that make it clear the state's power to regulate marriage is "**subject to constitutional guarantees**" (stated twice in the majority opinion) and "**of course, must respect the constitutional rights of persons**."  *Windsor*, 133 S. Ct at 2691-92 (emphasis added).  Where a state's regulation of marriage does not respect those rights, or infringes upon those guarantees -- such as the case here -- then the state's power is limited by the Constitution.  This is true regardless of the fact that domestic relations have been largely (but not exclusively) relegated to the states throughout our nation's history.

> **C.    The *Windsor* Decision Is Not Based on Federalism, Nor Does *Windsor* Mandate This Court's Deference to Utah's Unconstitutional Laws**

The *Windsor* decision does not  support  the position that the State of Utah has an unfettered right to determine all matters involving marriage in Utah, and the State Defendants wholly misinterpret the Supreme Court's decision in their efforts to uphold Utah's unconstitutional laws.  DOMA was in fact struck down, not because states have an exclusive and absolute right to regulate marriage, but because DOMA deprived same-sex couples of their constitutional rights under the Fifth Amendment.  *See Windsor*, 133 S. Ct. at 2692-93, 2695 (DOMA "result[s] [in] **injury and indignity**" that

"**is a deprivation of an essential part of the liberty** protected by the Fifth

Amendment;" DOMA "**violates basic due process and equal protection principles**;"

"DOMA is unconstitutional as a **deprivation of the liberty of the person protected by**

**the Fifth Amendment** of the Constitution.") (emphasis added).

Contrary to the State Defendants' arguments, the *Windsor* decision was *not*

based on federalism or the Tenth Amendment.  The majority opinion expressly states

this.  *See id.* at 2692 ("**it is unnecessary to decide whether this federal intrusion on**

**state power is a violation of the Constitution**;" "[t]he State's power in defining the

marital relation is of central relevance in this case quite **apart from principles of**

**federalism**" because "the State's decision to give this class of persons the right to

marry conferred upon them a dignity and status of immense import") (emphasis added).

Chief Justice Roberts' dissent, and his personal gloss on the *Windsor* decision as

being "based on federalism," is not binding on this Court.  *Id.* at 2697 (Roberts, C.J.,

dissenting).  This is especially true given that the majority opinion (which *is* binding on

this Court) expressly states that the holding is based on equal protection and due

process, and not on federalism.  The State Defendants' sole reliance on Chief Justice

Roberts' dissent is just further proof of the fallacy of their position.  Not only did the

majority reject Chief Justice Roberts' position, but so did Justice Scalia, who wrote a

separate dissent, recognizing the majority opinion for what it is:  a holding that would

bind lower courts, such as this Court, if presented a constitutional challenge to state

laws banning same-sex marriage, such as in this case.  *See id.* at 2709 (Scalia, J.,

dissenting) ("**[T]he view that *this* Court will take of state prohibition of same-sex**

**marriage is indicated beyond mistaking in today's opinion**. . . . [T]he real rationale of today's opinion . . . is that DOMA is motivated by 'bare . . . desire to harm' couples in same-sex marriages. . . . **How easy is it, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status.")** (italics emphasis in original; bold emphasis added).

Finally, *Windsor* does not stand for the proposition the State Defendants' urge, that Utah's laws must be accorded the same respect and deference as the laws allowing same-sex marriage in New York, including because Utah's laws do *not* respect the fundamental rights and liberties of Utah's gay and lesbian citizens, or provide these citizens equal protection of the law.  Utah's Marriage Discrimination Laws offend constitutional guarantees, for reasons set forth in Plaintiffs' Motion (and in *Windsor*), and cannot be condoned, as the State Defendants suggest, simply because the Supreme Court has shown deference to the entirely different marriage laws of another state (that are in fact the opposite of Utah's laws, and do not offend the Fourteenth Amendment).

   **D.** ***Windsor* Requires This Court To Invalidate Utah's Marriage Discrimination Laws**

A state's regulation of marriage is subject to constitutional guarantees.  *See Windsor*, 133 S. Ct at 2692.  These very guarantees are at issue in this case.  Under the Constitution, this Court is charged with deciding this case.  *See* U.S. Const. Art. III.  Moreover, under *Windsor*, this Court must decide this case in Plaintiffs' favor.

As demonstrated in Plaintiffs' Motion, the analysis and foundation for *Windsor's* holding that DOMA was unconstitutional applies with equal force to Utah's Marriage

Discrimination Laws. *See* Plaintiffs' Motion at 18-26 (equal protection right of same-sex couples to marry in general) & 37-39 (equal protection right of same-sex couples to have their out-of-state marriage recognized in Utah). Moreover, the majority in *Windsor* further indicated as much when they stated, "[w]hile the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes the Fifth Amendment right all the more specific and all the better understood and preserved." *Windsor*, 133 S. Ct at 2695. This language means that the Fourteenth Amendment prohibits the State of Utah from doing the same thing that the federal government did in DOMA. Further, even if the majority's opinion were not plain enough, Justice Scalia -- no friend to marriage equality -- also recognized that this was the import of the majority opinion in his dissent. *See id.* at 2709 (Scalia, J., dissenting) ("**to reach the same conclusion with regard to state laws denying same-sex couples marital status**" is "**inevitable**") (emphasis added).

Finally, as discussed in Plaintiffs' Motion, the Supreme Court in *Windsor* already analyzed and rejected as irrational all of the very same arguments that the State advances here, in attempting to present a justification for its unconstitutional laws. *See id.* at 2696 ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure . . . ."); *see also* Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives ("BLAG Brief") at 28-49 (list of potential state interests rejected by the Supreme Court in *Windsor* as not sufficient to "overcome[] the purpose and effect to disparage and injure"

same-sex couples) (Feb. 2013), *United States v. Windsor*, No. 12-307 before the United States Supreme Court, attached hereto as Exhibit 9.  In other words, the State Defendants' arguments are not new.  They have been presented to the nation's highest court in materially analogous circumstances, and rejected as not justifying a violation of the Due Process Clause of the Fifth Amendment.  Likewise, these very same rationales by the State of Utah do not overcome the purpose and effect to disparage and injure Utah's gay and lesbian citizens, in violation of the Fourteenth Amendment.

## II.  *BAKER V. NELSON* IS IRRELEVANT

The State Defendants invoke the Supreme Court's 1972 summary dismissal of *Baker v. Nelson* for want of a substantial federal question, contending that *Baker* requires dismissal of Plaintiffs' claims.  *See generally id.*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed w/o op.*, 409 U.S. 810 (1972).  But the Supreme Court has cautioned that, "'when doctrinal developments indicate otherwise,'" the lower federal courts should not "'adhere to the view that if the Court has branded a question as unsubstantial, it remains so.'" *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (quoting *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967)).  "In the forty years after *Baker*, there have been manifold changes to the Supreme Court's equal protection jurisprudence." *Windsor v. United States*, 699 F.3d 169, 178-79 (2d Cir. 2012).  As the Second Circuit has explained:

> When Baker was decided in 1971, "intermediate scrutiny" was not yet in the Court's vernacular. Classifications based on illegitimacy and sex were not yet deemed quasi-suspect.  The Court had not yet ruled that "a classification of [homosexuals] undertaken for its own sake" actually lacked a rational basis. And, in 1971, the government could lawfully

8

'demean [homosexuals'] existence or control their destiny by making their private sexual conduct a crime.'"

*Id.* at 179 (citation omitted); *see also Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *vacated on other grounds in Smelt v. County of Orange*, 447 F.3d 673 (9th Cir. 2006); *In re Kandu*, 315 B.R.123, 138 (Bankr. W.D. Wash. 2004) (explaining that "*Baker* is not binding precedent" because of, among other things, "the possible impact of recent Supreme Court decisions, particularly as articulated in *Lawrence*"); *Garden State Equality v. Dow*, No. Civ. A. MER-L-1729-11, 2012 WL 540608, at *4 (N.J. Super. Ct. Feb. 21, 2012) ("The United States Supreme Court has decided several pertinent cases both contemporaneous with *Baker* and more recently which indicate that the issue of denying same-sex couples access to the institution of marriage would not be considered 'unsubstantial' today.").

    *Baker* did not and could not address how any of these doctrinal developments bear on Plaintiffs' equal protection claims.  Similarly, *Baker* could not and did not address how Plaintiffs' substantive due process claims should be evaluated in light of the Supreme Court's intervening decisions in *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Roe v. Wade*, 410 U.S. 113 (1973); *Carey v. Population Services Int'l*, 431 U.S. 678 (1977); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Turner v. Safley*, 482 U.S. 78 (1987); and *Lawrence v. Texas*, 539 U.S. 558 (2003).

    These doctrinal developments closely resemble those that occurred in the anti-miscegenation cases.  In 1956, the Supreme Court refused to hear a challenge to

Virginia's anti-miscegenation statute because the case was "devoid of a properly presented federal question." *Naim v. Naim*, 350 U.S. 985 (1956).  Eleven years later, the Court struck down the same law in *Loving v. Virginia*, 388 U.S. 1 (1967).  In the intervening years, the Court decided *McLaughlin v. Florida*, 379 U.S. 184 (1964), holding for the first time that a state could not punish interracial sexual activity more severely than intra-racial sexual activity.  Like *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence*; and *United States v. Windsor*, 33 S. Ct. 2675 (2013), *McLaughlin* represented a change in doctrine that rendered a summary dismissal from years earlier inapplicable to future cases on the issue.

Further, *Baker* did not address whether a State violates equal protection and due process by categorically excluding legally married same-sex couples from its longstanding practice and law that a marriage valid where celebrated generally will be recognized as valid in Utah.  *See* Utah Code § 30-1-4 (2013) ("A marriage solemnized in any other country, state, or territory, if valid where solemnized, is valid here . . . .").  The *Baker* decision did not even consider this question, much less resolve it; therefore, *Baker* cannot be deemed to resolve whether Utah must afford equal recognition to the valid out-of-state marriages of same-sex couples.  *Mandel v. Bradley*, 432 U.S. 173, 176 (1979) (holding that a summary dismissal by the Supreme Court for want of a substantial federal question is dispositive only on "the precise issues presented and necessarily decided").

For all these reasons, *Baker* is irrelevant to Plaintiffs' challenge to Utah's

Marriage Discrimination Laws.[7]

### III.   THE FUNDAMENTAL RIGHT TO MARRIAGE PROTECTED BY THE DUE PROCESS CLAUSE ENCOMPASSES THE RIGHT OF PLAINTIFFS TO MARRY THE PERSON OF THEIR CHOICE

The State Defendants contend there is no fundamental right to "same-sex

marriage," and therefore Utah's Marriage Discrimination Laws do not violate Due

Process.  However, the Constitution protects the right to marriage of all citizens, and not

just the right to marriage in its "traditional" or historically accepted forms.  The contours

of civil marriage have changed throughout the history of our nation.  Notwithstanding, the

fact that marriage is a fundamental right protected by the Due Process Clause has

remain unchanged.  Because Utah's laws preclude Plaintiffs' access to the fundamental

---

[7] As discussed, *supra*, Baker has been made irrelevant by subsequent doctrinal developments of the Supreme Court.  This is especially true given that *Baker* is a summary affirmance, and not a published opinion.  The Supreme Court has stated that "summary affirmances have considerably less precedential value than an opinion on the merits."  *Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 180-81 (1979).  For summary affirmances, a lower court is *required* to independently examine a question in light of subsequent "doctrinal developments" even when the case has not been explicitly overruled.  *Hicks*, 422 U.S. at 344.  "In contrast to full opinions of the Supreme Court, the Court also has stated doctrinal developments may show a summary dismissal is no longer binding."  *Smelt*, 374 F. Supp. 2d at 874; *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 173 n.33 (3d Cir. 2002) ("[S]ubsequent doctrinal developments remove whatever precedential authority a summary disposition inconsistent with them might have"); *Jones v. Bates*, 127 F.3d 839, 851 n.13 (9th Cir. 1997) ("[E]ven if we were to assume that [a summary affirmance] concerned precisely the same issues involved here, extensive intervening doctrinal developments . . . strongly suggest that continued reliance on [the summary affirmance] is unwarranted"); *see also, e.g.*, *Soto-Lopez v. N.Y. City Civil Serv. Comm'n*, 755 F.2d 266, 273 (2d Cir. 1985) (holding that summary affirmance in 1974 is no longer binding in light of intervening precedent from 1982).

right of marriage, the State Defendants' motion should be denied, and summary

judgment entered in favor of Plaintiffs on the grounds that the Marriage Discrimination

Laws violate Plaintiffs' due process rights guaranteed by the Fourteenth Amendment.

### A.    Plaintiffs Are Not Advocating a "New" Fundamental Right, But Equal Access to an Already-Existing Fundamental Right

The State Defendants erroneously assert that Plaintiffs seek recognition of a

"new" right, not recognized in the Constitution.  *See, e.g.*, State Defendants' Answer at

7 ("State Defendants deny that same-sex marriage is a constitutionally protected right . .

. ."), Docket No. 16. However, Plaintiffs do not ask this Court "to break new ground," or

"to expand the concept of substantive due process."  *Collins v. Harker Heights*, 503 U.S.

115, 125 (1992).  "**To characterize plaintiffs' objectives as 'the right to same-sex**

**marriage' would suggest that plaintiffs seek something different from what**

**opposite-sex couples across the state enjoy – namely, marriage**."    *Perry v.*

*Schwarzenegger*, 704 F. Supp. 2d 921, 993 (N.D. Cal. 2010) (emphasis added).

"Rather, plaintiffs ask [the State of Utah] to **recognize their relationships for what**

**they are:  marriages**."  *Id.*  (emphasis added).

The "careful description" of the fundamental right to marriage has already been

set forth in the numerous cases of the Supreme Court that are discussed in great detail

in Plaintiffs' Motion, and expressly includes the right to make choices about marriage,

including, foremost, the person that you will marry.  *See* Plaintiffs' Motion at 4-13;

*Zablocki v. Redhail*, 434 U.S. 374, 383-385 (1978) ("[T]he right to marry is of

fundamental importance for all individuals . . . [and] the most important relation in life. . .

. Marriage is a coming together for better or for worse, hopefully enduring, and intimate

to the degree of being sacred. It is an association that promotes a way of life, not

causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or

social project. . . . [I]t is clear that among the decisions that an individual may make

without unjustified government interference are **personal decisions 'relating to**

**marriage**. . . .  This Court has long recognized that **freedom of personal choice in**

**matters of marriage and family life is one of the liberties protected by the Due**

**Process Clause of the Fourteenth Amendment**.") (quotation and citation omitted;

emphasis added).

  Sexual orientation and gender are irrelevant to the marriage relationship,

including because same-sex couples' intimate relationships embody the very same

attributes of marriage that the Supreme Court has identified as necessary to create a

constitutionally protected marital relationship.  The Supreme Court in *Turner v. Safley*

struck down a prison regulation denying inmates the right to marry as violating the

fundamental right of due process.  482 U.S. 78 (1987).  The Court concluded the

elements of marriage available to a prisoner "are sufficient to form a constitutionally

protected marital relationship in the prison context."  *Id.*, 482 U.S. at 96.

  The marriage attributes the unanimous Court in *Turner* found were sufficient to

form a constitutionally protected marital relationship are:

> First, inmate marriages, like others, are expression of emotional support
> and public commitment. . . . In addition, many religions recognize marriage
> as having spiritual significance . . . . Third, most inmates eventually will be
> released by parole or commutation, and therefore, most inmate marriages
> are formed in the expectation that they ultimately will be fully
> consummated.  Finally, marital status often is a precondition to the receipt

of government benefits . . ., property rights . . ., and other, less tangible benefits . . . . [8]

*Id.* at 95-96. Those same marriage attributes apply to same-sex marriage.

Because of the Supreme Court's large body of case law on the right to marry, this Court does not have to come up with its own description of the right to marriage, contrary to the State Defendants' assertions. This Court need only declare that all citizens have equal access to the fundamental right of marriage already established by binding, Supreme Court precedent, and that Utah's laws prohibit Plaintiffs' access to that fundamental right.

        **B.    That the Right to Marry Itself is Deeply Rooted in This Nation's History and Tradition Is Sufficient for This Court To Determine That the Marriage Discrimination Laws Violate Plaintiffs' Fundamental Right to Marriage under the Due Process Clause**

It is sufficient that the right to marry itself is "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997), for this Court to determine that the right to marry a person of the same gender is protected by the Due Process Clause of the Fourteenth Amendment. That is why the Constitution protects, for example, interracial marriage, *see Loving v. Virginia*, 388 U.S. 1 (1967), and the right of married couples to use contraceptives, *see Griswold v. Connecticut*, 3811 U.S. 479 (1965), even though interracial marriages were not "traditional" or historically accepted at points in our nation's past, and the use of contraceptives by married couples would not lead to offspring. This is true whether these liberties were originally intended to be

---

       [8] *Turner* also makes it clear that procreation is not an essential element for a marital relationship to be constitutionally protected.

recognized as fundamental or even recognized at all.  As the majority in *Lawrence* stated:

> Had those who drew and ratified the Due Process Clauses of the Fifth or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific.  They did not presume to have this insight.  **They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress**.  **As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.**

*Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003) (emphasis added).

While "[i]t seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might [marry]," *United States v. Windsor*, 133 S. Ct. 2675, 2689 (2013), the fact that, traditionally, same-sex marriage was not part of our vocabulary is not determinative.  "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry."  *Lawrence*, 539 U.S. at 572 (internal quotation and citation omitted).  As the Supreme Court's more-recent jurisprudence demonstrates, when the rights of gay and lesbian individuals are at issue, history and tradition do not dictate the outcome under substantive due process analysis.  *See, e.g.*, *id.*; *see also, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675 (2013).

Further, and contrary to the State Defendants' mischaracterization, this case is not like *Glucksberg*.  The Court in *Glucksberg* held that assisted suicide was not deeply rooted in the nation's history, including because it has been criminalized in Anglo-American law for over 700 years.  *See Glucksberg*, 521 U.S. at 710-19.  In contrast, marriage has been widely lauded and encouraged throughout history.  This case is

therefore the opposite of, and distinguishable from, *Glucksberg*, and the State Defendants' manipulation of the language in that case to argue against marriage equality is misleading.

      **C.**    **Civil Marriage Is Not a Static Institution, and the Fundamental Right to Marriage Is Not *Per Se* Bound to Any Particular Historical or Traditional Form**

The State of Utah cannot narrowly define the liberty and privacy rights at issue in this case to exclude gay and lesbian individuals from marriage, based on a claim of protecting a "traditional" definition of marriage, including because many tenets of "traditional" marriage have fallen by the wayside, as civil marriage in our country has never been as static as the State Defendants now contend.  *See* Cott Decl., ¶ 9 ("Marriage is not a fixed institution.  In the United States, marriage has changed dramatically over time . . . to meet changing social and ethical needs. . . . Societal change over the centuries has produced new features in marriage that are commonly accepted today although they would have been unthinkable at the founding of the United States.  **Marriage has been a successful civil institution precisely because it has been flexible, not static.**") (emphasis added); *see also Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 940 ("Nancy Cott, a historian testified as an expert in the history of marriage in the United States.  Cott testified that marriage has always been a secular institution in the United States, that regulation of marriage eased the state's burden to govern an amorphous populace and that marriage in the United States has undergone a series of transformations since the country was founded.").

16

For example, "traditional" marriage formerly embodied gender roles through the doctrine of coverture, which was ubiquitous throughout the country.  *See United States v. Graham*, 87 F. Supp. 237, 240 (D. Mich. 1949) ("[M]arriage destroyed a woman's separate legal identity; her legal existence was merged in that of her husband . . . ."). Indeed, unlike bans on interracial marriage, all fifty states adopted the doctrine of coverture.  Like bans on same-sex marriage, the doctrine of coverture was thought to be justified by biological differences between males and females.  However, this tenet of "traditional" marriage has perished.  *See* Cott Decl., ¶¶ 35 & 45-46 ("Over time our country has moved to gender parity in marriage which would have been unthinkable to most Americans at the founding of the United States. . . . These changes reflect the modern view of marriage as an arrangement between two equal and consenting parties who have freely chosen one another. . . . The gender equality of marriage today would profoundly shock any American from the era of the American Revolution of the Civil War.").

As another example, "traditional" marriage was permanent; i.e., "to death do us part."  Yet, all states now embrace some form of no-fault divorce, despite the fact that this change was met with much resistance:

> Divorce grounds initially involved only such breaches of the marriage as adultery, desertion, or conviction of certain crimes. . . . Over time, divorce became more easily obtainable . . . .  The expansion of grounds for divorce was hotly debated, and fiercely opposed in some quarters . . . . Major religions opposed divorce entirely, or accepted adultery as the sole justification for divorce. . . . Alarmist critics were sure that liberalized treatment of divorce would undermine the marital compact entirely. . . . [E]xtreme differences among [the states] arose. . . . [Ultimately] no-fault divorce was soon embraced nationally as a means of dealing honestly with marital breakdowns, achieving greater equality between men and

17

women within marriage, and advancing further the notion of consent and choice as to one's spouse.

*Id.*, ¶¶ 63, 66-67 & 70.

As yet another example, and analogous to the State's infringement on Plaintiffs' constitutionally-protected choice in this case, in some parts of the country, "traditional" marriage also prohibited marriages between individuals of different race.  However, such anti-miscegenation laws were found to be unconstitutional.  *See Loving v. Virginia*, 388 U.S. 1 (1967); *see also Perry*, 704 F. Supp. 2d at 992 ("When the Supreme Court invalidated race restrictions in *Loving*, . . . the Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry.") (internal citation omitted).

Finally, while "traditional" marriage has been historically linked with procreation,[9]

The ability or willingness of couples to produce progeny has never been required for or necessary to marriage under the law of any American state. For example, no state ever barred women past menopause from marrying or allowed a husband to divorce his wife because she was past childbearing age.  Men or women known to be sterile have not been prevented from marrying.  Nor could a marriage be annulled for an inability to bear or beget children. . . .  In the past, widows and widowers remarried

---

[9] Plaintiffs do not deny that procreation is one reason why people may marry, or contend that individuals should not seek to enter marriage to procreate.  However, contrary to the arguments of the State Defendants, procreation is not the *only* reason why people marry, or the reason why the Supreme Court has recognized marriage as a fundamental right.  The Supreme Court has, in fact, upheld the right to marry in cases where there is no ability to procreate.  *See, e.g., Turner v. Safley*, 482 U.S. 78, 95-96 (holding attributes of marriage, after considering  prison life limitations,  were sufficient to form constitutionally protected marital relationship) .  Moreover, not even the State Defendants would contend that (opposite-sex) infertile people, elderly people, or even people capable of procreation but not wanting children, should be denied the right to marry.

whenever a willing mate could be found; although it was often clear that no children would result, marriage was nonetheless desirable because it produced the division of labor expected to undergird a well-functioning household.  In our contemporary post-industrial economy, many divorced or widowed older adults marry when they are past childbearing age, usually for reasons of intimacy and stability. . . . [C]ouples with no interest in or expectation of childbearing marry, and re-marry.

Cott Decl., ¶¶ 24-25.  Notwithstanding, to protect the procreative tenet of "traditional" marriage, states attempted to deny married couples access to contraceptives, but the Supreme Court invalidated such laws under the Fourteenth Amendment.  *See Griswold v. Connecticut*, 3811 U.S. 479 (1965).

If history has demonstrated anything, it is that marriage is not a static concept, but is fluid to accommodate societies' evolving understanding of equality and privacy. But that does not make it any less fundamental.

Recently, the Supreme Court acknowledged the evolving nature of marriage in *Windsor*, stating that allowing same-sex couples to marry "enhance[s] the recognition, dignity, and protection of [that class of persons] in their own community," and that New York's authorization of same-sex marriages "reflects both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality."  133 S. Ct. at 2692-93.  The Supreme Court explained that "[t]he limitation of lawful marriage to heterosexual couples, which for centuries had been deemed both necessary and fundamental, came to be seen in New York and certain other States as an unjust exclusion."  *Id.* at 2689.  The Supreme Court emphasized that, while the "regulation of domestic relations" has long been entrusted to

19

the states, "[s]tate laws defining and regulating marriage, of course, **must respect the constitutional rights of persons** . . . ." *Id.* at 2691 (emphasis added).

In sum, the constitutional guarantees of the Fourteenth Amendment require that Utah's Marriage Discrimination Laws be struck down, even if it is difficult for some to accept. "Indeed, many features of modern marriage that we take for granted today -- such as the ability of both spouses to act as individuals, to marry someone of another race, or to divorce for numerous reasons -- were fiercely resisted as they were coming into being, and were viewed by opponents as threatening to destroy the institution itself." Cott Decl., ¶ 33. Notwithstanding, the institution of marriage changed in our country to meet society's changing needs and understanding of equality and privacy, and continues to flourish today because of that flexibility.

> **D.     This Court Must Invalidate Utah's Marriage Discrimination Laws Under the Due Process Clause of the Fourteenth Amendment**

The right to marriage is deeply rooted in the jurisprudence of the American courts, and all citizens should be free from having the State appropriate that right, without compelling justification. *See* Plaintiffs' Motion at 1-16. Plaintiffs need not convince this Court that same-sex marriage is a historically accepted tradition in this country, any more than the plaintiffs in *Loving* had to convince the Supreme Court in 1967 that interracial marriage was a historically accepted tradition in this country, in order for Plaintiffs to exercise the same fundamental choices, liberty, and privacy rights that heterosexual individuals enjoy. Under the Due Process Clause of the Fourteenth Amendment, the fundamental right of all individuals – regardless of sexual orientation –

to marry the person of his or her choice is protected from unjustified, governmental

intrusion.  For these and other reasons explained more fully in Plaintiffs' Motion, this

Court should deny the instant motion, and find that Utah's Marriage Discrimination Laws

violate Due Process.

IV.    POST *WINDSOR*, UTAH'S MARRIAGE DISCRIMINATION LAWS FAIL
       UNDER THE EQUAL PROTECTION CLAUSE BECAUSE PREJUDICE
       IS IRRATIONAL, AND UTAH'S LAWS ARE BASED ON PREJUDICE

The State of Utah is discriminating against gay and lesbian individuals based on

prejudice, and under *United States v. Windsor*, 133 S. Ct. 2675 (2013), this

discrimination fails under any standard of review, as explained in this opposition and in

Plaintiffs' Motion.  *Windsor* is the binding precedent applicable to this case, because it is

the only opinion of the Supreme Court on the issue of same-sex marriage, and because

the Supreme Court in *Windsor* struck down DOMA's limitation on marriage to a union

between a man and a woman as a violation of equal protection implicit in the Due

Process Clause of the Fifth Amendment, for reasons that require Utah's discriminatory

laws to be struck down as well under the Equal Protection of the Fourteenth

Amendment.  *Id.* at 2695-96.  In striking down DOMA, the Supreme Court held that

DOMA "injure[s]," "stigma[tizes]," "demean[s]," and "degrade[s]" same -sex couples,

treating their relationships as "second-class," "second-tier," and "unworthy of []

recognition."  *Id.* at 2692-94 & 2695-96.  In addition, the Supreme Court held that DOMA

"humiliates tens of thousands of children now being raised by same-sex couples" and

"financial[ly] harm[s]" them by denying them federal benefits.  *Id.* at 2694-95.  The

Supreme Court further emphasized that, by denying recognition to same-sex couples,

DOMA had a "substantial societal impact . . . in the daily lives and customs" of people. *Id.* at 2693.

In this case, the State of Utah seeks to uphold a definition of marriage which is even more far-reaching and injurious than the definition of marriage found unconstitutional in DOMA.  While the Supreme Court held that denying same-sex couples federal benefits under DOMA was unconstitutional, Utah's laws actually prohibit these couples from marrying in the first instance, or even from forming civil unions or domestic partnerships, having even more of a "substantial impact" on the "daily lives and customs" of Utah's citizens.  *Id.* at 2693.  As in *Windsor*, Utah's discrimination against same-sex couples "is invalid, for no legitimate purpose overcomes the purpose and effect [of the Marriage Discrimination Laws] to disparage and to injure" Utah's same-sex couples.  *Id.* at 2696.  Because Utah's Marriage Discrimination Laws treat these couples as "less respected than others," they violate the Equal Protection Clause, and must be struck down under the binding precedent of *Windsor*.  *Id.*

In sum, the analysis of this case under *Windsor* is dispositive, showing that Plaintiffs are entitled to summary judgment on their Equal Protection claim for reasons set forth in more detail in Plaintiffs' pending motion for judgment as a matter of law -- and irrespective of whether sexual orientation is "suspect."  *See* Plaintiffs' Motion at 18-26.  These same reasons demand that the State Defendants' motion for summary judgment be denied.

### A. Under *Windsor*, the State of Utah Bears the Burden of Showing Its Marriage Discrimination Laws Are Not Based Solely on Prejudice and Cannot Do So

The State Defendants contend they are not required to come forth with any reason for their laws, and this Court is required to accept their so-called "legislative facts," which are not supported by admissible evidence, are not presented to this Court in any form permitted under Federal Rule of Civil Procedure 56, and which the State Defendants virtually admit are "legitimately" contested, by argument of "serious strength."  State Defendants' Motion at 18.  Instead, the State Defendants argue they may rely on any "conceivable" reason for Utah's laws, no matter how "speculat[ive]," "tenuous," "illogical," and "unscientific."  *Id.* at 19-20.  However, as discussed, *infra*, even rational basis scrutiny is not as deferential as the State Defendants contend.  In any case, however, under the binding precedent of *Windsor* -- which is the *only* case decided by this nation's highest court on the subject of same-sex marriage -- this Court cannot uphold laws that discriminate against same-sex couples by purely deferring to the State.

Under the analysis of the Supreme Court in *Windsor*, this Court must look to the actual purpose, design, and effect of the exclusion of same-sex couples from marriage, and whether Utah's laws are undertaken solely to disadvantage Utah's gay and lesbian citizens, by denying them the same rights, protections, responsibilities, and benefits allowed to their similarly-situated, heterosexual counterparts.  In particular, the Supreme Court held in *Windsor* that "the design, purpose, and effect" of laws burdening same-sex couples "should be considered as the beginning point in deciding whether [they are]

valid under the Constitution," and "at the very least," Equal Protection "mean[s] that a

bare . . . desire to harm a politically unpopular group cannot justify disparate treatment

of that group." *Windsor*, 133 S. Ct. at 2689 & 2693 (quotation omitted).  The Court

further stated that DOMA's "avowed purpose and practical effect [was] to impose a

disadvantage, a separate status, and so a stigma upon all who [desire to] enter into

same-sex marriages . . . ." *Id.* at 2693.  The Court expressly rejected Congress's claim

that DOMA was justified by the need "to defend the institution of traditional heterosexual

marriage," to express "moral disapproval of homosexuality," and to promote "an interest

in protecting the traditional moral teachings reflected in heterosexual-only marriage

laws." *Id.*  After reviewing these purported justifications, and others, the Supreme Court

held that DOMA was not justified by any "legitimate purpose." *Id.* at 2696.  As such,

DOMA "raise[d] a most serious question under the Constitution's [equal protection

guarantees]," as its "principal effect [was] to identify a subset" of relationships "and

make them unequal." *Id.* at 2694.  DOMA's "principle purpose [was] to impose

inequality, not for other reasons like governmental efficiency." *Id.*  Instead, "it [told]

those couples, and all the world," that their relationships are "unworthy" of recognition.

*Id.*  "The differentiation demean[ed] the couple, whose moral and sexual choices the

Constitution protects." *Id.* (citing *Lawrence v. Texas*, 539 U.S. 558 (2003)).  In sum,

DOMA "single[d] out a class of persons," and "impose[d] a disability on the class."  It

"instruct[ed] all [government] officials, and indeed all persons with whom same-sex

couples interact, including their own children, that their [relationship] is less worthy than

the [relationships] of others." *Id.* at 2695-96.  Accordingly, the Court found DOMA

"invalid, for no legitimate purpose [overcame] the purpose and effect to disparage and to injure" same-sex couples.  *Id.* at 2696.

In this case, this Court can look to the stated reasons for the passage of Amendment 3 to determine "the design, purpose, and effect" of Utah's Marriage Discrimination Laws.  *Id.* at 2689.  These reasons are set forth in the voter information Pamphlet, prepared under the direction of the Lieutenant Governor, which reads:

> [T]he Amendment prohibits any other domestic union from being given the same or substantially equal legal effect as is given to a marriage between a man and a woman.  Presently when a man and a woman marry, they receive certain rights, benefits, and obligations provided in the law.  A married man and woman receive those rights, benefits, and obligations automatically, by operation of law and solely by virtue of being married. The Amendment prohibits a domestic union from being given those same or similar rights, benefits, and obligations.  The scope of that prohibition may be more precisely defined by Utah courts as they interpret the provision in the context of lawsuits that may arise.

Utah Voter Information Pamphlet General Election November 2, 2004 (the "Pamphlet") at 35, excerpts attached as Ex. C to Decl. of J.F. Parrish in Support of Plaintiffs' Motion for Summary Judgment, Docket No. 32-2.  The purpose of Amendment 3, as officially stated, is to create a state-sponsored institution of inequality, and to prohibit gay and lesbian couples from enjoying the same protections and benefits under the law as those "automatically" given to different-sex couples.  *Id.*  The Pamphlet further explains that Amendment 3 was necessary to "maintain[] public morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship."  *Id.*  The Pamphlet further states that Amendments 3 would ensure the continuation of "the ideal relationship where men, women and children thrive best and that is an enduring natural marriage

between a man and a woman."  *Id.*  Thus, the express and stated purpose of
Amendment 3 was to further privately-held moral views that same-sex couples are
immoral and inferior to heterosexual couples, by disadvantaging them in comparison to
opposite-sex couples in the eyes of the law.  That stated purpose and effect of
Amendment 3 is prejudice pure and simple, as analyzed and determined in *Windsor*
with regard to the analogous purpose and effect of DOMA.

Further, and contrary to the State Defendants' characterization, the debates on
Amendment 3 in the Utah legislature were not marked by "a feeling of toleration and
concern for the welfare [of] homosexuals in the state."  State Defendants' Motion at xiii.
Plaintiffs do not view statements like the following, which were made by the legislative
sponsor of Amendment 3 when it was introduced in the Utah House of Representatives,
as showing tolerance and concern for them, but instead as disparaging, and
demonstrating a desire to treat their relationships as second-class, inferior, unworthy,
immoral, and unequal:

> I would submit that there is a tide of events in the affairs of men and
> that the confusion and anarchy of Massachusetts and San Francisco and
> elsewhere have reached a boiling point, after similar issues have been
> simmering for some time.
>
> **We've come face to face with what Abraham Lincoln long ago
> said in his day would continue to be the [eternal] struggle between
> right and wrong that would go on forever and ever. . . .**
>
> **We should not shy away from the notion that this is, indeed, a
> moral question.  For surely it is and we make no apologies for
> that**.  You can be compassionate and empathetic, kind and considerate
> **without lowering standards** or transforming fundamental principles upon
> which our society is based.  It was John Adams long ago that said **the
> constitution is only suited and fit for a moral people.  It is unfit for
> any other.** . . .

It was Washington long ago that said **it is impossible to govern without the Bible**. . . .

**We measure time forward and backwards from the birth of Jesus Christ.  And we look to him.**  We not only pray each morning, but we look to him for the exemplar that he is.  He loved all people.  He blessed all people.  He showed great compassion and mercy.  But **he didn't lower his standards** while he was doing it.  **He called people to come up to those standards.** . . .

Where can you say in the time of your representation that you've had the opportunity to so clearly reaffirm and keep from being just a hollow ceremonial recital as politicians make it so at the conclusion of so many addresses:  God bless America. . . .

2/24/04 Tr., 2004 General Legislative Session, Utah House of Representatives, at 2, 4, 6 & 15-16  (Rep. L. Christensen , Sponsor of HJR025) (emphasis added), excerpts attached hereto as Exhibit 14.

The State's legislators believed that equal access to marriage would result, in their *personal* opinions, to a "lowering [of] standards."  *Id.* at 4 & 15; *see also, e.g.*, *id.* at 7 (other representative in support of HJR025:  "I support the resolution because I will not accept same-sex unions as marriage as sanctified.  I will not because that's in my heart.  And that's the way I feel.  But I tolerate them and respect them deeply, thank you.").  There can be no mistake that the only purpose of these laws was and is to exclude from civil marriage, those relationships viewed by the religious majority of the State as second-class, inferior, and immoral, not, as the State Defendants contend, to promote marriage between opposite-sex couples (which, as discussed, *infra*, has no

27

rational relationship to the laws, in any case).[10] [11]   Accordingly, for the reasons set forth

by the Supreme Court in *Windsor*, this Court is likewise bound to reject the furtherance

of privately-held moral views as a basis for disadvantaging Utah's same-sex couples,

and must find that the Marriage Discrimination Laws are unconstitutional under the

Fourteenth Amendment.

### V.   CLASSIFICATIONS BASED ON SEXUAL ORIENTATION REQUIRE HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE

Under the criteria established by this nation's highest court, classifications based

on sexual orientation require heightened scrutiny, and there is no binding authority

prohibiting this Court from making this finding.   Accordingly, and because classifications

based on sexual orientation require heightened scrutiny, the State Defendants' motion

must be denied, and Plaintiffs' Motion granted.   The State has come forth with no

---

[10] The sponsor of Amendment 3 was specifically asked during the floor debate for the rational basis of the law, and how Amendment 3 would make opposite-sex marriages stronger.  The sponsor could not answer either of these questions, responding to the latter by stating, "If you believe in radical individualism, you can go off in a private corner and you can answer that question."  *Id.* at 10.

[11] The fact Amendment 3 was even presented to the voters in November 2004 -- when same-sex marriage was already banned through two Utah statutes, and had been banned since 1977 -- further demonstrates that the purpose of the Amendment was to make a state-sponsored, public statement that the long-term, committed relationships of gay and lesbian couples in the State of Utah were and are inferior to those of opposite-sex couples, and should be treated unequal.  *See* Utah Code Ann. § 30-1-2 (same-sex exclusion clause effective July 15, 1977); *id.* at § 30-1-4.1 (statutory equivalent of Amendment 3, banning same-sex marriage and any equivalent union, effective March 23, 2004).

evidence to support that its Marriage Discrimination Laws are substantially related to *any* state interest, let alone an important state interest.

> ### A. Faithful Application of the Supreme Court's Binding Precedent Requires Heightened Scrutiny of Classifications Based on Sexual Orientation

A number of federal and state courts, the current Department of Justice, learned constitutional scholars, and others have recently pronounced that the *only* conclusion that results from a faithful application of the Supreme Court's criteria for determining whether a class should receive heightened scrutiny, is that classifications based on sexual orientation are suspect (or at least quasi-suspect). *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 310-33 (D. Conn. 2012); *Golinski v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 985-90 (N.D. Cal. 2012); *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010); *Varnum v. Brien*, 763 N.W.2d 862, 885-96 (Iowa 2009); *In re Marriage Cases*, 183 P.3d 384, 441-44 (Cal. 2008); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008); *see also, e.g.*, Brief of the United States on the Merit Question at 35-36 ("The government has not lightly concluded that the Court's decisions dictate that heightened scrutiny applies to classifications based on sexual orientation.") (Feb. 2013) & Brief of Constitutional Law Scholars Bruce Ackerman, *et al.*, as *Amici Curiae* Addressing the Merits at 33 ("[L]aws that classify individuals for disparate treatment on the basis of their sexual orientation trigger heightened scrutiny") (Feb. 2013), United States v. Windsor, No. 12-307 before the United States Supreme Court, attached hereto

as Exhibits 8 & 12, respectively.   Plaintiffs likewise urge this Court to faithfully apply the

Supreme Court's binding criteria to reach the same conclusion, for reasons set forth in

more detail in Plaintiffs' pending motion for summary judgment.[12]  *See* Plaintiffs' Motion

at 26-33.

Furthermore, the State Defendants are correct that the Supreme Court in

*Windsor* did not address the status of sexual orientation as a class under equal

protection.  *See generally United States v. Windsor*, 133 S. Ct. 2675 (2013).  Instead,

the Supreme Court issued a ruling that the type of discrimination embodied in DOMA,

which is the same type of discrimination embodied in Utah's Marriage Discrimination

Laws, does not withstand scrutiny under due process and equal protection, irrespective

of the standard of review.  *See* Plaintiffs' Motion at 18-26.  In so holding, this Court

should note that the Supreme Court expressly acknowledged -- and then let stand -- the

Second Circuit's holding that heightened scrutiny applies to classifications based on

sexual orientation.  *See Windsor*, 133 S. Ct. at 2684 ("[T]he Court of Appeals for the

Second Circuit affirmed the District Court's judgment.  It applied heightened scrutiny to

classifications based on sexual orientation, as both the Department and Windsor had

urged."); *see also Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012)

(classifications based on sexual orientation are subject to heightened scrutiny as quasi-

suspect).

---

[12] While Plaintiffs urge this Court to find that classifications based on sexual
orientation are at least quasi-suspect, this Court need not even reach this issue under
*Windsor* to enter judgment in Plaintiffs' favor, as discussed in the preceding section and
in Plaintiffs' Motion.  *See* Plaintiffs' Motion at 18-26.

**B.      The Relevant Supreme Court Case Law Suggests That
Heightened Scrutiny Should Apply to Classifications Based on
Sexual Orientation**

While the Supreme Court has never expressly stated -- one way or the other --
whether classifications based on sexual orientation are suspect or quasi-suspect, the
analysis in the relevant cases suggest that the Court would so hold if squarely
presented the issue, or that the Supreme Court may have in fact already spoke to this
issue in *Windsor*.  At the very least, these cases do not prevent this Court from making
such a finding.

First, as discussed in the preceding section and in Plaintiffs' Motion,
classifications based on sexual orientation meet the criteria established in the Supreme
Court's cases for heightened scrutiny.  *See* Plaintiffs' Motion at 26-33.

Second, the 1996 case of *Romer v. Evans* supports, or at least does not prevent,
this Court from finding that classifications based on sexual orientation are at least quasi-
suspect.  In *Romer*, the Supreme Court invalidated a Colorado law repealing existing
(and prohibiting future) legal protections for gay and lesbian individuals, by finding that
the law failed "even" rational basis review.  517 U.S. 620, 632 (1996) ("Amendment 2
fails, indeed defies, even [the] conventional inquiry. . . . [I]t lacks a rational relationship
to legitimate state interests.").  Accordingly, the Supreme Court in *Romer* did not reach
the issue of whether classifications based on sexual orientation are suspect or quasi-
suspect, including because there was no need in the case to decide whether
heightened scrutiny applied.

31

Notably, the *Romer* opinion acknowledged sexual orientation as a trait and not just a means of categorizing a group associated with particular behavior or sexual conduct, thereby signaling an important departure from the Supreme Court's previous decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986). *See, e.g.*, *Romer*, 517 U.S. at 633 (the amendment "identifies persons by a single trait and then denies them protection across the board"). Further, *Romer*, for the first time, suggested that more than mere deference to the State was required when evaluating the rights of gay and lesbian individuals. *See id.* at 633 ("**discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the [constitution]**") (internal quotation and citation omitted; emphasis added). As this Court is aware, *Romer* signaled what was yet to come, as this very language was repeated by the Supreme Court 17 years later in support of its decision in *Windsor. See Windsor*, 133 S. Ct. at 2692 (laws burdening gay and lesbian individuals, as cases of "unusual character," would be subject to a form of heightened scrutiny, and reviewing DOMA under such a standard).

Third, the 2003 case of *Lawrence v. Texas* likewise supports, or at least does not prevent, this Court from finding that classifications based on sexual orientation are at least quasi-suspect. In *Lawrence*, the Supreme Court invalidated Texas's criminal ban on sodomy by finding that the law violated the Due Process Clause of the Fourteenth Amendment. 539 U.S. 558, 578 (2003). Again, the Supreme Court did not evaluate the law under an equal protection analysis, nor reach the issue of the appropriate level of scrutiny for classifications based on sexual orientation, because it did not need to reach

this issue to hold the Texas law unconstitutional.  Notwithstanding, the majority opinion is a helpful context for this case.

While the Supreme Court in *Lawrence* declined to base its holding on the Equal Protection Clause, ruling instead on the basis of substantive due process, the Supreme Court expressly stated that such an argument was "tenable."  *Id.* at 574.  The Supreme Court then went on to explain how its Due Process holding would advance the Equal Protection argument, in any case:  "**Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests**."  *Id.* at 575 (emphasis added).

Fourth and finally, the 2013 case of *United States v. Windsor* likewise supports, or at least does not prevent, this Court from finding that classifications based on sexual orientation are at least quasi-suspect.  In *Windsor*, the Supreme Court invalidated DOMA based on a violation of the Due Process Clause of the Fifth Amendment.  133 S. Ct. 2675, 2695 (2013) (holding that "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws," and that DOMA was a "deprivation of such liberty.")  Again, the Supreme Court did not discuss whether classifications based on sexual orientation are suspect or quasi-suspect, because it did not need to resolve that issue to resolve the case.  However, as discussed in the preceding section, the Supreme Court expressly acknowledged -- and let stand -- the Second Circuit's holding that classifications based on sexual orientation are suspect.  Further, the Supreme Court

indicated that laws that deliberately target politically unpopular groups, as cases of "unusual character," would be subject to a closer examination of the law's purpose and effects, and did in fact review DOMA under such standard.   *Id.* at 2692 (quoting *Romer*, 517 U.S. at 623).

The Supreme Court in *Windsor* concluded that DOMA was not sufficiently connected to a legitimate governmental purpose because its "**interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute.  It was its essence**." *Id.*  The Court held that DOMA "is invalid, for **no legitimate purpose overcomes the purpose and effect to disparage and to injure** those whom the State, by its marriage laws, sought to protect in personhood and dignity." *Id.* at 2696.  In other words, the Supreme Court did not merely defer to Congress, but looked to the purpose of the legislation, and whether the classification was in fact drawn to disadvantage gay and lesbian individuals.  As such, the *Windsor* decision, particularly given the Supreme Court's well-established mandated criteria for heightened scrutiny, as well as the background of *Romer* and *Lawrence*, strongly suggests that classifications that impose broad and undifferentiated burdens upon politically unpopular groups are subject to more than mere deference to a State's potential rationale, and that the State bears the burden of showing that the law is not purely to disadvantage an identifiable group, even where the law may also (conceivably and incidentally) serve some other governmental interest.

In sum, *Windsor*, at a minimum, supports that the Court's review now includes a close examination of a law's purpose and effects when a law targets a politically

unpopular minority group.   *See United States v. Windsor*, 133 S. Ct. 2675, 2692-93

(2013).  Utah's Marriage Discrimination Laws, like DOMA, are also invalid because "no

legitimate purpose overcomes the purpose and effect to disparage" same-sex couples

in Utah.  *Id.* at 2696.  Likewise, "[the] essence" of Utah's laws is the "interference with

the equal dignity of same-sex marriages."  *Id.* at 2693.  The plain language and history

of these laws demonstrate they are motivated by animus, as discussed, *supra*, and in

Plaintiffs' Motion, and that the "classification of persons [is] undertaken for its own sake,

something the Equal Protection Clause does not permit."  *Romer v. Evans*, 517 U.S.

620, 635 (1996).

　　　In conclusion, the Supreme Court has never foreclosed a finding of suspect or

quasi-suspect classification with respect to sexual orientation, and the cases in fact

support such a conclusion.  Further, as discussed in the next section, the law of the

Tenth Circuit likewise does not foreclose such a finding by this Court.

> **C.**　　**The Tenth Circuit's Decision in *Price-Cornelison v. Brooks*
> Does Not Prohibit This Court From Finding Sexual Orientation
> Classifications Are at Least Quasi-Suspect**

　　　Despite the Supreme Court precedent already discussed, which compels a

finding by this Court that the Marriage Discrimination Laws should be reviewed under

heightened scrutiny, the State Defendants argue that, under the Tenth Circuit's decision

in *Price-Cornelison v. Brooks*, 524 F.3d 1103 (10th Cir.2008), this Court is bound to find

this case must be reviewed under rational basis scrutiny.  However, this argument fails.

　　　*Price-Cornelison* involved the claim of disparate treatment by a local law official

in enforcing a protective order of a lesbian victim of domestic violence.  *See id.* at 1110

n.4 ("Price-Cornelison specifically allege[d] discrimination against lesbian victims of domestic violence rather than discrimination against lesbians generally. . . . [as the] evidence[]indicat[ed] that [police] actions favored [Price-Cornelison's cohabiting partner], who is herself a lesbian.").  Moreover, while "[i]n the district court, Price-Cornelison also alleged lesbians comprise a suspect class, warranting strict scrutiny[,] Price-Cornelison [did] not reassert that claim [] on appeal."  *Id.* at 1113 n.9.

Accordingly, **whether sexual orientation in general constituted a suspect class was not an issue on appeal in *Price-Cornelison*.**  *Id.*  Moreover, while the Tenth Circuit noted that, "[i]n any event, this court . . . has previously rejected the notion that homosexuality is a suspect classification,"  *id.*, the only support cited for that proposition was the then 13-year-old (now 18-year-old), pre-*Lawrence*, case of *Walmer v. Department of Defense*, 52 F.3d 851, 854 (10th Cir. 1995).  *Id.*  Ultimately, the court held that Price-Cornelison had sufficiently established that her constitutional rights to equal protection were violated, because the Court "[could not] discern on this record, a rational reason to provide less protection to lesbian victims of domestic violence than to heterosexual domestic violence victims."  *Id.* at 1114.

The *Price-Cornelison* case does not dictate the level of scrutiny to be applied in this case for several reasons.  First, as expressly stated in the Tenth Circuit's decision, whether classifications based on sexual orientation in general were and are suspect was not an issue raised on appeal.  *Id.* at 1113 n.9.  Accordingly, the court's discussion of its previous holdings in a footnote was merely dicta, and not binding on this Court in this case in determining whether sexual orientation is a suspect or quasi-suspect class

36

for purposes of determining the level of scrutiny.  *See Bates v. Dep't of Corr. of Kan.*, 81 F.3d 1008, 1011 (10th Cir. 1996) ("[A] panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's dicta."); *see also United States v. Rickett*, No. 11-2165, 2013 U.S. App. LEXIS 18464, at *23-24 (10th Cir. Sept. 5, 2013) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment.  If not a holding, a proposition stated in a case counts as dicta.")).

Further, the Tenth Circuit in *Price-Cornelison*, like the Supreme Court in *Romer v. Evans*, did not reach the issue of whether classifications based on sexual orientation are suspect, because the court found that the discrimination at issue did not even survive rational basis review.  *Compare Price-Cornelison*, 524 F.3d at 1114 (police had no rational reason for discriminating against Price-Cornelison) *with Romer*, 517 U.S. 620, 632 (1996) (Colorado law did not "even" survive rational basis review).  As such, there was no need for the *Price-Cornelison* court to reach this issue in order to resolve Price-Cornelison's claim, further supporting that any discussion of sexual orientation as a class was non-binding dicta.

Finally, and most importantly, to the extent the Tenth Circuit's discussion of its past holding is more than mere dicta, it should be rejected because the only Tenth Circuit case the *Price-Cornelison* court cites  is a case decided in 1995 – 8 years before *Lawrence v. Texas*, 539 U.S. 558 (2003).  *See Price-Cornelison*, 524 F.3d at 1113 n.9

(citing *Walmer*, 52 F.3d at 854). In *Walmer*, the Tenth Circuit affirmed the denial of a preliminary injunction in favor of a lesbian major in the Army, who sought to prevent the Army from discharging her for engaging in sexual conduct with another woman, including because the movant would not likely prevail on the merits of her Equal Protection claim. 52 F.3d at 852-54. In wake of the Supreme Court's decision in *Lawrence*, *Walmer* can no longer be considered good law for any proposition related to discrimination against gay and lesbian individuals. Accordingly, any reliance on *Walmer* in *Price-Cornelison* would not have binding effect on this Court, thereby also calling into serious question any binding effect of *Price-Cornelison's* dicta on this Court.

In sum, the decision of the Tenth Circuit in *Price-Cornelison* does not prevent this Court from finding classifications based on sexual orientation are subject to heightened scrutiny under the criteria and cases of the Supreme Court, because any discussion of the subject in *Price-Cornelison* was dicta, and because the 1995 case solely relied upon can no longer be considered good law in the wake of *Lawrence*.[13]

---

[13] The American Civil Liberties Union ("ACLU") has filed a memorandum in support of Plaintiffs' Motion as *amicus curiae*. *See* Docket No. 65-1. In its brief, the ACLU states that, "The Tenth Circuit has held that sexual orientation is not a suspect classification receiving the most [exacting] level of scrutiny . . . ." and that there is "Tenth Circuit precedent holding that sexual orientation is not a suspect classification." *Id.* at 3 & 8. Because there is **no binding, post-*Lawrence* authority in this Circuit** on this issue (as discussed, *supra*), Plaintiffs disagree with these statements by the ACLU. However, Plaintiffs *do* agree with the ACLU that classifications based on sexual orientation meet the Supreme Court's criteria for heightened scrutiny; that the cases of the Tenth Circuit do not preclude this Court from finding classifications based on sexual orientation are quasi-suspect and subject to intermediate scrutiny; and that some jurisdictions have erroneously relied upon pre-*Lawrence* authorities to support holdings that classifications based upon sexual orientation do not require heightened scrutiny, even after *Lawrence*.

**VI.   CLASSIFICATIONS BASED ON GENDER ALSO REQUIRE HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE**

The State Defendants argue that Utah's Marriage Discrimination Laws do not differentiate between individuals based on gender, since neither women nor men may marry a person of the same sex.  However, the "differential treatment or denial of opportunity" that is the result of Utah's laws is based upon the gender of the individuals involved.  *United States v. Virginia*, 518 U.S. 515, 532-33 (1996).  In other words, *but for* the gender of each Plaintiff, they could marry the person of their choice.  Therefore, because the limitation created on civil marriage under the Marriage Discrimination Laws depends upon an individual's gender, these laws create gender-based classifications. As discussed in Plaintiffs' Motion, such classifications are reviewed under intermediate scrutiny.  *See* Plaintiffs' Motion at 35.  Accordingly, the State Defendants' motion must be denied, and Plaintiffs' Motion granted, because the State has come forth with no evidence to support that its Marriage Discrimination Laws are substantially related to *any* state interest, let alone an important state interest.

Further, the State Defendants' "equal application" defense was expressly considered and rejected by the Supreme Court in *Loving v. Virginia*:

> [T]he State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications do not constitute an invidious discrimination based upon race. . . . [W]e reject the notion that the mere "equal application" of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscriptions of all invidious discriminations. . . . In the case at bar, however, we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very

> heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.

388 U.S. 1, 8(1967).  In subsequent cases, the Supreme Court has held that gender classifications — like race classifications — are subject to heightened scrutiny under the Equal Protection Clause.  *United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (plurality opinion).   As a result, the State's "equal application" defense of the Marriage Discrimination Laws in this case must suffer the same fate as Virginia's prohibition against interracial marriage in *Loving*.  *See Baehr v. Lewin*, 852 P.2d 44, 68 (Haw. 1993) (plurality) ("Substitution of "sex" for "race" . . . [in the quoted passage from *Loving*] yields the precise case before us together with the conclusion that we have reached.").

In addition, the tradition of restricting an individual's choice of spouse based on gender does not rationally further any interest of the State, and in fact harms Utah. Even if preserving "traditional" marriage based upon opposite gender were a legitimate goal on its own (which it is not, for reasons discussed in this opposition), "the evidence shows that the tradition of gender restrictions arose when spouses were legally required to adhere to specific gender roles."  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 998 (N.D. Cal. 2010); *see also* Cott Decl., ¶¶ 35-36 (discussing the historical evolution of spouse's respective roles and rights).  Utah has eliminated all legally mandated gender roles within marriage, except the requirement of opposite sex in its Marriage Discrimination Laws.  Thus, the laws at issue -- which are based on gender stereotypes about the supposed "complementarity" of men and women in their domestic roles  --

40

"enshrine[] . . . a gender restriction that . . . [is] nothing more than an artifact of a foregone notion that men and women fulfill different roles in civic life."  *Perry*, 704 F. Supp. 2d at 998.  Moreover, Utah's Marriage Discrimination Laws, in fact, harm the State's interest in equality, "because [they] mandate that men and women be treated differently based only on antiquated and discredited notions of gender."  *Id.*

In sum, the tradition of restricting an individual's choice of spouse based on gender does not rationally further any legitimate interest of the State, let alone any important interest, and the State Defendants' motion must be denied.

## VII.   UTAH'S MARRIAGE DISCRIMINATION LAWS FAIL EVEN UNDER RATIONAL BASIS REVIEW

Utah's Marriage Discrimination Laws are subject to heightened scrutiny under *United States v. Windsor*, 133 S. Ct. 2675 (2013); the Due Process Clause; and the Equal Protection Clause, as discussed, *supra*, and in Plaintiffs' Motion.  However, even if this were not the case, Utah's Marriage Discrimination Laws are still unconstitutional because they cannot survive under the very lowest level of scrutiny, rational basis review, and must therefore be struck down.

Contrary to the State's position, even the rational basis standard is not a "toothless one."  *Lyng v. Int'l Union*, 485 U.S. 360, 375 (1988).  This test, "which requires that legislative classifications be 'rationally related to a legitimate governmental interest' . . . contains two substantive limitations on legislative choice: legislative enactments **must implicate legitimate goals**, and the means chosen by the legislature **must bear a rational relationship to those goals**."  *Id.* (internal citation omitted; emphasis added); *see also Romer v. Evans*, 517 U.S. 620, 633 (1996) ("By requiring

41

that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.").  In sum, the State's purported rationale "**must find some footing in the realities of the subject addressed by the legislation**."  *Heller v. Doe*, 509 U.S. 312, 321 (1993) (emphasis added).  Further, it should go without stating that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."  *Romer*, 517 U.S. at 634 (emphasis in original) (quoting *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).

The State of Utah points to interests that are not "legitimate" in the first instance, as they claim that the State may continue to discriminate against same-sex couples because they have always done so.  And, even where the goals may be legitimate, such as those related to children, Utah's Marriage Discrimination Laws do not bear any relationship – rational or otherwise – to obtaining them, and in fact work against them.

Notably, every purported interest presented by the State in this case was already presented to the Supreme Court in *Windsor*, and *rejected* as insufficient to overcome the prejudice to same-sex couples from their unequal treatment under DOMA.  *See Windsor*, 133 S. Ct. at 2696 ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure . . . ."); *see also*  BLAG Brief at 28-49 (list of potential state interests rejected by the Supreme Court in *Windsor* as not sufficient to "overcome[] the purpose and effect to disparage and injure" same-sex couples).

Again, the State Defendants' arguments are not new.  They have been presented

to the nation's highest court in analogous circumstances, and rejected as not justifying a

violation of the Due Process Clause of the Fifth Amendment.  Likewise, these very

same rationales by the State of Utah do not overcome the purpose and effect to

disparage and injure Utah's gay and lesbian citizens, in violation of the Fourteenth

Amendment.  The State Defendants' motion must therefore be denied.

### A. There Is No Rational Relationship Between Excluding Same-Sex Couples From Marriage and the Promotion of Opposite-Sex Marriage

This case is not about invalidating the marriage of a man to a woman, or whether

the union of a man to a woman through marriage is rational.  This case is about whether

the State of Utah's exclusion of same-sex couples from civil marriage violates the

Fourteenth Amendment.  These subjects are not related, as allowing same-sex couples

to marry will not impact *any* rights, protections, responsibilities, and benefits that

currently flow to married opposite-sex couples, or otherwise affect the decision of

opposite-sex couples to marry, or to stay in marriage.   Logically, there is no connection.

Moreover, all empirical data shows there is no negative impact of marriage equality on

opposite-sex marriage, and the State of Utah has not come forward with any empirical

evidence to the contrary.

In sum, there is no relationship between excluding same-sex couples from civil

marriage, and promoting the incidents of opposite-sex marriage.  Without this link, none

of the interests advanced by the State that directly correlate to the benefits of opposite-

sex marriage to individuals, families, and society, may objectively and rationally be

reached through Utah's Marriage Discrimination Laws, and the laws fail as a matter of law under rational basis review.

    1.    <u>The Relevant Rational Relationship Inquiry Is Not Whether It Is Rational for Utah to Permit Opposite-Sex Marriage, but Rather Whether It Is Rational for Utah to Exclude Same-Sex Couples from Civil Marriage to Achieve That Goal</u>

The State Defendants attempt to frame the issue of the State's interest in terms of whether it is rational for the State to advance opposite-sex marriage, or whether the union of a man and a woman in marriage is "irrational."  However, the claim that the intent of the Marriage Discrimination Laws is to promote opposite-sex marriage, and not to exclude same-sex marriage, is belied by the plain language of these laws.  Under basic principles of statutory construction, the Court must look first to this language to determine the legislative purpose.  *See Bo Hae Lee v. Mukasey*, 527 F.3d 1103, 1106 (10th Cir. 2008) ("We begin by analyzing the plain language employed by [the legislative body], and we must give words their ordinary and natural meaning.  Importantly, we assume that the legislative purpose is expressed by the ordinary meaning of the words used") (internal quotation and citation omitted).

Under the ordinary meaning of the words used in Utah's Marriage Discrimination Laws, the laws were intended to exclude same-sex couples from marriage, and from any union that would be similar to marriage, and not to promote or enlarge the existing rights of opposite-sex couples to marry:

> The following marriages are prohibited and declared void: . . . between persons of the same sex.

Utah Code Ann. § 30-1-2 (2013) (same-sex exclusion clause effective July 15, 1977).

> (1)(a)  It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
> (b)  Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married. . . .

*Id.* at § 30-1-4.1 (2013) (effective March 23, 2004).

> (1)  Marriage consists only of the legal union between a man and a woman.
> (2)  No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Utah Const. Art. I, § 29 (2013) (effective January 1, 2005).

Thus, the intended operation of the Marriage Discrimination Laws, as shown by their plain language, cannot be ignored when framing the rational relationship test.[14]

Plaintiffs do not dispute the benefits of marriage to opposite-sex couples, their families, and society at large.  Indeed, Plaintiffs (and their families) seek to experience and enjoy these benefits, too.  Those that would have this Court view the current dispute in terms of whether opposite-sex marriage is good for the State obfuscate the real issue, which is whether the State has any legitimate objective that is rationally related to excluding same-sex couples from marriage, or any similar union.  The State does not, and the laws at issue fail as a matter of law, even under rational basis review.

---

[14] As discussed, *supra*, this exclusionary intent is also evidenced through the materials provided to the voters in the November 2004 election, as well as in the floor debates in the Utah House of Representatives.

2.   As a Matter of Law, Any Purported Interest in Encouraging
Opposite-Sex Couples to Marry (and Encouraging the
Incidents of Such Marriages) Is Not Rationally Related to
Utah's Marriage Discrimination Laws

Any purported interest by the State in encouraging opposite-sex couples to marry

through the enactment of Utah's Marriage Discrimination Laws is not credible, and fails

as a matter of law.  "This is not merely a matter of poor fit of remedy to perceived

problem, but a lack of any demonstrated connection between [Utah's] treatment of

same-sex couples and its asserted goal of strengthening the bonds and benefits to

society of heterosexual marriage."   *Massachusetts v. U.S. Dep't of Health & Human

Servs.*, 682 F.3d 1, 15 (1st Cir. 2012) (citation omitted); *accord Windsor v. United

States*, 699 F.3d 169, 188 (2d Cir. 2012); *Golinski v. United States Office of Pers.

Mgmt.*, 824 F. Supp. 2d 968, 998 (N.D. Cal. 2012); *Varnum v. Brien*, 763 N.W.2d 862,

901-02 (Iowa 2009).

It goes without saying that, prior to enactment of Utah's first Marriage

Discrimination Law in 1977, the second Marriage Discrimination Law in 2004, and

Amendment 3 in 2005, opposite-sex couples in Utah could and did marry.  As such, the

enactment of the Marriage Discrimination Laws did not enable opposite-sex marriage,

as these marriages were already recognized by the State.  The Marriage Discrimination

Laws – which are clearly written with language to exclude same-sex couples from

marriage, and not to promote opposite-sex marriage through any expansion of already-

existing rights – demonstrate that the intended operation of these laws was and is to

exclude same-sex couples from marriage, and to disadvantage these couples in relation

to their similarly-situated heterosexual counterparts.[15]  Accordingly, **any purported interest by the State in encouraging opposite-sex marriage (and its incidents) must be shown by proving that excluding same-sex couples from marriage benefits opposite-sex marriage in a way that promotes the stated goals of the State.**  However, this cannot be done.

The promotion of opposite-sex marriage is not rationally achieved by excluding same-sex couples from marriage.  Logically speaking, there is no objective connection.  In addition, the empirical evidence conclusively demonstrates that there is no connection.

First, looking to Utah, passage of the Marriage Discrimination Laws did not result in an increase in the marriage rate, or appreciably change the rate of divorce in Utah.  For example, since the passage of Amendment 3, the marriage rate in Utah has steadily declined from 9.8% in 2005, to 8.6% in 2011.  *See* Center for Disease Control and Prevention's National Vital Statistics System, *Marriage Rates by State: 1990, 1995, and 1999-2011*, *at* http://www.cdc.gov/nchs/data/dvs/marriage_rates_90_95_99-11.pdf (last visited on Nov. 8, 2013); *see also id.*, *Divorce Rates by State: 1990, 1995, and 1999-2011*, *at* http://www.cdc.gov/nchs/data/dvs/divorce_rates_90_95_99-11.pdf  (last visited

---

[15] "Research shows that same-sex couples closely resemble heterosexual couples.  Like their heterosexual counterparts, many lesbian, gay, and bisexual individuals form loving, long-lasting relationships with a partner." Peplau Decl., ¶ 12; *see also id.*, ¶¶ 33-37 ("Negative stereotypes about same-sex couples are common in America, leading many people to believe and argue that same-sex relationships are fundamentally different from, and inferior to, heterosexual relationships.  But the consensus of the scientific research is that this characterization is inaccurate. . . .").

on Nov. 8, 2013) (divorce rate constant at 3.7 - 3.8% for the five years previous to

report).  Accordingly, Utah's ban on same-sex marriage has not had a positive effect on

opposite-sex marriage in the State, including because there is no relationship between

allowing same-sex couples to marry, and the decision of opposite-sex couples to marry,

or to stay married.

Second, in those States that have allowed same-sex marriage, opposite-sex

marriage has not been negatively affected by the legal recognition of same-sex couples

and their families:

> There is no scientific support for the notion that allowing same-sex couples to marry would harm different-sex relationships or marriages.  The factors that affect the quality, stability, and longevity of different-sex relationships would not be affected by marriages between same-sex couples. . . .

> [T]he data from Massachusetts suggest that marriage by same-sex couples would not harm marriage for different-sex couples.  The finding that marriages between same-sex couples lacks a correlation with break-ups between different-sex spouses is entirely consistent with scientific theories about marriage and our knowledge about the sociological and psychological reasons why people divorce.   Marriage by same-sex couples does not pose a threat to the stability of marriage for different-sex couples.

Peplau Decl., ¶ 15 & 63; *see also id.*, ¶¶ 56-62 (discussing the scientific theories and

sociological and psychological reasons people marry and divorce, and reviewing data

from Massachusetts); Badgett Decl., ¶¶ 69-77 (discussing data from the Netherlands,

the first country to allow same-sex marriage, as well as recent data from the United

States, and concluding that "[A]n analysis of demographic trends, population-based

surveys, and qualitative interviews shows no evidence that granting the right to marry to

same-sex couples will have any effect on heterosexual couples' willingness to marry, their probability of divorce, or the non-marital birth rate.").

Notably, just weeks ago, the fifteen jurisdictions recognizing same-sex marriages[16] filed a brief as *amici curiae* in the Ninth Circuit on behalf of the same-sex plaintiffs challenging the ban in Nevada, arguing that same-sex marriages in their states has not negatively affected the institution of marriage:

> Speculation that removing state restrictions on marriage between same-sex couples will erode the institution, as measured by the markers cited below -- marriage, divorce, and nonmarital birth rates -- does not justify discriminatory marriage laws. . . .
>
> **The *Amici* States' experience with equal marriage rights should carry substantially more weight than surmise or conjecture in the constitutional analysis of the challenged laws. . . . And, the actual data show that the conjecture about the negative impact of same-sex marriage is unfounded**. . . .
>
> Marriage rates in states that permit same-sex couples to marry have generally improved. . . .
>
> Although there are limited data available on different-sex marriage rates in particular, **the data that are available do not support the theory that same-sex marriage has a negative effect on different-sex marriage rates**.  To the contrary, it appears that rates of different-sex marriage in states licensing same-sex marriages are equivalent to rates in states that do not recognize same-sex marriage.  In fact, in some states, the number of different-sex marriages increased in the years following the state's recognition of same-sex marriages. . . .
>
> The Amici States' experience directly contradicts the suggestion that allowing same-sex couples to marry leads to increased rates of divorce.  In four of the seven states that allowed same-sex couples to marry as of 2011, divorce rates for the years following legalization stayed

---

[16] That number has now increased to seventeen with the recent addition of New Jersey and Hawaii.

at or below the divorce rate for the year preceding it, even as the national divorce rate increased. . . .

[Finally], [t]he suggestion that allowing same-sex couples to marry will lead to an increase in nonmarital births is likewise unsupported.

15 States' Brief at 30-35 (emphasis added; internal footnotes and citation omitted).

In sum, there is simply no evidence that allowing or prohibiting same-sex couples to marry has any effect – direct or indirect – on the decision of opposite-sex couples to marry, not to marry, or to stay married. Without this link, even if a stated goal of the State is positively associated with an increase in the rate of opposite-sex marriage (like "responsible procreation," for example), and even if that goal is a noble one, it is not sufficient to support the *exclusion* of Utah's same-sex couples from civil marriage, even under rational basis review.

> **B.    Utah's Marriage Discrimination Laws Are Not Rationally Related to *Any* Interest in Bettering the Lives of Utah's Children**

Marriage inequality cannot be justified by any genuine interest in bettering the lives of Utah's children. Utah's Marriage Discrimination Laws do nothing to make children being raised by opposite-sex couples better off. And, it is without question that these laws in fact harm, and significantly disadvantage, children raised in households headed by same-sex couples, as recently recognized by the Supreme Court:

[Marriage inequality] humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives. . . . DOMA also brings financial harm to children of same-sex couples. It raises the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex spouses. . . . And it denies or reduces benefits allowed to families upon the loss of a

> spouse and parent, benefits that are an integral part of family security. . . .
> DOMA instructs all federal officials, and indeed all persons with whom
> same-sex couples interact, including their own children, that their marriage
> is less worthy than the marriages of others.  The federal statute is invalid,
> for no legitimate purpose overcomes [DOMA's] purpose and effect to
> disparage and to injure . . . .

*Windsor*, 133 S. Ct. at 2694-96.[17]

Plaintiffs agree with the State Defendants that "[s]ociety benefits from an institution that provides the best opportunity for a child to reach his or her personal potential as an individual and as a productive citizen all the while minimizing the cost to society of caring for and rearing the child."  State Defendants' Motion at 28-29.  Plaintiffs also agree that a "child is not the mere creature of the state" and that "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him [or her] for additional obligations."  *Id.* at 29.  Plaintiffs agree that "parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," and that "democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens."  *Id.* at 29 & 31.

---

[17] Again, the very same justifications for marriage inequality that the State Defendants present in this case (responsible procreation, optimal childrearing, etc.) were already presented to this nation's highest court, and rejected, in *Windsor*.  *See* BLAG Brief at 28-49.  Congress's claimed interests in the well-being of children were insufficient to support DOMA's exclusion of same-sex couples from marriage under the Fifth Amendment.  Likewise, the State of Utah's purported interests in the well-being of children are not sufficient to support Utah's Marriage Discrimination Laws under the Fourteenth Amendment.

However, Plaintiffs fundamentally disagree with the narrow view that the State Defendants take of families, and who are, should be, and may be parents to children. For example, 3,861 same-sex couples were living together in Utah in 2008.  Patterson Decl., ¶ 40.  Approximately 30% of these Utah couples were raising children under the age of 18, reporting, on average, 2.5 children per household.  *Id.*  Thus, in 2008, approximately 2,900 of Utah's children under 18 years of age were being raised by same-sex couples.  *Id.*  Moreover, approximately 2% of adopted children in Utah live with a lesbian or gay parent.  Badgett Decl., ¶ 14.  Further, according to a recent poll by the Williams Institute, "[a]t 26 percent, Salt Lake City, Utah topped the list of large U.S. cities with the highest percentage of same-sex couples raising children [per capita]." *Gay Parents in the U.S.:  Salt Lake City Has Highest Percentage of Same-Sex Couples Raising Kids*, Huffington Post, *at* http://www.huffingtonpost.com/2013/05/22/ gay-parents-salt-lake-city-_n_3314969.html (updated Mar. 28, 2013; last visited Nov. 10, 2013).

**These families exist.  They are real.  And the children in these families are the *only* children in Utah that are affected by the laws at issue in this case.**

The State of Utah should be concerned with the well-being of *all* children within the State -- not just those children in families the State deems worthy of protection and benefit (i.e., opposite-sex married couples raising their biological children).  The State of Utah's unjustified, unequal concern for its citizens, as shown by its denigration of "untraditional" families through its marriage laws, is precisely why our Constitution includes a guarantee of equal protection under the law.  Plaintiffs agree with the State

Defendants that "marriage is society's best means of maximizing private welfare to the vast majority of children," State Defendants' Motion at 29, which is why, as a matter of law, it is irrational for the State of Utah to exclude same-sex couples from marriage, when allowing them to marry would benefit the children being raised in same-sex households, while having no effect, and causing no harm, to children being raised in other households.

          1.      <u>Utah's Marriage Discrimination Laws Are Not Rationally Related to any Interest in Promoting Responsible Procreation</u>

The State Defendants argue that the exclusion of same-sex couples from marriage is justified based on an interest in promoting responsible procreation within marriage.  They contend that marriage inequality is justified because "Traditional marriage with its accompanying governmental benefits provides an incentive for opposite-sex couples to commit together to form [][] a stable family in which their planned, and especially unplanned, biological children may be raised."  State Defendants' Motion at 28.  However, the State completely ignores that allowing or denying same-sex couples the right to marry does nothing to alter these "accompanying governmental benefits" and "incentive[s]" to opposite-sex couples.  This claimed interest is therefore *not* rationally related to Utah's Marriage Discrimination Laws*.*  In particular, there is no evidence to support that denying marriage equality to gay and lesbian individuals will increase the likelihood that opposite-sex couples capable of procreating will decide to get married; nor does permitting gay and lesbian individuals to marry decrease this likelihood.  *See Windsor v. United States*, 833 F. Supp. 2d 394, 405

(S.D.N.Y. 2012) (the responsible procreation and childrearing justification for denying marriage equality "is 'so far removed' from the classification, [that] it is impossible to credit" and relies on "factual assumptions that are beyond the 'limits of rational speculation'") (quoting *Romer v. Evans*, 517 U.S. 620, 635 (1996) & *Heller v. Doe*, 509 U.S. 312, 320(1993)); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 972 (N.D. Cal. 2010) ("[p]ermitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriage"); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 337-39 (D. Conn. 2012) (rejecting purported link between marriage equality and incidence of extra-marital procreation); *see also, e.g.*, *Goodridge v. Dep't Pub. Health*, 79 N.E.2d 941, 963 (Mass. 2003) ("The department has offered no evidence that forbidding marriage to people of the same sex will increase the number of couples choosing to enter into opposite-sex marriages in order to have and raise children.").  In sum, Utah's Marriage Discrimination Laws do "not make it more likely that opposite sex couples will marry and raise offspring biologically related to both parents." *Perry*, 704 F. Supp. 2d at 999-1000.

Moreover, no state has ever required procreative ability or willingness in order to marry.  Indeed, it is beyond dispute that the Constitution protects the right of all heterosexual individuals to marry, irrespective of their ability or desire to procreate, including the elderly, the infertile, and the incarcerated.  For example, in *Turner v. Safley*, the Supreme Court held that even those prisoners with no right to conjugal visits have the fundamental right to marry, including because "many important attributes of

marriage remain, however, after taking into account prison life . . . [including] expressions of emotional support[,] . . . [the] exercise of religious faith as well as an expression of personal dedication." 482 U.S. 78, 95 (1987).  In *Zablocki v. Redhail*, the Supreme Court struck down a statute barring marriage for individuals with child support obligations, distinguishing the right to marry as separate from procreation and childrearing.  434 U.S. 374, 376-77 & 386 (1978).  Finally, the Supreme Court has long held that married couples have the right *not* to procreate.  *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965).

Assuming that Utah has an interest in encouraging sexual activity to occur within marriage, Utah's Marriage Discrimination Laws are in fact detrimental to that interest. As a direct result of Utah's laws, "same-sex couples are not permitted to engage in sexual activity within marriage," and therefore, "[t]o the extent proponents seek to encourage a norm that sexual activity occur within marriage to ensure that reproduction occur within stable households, [the Marriage Discrimination Laws] discourage[] that norm . . . ." *Perry*, 704 F. Supp. 2d at 1000.

In conclusion, as a matter of law, there is no rational relationship between Utah's purported interest in responsible procreation and its Marriage Discrimination Laws.

a.  The Fact That Some (Though Not All) Opposite-Sex Couples Are Capable of Procreation Is Not a Distinguishing Characteristic Sufficient to Exclude Same-Sex Couples From Marriage

As discussed throughout this opposition and Plaintiffs' Motion, same-sex couples and opposite-sex couples are the same for all purposes relevant to marriage, and the State of Utah has no legitimate interest in differentiating between these unions.  *See*

Statement of Additional Undisputed Material Facts, *supra.*  Still, the State Defendants contend that the classification in Utah's Marriage Discrimination Laws, which is based purely on sexual orientation and gender, and not on procreative ability or the desire to raise children, should be upheld based on purported interests involving children, by relying on the statement in *Johnson v. Robinson*, 415 U.S. 361, 383 (1974), that such classifications are acceptable if "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not."  *Id.*  However, the State Defendants' position is not well taken.

First, "[w]hen a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618 (1985).  Thus, the State must justify its *exclusion* of same-sex couples from the benefits of marriage, and not just its inclusion of opposite-sex couples.  *See, e.g.*, *id.* (while purpose of rewarding Vietnam Veterans was valid, equal protection was violated by *exclusion* from tax benefit those who did not reside in the state before a certain date); *see also, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448-50 (1985) (examining the city's interest in *denying* housing for people with developmental disabilities, not in continuing to allow residence for others); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535-38 (1973) (testing the federal government's interest in *excluding* unrelated households from food stamp benefits, not in maintaining food stamps for related households); *Eisenstadt v. Baird*, 405 U.S. 438, 448-53 (1972) (requiring a state interest in the *exclusion* of unmarried couples from lawful access to contraception, not merely an interest in

continuing to allow married couples access); *Loving v. Virginia*, 388 U.S. 1, 12 (1967)

(question was not whether Virginia had reasons for providing marriage to same-race

couples, but whether "*restricting* the freedom to marry solely because of racial

classifications" violated equal protection) (emphasis added).

Second, *Johnson* does not support the State Defendants' position.  In that case,

the issue was whether denying veteran educational benefits to a draftee, conscientious

objector who performed alternative civilian service, was a denial of equal protection,

considering that these benefits were available to other draftees.  The argument was

made that such benefits were available in order to encourage people to *enlist* in the

Armed Forces, and that the government could therefore not justify providing the benefits

to non-conscientious objector draftees, and not to conscientious objector draftees,

considering that neither category of draftees volunteered or enlisted.  *Id.* at 382.   The

Supreme Court found no equal protection violation because the differentiation was

justified by substantial differences between the non-conscientious objectors (whether

enlisting or drafted) and the conscientious objectors, including that the latter did not

experience the same level of disruption to civilian life.  *Id.* at 376-383.  The Court also

found that inclusion of the latter would not promote the interest of encouraging and/or

making service *as a soldier* "more palatable," since the educational benefits would not

make "military service more attractive" to conscientious objectors, whose refusal to fight

in the Armed Services is based "upon deeply held religious beliefs."  *Id.* at 382-83.

Notably, the Supreme Court in *Johnson* also addressed the argument that the intent of the disparate treatment of conscientious objectors was to penalize them for their beliefs, stating:

> To be sure, **if that were the purpose of the exclusion** of the []conscientious objectors from the benefits of the Act, **the classification would be unconstitutional**, "for if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that **a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest**." *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). However, we have not been cited to, nor has our own research discovered, a single reference in the legislative history of the Act to support appellee's claim. We therefore find appellee's claim wholly lacking in merit.

*Id.* at 383 n.18 (italics emphasis in original; bold emphasis added).

As this Court is aware, this exact language was recently relied upon by the Supreme Court in *Windsor*, when it held DOMA unconstitutional because its exclusion of same-sex couples from marriage was based on a desire to harm a politically unpopular group, just like in this case.  *See United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) ("DOMA seeks to injure the very class New York seeks to protect.  By doing so it violates basic due process and equal protection principles . . . . The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group.  *Department of Agriculture v. Moreno*, 413 U. S. 528, 534-535, 93 S. Ct. 2821, 37 L. Ed. 2d 782 (1973).").  Moreover, unlike in *Johnson*, the legislative history of Utah's Marriage Discrimination Laws is replete with support that the intent of these laws is to disadvantage Utah's gay and lesbian citizens and to further private moral views, not to benefit children.  If the State's interest were the protection of

children, then the classification would be drawn differently:  opposite-sex couples

unable or unwilling to have and raise children would be excluded from marriage, and

same-sex couples raising children included.  Unlike the draftee soldiers in *Johnson*,

there is no reason to give opposite-sex couples who are unable or unwilling to have and

raise children the benefits of marriage, while excluding same-sex couples from marriage

-- especially those raising children, either through adoption or procreation.[18]

       In sum, Utah's Marriage Discrimination Laws are unconstitutional because they

invidiously discriminate against same-sex couples, who, for all purposes relevant to

marriage, are the same as their heterosexual counterparts, including *with regard to the*

*benefits of marrying* since both same-sex and opposite-sex couples may have children

inside or outside of marriage and both sets of couples -- and their children -- benefit in

precisely the same ways when those couples are permitted to marry.  However, even

accepting the State's position that the ability to procreate through sexual intercourse is a

meaningful difference (which it is not), by denying same-sex couples the rights,

protections, responsibilities, and benefits that flow from marriage -- while providing the

same to opposite-sex couples incapable and/or unwilling to have children -- Utah's laws

treat similarly-situated citizens unequally, without any justification.

---

[18] Contrary to the State Defendants assertions, same-sex couples can and do procreate, albeit through artificial insemination, surrogacy, and/or other assisted reproductive technologies ("ART").  Indeed, many opposite-sex couples also use these technologies to procreate.  Notwithstanding, the latter is allowed to marry, while the former is prohibited under Utah's discriminatory laws.  The distinction between families created through sexual intercourse, and those created through adoption or ART is constitutionally meaningless.  The Fourteenth Amendment requires the State to treat all children and parents alike, if they are similarly situated.

2.     Utah's Marriage Discrimination Laws Are Not Rationally Related to an Interest in Promoting Optimal Parenting and Childrearing

The State Defendants' contend that Utah's exclusionary laws are based on the State's interest in the development and parenting of children.  Again, this goal is not rationally related to the Marriage Discrimination Laws. Utah has no objective interest in promoting opposite-sex parents over same-sex parents.  *See* Statement of Additional Undisputed Material Facts, *supra*.  Even if it did, excluding same-sex couples from marriage does not promote the parenting of biological children by married opposite-sex parents.  Furthermore, since same-sex couples in Utah do in fact have children, the State's interest is undermined by its policy of marriage inequality.

The empirical evidence demonstrates that the gender of parents is not determinative of a child's developmental outcome, and that same-sex parents and opposite-sex parents are of equal quality.   As Dr. Patterson, a well-respected expert in this field testified:

> A considerable amount of research has examined the adjustment of children and adolescents who are growing up with lesbian or gay parents and/or same-sex couples.  This body of work consists of more than 50 peer-reviewed empirical journal articles, and many additional articles and book chapters intended for professional audiences. . . .
>
> . . . Researchers have found children and adolescents of same-sex parents to be as emotionally healthy, as well-behaved, and as socially and educationally successful as their peers who have opposite-sex parents. The idea that there is an optimal gender mix of parents has received no empirical support from psychological research.  The notation that children or adolescents with same-sex parents suffered developmental disadvantages due to their parents' sexual orientation has likewise gone without empirical support

Patterson Decl., ¶¶ 26 & 28.

The State Defendants and *Amici Curiae* professors from Brigham Young University and Southern Utah University ("*Amici* Professors") criticize the methodology of the research underlying such conclusions, stating that the studies rely on small, non-random samples.  However, these studies are the only studies to date on same-sex parenting, they all reach the same findings, and these findings have been replicated, again and again, over a period of decades.  As a result, all of the country's major medical, psychological, public health, and child welfare organizations agree that a parent's sexual orientation and gender are not relevant to a child's wellbeing.  *See* APA Brief at 18-26 ("There Is No Scientific Basis for Concluding That Gay and Lesbian Parents Are Any Less Fit or Capable Than Heterosexual Parents, or That Their Children Are Any Less Psychologically Healthy and Well Adjusted"); ASA Brief at 6-14.  As such, the relevance of this data cannot be disputed, irrespective of its weight.  And indeed, every court to consider the question has held that a person's sexual orientation "is not relevant to the individual's ability to perform and contribute to society."  *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 182-83 (2d Cir. 2012).

In contrast, there is *no* evidence to dispute the findings that the sexual orientation or gender of a parent affects children's developmental outcomes, because the State Defendants' studies are irrelevant, as they do not measure the impact of a parent's sexual orientation or gender on parenting.  All of the State Defendants' studies suffer from the same logical flaw:  They compare apples to oranges.  They compare the children of married heterosexual parents to the children of divorced parents, or the

children of single parents.[19]  If anything, these studies show that marriage is good for

kids, and that two parents are better than one.  But neither of these facts are material to

_____

[19] In particular, the State Defendants and *Amici* Professors rely on and cite to the work of Mark Regnerus, *How Different Are the Adult Children of Parents Who Have Same-Sex Relationships?  Findings from the New Family Structures Study*, 41 Soc. Sci. Res. 752, 763 (2012), to support their position that children are less likely to thrive when raised by gay and lesbian parents than if raised by heterosexual parents.  *See, e.g.*, State Defendants' Motion at 35 (citing to Regnerus's study to support "that children raised by married biological parents fared better than children raised in  same-sex households in a range of significant outcomes"); Brief of *Amici Curiae* Professors . . . in Support of Defendants ("*Amici* Professors' Brief"), Docket  No. 72 at 12 & 18 (citing to Regnerus's study to support that "[d]ecades of study on various parenting structures yield the near uniform conclusion that a biological mother and father provide optimal child outcomes" and that the study "[Does] Not Confirm the 'No Differences' Conclusion About Child Outcomes Among Same-Sex Parents").

However, Regnerus's study suffers from the same fundamental flaw as all of the State's other evidence, again comparing apples to oranges.  Although the study purports to describe children raised by "lesbian mothers" and "gay fathers," the study itself admits that these are shorthand labels, which do not refer to children raised by same-sex couples.  *See* Patterson Decl., ¶ 29.  Instead, they refer to a group of adults who reported that at some point during childhood, one of their parents had a romantic relationship with a person of the same sex.  *See id.*  But in a breathtaking admission, the authors acknowledge that "just under half of such respondents reported that their biological parents were once married."  Regnerus, *How Different . . . ?* at 757.  As a result, they concede, "a failed heterosexual union is clearly the modal method" in these families, which "distinguishes [the Regnerus study] from the numerous studies that have been entirely concerned with 'planned' gay and lesbian families."  *Id.*  In other words, half of the respondents were raised by heterosexual parents who divorced.  Moreover, "Fifty-eight (58) percent of those whose biological mothers had a same-sex relationship also reported that their biological mother exited the respondent's household at some point during their youth, and just under 14% of them reported spending time in the foster care system, indicating greater-than-average household instability."  *Id.*  Yet, when comparing the children of "lesbian mothers" to the children of "intact biological families," the authors made no effort to control for these factors.

The State Defendants and *Amici* Professors also cite to research by Kristen Anderson Moore to support their arguments that "research clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage" and that "it is not simply the presence of two parents . . . but the presence of two biological parents that seems to support children's development."  State Defendants' Motion at 30 & *Amici*

(continued...)

this case (except to the extent that they actually *support* allowing more couples to marry), nor are they disputed.

However, even if parenting by individuals of opposite-sex of their biological offspring, within the bonds of marriage, were the optimal parenting paradigm (which has not been shown by empirical evidence),[20] Utah's Marriage Discrimination Laws would still bear no rational relationship to promoting this familial structure. Again, as already discussed extensively in this memorandum, excluding gay and lesbian individuals from marriage has no connection to opposite-sex marriage, divorce, cohabitation,

_____

(...continued)
Professors' Brief at 4-5, respectively (citing Moore, et al., *Marriage From a Child's Perspective*, Child Trends Res. Br. 1-2 & 6 (June 2002)). Again, this is another case of apples to oranges. In fact, the authors of that study have added an introductory note to their study explicitly warning that no conclusions can be drawn from this research about the well-being of children raised by same-sex parents or adoptive parents. *See id.*, ("This Child Trends brief summarizes research conducted in 2002, when neither same-sex parents nor adoptive parents were identified in large national surveys. Therefore, no conclusions can be drawn from this research about the well-being of children raised by same-sex parents or adoptive parents."). The version of this study included in the State Defendants' appendix does not include this introductory note, but the complete article, with the introductory note, is available on the publication's website at http://www.childtrends.org/wp-content/uploads/2013/03/MarriageRB602.pdf.

In short, like all of the State's purported empirical evidence, the Regnerus and Moore studies prove that marriage is good for kids, and that two parents are better than one. But neither of these claims have anything to do with the sexual orientation and gender of parents, and thus, have nothing to do with the Marriage Discrimination Laws.

[20] The Court should note that, while there are studies showing that divorce and/or single parenting are sub-optimal for child development outcomes, *see* Patterson Decl., ¶¶ 20-21, individuals still have the right to divorce, or to have children on their own. The Constitution protects these private decisions, even though there is evidence that the exercise of these decisions may adversely affect children. As such, childrearing, while indisputably important to society, is not determinative of whether the government can intrude on an individual's constitutionally-protected and fundamental rights, such as the right to marriage.

childrearing, or otherwise.

Utah's exclusion of same-sex couples from marriage in fact undermines the interests of parenting and childrearing.  In 2008, there were approximately 2,900 children under the age of 18 being raised in same-sex couple homes in Utah.  Patterson Decl., ¶ 40.  The inability of the parents of these children to marry excludes these families from the benefits of marriage.  Utah's laws in fact result in these households being less stable for these children, whereas allowing same-sex couples to marry would promote the household stability in which children flourish.  *See Goodridge v. Dep't Pub. Health*, 79 N.E.2d 941, 963 (Mass. 2003) ("Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying [the advantages provided by marriage].");  *Baker v. State*, 744 A.2d 864, 882 (Vt. 1999) ("If anything, the exclusion of same-sex couples from the legal protections incident to marriage exposes *their* children to the precise risks that the State argues the marriage laws are designed to secure against.");  *see also* Patterson Decl., ¶ 40.

Prior to the Supreme Court holding DOMA unconstitutional in *Windsor*, the United States District Court for the District of Connecticut criticized the Act's definition of marriage for its effects on children:

> DOMA's denial of federal marital benefits to same-sex married couples in fact leads to a significant unintended and untoward consequence by limiting the resources, protections and benefits available to children of same-sex parents. . . .  DOMA ham-fistedly deprives these adopted children of governmental services and benefits desirable, if not necessary, to their physical and emotional wellbeing and development creating an increased potential that they will become a burden on society.

64

> DOMA . . . inflicts significant and undeniable harm upon such couples and
> their children by depriving them of a host of federal marital benefits and
> protections . . . [including the right] to take leave to care for a spouse with
> a serious health condition. . . . [The denial of this benefit, in turn, puts the
> household and its children] under greater stress in attempting to cope with
> the serious illness of a parent.

*Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 338 (D. Conn. 2012).

Subsequently, in *Windsor*, the Supreme Court also acknowledged that the

marriage inequality promoted by DOMA was injurious to children, including that DOMA

"humiliates tens of thousands of children now being raised by same-sex couples [and]

makes it even more difficult for the children to understand the integrity and closeness of

their own family and its concord with other families in their community and in their daily

lives." *Windsor*, 133 S. Ct. at 2694.  The children in Utah being raised by same-sex

couples are similarly injured by Utah's laws.

Utah's Marriage Discrimination Laws do not increase the likelihood that children

will be raised by their married biological parents, but instead harm and injure children

that do not fit the State Defendants' mold.   An interest in the development and

parenting of children cannot rationally justify marriage inequality in Utah, including

because the *only* effect the Marriage Discrimination Laws have on children is to

stigmatize and humiliate the children of same-sex couples, while at the same time

denying them the protections afforded by marriage to children of opposite-sex couples.

### C. Preserving Tradition, and Avoiding the Consequences of Change, Are Not ‒ In and of Themselves ‒ Legitimate Goals of the State

The State Defendants assert that Utah has an interest in preserving "the ancient

and ongoing tradition of marriage between a man and a woman."  State Defendants'

65

Motion at 38.  They further assert that the consequences of marriage equality are

unknown, and that Utah is therefore justified in "proceeding with caution."  *Id.*  However,

such arguments are circular:  They claim that the State may continue to discriminate

against same-sex couples because they have always done so.  But these are not

legitimate interests of the State sufficient to justify Utah's unconstitutional laws -- even

under a deferential standard of review.  Again, the Supreme Court rejected these

tradition-based arguments in *Windsor*.[21]  Accordingly, this Court must also reject these

purported rationales.

> 1.   Preserving "Traditional" Marriage, Solely for Tradition's
>      Sake, Is Not a Legitimate Goal of the State

The State Defendants contend that Utah has an interest in preserving a

"traditional" definition of marriage.[22]  However, deference to tradition, by itself, is not a

legitimate state interest sufficient to survive rational basis review.  *See Heller v. Doe*,

509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept does not give it immunity

from attack for lacking a rational basis."); *Williams v. Illinois*, 399 U.S. 235, 239 (1970)

---

[21] The Supreme Court in *Windsor* recognized the long history and tradition of man/woman marriage.  *See Windsor*, 133 S. Ct. at 2689 ("[U]ntil recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage.  For marriage, between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.").  But this history and tradition was not enough to justify DOMA, and the same analysis applies here.

[22] As discussed, *supra*, many tenets of "traditional" marriage have already been rejected by our society and the courts.  Accordingly, the notion that marriage is static, and that there is a "traditional" form of marriage to preserve, fails in the first instance.

("[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack").  Nor can tradition alone validate the notion – even if held by a majority of the citizens – that same-sex relationships are of lower quality, or even immoral.[23]  *See Lawrence v. Texas*, 539 U.S. 558, 577 (2003) ("[T]hat the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice . . . .").  "Rather, the state must have an interest apart from the fact of the tradition itself."  *Perry*, 704 F. Supp. 2d at 998.

The invocation of tradition as a basis for legislation should invoke the suspicion of this Court.  Throughout our nation's history, tradition has been used to justify what we now recognize as invidious discrimination.  *See, e.g.*, *Plessy v. Ferguson*, 163 U.S. 537, 550 (1896) (the legislature is "at liberty to act with reference to the established usages, customs and traditions of the people"); *Muller v. Oregon*, 208 U.S. 412, 421 (1908) ("[H]istory discloses the fact that woman has always been dependent upon man.").  In the context of marriage, if deference to tradition was a legitimate goal, then laws restricting marriage based on race would have survived.  But the Supreme Court understood that even the long duration of an unconstitutional law does not justify its perpetuation.  *See Loving v. Virginia*, 388 U.S. 1, 7 & 12 (1967) (holding Virginia's anti-miscegenation statutes unconstitutional under the Fourteenth Amendment, despite the

---

[23] This is particularly true when all evidence concludes that same-sex relationships are in fact not inferior to opposite-sex relationships.  *See* Statement of Additional Undisputed Material Facts, *supra*.

fact that "[p]enalties for miscegenation . . . [were] common in Virginia since the colonial period"); *see also Lawrence*, 529 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (internal quotation omitted).

In sum, as our understanding of equality evolves, the illegitimacy of laws that might once have seemed too entrenched in custom and tradition to question become apparent. *See, e.g.*, *Windsor*, 133 S. Ct. at 2692-93 (New York's recognition of same-sex marriage "reflects both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality."). Accordingly, tradition by itself cannot form a legitimate basis for Utah's Marriage Discrimination Laws, and the Court should reject any State interest in preserving "traditional" marriage, for its own sake, as a matter of law.

2. <u>Utah's Marriage Discrimination Laws Are Not Rationally Related to the Purported Interest in Proceeding with Caution When Implementing Social Changes</u>

The State Defendants contend that Utah has a legitimate interest in avoiding the unknown consequences of allowing gay and lesbian individuals equal access to marriage. However, the belief that same-sex marriage will result in a corrosion of marital norms, and ultimate societal devaluation of marriage as an institution, is not factually supported, and appears to be based solely on the fears of same-sex marriage opponents, which are in turn based upon speculation and their unsubstantiated private views of the inferiority of the committed relationships of gay and lesbian individuals. This is not sufficient to survive scrutiny even at the lowest levels. *See City of Cleburne*

*v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("mere negative attitudes or fear, unsubstantiated by factors which are properly cognizable" are not permissible bases for differential treatment).

In any case, the empirical evidence is that the inclusion of same-sex couples in the institution of marriage does not amount to the "sweeping social change" that its opponents fear. *Perry*, 704 F. Supp. 2d at 999. As already discussed, *supra*, where states and other countries have legalized same-sex marriage, the evidence shows that there is at least a neutral, if not positive, effect on the institution of marriage. *See* Peplau Decl., ¶¶ 15 & 56-63; Supp. Peplau Decl., ¶¶ 4-7; Badgett Decl., ¶¶ 69-77 (discussing the empirical data of states and countries allowing same-sex marriage); 15 States' Brief at 22-31 (concluding that, based on the experience of states allowing same-sex marriage, "Speculation About the Erosion of the Institution of Marriage Is Demonstrably False").

Further, as the U.S. Court of Appeals for the Ninth Circuit concluded in *Perry*, "there [can] be no rational connection between the asserted purpose of *'proceeding* with caution' and the enactment of an absolute ban, unlimited in time, on same-sex marriage in the state constitution." *Perry v. Brown*, 671 F.3d 1052, 1090 (2012) (emphasis in original). While this decision has now been vacated on jurisdictional grounds, *see Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), the logic of the Ninth Circuit is no less

compelling here, where Utah has enacted such an absolute ban in its state constitution, thereby belying any purported interest in "proceeding with caution."[24]

In sum, fear of the unknown alone has never been a sufficient basis to burden a class of citizens, and is not a proper goal of the State under rational basis review. Accordingly, Utah's Marriage Discrimination Laws cannot be justified, as a matter of law, by any purported interest by the State in proceeding with caution, particularly when nothing but fear, prejudice, and speculation fuels that caution.

### D.    Utah's Marriage Discrimination Laws Damage the State and Same-Sex Couples

Not only is there no rational relationship between the Marriage Discrimination Laws and any purported interest by the State, but it is undisputed that the ban on same-sex marriage has a significant, negative impact on the State, as well as Utah citizens in same-sex committed relationships.

The negative economic impact on Utah comes in a number of ways from the ban on same-sex marriage.  The State and its local subdivisions lose significant tax and fee revenue resulting from weddings of same-sex couples.  Badgett Decl., ¶ 10.  In addition, the decrease in the number of couples entering legally-recognized marriages as the

---

[24] The State Defendants contend that this Court should be wary to uphold the constitutional rights of Plaintiffs, and the gay and lesbian citizens of Utah, because doing so may be "irreversible."  However, Plaintiffs are not a science experiment.  This is not a trial run, and this Court should reject any suggestion that these constitutional rights, once restored to Plaintiffs, should or could be taken away at some time in the future.  Indeed, the lack of merit of this argument is demonstrated by the fact that in every case where a court has struck down as unconstitutional laws invidiously discriminating against a class of persons, such an argument could have (and maybe was) made, such as in *Loving*.

result of the Marriage Discrimination Laws imposes State costs for additional spending

on compensation care for uninsured people and the loss of productivity generated by

unequal treatment of same-sex couples in the workplace.  *Id.*  The State is also harmed

by being a comparatively less attractive location for highly qualified workers and

business as a result of Utah's discriminatory laws.  *Id.*, ¶ 15.

In addition, the Marriage Discrimination Laws impose substantial economic

harms on same-sex couples residing in Utah and their children in a number of ways.

The Marriage Discrimination Laws eliminate, for same-sex couples, the economic

efficiencies and cost savings associated with entering a legally recognized relationship,

as compared to being single.  *Id.*, ¶ 11.  In addition, the Marriage Discrimination Laws

deprive same-sex couples and their families of significant direct and indirect economic

benefits from the State and federal government that flow as a natural consequence from

the status of being legally married.  *Id.*

Finally, the harms of Utah's same-sex ban are not only financial.  It is undisputed

that marriage provides stability and a social fabric that benefits society as a whole.  The

individuals and children being raised in same-sex households are being denied those

benefits.  Further, marriage increases the psychological and physical health of those

individuals in marriage.  Peplau Decl., ¶¶ 38-40.  In sum, the long-standing policy of our

nation is that marriage is a public good.  Accordingly, excluding couples from the

institution runs contrary to our social policy.

**VIII.   THE STATE OF UTAH MAY NOT CATEGORICALLY DENY RECOGNITION OF SAME-SEX MARRIAGES PERFORMED IN OTHER STATES**

Utah's refusal to recognize the marriages of Plaintiffs Archer and Call, who married in Iowa, violates due process and equal protection, for all of the reasons set forth by Plaintiffs' in their pending motion for summary judgment, including under the Supreme Court's recent analysis in *United States v. Windsor*, 133 S. Ct. 2675 (2013). *See* Plaintiffs' Motion at 37-39.  Contrary to the State Defendants' arguments, federal law does *not* authorize the State of Utah to discriminate, without justification, against same-sex couples living in Utah that have legally married in other states, because the Constitution forbids such unequal treatment and denial of the right to marriage.  Thus, Plaintiffs agree with the State Defendants that Section 2 of DOMA is "wholly unremarkable," but for the reason that no act of Congress may override the protections guaranteed by the Constitution.  *See* U.S. Const. Amend. V; *see also, e.g., Windsor*, 133 S. Ct. 2675.  Accordingly, Section 2 of DOMA is irrelevant to the Court's analysis of whether Utah's policy of non-recognition violates the Fourteenth Amendment.

In considering the interplay of the rights of Plaintiffs Archer and Call, the power of the State of Utah, the authority of sister states, and the principles protected by the federal Constitution, it is important to bear in mind the purposes of federalism.  The Supreme Court has emphasized that federalism does not just safeguard the various interests of the states and the federal government.  Properly understood, "[f]ederalism [also] secures the freedom of the individual."  *Bond v. United States,* 131 S. Ct. 2355, 2364 (2011).  "By denying any one government complete jurisdiction over all the

concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* Utah's broad authority over the law of domestic relations is subject to constitutional guarantees. *See Windsor* 133 S. Ct. at 2691 ("[s]tate laws . . . regulating marriage, of course, must respect the constitutional rights of persons"). Accordingly, the State of Utah does not have absolute and exclusive jurisdiction over Plaintiffs Archer's and Call's marital status, which a sister state validly conferred and which the Constitution protects.

In *Windsor*, the Supreme Court held that same-sex spouses who have entered into valid marriages have a constitutionally protected interest in their marital status and that the categorical refusal of the federal government to recognize the valid marriages of same-sex couples was "unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution." *Windsor*, 133 S. Ct. at 2695. Like Section 3 of DOMA, which the Supreme Court struck down in *Windsor*, Utah's Marriage Discrimination Laws treat the valid marriages of same-sex couples as if they did not exist, denying those marriages recognition for all purposes under state law, just as DOMA did under federal law. As with DOMA, the injury that Utah's laws inflict on legally married same-sex couples "is a deprivation of an essential part of the liberty protected by the [Constitution's due process guarantee]." *Id.* at 2692.

Utah, almost without exception, respects the marriages of couples who married in other states, but it categorically refuses to recognize the otherwise valid marriages of same-sex couples for any purpose under state law. Utah's refusal to recognize Plaintiffs' marriages constitutes an extraordinary disruption of their lives and severely

73

infringes upon their protected interests in the comprehensive set of protections and responsibilities afforded by marriage, which cannot be fully replicated by other means. The resulting negative impact on Plaintiffs Archer's and Call's stability, security, and dignity is as severe as that caused by federal non-recognition in *Windsor*, exposing their families to an alarming array of legal vulnerabilities and harms, "from the mundane to the profound." *Id.* at 2694. As with DOMA, because the purpose and effect of Utah's discriminatory marriage laws are precisely to achieve that unequal treatment by excluding "persons who are in a lawful same-sex marriage" from the same protections given to other married persons, those laws violate the Constitution's due process guarantee. *Id.*

Utah's refusal to respect Plaintiffs' existing marriages also denies them equal protection. Like DOMA, Utah law facially targets the class of married same-sex couples. Utah has thus created two categories of couples who married out of state: opposite-sex couples married out of state, whose marriages are fully recognized in Utah, and same-sex couples married out of state, whose marriages are categorically denied recognition. In *Windsor*, the Supreme Court held that DOMA's targeting of that class required "careful consideration" under both due process and equal protection review for two reasons: first, because the statute departed from the federal government's longstanding practice of deferring to the states to determine marital status; and second, because it did so in order to subject a particular group of married couples to unequal treatment. *Id.* at 2694. The same equal protection analysis applies here. Utah's refusal to respect plaintiffs' valid out-of-state marriage constitutes

"discrimination[] of an unusual character."  *Id.* at 2692-93.  And like DOMA, Utah's laws prohibiting recognition of Plaintiffs' marriage were not enacted for any reason independent of or unrelated to excluding married same-sex couples from recognition, but to achieve that very result.  Such laws fail the requirement of equal protection.  *Id.*

In our federal system, in which interstate travel is ordinary, expected, and constitutionally protected, a state's power to marry couples within its borders is enhanced if the state can be confident that the state's conferral of marital status on couples will be respected by other states.  A state's categorical exclusion of an entire class of marriages from other states without adequate justification therefore is an affront to our nation's federalism of a sort that has been rare in our constitutional tradition.

### IX.   THE STATE DEFENDANTS DO NOT DENY THAT INJUNCTIVE RELIEF IS AVAILABLE TO PLAINTIFFS UNDER 42 U.S.C. § 1983, AND A DETERMINATION AS TO WHETHER PLAINTIFFS WOULD BE ENTITLED TO ANY MONETARY AMOUNT IS PREMATURE

Foremost, Plaintiffs seek to enjoin the State Defendants from enforcing Utah's Marriage Discrimination Laws, so that they may be married, or have the State recognize their out-of-state marriage.  Under the *Ex Parte Young* exception to a state's sovereign immunity, this type of relief is clearly available to Plaintiffs under their § 1983 claim, and the State Defendants do not deny that this Court may dispense injunctive relief in this case (other than to argue that such relief is not merited).  *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 495 (10th Cir. 1998) ("*Ex Parte Young* recognizes an exception to Eleventh Amendment immunity under which a state officer may be enjoined from 'taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant.'").

However, the State Defendants argue in their motion that Plaintiffs are not entitled to any monetary relief if they prevail, including attorneys' fees.  While Plaintiffs reserve the right to more fully respond to these arguments at the appropriate juncture, this issue is premature.   Plaintiffs therefore respectfully request that this Court defer briefing and ruling on the narrow issue of whether Plaintiffs may be entitled to attorneys' fees under 42 U.S.C. § 1988 until the issue becomes germane.

## CONCLUSION

For all of the reasons discussed in this opposition, and in Plaintiffs' pending motion for summary judgment, the State Defendants' motion should be denied.

DATED this 22nd day of November, 2013.

**MAGLEBY & GREENWOOD, P.C.**

_____
Peggy A. Tomsic
James E. Magleby
Jennifer Fraser Parrish

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**PLAINTIFFS' OPPOSITION TO MOTION OF THE GOVERNOR AND ATTORNEY**

**GENERAL FOR SUMMARY JUDGMENT** was delivered to the following this 22nd day of

November, 2013, by:

[   ]   Hand Delivery

[X]   Depositing the same in the U.S. Mail, postage prepaid

[X]   CM/ECF System

[X]   Electronic Mail

Philip S. Lott                                  Ralph Chamness
  phillott@utah.gov                         rchamness@slco.org
Stanford E. Purser                         Darcy Goddard
  spurser@utah.gov                         dgoddard@slco.org
John E. Swallow                             SALT LAKE COUNTY DISTRICT ATTORNEYS
UTAH ATTORNEY GENERAL               2001 South State Street, S3500
160 East 300 South, Sixth Floor       Salt Lake City, Utah 84190-1210
P.O. Box 140856
Salt Lake City, Utah84114-0856

*Attorneys for Defendants Gary R. Herbert*        *Attorneys for Defendant Sherrie Swensen*
*and John Swallow*